**No. 23-1654**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Consumer Financial Protection Bureau,

*Plaintiff-Appellant*,

*v.*

Townstone Financial, Inc., and Barry Sturner,

*Defendants-Appellees.*

On Appeal From the United States District Court
For the Northern District of Illinois
Hon. Franklin U. Valderrama
Case No. 1:20-cv-4176

**BRIEF OF APPELLANT
CONSUMER FINANCIAL PROTECTION BUREAU**

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Deputy General Counsel*
Christopher Deal
  *Assistant General Counsel*
Justin M. Sandberg
  *Senior Counsel*
  Counsel of Record
Lauren Gorodetsky
  *Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7043 (Sandberg)
(202) 435-7560 (Gorodetsky)

justin.sandberg@cfpb.gov
lauren.gorodetsky@cfpb.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................ii

JURISDICTIONAL STATEMENT ........................................................ 1

   I.   Subject Matter Jurisdiction.............................................................. 1

   II.  Appellate Jurisdiction..................................................................... 1

STATEMENT OF THE ISSUE ............................................................... 1

STATEMENT OF THE CASE.................................................................. 2

   A.  ECOA and Regulation B.............................................................. 2

   B.  Townstone's Discouragement of Applications from African Americans and African-American Neighborhoods............................................................. 7

   C.  This Enforcement Action ............................................................. 9

SUMMARY OF ARGUMENT ............................................................... 11

STANDARD OF REVIEW .................................................................... 15

ARGUMENT ......................................................................................... 15

   I.   ECOA's Plain Text Authorizes the Prohibition on Discouragement, and the District Court Erred in Concluding Otherwise.............................................. 17

      A.  Congress Has Clearly Spoken: Discriminatory Discouragement is Unlawful, and the Bureau Has the Authority to Prohibit It ................... 17

      B.  The District Court Erred in Concluding that ECOA Precluded Regulation B's Adoption ........................................................................ 23

      C.  Congress Did Not Foreclose the Bureau's Interpretation........................... 31

   II.  Regulation B's Prohibition on Discouragement is Not "Arbitrary, Capricious, or Manifestly Contrary to the Statute" ........................................... 33

CONCLUSION.................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**..................................................................................................... **Page(s)**

*Adams v. Plaza Fin. Co.*,
   168 F.3d 932 (7th Cir. 1999) ................................................... 32

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   934 F.3d 649 (D.C. Cir. 2019) ........................................... 33, 34

*Am. Fed'n of Lab. & Cong. Of Indus. Organizations v. Chao*,
   409 F.3d 377 (D.C. Cir. 2005) ................................................. 18

*Barnhart v. Walton*,
   535 U.S. 212 (2002) ................................................................. 39

*Beeler v. Saul*,
   977 F.3d 577 (7th Cir. 2020) ................................................... 25

*Bhd. of R.R. Signalmen v. Surface Transp. Bd.*,
   638 F.3d 807 (D.C. Cir. 2011) ................................................. 39

*Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*,
   474 U.S. 361 (1986) ........................................................... 29, 30

*Buongiorno v. Sullivan*,
   912 F.2d 504 (D.C. Cir. 1990) ....................................... 31, 32, 33

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ........................................................ *passim*

 *Children's Hosp. Ass'n of Texas v. Azar*,
   933 F.3d 764 (D.C. Cir. 2019) ................................................. 32

*Cook Cnty., Illinois v. Wolf*,
   962 F.3d 208 (7th Cir. 2020) ....................................... 16, 17, 21

*Coyomani-Cielo v. Holder*,
   758 F.3d 908 (7th Cir. 2014) ................................................... 16

*Cragin v. First Fed. Sav. & Loan Ass'n*,
   498 F. Supp. 379 (D. Nev. 1980) ............................................. 25

*Davis v. Strata Corp.*,
   242 F. Supp. 2d 643 (D.N.D. 2003) ......................................... 25

*Doe, 1 v. FEC,*
   920 F.3d 866 (D.C. Cir. 2019) ............................................................ 20, 21

*Esquivel-Quintana v. Sessions,*
   581 U.S. 385 (2017) ..................................................................................... 31

*Fed. Nat'l Mortg. Ass'n v. City of Chicago,*
   874 F.3d 959 (7th Cir. 2017) ..................................................................... 21

*Fournier v. Sebelius,*
   718 F.3d 1110 (9th Cir. 2013) .................................................................. 39

*Hildebrandt v. Vilsack,*
   102 F. Supp. 3d 318 (D.D.C. 2015) .................................................. 14, 24

*Int'l Bhd. of Teamsters v. United States,*
   431 U.S. 324 (1977) ............................................................................. 18, 35

*Kitterman v. City of Belleville,*
   66 F.4th 1084 (7th Cir. 2023) ...................................................................... 7

*Merck & Co. v. U.S. Dep't of Health and Human Services,*
   962 F.3d 531 (D.C. Cir. 2020) ................................................................. 31

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
   547 U.S. 71 (2006) ....................................................................................... 20

*Mourning v. Fam. Publ'ns Serv., Inc.,*
   411 U.S. 356 (1973) ........................................................................... *passim*

*Nat'l Shopmen Pension Fund v. DISA Indus., Inc.,*
   653 F.3d 573 (7th Cir. 2011) ..................................................................... 15

*Phelan v. City of Chicago,*
   347 F.3d 679 (7th Cir. 2003) ..................................................................... 15

*Rush Univ. Med. Ctr. v. Burwell,*
   763 F.3d 754 (7th Cir. 2014) ..................................................................... 32

*Sacco v. Bank of Versailles,*
   No. 2:14–cv–04185, 2014 WL 5343537 (W.D. Mo. Oct. 20, 2014) .................... 24, 25

*Smiley v. Citibank (S. Dakota), N.A.,*
   517 U.S. 735 (1996) ..................................................................................... 39

*Transitional Hosps. Corp. of La. v. Shalala,*
   222 F.3d 1019 (D.C. Cir. 2000) ................................................... 31, 32, 33

*Treadway v. Gateway Chevrolet Oldsmobile Inc.,*
     362 F.3d 971 (7th Cir. 2004) ................................................. 34

*United States v. Mead Corp.,*
     533 U.S. 218 (2001) ............................................................. 16

*United States v. O'Hagan,*
     521 U.S. 642 (1997) ......................................................... 27, 28

**Statutes**

1 U.S.C. § 1 ......................................................................... 24

12 U.S.C. § 1844(b) ............................................................. 29

12 U.S.C. § 5536(a)(1)(A) ...................................................... 1

15 U.S.C. § 78n(e) ............................................................... 28

15 U.S.C. § 1601 .............................................................. 13, 18

15 U.S.C. § 1691(a) ........................................................ *passim*

15 U.S.C. § 1691(d) ............................................................. 23

15 U.S.C. § 1691a ............................................................... 17

15 U.S.C. § 1691a(b) ............................................................. 4

15 U.S.C. § 1691b ................................................. 12, 19, 25, 28

15 U.S.C. § 1691b(a) ...................................................... *passim*

15 U.S.C. § 1691e(g) ...................................................... *passim*

15 U.S.C. §§ 1691–1691f ....................................................... 1

28 U.S.C. § 1291 .................................................................. 1

28 U.S.C. § 1331 .................................................................. 1

28 U.S.C. § 1345 .................................................................. 1

28 U.S.C. §§ 3301–3308 ......................................................... 1

Dodd-Frank Wall Street Reform and Consumer Protection Act,
     Pub. L. No. 111-203, § 1085, 124 Stat. 1376 (2010) .................. 6

Equal Credit Opportunity Act Amendments of 1976,
    Pub. L. No. 94-239, 90 Stat. 251 (1976) ............................................... 3, 4

Equal Credit Opportunity Act of 1974,
    Pub. L. 93-495, § 502, 88 Stat. 1500 (1974) ................................. 2, 3, 12, 18

FDIC Improvement Act of 1991,
    Pub. L. 102-242, § 223, 105 Stat 2236 (1991) ............................... 5, 21, 22

Pub. L. 96-221, § 610, 94 Stat 132, 174 (1980) .......................................... 5

Pub. L. 100-533, § 301, 102 Stat 2689, 2692-93 (1988) ............................. 5

Pub. L. 104-208, § 2302, 110 Stat 3009 (1996) ......................................... 5

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................... 7

**Regulations**

12 C.F.R. pt. 202 ...................................................................................... 2

12 C.F.R. pt. 1002 .................................................................................. 1, 6

12 C.F.R. pt. 1002, Supp. I ..................................................................... 27

12 C.F.R. § 202.4 (1975) .......................................................................... 22

12 C.F.R. § 1002.2(f) ............................................................................... 24

12 C.F.R. § 1002.4(b) ...................................................................... *passim*

17 C.F.R. § 240.14e–3(a) ......................................................................... 28

40 Fed. Reg. 49,298 (Oct. 22, 1975) ...................................................... 2, 3

42 Fed. Reg. 1242 (Jan. 6, 1977) .............................................................. 4

50 Fed. Reg. 48,018 (Nov. 20, 1985) ......................................................... 4

76 Fed. Reg. 79,442 (Dec. 21, 2011) ................................................... 6, 22

81 Fed. Reg. 25,323 (April 28, 2016) ........................................................ 6

**Other Authorities**

1974 U.S.C.C.A.N. 6148 .......................................................................... 36

Brief for the United States, *Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 1985 WL 669529 ........................................................................ 30

*Credit Discrimination: Hearings on H.R. 14856 and H.R. 14908 Before the Subcomm. On Consumer Affs. Of the H. Comm. on Banking and Currency*, 93d Cong. 369 (1974) ................................................................................. 3, 36

*Discrimination in Home Mortgage Lending: Hearing Before the Subcomm. on Consumer and Regul. Affs. of the S. Comm. on Banking, Housing, and Urban Affs.*, 101st Cong. 5 (1989) ......................................................... 38

*Equal Opportunity in Lending: Hearing Before the of S. Comm. on Banking, Housing, and Urban Affairs*, 94th Cong., 1 (1976) ................................ 37

*Mortgage Discrimination; Hearing Before the Subcomm. on Consumer and Regul. Affs. of the S. Comm. on Banking, Housing, and Urban Affs.*, 101st Cong. 2 (1990) ............................................................................... 5

*Reports from Thrift Regulatory Agencies and the Department of HUD on the Evil of Racial Discrimination in Home Mortgage Lending and the Inadequate Regulatory Response to the Situation, Hearing Before S. Subcomm. on Consumer and Reg. Affairs of the Comm. on Banking Housing and Urban Affairs*, 101st Cong. 108 (1990) ........................................................................... 38

S. Rep. 102-167 (1991) .................................................................... 5, 6, 37

## JURISDICTIONAL STATEMENT

### I.    Subject Matter Jurisdiction

This Court has jurisdiction over this action (as did the district court) because it arises under federal law (the Equal Credit Opportunity Act [ECOA], 15 U.S.C. §§ 1691–1691f, and an implementing regulation, 12 C.F.R. Part 1002 [Regulation B]; the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5536(a)(1)(A); and the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3301–3308), presents federal questions, 28 U.S.C. § 1331, and was brought by an agency of the United States, the Consumer Financial Protection Bureau (Bureau or CFPB), 28 U.S.C. § 1345.

### II.    Appellate Jurisdiction

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The Bureau seeks review of a final judgment entered by the district court on February 3, 2023.[1] A027. That judgment dismissed the Bureau's complaint, thereby denying all relief sought by the Bureau. The Bureau timely filed its notice of appeal concurrently with a Docketing Statement on April 3, 2023. ECF Nos. 113, 114, *CFPB v. Townstone*, 20-cv-4176 (N.D. Ill.).

## STATEMENT OF THE ISSUE

Did the district court err in holding that Regulation B's longstanding proscription on the discriminatory discouragement of prospective applicants from applying for credit is inconsistent with ECOA, which recognizes that discouraging

---

[1] This brief cites to the Short Appendix using the format "A_."

applications for credit constitutes prohibited discrimination, 15 U.S.C. § 1691e(g), and which expressly delegates the authority to issue rules to the Bureau?

## STATEMENT OF THE CASE

### A.   ECOA and Regulation B

ECOA protects individuals and businesses against discrimination in accessing and using credit. First enacted in 1974, ECOA was originally designed to "make … credit equally available to all credit-worthy customers without regard to sex or marital status." Equal Credit Opportunity Act of 1974, , § 502, 88 Stat. 1500, 1521 (1974). ECOA thus prohibited discrimination against applicants on the basis of sex or marital status. *Id.* § 503, 88 Stat at 1521 (codified at 15 U.S.C. § 1691(a); *see* A028).

From the start, Congress directed the Board of Governors of the Federal Reserve System (Board) to "prescribe regulations to carry out the purposes of" ECOA, which may contain "such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are *necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith*." *Id.* § 503, 88 Stat. at 1522 (emphasis added) (codified at 15 U.S.C. § 1691b(a); *see* A032).

Before ECOA took effect, the Board issued regulations as prescribed by Congress, collectively known as Regulation B. 40 Fed. Reg. 49,298 (Oct. 22, 1975) (promulgating 12 C.F.R. pt. 202). These rules—issued after notice and comment— provided that "[a] creditor shall not make any statements to applicants or

2

prospective applicants which would, on the basis of sex or marital status, discourage a reasonable person from applying for credit or pursuing an application for credit." *Id.* at 49,307. The Board explained that this provision was "necessary to protect applicants against discriminatory acts occurring before an application is initiated." *Id.* at 49,299.

When it enacted ECOA, Congress had likewise noted that many creditors were discouraging women from applying for credit at that time. *See, e.g.*, *Credit Discrimination: Hearings on H.R. 14856 and H.R. 14908 Before the Subcomm. On Consumer Affs. Of the H. Comm. on Banking and Currency*, 93rd Cong. 369 (1974) (quoting representative of Sears Roebuck and Company who admitted that "[w]e discourage married women from opening their own accounts, but if they push us on it, we'll go along"); *id.* at 236 (report of the U.S. Commission on Civil Rights observing that "[o]fficials at five lending institutions reported that, following informal interviews at which various subjective factors are considered, they are expected to discourage applications from people they consider 'ineligible'"). ECOA and Regulation B went into effect on the same day, October 28, 1975, establishing the foundation of today's statutory and regulatory scheme. 40 Fed. Reg. at 49,310; 88 Stat. at 1525.

The following year, Congress expanded ECOA's reach to prohibit discrimination on the basis of race, color, religion, national origin, sex or marital status, or age (among other things). Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, 90 Stat. 251 (1976). The resulting prohibition on discrimination read—

and still reads—as follows: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction" on the grounds of race, sex, and other specified prohibited bases.[2] *Id.*; 15 U.S.C.A. § 1691(a). The Board, in turn, expanded Regulation B to prohibit discouragement "on a prohibited basis," defined to include not only sex but also race, color, and national origin (among other things). 42 Fed. Reg. 1242, 1253-54 (Jan. 6, 1977). The resulting provision, which makes it unlawful for a creditor to "discourage on a prohibited basis a reasonable person from making or pursuing an application," *id.* at 1254, has remained the same ever since.

Later, the Board added (after notice and comment) official staff commentary and interpretations of Regulation B. *See* 50 Fed. Reg. 48,018, 48,048 (Nov. 20, 1985). With respect to the provision prohibiting discouragement, the Board identified specific practices that would violate the provision, including advertising efforts that "express, imply or suggest a discriminatory preference or a policy of exclusion in violation of the act," "statement[s] that the applicant should not bother to apply, after the applicant states that he is retired," and "interview scripts that discourage applications." *Id.* at 48,050. The commentary also reiterated that, in "keeping with the purpose of the act—to promote the availability of credit on a nondiscriminatory basis"—this provision "covers acts or practices directed at potential applicants." *Id.* at 48,050.

---

[2] The statute defines an "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b); *see* A031.

In the following decades, Congress revisited ECOA's provisions many times, adding substantive obligations and making technical amendments. *E.g.*, Pub. L. 96-221, § 610, 94 Stat 132, 174 (1980) (making technical change to date of making annual reports); Pub. L. 100-533, § 301, 102 Stat 2689, 2692-93 (1988) (amending provision on issuing regulations); Pub. L. 104-208, § 2302, 110 Stat 3009, 3009—420-23 (1996) (adding new incentives for self-testing and self-correction). As relevant here, in 1991, Congress adopted a provision explicitly recognizing that discouragement (on a prohibited basis, like race or sex) violates ECOA's prohibition on discrimination. FDIC Improvement Act of 1991, Pub. L. 102-242, § 223, 105 Stat 2236, 2306 (1991) (codified at 15 U.S.C. § 1691e(g); A035).

This provision arose out of Congress's dissatisfaction with the slow pace of federal regulatory agencies' enforcement of ECOA and Regulation B, including the prohibition against "discouraging applications on a prohibited basis and advertising which implies a discriminatory preference." S. Rep. 102-167, at *83, 86 (Oct. 1, 1991); *see also Mortgage Discrimination; Hearing Before the Subcomm. on Consumer and Regul. Affs. of the S. Comm. on Banking, Housing, and Urban Affs.*, 101st Cong. 2 (1990) (statement of Sen. Dixon) ("[N]o agency has yet seen fit to refer any cases whatsoever to the Justice Department for further investigation or prosecution. The financial regulatory agencies may see, hear and speak no evil, but I believe that the evidence demonstrates that discrimination in mortgage lending does still exist in this country."); *id*. 142-45 (statement of Allen Fishbein, General Counsel, Center for Community Change) ("[T]he regulators are sleeping and

sleeping and sleeping…. The examination process that the banking regulatory agencies use, by their own admission, cannot detect the problem of prescreening, of discouragement of potential applicants before they actually submit an application.").

Congress addressed this problem by mandating referrals to the Department of Justice. S. Rep. 102-167, at *93. Specifically, Congress amended ECOA to provide that the agencies enforcing ECOA "shall refer" to the Attorney General any matter involving a suspected "pattern or practice of *discouraging* or denying applications for credit in violation of section 1691(a) of this title." 15 U.S.C. § 1691e(g) (emphasis added).

Finally, in 2010, Congress transferred primary rulemaking responsibility under ECOA to the Bureau. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1085, 124 Stat. 1376, 2083-84 (2010). The Bureau republished the Board's Regulation B—which had been in effect for decades—without material change through an Interim Final Rule with request for public comment. 76 Fed. Reg. 79,442 (Dec. 21, 2011) (promulgating 12 C.F.R. pt. 1002). After a public comment period, the Bureau's Regulation B became final. 81 Fed. Reg. 25,323 (April 28, 2016). The resulting Bureau regulation, like the Board regulation, provides in pertinent part that "[a] creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application." 12 C.F.R. § 1002.4(b); A037.

In short, consistent with ECOA, Regulation B has long provided that creditors cannot "discourage on a prohibited basis a reasonable person from making or pursuing an application." *Id.* Congress has revisited ECOA on several occasions without once disturbing the understanding that such conduct is unlawful. Instead, Congress created a mandatory referral obligation for cases in which a creditor has unlawfully "engaged in a pattern or practice of discouraging … applications." 15 U.S.C. § 1691e(g).

### B. Townstone's Discouragement of Applications from African Americans and African-American Neighborhoods

Since at least 2014, Townstone Financial, Inc. (Townstone)—a Chicago-based mortgage broker and former lender—has discouraged African Americans from applying for credit and discouraged applications for and from African-American neighborhoods in the Chicago metropolitan area.[3] Amend. Compl. ¶ 5, ECF No. 27, *CFPB v. Townstone*, 20-cv-4176 (N.D. Ill.).

To start, Townstone's marketing and consumer outreach has demeaned African-American neighborhoods and African Americans in the market for credit. *Id.* ¶¶ 32-41. Townstone has marketed its business through the "Townstone Financial Show," which Townstone distributes as a radio show and as a podcast. *Id.* ¶ 24. This show is a long-form commercial advertisement, or an infomercial, which also includes shorter advertisements for Townstone during commercial breaks. *Id.* ¶ 26. During

---

[3] The case comes to this Court from an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Accordingly, the well-pleaded facts in the Bureau's complaint should be accepted as true, and all reasonable inferences should be drawn in the agency's favor. *See Kitterman v. City of Belleville*, 66 F.4th 1084, 1090 (7th Cir. 2023).

the show, the hosts (who are or were loan officers at Townstone) typically included Townstone's licensing information, described themselves as "Chicago real-estate experts," and "promoted the benefits that prospective applicants might expect from applying for mortgage loans from Townstone." *Id.* ¶¶ 26-28. Townstone generated up to 90% of its mortgage-loan applications from radio advertising, including through the Townstone Financial Show. *Id.* ¶ 25.

During Townstone's infomercial, the hosts made repeated comments that disparaged African Americans and African-American neighborhoods. *See, e.g.*, *id.* ¶¶ 33, 35, 37. In one episode, a host described the South Side of Chicago as "hoodlum weekend" and "a real war zone." *Id.* ¶ 35. In another episode, a host described walking through the South Side as giving the same "rush" as skydiving. *Id.* ¶ 37. And in another, when discussing a caller's credit concerns, a host described a south suburb of Chicago—with an African-American population of 80.3%—as "crazy" and a place "[y]ou drive very fast through" and "you don't look at anybody or lock on anybody's eyes." *Id.* ¶ 33.

Townstone's marketing practices were just one way that the company discouraged applications on the basis of race. When Townstone was not disparaging African Americans and predominantly African-American neighborhoods, Townstone ignored them, by declining to direct any of its marketing efforts toward African Americans or to hire a single African-American loan officer who could build client relationships. *Id.* ¶¶ 40, 51.

The effects of Townstone's business model are seen in its applicant pool as compared to its peer lenders. *See id.* ¶ 50. From 2014 through 2017, Townstone drew significantly fewer applications from African Americans or for majority African-American neighborhoods than peer mortgage lenders. *Id.* Though Townstone drew about 2,700 mortgage-loan applications, only 1.4% of those applications (37) came from African Americans in the Chicago area, *id.* ¶ 43, even though African Americans made up 17% of the population as of the 2010 census, *id.* ¶ 18. Similarly, for properties in high-African-American neighborhoods (*i.e.*, where more than 80% of the residents are Black or African American), Townstone drew almost no applications for mortgage loans—less than 1% each year—even though such neighborhoods made up 13.8% of the Chicago metropolitan area. *Id.* ¶ 15, 44. By contrast, during the same period, its peer mortgage lenders in the Chicago area drew 9.8% of their applications from African-American applicants, *id.* ¶ 43, and significantly more mortgage-loan applications for properties in African-American neighborhoods, *id.* ¶¶ 49, 50. These statistically significant disparities show Townstone's failure to draw applications from African Americans who were in the market for mortgage loans and failure to draw applications from African-American neighborhoods.

### C.    This Enforcement Action

On July 15, 2020, the Bureau filed suit against Townstone, alleging that it violated ECOA and Regulation B by discouraging prospective applicants, on the basis of race, from seeking credit. Compl. ¶¶ 52-55, ECF No. 1. The Bureau also

alleged that Townstone had violated the CFPA by violating ECOA. *Id.* ¶¶ 56-58. The Bureau filed an Amended Complaint on November 25, 2020, adding a fraudulent transfer claim against the co-founder of Townstone. *See* Am. Compl. ¶¶ 62-78.

On February 8, 2021, Townstone and its co-founder (Defendants) jointly moved to dismiss the Bureau's suit for failure to state a claim. Mot. to Dismiss, ECF No. 31. They argued that Regulation B's longstanding prohibition on discouragement of prospective applicants expands ECOA beyond the text of the statute and is invalid. Mem. in Support of Mot. to Dismiss at 5-7, ECF No. 32. Defendants also challenged the prohibition on discouragement as violating the First and Fifth Amendments both facially and as applied. *Id.* at 9-18. In a memorandum of supplemental authority, Defendants argued that dismissal of the complaint was also warranted based on the major-questions doctrine. Defs.' Mem. of Supp. Auth., ECF No. 67.

The district court granted Defendants' motion to dismiss. A001-026. The court applied the "two-step framework" from *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). A009. At *Chevron*'s first step, the court reasoned that the "plain text of the ECOA [] clearly and unambiguously prohibits discrimination against applicants, which the ECOA clearly and unambiguously defines as a person who applies to a creditor for credit." A011. The court therefore found "that Congress has directly and unambiguously spoken on the issue at hand and only prohibits discrimination against applicants," and thus "that the ECOA does not apply to prospective applicants." *Id.* The court believed that this result was

supported by case law that "found the ECOA's definition of 'applicant' to be unambiguous" in the context of its application to guarantors. *Id.* Further, the court reasoned that although the Bureau's authority to enact regulations "is, no doubt, broad," A015, it is still constrained by the bounds of ECOA, and "ECOA clearly marks its boundary with the term 'applicant,'" A016. Thus, the court held that Regulation B exceeded the bounds of ECOA by including discouragement of prospective applicants within its reach. A017-A018. In so doing, the court "agree[d] with the CFPB that the major-questions doctrine is unimportant to the issue presented here." A006 n.3. In light of its ruling, the court declined to analyze Defendants' additional challenges to Regulation B. A011 n.5.

## SUMMARY OF ARGUMENT

For nearly 50 years, consistent with ECOA, Regulation B has made clear that it is unlawful for creditors to discourage prospective applicants from applying for credit on a prohibited basis. This makes sense. Since its inception, ECOA has authorized the implementing agency (once the Board, now the Bureau) to enact regulations to further ECOA's purpose and prevent evasions of and facilitate compliance with the statute. And discouraging consumers on a protected basis (like their race, sex, or religion) from applying for credit would plainly frustrate ECOA's purpose of prohibiting credit discrimination. Moreover, in 1991, Congress expressly recognized that discouraging applications for credit violates ECOA.

The district court nonetheless dismissed an enforcement action brought by the Bureau against Defendants, a mortgage broker and its owner. The district court opined, at *Chevron* step one, that ECOA precludes Regulation B's protection of

11

prospective applicants because (i) ECOA prohibits discrimination only against "applicants" for credit, and (ii) the definition of the term "applicant" in ECOA does not encompass "prospective applicants." A010-011.

The district court erred. From the start, ECOA has directed the implementing agency to issue regulations that "in the judgment of the [agency] are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." 15 U.S.C § 1691b. This language sufficed to give the Board the authority to issue Regulation B in 1975—and then to re-issue it (in 1977) when Congress expanded the scope of ECOA. After all, discouraging prospective applicants from applying (on a prohibited basis) is a straightforward evasion of the text of § 1691(a) and would frustrate the statute's purpose of "requir[ing] that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers without regard to [prohibited characteristics]." Equal Credit Opportunity Act of 1974, Pub. L. 93-495, § 502. For example, including the statement "no Catholics need apply" in an advertisement would surely frustrate ECOA's purpose to make credit "equally available" to all creditworthy customers without regard to religion.

If that were not enough, Congress's 1991 amendments to ECOA confirmed the unlawfulness of discouraging applications on a prohibited basis by instructing that "discouraging . . . applications for credit," 15 U.S.C. 1691e(g), warrants referral to the Department of Justice as a violation of ECOA. As a result, by the time that the

Bureau issued its version of Regulation B in 2011, Congress had spoken clearly about the Bureau's authority to prohibit the discouragement of applications by applicants and prospective applicants alike.

The statutory context underscores Congress's intent. Specifically, in ECOA, Congress employed rulemaking language nearly identical to the language that it had used in the Truth in Lending Act (TILA), 15 U.S.C. § 1601, *et seq*. And Congress did so just a little over two years after the Supreme Court had decided *Mourning v. Fam. Publ'ns Serv., Inc*., 411 U.S. 356 (1973). In *Mourning*, the Supreme Court upheld a regulation issued by the Board to implement TILA that policed "matter[s] not specifically mentioned in the enabling legislation." *Mourning*, 411 U.S. at 374. This sequence of events demonstrates that Congress intended for the implementing agency—initially the Board, but now the Bureau—to have authority to issue rules to further ECOA's purpose and to protect the statute from evasion. The Bureau should prevail at *Chevron* step one.

In any case, even if ECOA's text does not unambiguously authorize Regulation B's prohibition on discouraging prospective applicants, it certainly does not foreclose it. The district court's decision to the contrary suffers from two fundamental flaws. First, the district court did not recognize that Congress made clear through the referral provision that "discouraging . . . applications for credit" violates ECOA. Second, the court concluded that ECOA's reference to "applicants" in §1691(a) (entitled "Activities constituting discrimination") demonstrated that Congress foreclosed prohibiting discouragement as to prospective applicants. Not so. The text

13

of the statute, along with the context of the statute (e.g., its relationship to TILA), demonstrate that the term "applicant" does not preclude a prohibition on discouragement of prospective applicants. Indeed, numerous courts have recognized that the term can encompass individuals who have not submitted an application for credit. *See, e.g., Hildebrandt v. Vilsack*, 102 F. Supp. 3d 318, 323 (D.D.C. 2015).

The Bureau, then, should prevail at *Chevron* step one—and the same is true at step two. (The district court did not address *Chevron* step two, or Defendants' non-*Chevron* arguments.[4]) The interpretation of ECOA reflected in Regulation B's discouragement prohibition is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44. Quite the opposite: The interpretation is supported by the text, purpose, and legislative history of ECOA. Indeed, there is perhaps no more straightforward frustration of Congress's efforts to prohibit discrimination and ensure equal access to credit, through ECOA, than to discourage prospective applicants from applying in the first place based on their race or their sex (or any other prohibited basis). A creditor need not wait to rip up an African American's completed application if he can just hang a "Whites Only" sign in front of the lending office. Regulation B reflects the longstanding effort of the Board and the Bureau to stamp out this kind of odious conduct, consistent with Congress's express grant of authority and the statutory purpose.

---

[4] Below, Defendants raised other challenges to the amended complaint, including arguments under the First and Fifth Amendment. The district court did not reach those arguments, A011 n.5, and this Court need not address them in the first instance on appeal. If the Court agrees with the Bureau that Regulation B's discouragement prohibition is within the scope of the agency's rulemaking authority, Defendants may renew their other arguments in any further proceedings below.

14

The district court's judgment should be reversed.

## STANDARD OF REVIEW

This Court "review[s] [a] district court's decision to dismiss [a] plaintiff's complaint, along with issues of statutory interpretation, de novo." *Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*, 653 F.3d 573, 578 (7th Cir. 2011). Though the Court affords no deference to a district court's resolution of questions of statutory interpretation, the Court defers to an agency's interpretation of a statute in appropriate circumstances. *Chevron*, 467 U.S. at 844. In addition, this "[C]ourt must accept all well-pleaded facts alleged in the complaint as true and must draw all reasonable inferences in favor of the non-movant [i.e., the Bureau]." *Phelan v. City of Chicago*, 347 F.3d 679, 681 (7th Cir. 2003).

## ARGUMENT

The district court reached the novel conclusion that the text of ECOA precludes Regulation B's prohibition of discouraging prospective applicants—because of their race, sex, or any other specified prohibited basis—from submitting credit applications. This is incorrect. ECOA is clear: Regulation B's long-standing prohibition on the discouragement of prospective applicants is proper. *See* 15 U.S.C. §§ 1691b(a), 1691e(g). In any case, ECOA in no way forecloses Regulation's B's long-standing prohibition on the discouragement of prospective applicants. *See* 12 C.F.R. § 1002.4(b).

The district court was, however, right to apply the *Chevron* framework because "Congress [has] delegated authority to the agency generally to make rules carrying

the force of law, and [ ] the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); 15 U.S.C. § 1691b(a) (instructing that the Bureau "shall prescribe" regulations).

When implementing the *Chevron* test, courts first ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, then "that is the end of the matter." *Id.* To make this determination, courts consider the relevant text of the statute, "its place in the over-all statutory scheme, the relation of [ECOA] to other statutes, and common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 222 (7th Cir. 2020) (cleaned up).

If Congress has not spoken to the precise question at issue, then courts "consider whether the agency's interpretation reflects a permissible construction of the statute." *Id.* at 221. At this stage, a court can consider legislative history, among other things. *See Coyomani-Cielo v. Holder*, 758 F.3d 908, 914 (7th Cir. 2014). If Congress has made "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," then the resulting "regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44.

Application of this framework demonstrates that Regulation B is valid.

# I.    ECOA's Plain Text Authorizes the Prohibition on Discouragement, and the District Court Erred in Concluding Otherwise

In this case, "Congress has directly spoken to the precise question at issue," *Wolf,* 962 F.3d at 221—whether, consistent with ECOA, Regulation B can protect prospective applicants from discouragement—and it has answered in the affirmative.

## A.  Congress Has Clearly Spoken: Discriminatory Discouragement is Unlawful, and the Bureau Has the Authority to Prohibit It

Since the mid-1970s, ECOA has made it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction" on certain listed prohibited bases. 15 U.S.C. § 1691(a). And ECOA defines the term "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a.

But, for purposes of this case, that's where the story begins, not where it ends. From the statute's inception, Congress has granted the implementing agency (once the Board, and now the Bureau) the authority to issue regulations, like Regulation B, to further ECOA's purposes and prevent evasion of the statute, including by prohibiting discouragement of prospective applicants. And when Congress amended ECOA in 1991, *see* § 1691e(g), it made clear that discouraging credit applications on a prohibited basis violates ECOA.

The delegation of regulatory authority brings Congress's intent into focus. That delegation directs the implementing agency to enact regulations that "in the

judgment of the [agency] are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." *Id.* § 1691b(a). Regulation B's prohibition of discouragement falls comfortably within the bounds Congress established. *Cf. Am. Fed'n of Lab. & Cong. Of Indus. Organizations v. Chao*, 409 F.3d 377, 393 (D.C. Cir. 2005) (Roberts, J., concurring in part and dissenting in part) (explaining that agencies are typically entitled to deference when statutes require predictive judgments and are phrased in terms of the "judgment" of the agency and what is "necessary and proper"). Congress delineated the statute's purposes plainly in the original ECOA, stating that "the purpose of [ECOA is] to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers without regard to [prohibited characteristics]." Equal Credit Opportunity Act of 1974, Pub. L. 93-495, § 502. If a creditor could discourage prospective applicants from applying, they could frustrate this critical statutory purpose. *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977) (explaining that a person who declines to submit a "formal application solely because of his unwillingness to engage in a futile gesture  [ ] is as much a victim of discrimination as is [a person] who goes through the motions of submitting an application").

The meaning of ECOA's delegation of authority is illuminated by the nearly identical provision in the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq*. Like it did with ECOA, Congress in TILA delegated to the Board authority to

prescribe regulations to "further" the statute's purposes or "prevent circumvention or evasion" of or "facilitate compliance" with the statute.[5] And in *Mourning v. Family Publications Service, Inc*., 411 U.S. 356 (1973), the Supreme Court confirmed the breadth of this statutory delegation.

*Mourning* presented the question of whether TILA empowered the Board to issue a portion of TILA's implementing regulation (Regulation Z)—the "four installment rule." *Id*. at 358. A creditor argued that the Board's issuance of the four installment rule exceeded the scope of TILA because the statute applied only to those who regularly extend credit with "attendant finance charges," and the four installment rule imposed disclosure requirements on entities (like the *Mourning* creditor) that hadn't explicitly imposed finance charges. *Id*. at 361. The Supreme Court rejected this "narrow [ ] interpretation of the Board's power." *Id*. at 371. It was true that, by its terms, TILA required disclosures by those who regularly extended credit with finance charges. *Id*. at 361. But this did not mean that the Board was prohibited from exercising its power to prevent evasions of TILA by requiring disclosures by those who regularly extend credit payable in more than four installments,

---

[5] The delegatory language interpreted by the Supreme Court in *Mourning* read: "The (Federal Reserve) Board shall prescribe regulations to carry out the purposes of (the Act). These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of (the Act), to prevent circumvention or evasion thereof, or to facilitate compliance therewith." *Mourning,* 411 U.S. at 361-62 (quoting 15 U.S.C. § 1604). ECOA's delegatory language reads as follows: "The Bureau shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." 15 U.S.C. § 1691b.

transactions that the Board found could allow creditors to conceal finance charges. *Id.* at 371. The Court emphasized that "Congress ha[d] stressed the agency's power to counteract attempts to evade the purposes of a statute" through the delegatory language. *Id.* at 370. The Court explained, "[t]he language employed evinces the awareness of Congress that some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish," and the broad delegation to the Board establishes "the clear desire of Congress to insure that the Board had adequate power to deal with such attempted evasion." *Id.* at 365.

The Supreme Court's issued its decision in *Mourning* less than two years before Congress passed ECOA, which delegated rulemaking authority to the Board in language substantively identical to the language in TILA at issue in *Mourning*. This sequence of events is powerful evidence that Congress intended ECOA's delegatory language to mean what the Supreme Court said the nearly identical language meant in *Mourning*. That is, Congress specifically intended to allow the Board (and now the Bureau) to police "matter[s] not specifically mentioned in the enabling legislation," *Mourning*, 411 U.S. at 374, if the failure to regulate would frustrate ECOA's purposes or permit evasion of the statute. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("When judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.") (cleaned up); *see also Doe, 1 v. FEC*, 920 F.3d

866, 871 (D.C. Cir. 2019) ("This regulation—like the regulation in *Mourning*—requires more disclosure than the governing statute, but that is no reason for rejecting it.").

Empowering the responsible agency to issue rules to "effectuate the purposes" of ECOA, and "prevent evasions" of, and "facilitate compliance" with the statute, 15 U.S.C. § 1691b(a), was exactly how Congress in 1974 was "likely to delegate," *Wolf*, 962 F.3d at 222, authority to ensure that the agency with substantive expertise in the market had the power to stop creditors from frustrating Congress's intent through conduct that would "render the [a]ct inoperable," *Mourning*, 411 U.S. at 370. And since 1975, Regulation B has expressly protected prospective applicants from discriminatory discouragement in the credit markets. Congress has never repudiated the Board's or Bureau's interpretation of ECOA in the intervening decades. This is no surprise given the historical connection between ECOA's delegatory language and the Supreme Court's interpretation of nearly identical language in TILA.

Importantly, we need not speculate about whether Regulation B's prohibition on discrimination accords with Congress's intent. The text of the statute—specifically, § 1691e(g)—tells us it does. *See Fed. Nat'l Mortg. Ass'n v. City of Chicago*, 874 F.3d 959, 962 (7th Cir. 2017) ("The language of the statute itself is considered the best indicator of Congress's intent."). Section 1691e(g) was enacted in 1991 when Congress amended ECOA to strengthen the "enforcement of the Equal Credit Opportunity Act." FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 223(a),

105 Stat 2236 (1991). Among other things, Congress enacted a referral provision, instructing that specified agencies shall "refer [a] matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a) of this title." 15 U.S.C. § 1691e(g).

The reference to "discouraging . . . applications for credit" jumps off the page—and for a simple reason: It confirms that discouragement violates ECOA, just as the Board had concluded years earlier when it provided in Regulation B that a creditor may not "discourage on a prohibited basis" applicants or prospective applicants "from making or pursuing an application." 12 C.F.R. § 202.4 (1975). Thus, when it came time for the Bureau to adopt regulations implementing ECOA in 2011, 76 Fed. Reg. 79,442 (Dec. 21, 2011), 20 years after the 1991 amendment, there was no ambiguity about Congress's view on discouragement. The Bureau simply followed Congress's lead by adopting the Board's prohibition on discouragement. *See* 12 C.F.R. § 1002.4(b) ("A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.").

It is no surprise that Congress endorsed the prohibition on discouragement. Not only does the prohibition further ECOA's purposes and protect the statute from evasion, but it also fits neatly with ECOA's regulatory structure. ECOA focuses on the credit application process, imposing substantive and procedural obligations on

22

creditors with respect to the handling of applications. *See, e.g.*, 15 U.S.C. § 1691(a) (prohibiting discrimination); § 1691(d) (requiring a statement of reasons for adverse actions). The anti-discouragement rule shares this focus on the application process: It is designed to stop those who would disrupt the process (and evade ECOA's protections and frustrate the statute's purposes) by discouraging prospective applicants from submitting applications. *See* 12 C.F.R. § 1002.4(b).

In short, Congress has spoken to the precise question at issue in this case—whether, consistent with ECOA, Regulation B can protect prospective applicants from discouragement —and Congress's answer is clear: It can.

### B. The District Court Erred in Concluding that ECOA Precluded Regulation B's Adoption

The district court held that the plain text of ECOA "directly and unambiguously" prohibits Regulation B's protection of prospective applicants. A011. It observed that § 1691(a) forbids discrimination against "applicants" and that Congress defined the term "applicant" to include "any person who applies to a creditor directly for an extension, renewal, or continuation of credit." A010-011. Thus, the district court reasoned, the statutory terms unambiguously precluded the Board from extending anti-discrimination protections to prospective applicants in Regulation B. *Id.* at A010-011.

The district court was mistaken. ECOA does not establish a bright line in § 1691(a) prohibiting discrimination only at the moment at which a consumer submits an application. Congress defined "applicant" to include "any person who applies to a creditor directly for an extension, renewal, or continuation of credit."

But Congress did not define "applies," and what is more, under the Dictionary Act, it could be understood to refer to individuals who "will apply" for credit. 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise. . . words used in the present tense include the future as well as the present[.]"). Congress similarly declined to provide a definition of "application." Instead, Congress left it to the Board and now the Bureau to determine when a consumer applies for credit. And the terms "applies" and "application" are not self-defining; questions abound. Does the application have to be written? Should the definition of "application" depend on what the creditor considers an application? What is the creditor's role in obtaining the information it needs to review the application? When does a prequalification request become an application? Congress left the resolution of these boundary questions to the Bureau, *see* 12 C.F.R. § 1002.2(f) (defining "application" and addressing these and other issues), demonstrating that it did not intend for § 1691(a), with its reference to "applicants," to foreclose the prohibition of discouragement of prospective applicants.

Accordingly, numerous courts have concluded that ECOA's protections for "applicants" extend to—and thus the term "applicants" includes—those who have not formally initiated an application. *See, e.g., Hildebrandt,* 102 F. Supp. 3d at 323 (holding a "refusal to provide a person with a credit application because of the applicant's race plainly constitutes 'discriminat[ion] . . . with respect to an[ ] aspect of a credit transaction . . . on the basis of race'"); *Sacco v. Bank of Versailles*, No. 2:14–cv–04185, 2014 WL 5343537, at *2 (W.D. Mo. Oct. 20, 2014) (holding plaintiffs

24

qualified as ECOA "applicants" after inquiring about mortgage, even though they did not submit loan paperwork); *Davis v. Strata Corp.*, 242 F. Supp. 2d 643, 650-51 (D.N.D. 2003) (denying defendant-creditor's motion for summary judgment on plaintiff's ECOA claim, reasoning that a policy refusing to grant credit within tribal reservation equated to a "pre-emptive denial" of credit, and that there were factual issues in dispute as to whether the plaintiff, who had sought credit before the policy and would have continued to seek credit absent the policy, was an "applicant" under ECOA); *Cragin v. First Fed. Sav. & Loan Ass'n,* 498 F. Supp. 379, 383 (D. Nev. 1980) (distinguishing between "applications" and "applicants," and holding that plaintiff qualified as an "applicant" because he requested credit during a telephone conversation, even though did not meet creditor's standards for application).

Moreover, the district court did not properly account for other salient provisions of ECOA beyond the statutory prohibition on discrimination, 15 U.S.C. § 1691(a) (delineating "[a]ctivities constituting discrimination"). *See Beeler v. Saul*, 977 F.3d 577, 585 (7th Cir. 2020) (explaining that, when interpreting a statute, a court should "consider the entire text").

To that end, the district court failed to even address the referral provision, 15 U.S.C. § 1691e(g), which directly speaks to the issue and describes a pattern or practice of "discouraging . . . applications for credit in violation of 1691(a)" as conduct that merits a referral to the Department of Justice. This provision, in conjunction with Congress's express delegation of rulemaking authority to the Bureau, 15 U.S.C. § 1691b, establishes that Congress spoke to the precise question

at issue—whether, consistent with ECOA, Regulation B can protect prospective applicants from discouragement—and answered in the affirmative.

Defendants argued below that § 1691e(g) has no bearing the Bureau's authority to protect prospective applicants from discouragement because § 1691e(g) states that "discouraging . . . applications" violates § 1691(a), and § 1691(a) merely makes it "unlawful for any creditor to discriminate against any *applicant*." 15 U.S.C. § 1691(a) (emphasis added). This argument does not support the district court's conclusion. As an initial matter, Defendants' interpretation ignores the fact that § 1691e(g)'s reference to "discouraging . . . applications," parallels Regulation B's prohibition on conduct that would "discourage" someone "from making or pursuing an application." 12 C.F.R. § 1002.4(b). What's worse, Defendants' interpretation makes little practical sense. Under their theory, Congress enacted a provision that applies only to consumers who are discouraged from applying for credit but apply anyway, and not to consumers who don't apply for credit because they are successfully discouraged from applying. The most natural reading of the text is that, consistent with Regulation B, discouraging applications is illegal whether or not that discouragement succeeds.

The district court did address ECOA's broad delegatory language, but its brief analysis misses the mark. The court acknowledged that "the delegating section is, no doubt, broad," but it concluded that "the ECOA clearly marks its boundary with the term 'applicant,'" and "[t]he CFPB cannot regulate outside the bounds of the

ECOA." A015-16. Not so: The term "applicants" does not mark the boundary of the Bureau's rulemaking authority with respect to discouragement.

ECOA authorizes the Bureau to issue regulations that in the agency's "judgment" are "necessary or proper to effectuate the purposes of this subchapter" or "to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." 15 U.S.C. § 1691b(a); 12 C.F.R. pt. 1002, Supp. I, ¶ 4(b)-1 (explaining that § 1002.4(b) extends to prospective applicants to remain faithful to the "the purpose of [ECOA]—[i.e.,] to promote the availability of credit on a nondiscriminatory basis"). ECOA, however, contains no indication that this rulemaking authority is limited to the issuance of regulations regarding applicants who have begun the application process. 15 U.S.C. § 1691b(a). And various aspects of ECOA's statutory context—specifically, (i) Congress's post-*Mourning* incorporation of delegatory language nearly identical to that in TILA, and (ii) its 1976 enactment of the operative version of § 1691(a) *after* the Board had already promulgated Regulation B—sink any argument that an "applicants only" limitation is somehow implicit in the statute's facially broad delegation of regulatory authority. Moreover, as noted above, the referral provision underscores the validity of regulations addressed to creditors "discouraging or denying applications for credit." 15 U.S.C. § 1691e(g).

The Supreme Court's decision in *United States v. O'Hagan*, 521 U.S. 642 (1997), confirms that, when Congress delegates authority to an agency to prevent particular harms, courts should take Congress at its word. In *O'Hagan*, a statute

gave the Securities and Exchange Commission (SEC) the authority to "by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." 15 U.S.C. § 78n(e). The Eighth Circuit held that a regulation adopted by the SEC, 17 C.F.R. § 240.14e–3(a), exceeded the agency's rulemaking authority under this statute because "the SEC may identify and regulate . . . acts and practices the law already defines as fraudulent; but, the Eighth Circuit maintained, the SEC may not create its own definition of fraud." *O'Hagan*, 521 U.S. at 670 (cleaned up). The Supreme Court reversed the Eighth Circuit. It held that "[a] prophylactic measure, because its mission is to prevent, typically encompasses more than the core activity prohibited. . . . We hold, accordingly, that under § 14(e), the Commission may prohibit acts not themselves fraudulent under the common law or [statute], if the prohibition is 'reasonably designed to prevent . . . acts and practices [that] are fraudulent.'" *Id.* at 672-73 (cleaned up). Similar logic applies here: ECOA's rulemaking provision authorized the Board and the Bureau to prohibit the discouragement of credit applications to prevent conduct that would frustrate the purposes of ECOA and evade compliance with its requirements.

Nor does the district court's survey of precedent, A011-A014, support its conclusion. In the cited cases, courts did not determine the scope of Bureau's authority to issue regulations under § 1691b. Moreover, the cases involve the distinct question of whether the term "applicant" encompasses guarantors, and, among other things, that question—unlike the question at issue here—was not put

to rest by the referral provision. 15 U.S.C. § 1691e(g). Put simply, ECOA does not foreclose the Bureau's authority to prohibit discouragement, but, to the contrary, authorizes it.[6]

   *Board of Governors of Federal Reserve System. v. Dimension Financial Corporation*, 474 U.S. 361 (1986), on which Defendants relied below, Reply to Mot. to Dismiss, ECF No. 38, at 1-3, is not to the contrary. That case concerned the Board's definition of the term "bank" in the Bank Holding Company Act. *Dimension Financial*, 474 U.S. at 363. The definition covered two categories of "nonbanks" that Congress had intentionally excluded from the statute. *Id.* at 365-66. The Supreme Court concluded that the Board's interpretations of the relevant terms were inconsistent with the language of the statute. *Id.* at 375. In a short footnote, the Court rejected the Board's alternative argument that its definitions were justified by its authority to promulgate rules "necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions thereof," 12 U.S.C. § 1844(b). *See Dimension Fin.*, 474 U.S. at 373 n.6. The Court held that § 1844(b) "only permits the Board to police within the boundaries of the Act; it does not permit the

---

[6] The district court also understood the Bureau to be asking for its interpretation of ECOA to be judged under a distinct *Mourning* standard, rather than under *Chevron*. A008-011. (*Mourning*, a pre-*Chevron* case, states that "[w]here the empowering provision of a statute states simply that the agency may 'make such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is reasonably related to the purposes of the enabling legislation." *Mourning*, 411 U.S. at 369 (cleaned up).) But the court misunderstood the Bureau's position. The Bureau cited *Mourning* as support for the argument that Congress had expressly delegated to the Bureau the authority to issue regulations, like Regulation B, not as the foundation for an alternative review standard. Opp. to MTD, ECF No. 35, at 6-7. Indeed, in its brief in opposition to the motion to dismiss, the Bureau referred to the *Chevron* standard as the governing standard. *Id.* at 6 n.29.

Board to expand its jurisdiction beyond the boundaries established by Congress. . ." *Id.*

*Dimension Financial* differs from this case in several fundamental respects. Unlike in *Dimension Financial*, in which Congress had expressly rejected the Board's definition of "banks" in adopting the Bank Holding Company Act, 474 U.S. at 365-66, here, Congress has instead adopted an amendment to ECOA, the referral provision, 15 U.S.C. § 1691e(g), that accords with Regulation B in treating discouragement as unlawful. Further, the definitions at issue in *Dimension Financial* were not properly categorized as anti-evasion measures. To the contrary, the Board's interpretation undermined rather than furthered the statutory scheme; indeed, the Department of Justice opposed the Board's definition on the ground that the "Board's amendments to Regulation Y disturb the carefully considered balance that Congress has struck." Brief for the United States, *Dimension Fin.*, ("SG Br."), 1985 WL 669529, at *3; *see also id.* at *27, *27 n.26 (explaining that the entities at issue, once denominated as banks, were required to obtain insurance from the Federal Deposit Insurance Corporation, but that some of the entities were statutorily ineligible for such insurance). In contrast, there can be no doubt that Regulation B's prohibition of discouragement furthers ECOA's statutory scheme by seeking to stop those who would discourage prospective applicants from submitting applications and, thereby, disrupt the application process. Finally, unlike in *Dimension Financial*, the history of ECOA's enactment—most notably, that the statutory rulemaking provision was enacted in the shadow of *Mourning*—confirms

that Congress intended to permit the Board's enactment of a rule to prevent the evasion of and facilitate compliance with ECOA, and further the statute's purposes.[7]

Quite simply, the district court erred. Congress has spoken: The text of ECOA authorizes Regulation B's prohibition on the discouragement of prospective applicants.

### C. Congress Did Not Foreclose the Bureau's Interpretation

Even if the Court concludes that Congress has not specifically addressed the question at issue in this case, it certainly has not foreclosed the Bureau's interpretation of ECOA. *Cf. Esquivel-Quintana v. Sessions*, 581 U.S. 385, 398 (2017) (holding that *Chevron* deference could not apply because the text "unambiguously foreclose[d]" the agency's interpretation).

"When Congress expressly delegates the authority to fill a gap in a statute, Congress speaks, in effect, directly, and says, succinctly, that it wants the agency to annotate its words." *Buongiorno v. Sullivan*, 912 F.2d 504, 509 (D.C. Cir. 1990) (Thomas, J.); *see also Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019,

---

[7] Nor, contrary to Defendants' suggestion, *see* Reply to Mot. to Dismiss, ECF No. 38, at 4-5, does this case bear any resemblance to *Merck & Co. v. United States Department of Health and Human Services*, 962 F.3d 531 (D.C. Cir. 2020). In *Merck*, the D.C. Circuit decided that Health and Human Services (HHS) did not have the authority to issue a rule requiring drug manufacturers to disclose certain price data in drug advertisements. HHS's challenged rule, "command[ed] the disclosure to the public at large of pricing information that bears at best a tenuous, confusing, and potentially harmful relationship to the Medicare and Medicaid programs" that HHS was charged with administering. *Id.* at 541. In contrast, the relationship between Regulation B's rule against discouragement and ECOA's prohibition on discrimination could not be closer, as Congress and the responsible agencies have recognized for years.

1025 (D.C. Cir. 2000) (holding that a statute provided an "express delegation" to the Secretary to the extent it allowed the Secretary to determine when a hospital has an average length of stay greater than 25 days); *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (finding express delegation where a statute provides that "the costs incurred during the year of furnishing hospital services" will be "determined by the Secretary"). For this reason, in the face of an express delegation, "courts concentrate their analysis on *Chevron*'s second step after pausing for a moment at the first." *Buongiorno*, 912 F.2d at 508.

Indeed, this Court did just that in *Rush University Medical Center v. Burwell*, 763 F.3d 754, 760-61 (7th Cir. 2014). In that case, the Court held that a statute— the Medicare Act—"explicit[ly] delegate[ed][ ] the power to define the term at the heart of this appeal" to the Secretary of Health and Human Services, and, therefore, that the court could not "say that the Secretary's regulation fails as a matter of *Chevron*'s first inquiry." *Id.* at 760. The Court continued: To hold that the "plain text" of the statute controlled the content of the regulation that Congress entrusted the agency to adopt would "undermine Congress's ability to delegate the power" to enact regulations and would "thrust the courts into a role that Congress meant to reserve for the agency." *Id.*; *see also Children's Hosp. Ass'n of Texas*, 933 F.3d at 770 (noting that "[b]ecause the delegation at issue here is express rather than implied, we have no need to search for statutory ambiguity. We skip straight to asking whether the Rule is reasonable"); *Cf. Adams v. Plaza Fin. Co.*, 168 F.3d 932, 939 (7th Cir. 1999) (Easterbrook, J., dissenting) ("Which is not to deny that evasions

32

should be dealt with. My point is that the TILA does not charge courts with the duty of plugging loopholes; that task belongs to Congress, with the aid of the Federal Reserve, which acts by regulation, so that lenders may know the rules and apply them ex ante.").

Thus, if the Court concludes that the text and context do not establish that Congress has spoken to the precise question at issue, then the logic of *Buongiorno*, *Rush*, and similar cases applies here. Congress explicitly delegated to the Board—and now the Bureau—the task of issuing regulations that "in the judgment of the [agency] are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." 15 U.S.C. § 1691b(a). This text provides the Bureau with the significant discretion to issue regulations implementing ECOA. *See Transitional Hosps. Corp. of La.*, 222 F.3d at 1025 (explaining that because of the express delegation to the Secretary, "we are bound to uphold her determination as long as she exercises that discretion in a reasonable way").

## II.     Regulation B's Prohibition on Discouragement is Not "Arbitrary, Capricious, or Manifestly Contrary to the Statute"

At *Chevron* step two, if Congress has made "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," as it has here with § 1691b(a), then the resulting regulations are "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44; *see also, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union*

*Admin.*, 934 F.3d 649, 663 (D.C. Cir. 2019) (same). Regulation B passes muster under this deferential standard.[8] *Chevron*, 467 U.S. at 844.

Far from being arbitrary and capricious, Regulation B's prohibition of discouragement is reasonable. "ECOA was [ ] enacted in 1974 to prohibit discrimination in credit transactions." *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 975 (7th Cir. 2004). Regulation B's prohibition on the discouragement of prospective credit applicants furthers this purpose. Absent this prohibition, a discriminating lender could easily frustrate the intent of Congress by discouraging applications on the basis of race, sex, or any of the other protected categories listed in § 1691(a). Indeed, there may be no more obvious way to frustrate the central purpose of ECOA than by discouraging prospective applicants. After all, a creditor's ability to deprive an individual of the fair opportunity to obtain credit does not commence with the submission of an application. Discouraging prospective applicants accomplishes the same odious goal. Hanging a "Whites Only" sign in front of a loan office can be just as effective as ripping up an application because of the applicant's race.

The logic of Regulation B should be self-explanatory, but if there is any doubt, the *Teamsters* case eliminates it. In *Teamsters*, which arose in the employment context, the Supreme Court recognized that a person who declines to submit a "formal application solely because of his unwillingness to engage in a futile gesture

---

[8] Asking whether the regulation reflects a "reasonable interpretation" of the statute, *Chevron*, 467 U.S. at 844, yields the same conclusion: The regulation is valid. Indeed, the agency's interpretation would be upheld even if no deference were appropriate, for it is correct.

[ ] is as much a victim of discrimination as is [a person] who goes through the motions of submitting an application." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977). Just so here: the discouragement rule recognizes that discrimination in the credit markets, as in the job market, does not necessarily start at the application threshold.

Indeed, as the *Teamsters* Court explained in language just as applicable to the credit market as to the employment market, "[i]f an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Id.* at 365. Nor must the discrimination be as obvious as a "Whites Only" sign to be effective and, therefore, in need of elimination. *Id.* ("The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices[,] by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups."). In short, discriminatory discouragement would frustrate ECOA's purposes and evade the statute's requirements, and the Bureau—like the Board before it—acted reasonably to police this pernicious conduct.

ECOA's legislative history provides further support for the Bureau's interpretation. A precursor to the bill that became ECOA would have empowered

the Board to issue regulations that are "necessary and proper" to the fulfillment of the law's purposes. H.R. 14856, 93d Congress (1974). The Board expressed concern about whether that grant of authority would "prove too narrow," and suggested instead that Congress "delegate broader regulatory authority" modeled on TILA. *H.R. 14856 and H.R. 14908: Hearing Before the H. Comm. on Banking and Currency* ("Hearing on H.R. 14856"), 93d Cong. 72 (1974). The Board noted that TILA's grant of authority had already "withstood several litigation challenges … and thus appears to be an appropriate model." *Id.*; *see also id.* at 326-27 (statement of representative of National Bankamericard Incorporated urging Congress to rely on TILA's broader rulemaking provision to "avoid unnecessary litigation"). Congress agreed. It endowed the agency with the broad grant of authority contained in TILA, including the ability to prevent the "evasion" and "circumvention" of ECOA. 1974 U.S.C.C.A.N. 6148, 6153 ("The flexibility of the regulatory authority was broadened."). More broadly, the legislative history makes clear that Congress empowered the Board to issue rules to implement ECOA precisely because it approved of the job that the Board did in enacting regulations under TILA, which, of course, included the rule blessed by the Supreme Court in *Mourning*. *See, e.g.*, Hearing on H.R. 14856 at 54 ("[W]e all know that under Governor Robertson's direction, the Fed did a magnificent job in drafting Regulation Z, and won our confidence and respect as, believe it or not, a consumer agency.") (Cong. Sullivan, Chair of Subcommittee).

What is more, in March 1976, just one day after Congress passed the bill that would extend ECOA to cover race discrimination (among other things), the Senate Committee on Banking, Housing, and Urban Affairs kicked off "two days of oversight hearings on equal opportunity in lending enforcement by the bank regulatory agencies." *Equal Opportunity in Lending: Hearing Before the of S. Comm. on Banking, Housing, and Urban Affairs*, 94th Cong., 1 (1976). The Committee members generally expressed concern about the laxity of the agencies' enforcement efforts. *See, e.g., id.* at 1, 2. And, relevant for purposes of this case, this concern included worries about more "sophisticated" forms of credit discrimination that are "hard[ ] to ferret out." *Id.* at 29-30 (Sen. Biden). The Board recognized that the more nuanced forms of discrimination include that "a person can be discouraged from filing a loan application" at the "pre-application stage." *Id.* at 30. Regulation B's prohibition of discouragement responds to this very problem.

In addition, the legislative history of the 1991 amendments confirms the commonsense understanding that, when Congress referred, in § 1691e(g), to discouraging applications in violation of ECOA, it was referring to the discouragement of prospective applicants (as well as applicants). One Senate report explains, that, under Regulation B, "[d]iscouraging applications on a prohibited basis and advertising which implies a discriminatory preference are also prohibited." S. Rep. 102-167, at *86, 93, n.8 (Oct. 1, 1991). The Senate Report's reference to (i) Regulation B and (ii) pre-application advertising makes it even harder to credit Defendants' view that § 1691e(g)'s use of the phrase "discouraging

applications for credit" does not refer to pre-application conduct. Other references to discouragement in the legislative history confirm that Congress was focused on conduct that would discourage consumers from filing applications in the first place. *See Discrimination in Home Mortgage Lending: Hearing Before the Subcomm. on Consumer and Regul. Affs. of the S. Comm. on Banking, Housing, and Urban Affs.*, 101st Cong. 5 (1989) (noting that in the short period spent on site, "examiners may also not be able to detect the, I hope, isolated instances in which certain applicants are discouraged, perhaps in very subtle ways, before an application is actually filed") (John LaWare, Governor, Fed. Reserve Bd.), 273 ("I'm trying to figure out how you do that at the pre-application . . . A black person comes in to make a loan. And there's this discouragement factor. Oh, we don't know, and so no encouragement, and they kind of discourage the person from pursuing the loan process much further.") (Sen. Alan Dixon); *Reports from Thrift Regulatory Agencies and the Department of HUD on the Evil of Racial Discrimination in Home Mortgage Lending and the Inadequate Regulatory Response to the Situation, Hearing Before S. Subcomm. on Consumer and Reg. Affairs of the Comm. on Banking Housing and Urban Affairs*, 101st Cong.108 (1990) ("Well let me say that we are finding some instances where applicants may not have been given the full opportunity to provide a written application; we're concerned about that.") (Jerauld Kluckman, Director, Compliance Programs, Office of Thrift Supervision), 144 ("I hear what you're saying. These are all those practical things that one can do to discourage initially the pursuit of the application for a loan.") (Sen. Dixon).

38

Finally, a different kind of history, namely, the long history of Regulation B, also supports the Bureau's interpretation of ECOA. Regulation B, with its express prohibition of discouragement, was first implemented 48 years ago. It has applied to prospective applicants for all of that time and has never operated without this safeguard. This history supports the rationality of the Bureau's interpretation: "agency interpretations that are of long standing come before us with a certain credential of reasonableness, since it is rare that error would long persist." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 740 (1996). And because of this "credential of reasonableness," courts will "normally accord particular deference to an agency interpretation of longstanding duration." *Barnhart v. Walton*, 535 U.S. 212, 220 (2002); *see also, e.g., Fournier v. Sebelius,* 718 F.3d 1110, 1121 (9th Cir. 2013) (deciding that a 46-year-old interpretation merited deference)*; Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, 638 F.3d 807, 815 (D.C. Cir. 2011) (holding that 20-year-old interpretation deserved deference). Thus, the longevity of the interpretation of ECOA reflected in Regulation B bolsters the case for upholding it.

In view of the relevant considerations, the Bureau's interpretation of ECOA to permit Regulation B's protection of prospective applicants is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

## CONCLUSION

The judgment of the district court should be reversed.

Dated:  June 14, 2023                        Respectfully submitted,

                                                          */s/ Justin M. Sandberg*

Seth Frotman
    *General Counsel*
Steven Y. Bressler
    *Deputy General Counsel*
Christopher Deal
    *Assistant General Counsel*
Justin M. Sandberg
    *Senior Counsel*
    Counsel of Record
Lauren Gorodetsky
    *Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7043 (Sandberg)
(202) 435-7560 (Gorodetsky)
justin.sandberg@cfpb.gov
lauren.gorodetsky@cfpb.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Federal Rule of

Appellate Procedure 32(a)(7) and Circuit Rule 32(c). It contains 10,370 words,

excluding the portions exempted by Federal Rule 32(f).


*/s/ Justin M. Sandberg*
Justin M. Sandberg

## **CIRCUIT RULE 30(d) CERTIFICATE**

The Bureau's attached required short appendix includes all of the materials

required by Circuit Rule 30(a) and (b).

_/s/ Justin M. Sandberg_
Justin M. Sandberg

# APPENDIX

# TABLE OF CONTENTS - SHORT APPENDIX

Memorandum Opinion and Order, *CFPB v. Townstone*, 20-CV-4176,
ECF No. 110 (N.D. Ill. February 3, 2023)......................................................A001

Judgment in a Civil Case, *CFPB v. Townstone*, 20-CV-4176,
ECF No. 111 (N.D. Ill. February 3, 2023)......................................................A027

15 U.S.C. § 1691............................................................................................A028

15 U.S.C. § 1691a..........................................................................................A031

15 U.S.C. § 1691b..........................................................................................A032

15 U.S.C. § 1691e..........................................................................................A034

12 C.F.R. § 1002.4.........................................................................................A037

**I**n the **U**nited **S**tates **D**istrict **C**ourt
for the **N**orthern **D**istrict of **I**llinois
**E**astern **D**ivision

| | |
|---|---|
| BUREAU OF CONSUMER FINANCIAL PROTECTION,<br><br>    Plaintiff,<br><br>    v.<br><br>TOWNSTONE FINANCIAL, INC. and BARRY STURNER,<br><br>    Defendants. | No. 20-cv-4176<br>Judge Franklin U. Valderrama |

**M**emorandum **O**pinion and **O**rder

The Equal Credit Opportunity Act (ECOA) makes it "unlawful for any creditor to discriminate against any applicant with, respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age . . . ." 15 U.S.C. § 1691(a). The ECOA's implementing regulation, Regulation B, extends the ECOA's prohibition to "prospective applicants." 12 C.F.R. § 1002.4(b). The Bureau of Consumer Financial Protection (CFPB) filed this lawsuit against Townstone Financial, Inc. (Townstone), a mortgage broker/lender and its owner Barry Sturner (Sturner) (collectively, Defendants) for allegedly discouraging prospective African-American applicants in the Chicago metropolitan area from applying for mortgages. R. 27, First Amended Complaint (FAC).[1] Defendants have moved to dismiss the FAC with prejudice. R. 31, Mot. Dismiss. For the following reasons, Defendants' motion to dismiss is granted.

---

[1]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

## Background

### I.    The Parties

The CFPB is an independent agency of the United States created by the Consumer Financial Protection Act of 2010 (CFPA), with authority to enforce the CFPA and ECOA. FAC ¶ 8.[2] Townstone is a mortgage broker/lender headquartered in Chicago, which operates in Illinois, Indiana, Michigan, Wisconsin, and Florida. *Id.* ¶ 9. Most of Townstone's mortgage lending and brokering takes place in the Chicago-Naperville-Elgin Metropolitan Statistical Area (Chicago MSA). *Id.* ¶¶ 4, 9. Sturner is Townstone's co-founder, sole owner, sole director, President, and Chief Executive Officer. *Id.* ¶ 13. Sturner is also a loan officer. *Id.*

### II.    The Townstone Financial Show

Starting as early as 2014, Townstone has marketed its services through its own radio show and podcast called "The Townstone Financial Show." FAC ¶ 24. The Townstone Financial Show was conducted weekly on AM radio and reached the entire Chicago MSA. *Id.* ¶ 29. A weekly podcast of the radio show is also made available online, and the show has been streamed on Facebook Live and advertised on Facebook, Twitter, and LinkedIn. *Id.* The Townstone Financial Show is a long-form commercial advertisement, in which the hosts discuss mortgage-related issues on the show and take questions from prospective applicants. *Id.* ¶ 26. Since about January 2015, the Townstone Financial Show has been co-hosted by Sturner and another

---

[2]The Court accepts as true all of the well-pled facts in the FAC and draws all reasonable inferences in favor of the CFPB. *Smith v. City of Chicago*, 3 F.4th 332, 334 n.1 (7th Cir. 2021) (internal citation omitted).

2

senior loan officer. *Id.* ¶ 27. Townstone's website and the Townstone Financial Show characterize the hosts of the Townstone Financial Show as "Chicago real-estate experts." *Id.* ¶ 28.

The Townstone Financial Show has allegedly included statements that would discourage African-American prospective applicants from applying for mortgage loans from Townstone. FAC ¶ 32. For instance, during a January 2014 broadcast of the Townstone Financial Show, a caller from Markham, Illinois, a city with an 80.3% African-American population, asked how he and his wife could improve their credit scores. *Id.* ¶ 33. The Townstone host responded that "[you've] got to keep those women in line over there in Markham." *Id.* The host went on to state that the caller should "stop spending freaking money [on his wife] and tell her to get a better job." *Id.* While discussing the couple's credit concerns, the host turned his comments toward Markham generally, claiming that "it's crazy in Markham on weekends" and stating, "I know, I've been to Markham." *Id.* "You drive very fast through Markham," he continued, "and you don't look at anybody or lock on anybody's eyes in Markham . . . . You look at your dashboard, you don't lock on anybody." *Id.*

In the same month, Townstone's then-president informed listeners on the Townstone Financial Show that it was a great time to buy, rent, and sell. FAC ¶ 34. The show's hosts, including a local realtor and a bankruptcy attorney, recommended that the listeners who were preparing a home for sale should take down their Confederate flags. *Id.*

3

**A003**

In a June 2016 episode of the Townstone Financial Show, Sturner volunteered his view of the South Side of Chicago, an area that is majority-African American. FAC ¶ 35. Sturner stated that the South Side of Chicago is "hoodlum weekend" between Friday and Monday, and that the police are "the only ones between that [area] turning into a real war zone and keeping it where it's kind of at." *Id.*

In January 2017, on the Townstone Financial Show, Sturner and the other hosts discussed a now-replaced grocery store in downtown Chicago that was part of the Jewel-Osco grocery-store chain. FAC ¶ 36. Sturner described "[having] to go to the Jewel on Division," which he referred to as "Jungle Jewel." *Id.* Sturner called the "Jungle Jewel" a "scary place," attributing his fear and the store's nickname to the "Jungle Jewel's" patrons who "packed" the store and "were people from all over the world." *Id.*

In a November 2017 episode, Townstone's senior loan officer discussed a recent skydiving experience and the ensuing "rush" from the jump. FAC ¶ 37. Another Townstone host responded that he thought skydiving was crazy, and suggested that someone who walked "through the South Side at 3AM." could get the "same rush." *Id.*

Despite African Americans making up 30% of the population of the City of Chicago, Townstone has not targeted any marketing toward African Americans in the Chicago MSA. FAC ¶ 40.

## III.    Applications from African-American Neighborhoods

Based on Home Mortgage Disclosure Act data from 2014 through 2017, Townstone received an average of 740 mortgage-loan applications each year. FAC

¶ 42. Townstone brokered an average of 60 total Federal Housing Administration and Veterans Administration home loans each year. *Id.*

Townstone has drawn few mortgage applications from African-American applicants throughout the Chicago MSA. FAC ¶ 43. From 2014 to 2017, for example, Townstone drew around 2,700 applicants, only 37 (1.4%) of which came from African Americans in the Chicago MSA. *Id.* During the same period, Townstone drew an average of five or six applications each year (0.8%, 0.8%, 0.7%, and 0.9% of all Townstone applications) for properties in high-African-American neighborhoods, even though such neighborhoods made up 13.8% of the Chicago MSA's census tracts. *Id.* ¶ 44. Of Townstone's five or six applications each year for properties in high-African-American neighborhoods (more than 80% African American), more than half each year were from non-Hispanic white applicants. *Id.*

Similarly, only 2.3%, 1.4%, 1.4%, and 2.2% of Townstone's applications for the years 2014 through 2017, respectively, came from applicants applying for mortgage loans for properties in majority-African-American areas, even though 18.7% of the Chicago MSA's census tracts were majority-African American. FAC ¶ 45. While Townstone drew 2.3%, 1.4%, 1.4%, and 1.3% of its applications for properties in majority-African-American neighborhoods from 2014 through 2017, respectively, Townstone's peers drew many times more—8.2%, 7.6%, 7.7%, and 8.1%. *Id.* ¶ 49.

## IV.    Procedural History

The CFPB filed suit against Defendants on July 15, 2020, R. 1, and amended its complaint on November 25, 2020, FAC. The three-count complaint alleges that:

(1) Townstone violated the ECOA, 15 U.S.C. § 1691(a), and its implementing regulation, Regulation B, 12 C.F.R. § 1002.4(b) (Count I); (2) Townstone violated the CFPA, 12 U.S.C. § 5536(a)(1)(A) (Count II); and (3) Sturner fraudulently transferred assets in violation of 28 U.S.C. §§ 3301–3308. FAC ¶¶ 53–78. Defendants have moved to dismiss the FAC. Mot. Dismiss. Defendants subsequently filed a motion for leave to file a notice of supplemental authority regarding *W. Virginia v. Env't Prot. Agency*, 213 L. Ed. 2d 896, 142 S. Ct. 2587 (2022). R. 65; R. 67. The CFPB responded to Defendants' notice of supplemental authority. R. 71.[3] The Court subsequently held an in-person hearing on Defendants' motion to dismiss the FAC. R. 74.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

---

[3]In *West Virginia*, the Supreme Court held that the Environmental Protection Agency (EPA) did not have authority to adopt the regulation at issue because it raised a "major question" of "economic and political significance" as to which Congress had not clearly delegated authority to the EPA. 142 S. Ct. at 2613. The Court has considered Defendants' arguments as to the applicability of *West Virginia* to this case, R. 67, and the CFPB's response, R. 71, and agrees with the CFPB that the major-questions doctrine is unimportant to the issue presented here.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## Analysis

### I.     The ECOA and Regulation B (Count I)

The CFPB alleges that Townstone's acts and practices would discourage African-American prospective applicants, as well as prospective applicants in majority- and high-African-American neighborhoods in the Chicago MSA from seeking credit, in violation of Regulation B and the ECOA. FAC ¶¶ 54–55.

The ECOA provides, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . ." 15 U.S.C. § 1691(a). The ECOA was a landmark civil rights law enacted in 1974 to protect individuals and businesses against discrimination in accessing and using credit, "a virtual necessity of life" for most Americans. S. Rep. No. 94-589, at 3–4 (1976); *see also Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 975 (7th Cir. 2004) (the ECOA enacted to prohibit discrimination in credit transactions).

In Section 1691b of the ECOA, Congress directed, first the Federal Reserve Board, and then the CFPB,[4] to make regulations to carry out the purposes of the ECOA:

> The Bureau shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith.

15 U.S.C. § 1691b(a).

The resulting regulations enacted in 1975, known collectively as Regulation B, provide in pertinent part:

> Discouragement. A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

12 C.F.R. § 1002.4(b).

Defendants move to dismiss Count I based on Regulation B and the ECOA, arguing that the CFPB improperly attempts to expand the ECOA's reach beyond the express and unambiguous language of the statute. R. 32, Memo. Dismiss at 5 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984)). Specifically, Defendants argue that while the ECOA regulates behavior towards applicants for credit, it does not regulate any behavior relating to prospective

---

[4] In 2010, Congress transferred the Federal Reserve Board's rulemaking authority to the CFPB. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2083–84 (2010); *see Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1208 n.9 (11th Cir. 2019).

applicants who have not yet applied for credit. Memo Dismiss at 4. The CFPB responds that Regulation B's longstanding discouragement prohibition is authorized by and necessary to the ECOA, and that courts have consistently recognized Regulation B's discouragement prohibition, even when applied to prospective applicants. R. 35, Resp. at 8–10 (citing *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017); *Dhade v. Huntington Learning Centers, Inc.*, 414 F. Supp. 3d 703 (D. Del. 2019); *Page v. Midland Fed. Sav. & Loan Ass'n*, 2013 WL 5211747, at \*5 (N.D. Ill. Sept. 13, 2013)).

The parties' arguments present the question of whether the agency's interpretation of the ECOA in Regulation B is one that the ECOA permits. The Court approaches that inquiry, as it must, "through the two-step framework set forth in *Chevron*[.]" *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (citing *Chevron*, 467 U.S. 837). The first step of *Chevron* is to determine "whether Congress has directly spoken to the precise question at issue." *Id.* (internal quotation marks omitted). If Congress has spoken to the precise question at issue "unambiguously," then "that is the end of it: the agency and courts alike are bound by what Congress wrote." *Id.* However, if Congress has "not spoken clearly," the court moves on to step two, in which the court "consider[s] whether the agency's interpretation reflects a permissible construction of the statute." *Id.*

## A. *Chevron* Step One

Turning to step one of *Chevron*, as stated above, the Court looks to the text of the ECOA to determine "whether Congress has directly spoken to the precise question

9

at issue," *Wolf*, 962 F.3d at 221, namely, whether the ECOA prohibits discouragement of prospective applicants on the basis of race. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Turley v. Gaetz*, 625 F.3d 1005, 1008 (7th Cir. 2010) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)) (internal quotation marks omitted). "Statutory interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013) (internal quotation marks and citation omitted). "Indeed, statutory interpretation is a holistic endeavor and, at a minimum, must account for the statute's full text, language as well as punctuation, structure, and subject matter." *Trs. of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996) (internal quotation marks and citation omitted); *see also Estate of Moreland v. Dieter*, 576 F.3d 691, 699 (7th Cir. 2009).

The ECOA states that "[i]t shall be unlawful for any creditor to *discriminate against any applicant*, with respect to any aspect of a credit transaction—*on the basis of race*, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . ." 15 U.S.C. § 1691(a) (emphases added). The ECOA further defines "applicant" to mean "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor

indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." *Id.* § 1691a(b).

The plain text of the ECOA thus clearly and unambiguously prohibits discrimination against *applicants*, which the ECOA clearly and unambiguously defines as a person who applies to a creditor for credit. 15 U.S.C. §§ 1691(a), 1691a(b). The Court therefore finds that Congress has directly and unambiguously spoken on the issue at hand and only prohibits discrimination against applicants. As such, "that is the end of it," *Wolf*, 962 F.3d at 221, and the Court need not move on to the second step of the *Chevron* analysis because it is clear that the ECOA does not apply to prospective applicants.[5] The Court consequently affords no deference to 12 C.F.R. § 1002.4. *See, e.g.*, *Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1173 (9th Cir. 1999) (affording no weight to 28 C.F.R. § 35.140(a), having found that "Congress unambiguously expressed its intent for Title II not to apply to employment"); *Patterson v. Illinois, Dep't of Corr.*, 35 F. Supp. 2d 1103, 1108 (C.D. Ill. 1999) (same).

Case law supports the Court's interpretation of the ECOA. The Seventh Circuit similarly found the ECOA's definition of "applicant" to be unambiguous in *Moran Foods, Inc. v. Mid-Atlantic Market Development Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007), a case cited by Defendants. There, Susan Camp, a party who had guaranteed her husband's debt, brought a counterclaim alleging that a grocery store had violated

---

[5]Because the Court finds that the ECOA unambiguously applies to "applicants" and not "prospective applicants," the Court does not analyze whether the ECOA's prohibition on "discrimination" encompasses "discouragement." The Court likewise does not reach Defendants' argument that the CFBP is attempting to create affirmative obligations with respect to marketing and the hiring of loan officers, nor its arguments under the First and Fifth Amendments. Memo. Dismiss at 8–9, 12–23.

the ECOA by discriminating against her based on her marital status. *Id.* at 437. Camp obtained a jury verdict on her ECOA counterclaim. *Id.* On appeal, Camp asked to be awarded the attorney's fees that she incurred in litigating her ECOA case and pursued additional relief under the ECOA. *Id.* at 437–38.

In assessing Camp's ECOA claim, the Seventh Circuit initially concluded that she was not an applicant at all: "Susan Camp was not an applicant for credit, and neither received credit nor was denied it. Instead, she guaranteed her husband's debt and by doing so enabled his company to buy groceries from Moran on credit." *Moran*, 476 F.3d at 441. The court recognized, however, that the Federal Reserve Board had "defined 'applicant' for credit (the term in the statute) to include a guarantor." *Id.* (citing 12 C.F.R. §§ 202.2(e), 202.7(d)). While the Seventh Circuit acknowledged that "courts defer to administrative interpretations of statutes when a statute is ambiguous," the court found that "there is nothing ambiguous about ' applicant' and no way to confuse an applicant with a guarantor." *Id.* (citations omitted). The court in *Moran* elaborated that "to interpret 'applicant' as embracing 'guarantor' opens vistas of liability that the Congress that enacted the Act would have been unlikely to accept." *Id.*[6] So too here, the Court doubts that the ECOA can be "stretched far

---

[6]Ultimately, the court in *Moran* found that even if the Federal Reserve Board's interpretation were authorized, Camp's ECOA claim "must lose because she failed to prove discrimination." 476 F.3d at 441. The court therefore reversed the judgment of the district court. *Id.* at 442. As a result, the Seventh Circuit's ECOA discussion in *Moran* is non-binding dicta. *See FirstMerit Bank, N.A. v. Ferrari*, 71 F. Supp. 3d 751, 758–59 (N.D. Ill. 2014). Even so, the analysis provides a straightforward interpretation of the ECOA, which the Court finds persuasive.

enough" to interpret a prohibition of discrimination against *applicants* as prohibiting discrimination of *prospective applicants. Id.*

Defendants direct the Court to other Court of Appeals decisions as well, which hold that an "applicant" does not encompass a "guarantor" under the ECOA. Memo. Dismiss at 7 (citing *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 942 (8th Cir. 2014); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1193 (11th Cir. 2019)). Both decisions buttress this Court's finding that no deference is owed to Regulation B's anti-discouragement provision for prospective applicants.

In *Hawkins*, for example, the plaintiffs, guarantors, brought an ECOA claim alleging that the defendant bank discriminated against them based on their marital status. 761 F.3d at 939. The district court granted summary judgment against the plaintiffs, holding that they did not constitute "applicants" under the ECOA. *Id.* at 940. On appeal, the plaintiffs insisted they could bring a claim under the ECOA because 12 C.F.R. § 202.2(e) of Regulation B provided that the definition of "applicant" included a guarantor. *Id.* Observing that the case turned on whether the court should defer to Regulation B Section 202.3(e)'s definition of "applicant," which would allow the plaintiffs' suit, the court applied the *Chevron* two-step framework. *Id.* At step one, the Eighth Circuit found that the "text of the ECOA clearly provides that a person does not qualify as an applicant under the statute solely by virtue of executing a guaranty to secure the debt of another." *Id.* at 941. The court looked to the ECOA's definition of "applicant," reviewed the dictionary definition for "apply," and concluded that "the plain language of the ECOA unmistakably provides that a

person is an applicant only if she requests credit." *Id.* (citing 15 U.S.C. § 1691a(b); Webster's Third New International Dictionary 105 (2002)). "Because the text of the ECOA is unambiguous regarding whether a guarantor constitutes an applicant," the Eight Circuit stopped after *Chevron* step one and did not defer to the agency's interpretation of applicant. *Id.* at 942.

In *Regions Bank*, defendants who had been sued for breach of promissory notes and breach of guaranties brought counterclaims alleging they were discriminated against on the basis of marital status in violation of the ECOA. 936 F.3d at 1187. After losing on summary judgment, the defendants appealed, relying on the definition of "applicant" in Regulation B to argue that they could bring their ECOA counterclaims. *Id.* at 1190. The Eleventh Circuit, like the Eighth, applied the two-step *Chevron* framework to determine whether it owed deference to Regulation B's interpretation of "applicant." *Id.* Because the court "agree[d] with the Seventh and Eighth Circuits that the ordinary meaning of 'applicant' does not encompass a guarantor," the Eleventh Circuit concluded that no deference was due Section 202.2(e). *Id.* at 1193 (citing *Moran*, 476 F.3d at 441; *Hawkins*, 761 F.3d at 942). *But see RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 385 (6th Cir. 2014) (proceeding to *Chevron* step two and deferring to section 202.2(e) on theory that the term "applies" is ambiguous and that guarantors qualify as requesting credit because they "make formal requests for aid in the form of credit for a third party").

14

The CFPB attempts to distinguish Defendants' authority by arguing that the cases are inapposite because they analyze whether a "guarantor" is within the definition of "applicant" for purposes of bringing a private action under the ECOA. Resp. at 8–9. The CFPB posits that neither the definition of "applicant," nor the question of whether a private right of action exists, is at issue in this case. *Id.* at 9. True, the cases cited by Defendants involved the question of whether individual guarantors could maintain an action under the ECOA. But the analysis employed by the courts to resolve the issue in those cases provides a sound framework to resolve the issue in this case.

The CFPB argues that it has more expansive enforcement powers than the private right of action, and moreover, its authority to prohibit discouragement of "prospective applicants" does not require stretching the term "applicant" to encompass "prospective applicants." *Id.* The Court disagrees.

The CFPB's authority to enact regulations is not limitless. Under Section 1691b, the CFPB "shall prescribe regulations to carry out the purposes of [the ECOA]." 15 U.S.C. § 1691b(a). While the delegating section is, no doubt, broad,[7] the ECOA explicitly defines its "Scope of prohibition" as: "[i]t shall be unlawful for any creditor to discriminate against any *applicant*, with respect to any aspect of a credit transaction—on the basis of race[.]" *Id.* § 1691(a) (emphasis added). Indeed, the entire statutory scheme revolves around applicants. As Defendants point out, the word

---

[7]The CFPB, relying on the *Mourning* test, argues that the broad language in Section 1691b means that it can enact any regulations "reasonably related" to the purposes of the ECOA. Resp. at 6–7. As discussed further below, the CFPB cannot use the *Mourning* test to avoid the two-step *Chevron* framework. *See infra* Section I.B.

"applicant" is used twenty-six times in the statute, and the statute does not prohibit or discuss conduct prior to the filing of an application. *See* Memo. Dismiss at 4. So, contrary to the CFPB's position, the statute's expression of "applicant," is essential to understanding whether the CFPB can regulate with respect to "prospective applicants." The CFPB cannot regulate outside the bounds of the ECOA, and the ECOA clearly marks its boundary with the term "applicant."

The Court's reading of the ECOA, moreover, is not limited to the civil liability section of the ECOA, which provides that "[a]ny creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class." 15 U.S.C. § 1691e(a).[8] That is, the Court is not looking exclusively at the private right of action section of the ECOA to conclude that the whole act applies only to those who qualify as proper plaintiffs under that section. While this case may not present the specific issue of whether a private right of action exists for a private prospective applicant under Section 1691e, Count I, nevertheless,

---

[8]By contrast, the holding in one of the cases relied on by the CFPB, *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698 (5th Cir. 2017), was limited to the court's interpretation of the civil liability section, Section 1691e. There, the court found, without applying the *Chevron* framework, that "[d]iscouragement of a 'prospective applicant' may be regulatorily prohibited, but it cannot form the basis of a private claim or cause of action under the ECOA." *Id.* at 708. The Court finds *Alexander* of limited utility because the court did not address whether the court should defer to Regulation B under the two-step *Chevron* framework. Similarly, in *Dhade*, 414 F. Supp. 3d at 707, another case relied on by the CFPB limited to a claim brought under the civil liability section, the court found that Regulation B did not expand the definition of "applicant" to include "prospective applicant" in Section 1691e. Although the court noted that "the ECOA vested the CFPB with enforcement powers that are more expansive than the private right of action," it also applied *Chevron* step one to find that "[t]here is nothing ambiguous about 'applicant,'" meaning the court should not defer to an agency's interpretation of the statute. *Id.* at 706–07.

16

cannot stand if it is based on a portion of Regulation B to which the Court owes no deference. Put another way, the ECOA says nothing about "prospective applicants," so if the Court does not defer to Regulation B, Count I fails to state a claim, regardless of Section 1691e. *C.f. Dhade*, 414 F. Supp. 3d at 707.

To further rebut Defendants' authority, the CFPB cites to cases which purportedly acknowledge and treat Regulation B's discouragement of prospective applicants as presumptively valid. Resp. at 9–10 (citing *Treadway*, 362 F.3d at 979–80; *Harbaugh v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 615 F.2d 1169, 1174 (7th Cir. 1980)). Yet, a court's acknowledgment of—or even reliance on—a regulation, when the validity of that regulation is not dispute, does not help the Court resolve the *Chevron* deference question at play here. The CFPB points to *Page*, 2013 WL 5211747, at *5, in which the court rejected Defendant's argument that the individual plaintiff's claim under the civil liability provision failed because she never submitted an application. The court looked to Regulation B's language and found that "the ECOA applies to all stages of a credit transaction." *Id.* However, the court did not engage in the two-step *Chevron* analysis to determine whether the court should defer to Regulation B. *Id.* After applying the *Chevron* analysis, the Court respectfully disagrees with the court's deference to Regulation B in *Page*. The CFPB cites to no authority in which a court engaged in a *Chevron* analysis and after doing so, deferred to the anti-discouragement provision in Regulation B. For the reasons stated above, the Court finds that, when applying step one of *Chevron*, it cannot defer to Regulation

17

B's anti-discouragement provision of with respect to "prospective applicants," no matter how desirable it might be to do so as a policy matter.

## B. The CFPB's Reliance on the *Mourning* Standard

Rather than engage in any *Chevron* analysis, the CFPB attempts to skirt the *Chevron* framework by emphasizing the broad language of the delegation provision of the ECOA, Section 1691b. Resp. at 6 (citing 15 U.S.C. § 1691b(a)). According to the CFPB, "Congress understood that additional rules may be necessary to prevent evasion of [the] ECOA's prohibitions and expressly instructed the Board, then the [CFPB], to enact any such rules." *Id.* The CFBP essentially suggests that Congress gave the CFPB rulemaking carte blanche in Section 1691b. In support, the CFPB directs the Court to a similar "anti-evasion provision" in the Truth in Lending Act (TILA), 15 U.S.C. § 1604(a)), as well as a pre-*Chevron* case interpreting the TILA, *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356 (1973). *Id.* at 6–7.

In *Mourning*, the Supreme Court addressed whether the Federal Reserve Board had exceeded its authority under the TILA in promulgating a portion of its Regulation Z, commonly referred to as the "Four Installment Rule." 411 U.S. at 358. Section 121 of the TILA required merchants who regularly extend credit with attendant finance charges to disclose certain contract information. 15 U.S.C. § 1631. The Federal Reserve Board promulgated Regulation Z, which required disclosure under Section 121 of the TILA whenever credit is offered to a consumer "for which either a finance charge is or may be imposed or which pursuant to an agreement, is or may be payable in more than four installments." 411 U.S. at 362 (citing 12 CFR

§ 226.2(k)). To determine whether the Federal Reserve Board had exceeded its rulemaking authority, the Supreme Court looked to the delegation provision of the TILA, Section 105, which provided that the Federal Reserve Board "shall prescribe regulations to carry out the purposes of (the Act). These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of (the Act), to prevent circumvention or evasion thereof, or to facilitate compliance therewith." 15 U.S.C. § 1604.

From this language, the Supreme Court found that Congress gave the Federal Reserve Board "broad authority to promulgate regulations necessary to render the Act effective." 411 U.S. at 365. Specifically, the Court in *Mourning* highlighted both the general grant of authority to promulgate regulations designed to carry out the purposes of the act, as well as the language in Section 105 allowing regulations that may define classifications and exceptions to ensure compliance with the TILA. *Id.* Under the applicable precedent at the time, where an empowering provision of a statute, like Section 105, gave the agency the power to make such rules and regulations as may be necessary to carry out the act, the validity of a regulation promulgated under such an empowering provision would be sustained, so long as it was "reasonably related to the purposes of the enabling legislation." 411 U.S. at 369 (internal quotation marks and citations omitted). The Supreme Court therefore upheld the "Four Installment Rule" because the rule was reasonably related to the

19

TILA's objectives of preventing the evasion of its reporting requirements by concealing credit charges. *Id*. at 371.

The CFPB submits that, per the *Mourning* decision, the anti-discouragement provision of Regulation B must be sustained, so long as it is reasonably related to the ECOA's objectives. Resp. at 7. The Seventh Circuit, contends the CFPB, "has likewise held that rules necessary to render TILA effective must be sustained so long as they are reasonably related to the legislation's purposes." *Id*. (citing *Muro v. Target Corp.*, 580 F.3d 485, 494 n.9 (7th Cir. 2009)). However, neither *Mourning* nor *Muro* permits this Court to dodge the two-step *Chevron* framework.

First and foremost, the Supreme Court mandates that a court faced with a disputed agency interpretation must apply *Chevron*. In *City of Arlington, Tex. v. F.C.C.*, for example, the Supreme Court rejected using a non-*Chevron* standard when an agency interprets the scope of its own statutory authority. 569 U.S. 290, 296–97 (2013). The Supreme Court held that the *Chevron* framework applied, reasoning that "[n]o matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *Id*. at 297 (emphasis in original). And in an earlier, post-*Mourning* case analyzing the TILA, the Supreme Court approached a regulation, not by asking whether the Federal Reserve Board's interpretation was reasonably related to TILA's objectives (the *Mourning* test), but by asking whether the statute had spoken on the issue (*Chevron* step one): "In determining whether the Board was empowered to make such a change, we begin, of

course, with the language of the statute. If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368 (1986) (citing *Chevron*, 467 U.S. at 842–43); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92 (2002) (explaining that *Mourning* does not authorize agencies to "contravene Congress' will").

Seventh Circuit decisions, too, plainly require the Court to apply the *Chevron* framework when faced with a disputed agency interpretation that merits *Chevron* deference.[9] *See, e.g., Zaragoza v. Garland*, 52 F.4th 1006, 1019 (7th Cir. 2022) (applying two-step *Chevron* framework to decision of Attorney General interpreting federal immigration statutes); *Wolf*, 962 F.3d at 221 ("The overriding question is whether the agency's interpretation of the relevant statute is one the text will permit. We approach this inquiry through the two-step framework set forth in *Chevron*[.]"); *Khan v. United States*, 548 F.3d 549, 554 (7th Cir. 2008), *as amended* (Dec. 4, 2008) (reviewing general authority regulations under the two-step *Chevron* framework).

Because the *Chevron* framework reigns supreme, numerous courts have rejected similar agency attempts to eschew *Chevron* in favor of *Mourning*. For instance, Defendants point to *First Premier Bank v. U.S. Consumer Fin. Prot. Bureau,*

---

[9]An agency interpretation qualifies for *Chevron* step one when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *see also Brumfield v. City of Chicago*, 735 F.3d 619, 625–26 (7th Cir. 2013). This threshold question, sometimes referred to as "Chevron step zero," *see, e.g., Pugin v. Garland*, 19 F.4th 437, 441 (4th Cir. 2021), is not disputed in this case.

819 F. Supp. 2d 906, 909 (D.S.D. 2011). R. 38, Reply at 2–3. In *First Premier Bank*, a bank sued the CFPB, seeking a preliminary injunction to postpone and enjoin the effective date of an amendment to a credit card fee regulation. 819 F. Supp. 2d at 909. The bank attacked the regulation amendment under the Administrative Procedure Act. *Id.* at 911–12. In analyzing the disputed regulation amendment, the court applied the two-step *Chevron* framework. *Id.* at 914. The CFPB argued that the *Chevron* framework did not apply, citing *Mourning* and two other pre-*Chevron* cases. *Id.* at 917 (citing *Anderson Bros. Ford v. Valencia*, 452 U.S. 205 (1981); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980); *Mourning*, 411 U.S. 356). The court rejected the CFPB's contention, stating "the language of *Mourning* and its progeny make sense standing alone only in a pre-*Chevron* setting" in which "'pre-*Chevron* courts frequently looked to the relative competence of the agency and the court in deciding the matter in question.'" *Id.* at 917–18 (quoting *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B.*, 46 F.3d 82, 90 (D.C. Cir. 1995)).

Similarly in *Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, the National Indian Gaming Commission argued that its minimum internal control standards for a casino should be sustained under *Mourning*, as the rules were "reasonably related to the statutory purposes of the [Indian Gaming Regulatory Act]." 383 F. Supp. 2d 123, 143 (D.D.C. 2005), *aff'd*, 466 F.3d 134 (D.C. Cir. 2006). The court disagreed, explaining that "courts and agencies 'are bound, not only by the ultimate purposes Congress has selected but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Id.* (quoting *MCI Telecommunications*

*Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994)). The court concluded that

"although *Mourning* stated that a broad grant of rule-making authority allows an

agency to issue regulations that are 'reasonably related to the purposes of the

enabling legislation,' courts have consistently read this language to describe a

heightened level of deference that is due the agency's interpretation of an ambiguous

statute under *Chevron* step two, *rather than a warrant to override a clear statute*

*under Chevron step one.*" *Id.* at 144 & n.15 (emphasis added) (collecting cases).

The Court joins *First Premier Bank* and *Colorado River Indian Tribes* in

declining the agency's invitation to bypass *Chevron* by way of *Mourning*. The Court

further sides with the numerous courts who have held that *Mourning*'s application

belongs, if anywhere, in *Chevron* step two. *See, e.g.*, *Merck & Co. v. United States*

*Dep't of Health & Hum. Servs.*, 385 F. Supp. 3d 81, 88–89 (D.D.C. 2019), *aff'd*, 962

F.3d 531 (D.C. Cir. 2020) (rejecting agency's attempt to circumvent *Chevron* in light

of *Mourning* and collecting cases situating *Mourning* with *Chevron*'s second step);

*Chamber of Com. of U.S. v. N.L.R.B.*, 721 F.3d 152, 161 (4th Cir. 2013) (holding

*Mourning* analysis only relevant once the court has determined that a statute is

ambiguous, concluding "*Mourning*'s exhortation that we 'defer to the informed

experience and judgment of the agency to whom Congress delegated appropriate

authority,' . . . cannot be read as requiring [the court] to defer to the agency's

interpretation as [the court] conduct[s its] initial analysis of the Act."); *Brackeen v.*

*Haaland*, 994 F.3d 249, 360 (5th Cir. 2021) (applying *Mourning* test in second step of

23

*Chevron*). Here, because the ECOA is unambiguous, the Court does not reach *Chevron* step two,[10] and *Mourning* is inapplicable.

The Seventh Circuit's *Muro* decision does not revive *Mourning*'s significance either. In *Muro*, the Seventh Circuit reviewed a district court's denial of class certification in an attempted TILA class action. 580 F.3d at 487. When interpreting Section 1637(a) of TILA, the court found that TILA was silent on "when an account is 'open.'" *Id.* at 493. Having found a gap in the statute, the court looked to Regulation Z's specification that initial disclosures must be made before the first transaction is made under the plan. *Id.* (citing 12 C.F.R. § 226.5(b)(1)). Dropping a footnote, the Seventh Circuit cited *Mourning* generally for the proposition that "[t]he provisions of Regulation Z are afforded substantial weight." *Id.* at 493 n.9. So, although the court in *Muro* cited *Mourning*, Regulation Z was not under review, and even if it were, the court only looked to *Mourning* after the court had determined that Congress had been silent on the issue the court was concerned with. *Muro* in no way stands for the proposition that a court can avoid the *Chevron* framework in light of *Mourning*.

In sum, the *Chevron* framework requires the Court to begin its analysis with the plain language of the ECOA. Because the Court finds the ECOA unambiguously prohibits discrimination of "applicants," and not "prospective applicants," the Court does not assess Regulation B for the soundness of its policy, the need for it in the

---

[10]Because the Court does not reach *Chevron* step two, the CFPB's arguments about legislative history and the ineffectiveness of the ECOA without Regulation B's anti-discouragement provision, *see* Resp. at 4–5, 7–8, are inapposite. *Coyomani-Cielo v. Holder*, 758 F.3d 908, 914 (7th Cir. 2014) (holding legislative history is reserved for *Chevron*'s second step, in which court deferentially determines whether the agency's interpretation is reasonable).

statute, or even whether it is reasonably related to the ECOA's objectives. To be clear, the Court appreciates the expertise of the CFPB in implementing the ECOA and commends its attempts to prevent the deplorable practice of discouraging people, on the basis of race, from applying for credit. The practice of limiting credit to individuals based on criteria other than creditworthiness is as odious as it is offensive. However, the Court is duty-bound to follow precedent, which means the Court can only defer to an agency's interpretation of a statute, no matter how laudable its purpose, when it survives the two-step *Chevron* framework. The anti-discouragement provision of Regulation B with respect to "prospective applicants" does not survive *Chevron* step one, so the Court does not defer to the CFPB's interpretation.

Accordingly, the CFPB's ECOA count is dismissed. The dismissal is with prejudice because any amendment would be futile. *See Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017). The CFPB cannot amend its pleading in a way that would change the language of the ECOA. Counts II and III, which are dependent on the CFPB's ECOA claim, *see* FAC ¶¶ 59–78, are likewise dismissed with prejudice.

## Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss the

FAC [31] and dismisses the FAC with prejudice. Civil case terminated.


Dated: February 3, 2023


United States District Judge
Franklin U. Valderrama

ILND 450 (Rev. 10/13) Judgment in a Civil Action

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

Bureau of Consumer Financial Protection,

Plaintiff(s),

v.

Townstone Financial, Inc. and Barry Sturner,

Defendant(s).

Case No.  20 C 4176
Judge Franklin U. Valderrama

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $ ,

       which ☐ includes     pre–judgment interest.
              ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒     in favor of defendant(s) Townstone Financial, Inc. and Barry Sturner.
and against plaintiff(s) Bureau of Consumer Financial Protection.

Defendant(s) shall recover costs from plaintiff(s).

---

☐     other:

---

This action was *(check one)*:

☐ tried by a jury with Judge     presiding, and the jury has rendered a verdict.
☐ tried by Judge     without a jury and the above decision was reached.
☒ decided by Judge Franklin U. Valderrama on a motion.

Date:  2/3/2023

Thomas G. Bruton, Clerk of Court

Analeah Charles, Deputy Clerk

**A027**

---

**15 USC 1691: Scope of prohibition**
Text contains those laws in effect on June 12, 2023

**From Title 15-COMMERCE AND TRADE**
    CHAPTER 41-CONSUMER CREDIT PROTECTION
    SUBCHAPTER IV-EQUAL CREDIT OPPORTUNITY
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **Amendments**
    **Effective Date**
    **Short Title**

---

## §1691. Scope of prohibition

**(a) Activities constituting discrimination**

It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction-

    (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

    (2) because all or part of the applicant's income derives from any public assistance program; or

    (3) because the applicant has in good faith exercised any right under this chapter.

**(b) Activities not constituting discrimination**

It shall not constitute discrimination for purposes of this subchapter for a creditor-

    (1) to make an inquiry of marital status if such inquiry is for the purpose of ascertaining the creditor's rights and remedies applicable to the particular extension of credit and not to discriminate in a determination of credit-worthiness;

    (2) to make an inquiry of the applicant's age or of whether the applicant's income derives from any public assistance program if such inquiry is for the purpose of determining the amount and probable continuance of income levels, credit history, or other pertinent element of credit-worthiness as provided in regulations of the Bureau;

    (3) to use any empirically derived credit system which considers age if such system is demonstrably and statistically sound in accordance with regulations of the Bureau, except that in the operation of such system the age of an elderly applicant may not be assigned a negative factor or value;

    (4) to make an inquiry or to consider the age of an elderly applicant when the age of such applicant is to be used by the creditor in the extension of credit in favor of such applicant; or

    (5) to make an inquiry under section 1691c–2 of this title, in accordance with the requirements of that section.

**(c) Additional activities not constituting discrimination**

It is not a violation of this section for a creditor to refuse to extend credit offered pursuant to-

    (1) any credit assistance program expressly authorized by law for an economically disadvantaged class of persons;

    (2) any credit assistance program administered by a nonprofit organization for its members or an economically disadvantaged class of persons; or

    (3) any special purpose credit program offered by a profit-making organization to meet special social needs which meets standards prescribed in regulations by the Bureau;

if such refusal is required by or made pursuant to such program.

**(d) Reason for adverse action; procedure applicable; "adverse action" defined**

    (1) Within thirty days (or such longer reasonable time as specified in regulations of the Bureau for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

    (2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by-

        (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

        (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

**A028**

(3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

(4) Where a creditor has been requested by a third party to make a specific extension of credit directly or indirectly to an applicant, the notification and statement of reasons required by this subsection may be made directly by such creditor, or indirectly through the third party, provided in either case that the identity of the creditor is disclosed.

(5) The requirements of paragraph (2), (3), or (4) may be satisfied by verbal statements or notifications in the case of any creditor who did not act on more than one hundred and fifty applications during the calendar year preceding the calendar year in which the adverse action is taken, as determined under regulations of the Bureau.

(6) For purposes of this subsection, the term "adverse action" means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

**(e) Copies furnished to applicants**

**(1) In general**

Each creditor shall furnish to an applicant a copy of any and all written appraisals and valuations developed in connection with the applicant's application for a loan that is secured or would have been secured by a first lien on a dwelling promptly upon completion, but in no case later than 3 days prior to the closing of the loan, whether the creditor grants or denies the applicant's request for credit or the application is incomplete or withdrawn.

**(2) Waiver**

The applicant may waive the 3 day requirement provided for in paragraph (1), except where otherwise required in law.

**(3) Reimbursement**

The applicant may be required to pay a reasonable fee to reimburse the creditor for the cost of the appraisal, except where otherwise required in law.

**(4) Free copy**

Notwithstanding paragraph (3), the creditor shall provide a copy of each written appraisal or valuation at no additional cost to the applicant.

**(5) Notification to applicants**

At the time of application, the creditor shall notify an applicant in writing of the right to receive a copy of each written appraisal and valuation under this subsection.

**(6) Valuation defined**

For purposes of this subsection, the term "valuation" shall include any estimate of the value of a dwelling developed in connection with a creditor's decision to provide credit, including those values developed pursuant to a policy of a government sponsored enterprise or by an automated valuation model, a broker price opinion, or other methodology or mechanism.

(Pub. L. 90–321, title VII, §701, as added Pub. L. 93–495, title V, §503, Oct. 28, 1974, 88 Stat. 1521 ; amended Pub. L. 94–239, §2, Mar. 23, 1976, 90 Stat. 251 ; Pub. L. 102–242, title II, §223(d), Dec. 19, 1991, 105 Stat. 2306 ; Pub. L. 111–203, title X, §§1071(b), 1085(1), title XIV, §1474, July 21, 2010, 124 Stat. 2059 , 2083, 2199.)

**Editorial Notes**

## Amendments

**2010**-Pub. L. 111–203, §1085(1), substituted "Bureau" for "Board" wherever appearing.

Subsec. (b)(5). Pub. L. 111–203, §1071(b), added par. (5).

Subsec. (e). Pub. L. 111–203, §1474, amended subsec. (e) generally. Prior to amendment, subsec. (e) read as follows: "Each creditor shall promptly furnish an applicant, upon written request by the applicant made within a reasonable period of time of the application, a copy of the appraisal report used in connection with the applicant's application for a loan that is or would have been secured by a lien on residential real property. The creditor may require the applicant to reimburse the creditor for the cost of the appraisal."

**1991**-Subsec. (e). Pub. L. 102–242 added subsec. (e).

**1976**-Subsec. (a). Pub. L. 94–239 designated existing provisions as cl. (1), expanded prohibition against discrimination to include race, color, religion, national origin and age, and added cls. (2) and (3).

Subsec. (b). Pub. L. 94–239 designated existing provisions as cl. (1) and added cls. (2) to (4).

Subsecs. (c), (d). Pub. L. 94–239 added subsecs. (c) and (d).

**A029**

STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2010 AMENDMENT

Pub. L. 111–203, title X, §1071(d), July 21, 2010, 124 Stat. 2059 , provided that: "This section [enacting section 1691c–2 of this title and amending this section] shall become effective on the designated transfer date."

[The term "designated transfer date" is defined in section 5481(9) of Title 12, Banks and Banking, as the date established under section 5582 of Title 12.]

Amendment by section 1085(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

Amendment by section 1474 of Pub. L. 111–203 effective on the date on which final regulations implementing that amendment take effect, or on the date that is 18 months after the designated transfer date if such regulations have not been issued by that date, see section 1400(c) of Pub. L. 111–203, set out as a note under section 1601 of this title.

### EFFECTIVE DATE

Section 708, formerly §707, of title VII of Pub. L. 90–321, as added by Pub. L. 93–495, title V, §503, Oct. 28, 1974, 88 Stat. 1525 , renumbered and amended by Pub. L. 94–239, §§7, 8, Mar. 23, 1976, 90 Stat. 255 , provided that: "This title [enacting this subchapter and provisions set out as notes under section 1691 of this title] takes effect upon the expiration of one year after the date of its enactment [Oct. 28, 1974]. The amendments made by the Equal Credit Opportunity Act Amendments of 1976 [enacting section 1691f of this title, amending this section and sections 1691b, 1691c, 1691d, and 1691e of this title, repealing section 1609 of this title, enacting provisions set out as notes under this section, and repealing provisions set out as a note under this section] shall take effect on the date of enactment thereof [Mar. 23, 1976] and shall apply to any violation occurring on or after such date, except that the amendments made to section 701 of the Equal Credit Opportunity Act [this section] shall take effect 12 months after the date of enactment [Mar. 23, 1976]."

### SHORT TITLE

This subchapter known as the "Equal Credit Opportunity Act", see Short Title note set out under section 1601 of this title.

### CONGRESSIONAL FINDINGS AND STATEMENT OF PURPOSE

Pub. L. 93–495, title V, §502, Oct. 28, 1974, 88 Stat. 1521 , provided that: "The Congress finds that there is a need to insure that the various financial institutions and other firms engaged in the extensions of credit exercise their responsibility to make credit available with fairness, impartiality, and without discrimination on the basis of sex or marital status. Economic stabilization would be enhanced and competition among the various financial institutions and other firms engaged in the extension of credit would be strengthened by an absence of discrimination on the basis of sex or marital status, as well as by the informed use of credit which Congress has heretofore sought to promote. It is the purpose of this Act [see Short Title note set out under section 1601 of this title] to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all credit-worthy customers without regard to sex or marital status."

**A030**

---

**15 USC 1691a: Definitions; rules of construction**
Text contains those laws in effect on June 12, 2023

**From Title 15-COMMERCE AND TRADE**
    CHAPTER 41-CONSUMER CREDIT PROTECTION
    SUBCHAPTER IV-EQUAL CREDIT OPPORTUNITY
**Jump To:**
    **<u>Source Credit</u>**
    **<u>Miscellaneous</u>**
    **<u>Amendments</u>**
    **<u>Effective Date</u>**

---

## §1691a. Definitions; rules of construction

(a) The definitions and rules of construction set forth in this section are applicable for the purposes of this subchapter.

(b) The term "applicant" means any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit.

(c) The term "Bureau" means the Bureau of Consumer Financial Protection.

(d) The term "credit" means the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor.

(e) The term "creditor" means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

(f) The term "person" means a natural person, a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association.

(g) Any reference to any requirement imposed under this subchapter or any provision thereof includes reference to the regulations of the Bureau under this subchapter or the provision thereof in question.

(Pub. L. 90–321, title VII, §702, as added Pub. L. 93–495, title V, §503, Oct. 28, 1974, 88 Stat. 1522 ; amended Pub. L. 111–203, title X, §1085(1), (2), July 21, 2010, 124 Stat. 2083 .)

### EDITORIAL NOTES

### AMENDMENTS

**2010**-Subsec. (c). Pub. L. 111–203, §1085(2), added subsec. (c) and struck out former subsec. (c) which read as follows: "The term 'Board' refers to the Board of Governors of the Federal Reserve System."

Subsec. (g). Pub. L. 111–203, §1085(1), substituted "Bureau" for "Board".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

**15 USC 1691b: Promulgation of regulations by the Bureau**
Text contains those laws in effect on June 12, 2023

**From Title 15-COMMERCE AND TRADE**
    CHAPTER 41-CONSUMER CREDIT PROTECTION
    SUBCHAPTER IV-EQUAL CREDIT OPPORTUNITY
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **Amendments**
    **Effective Date**

# §1691b. Promulgation of regulations by the Bureau

**(a) In general**

The Bureau shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith.

**(b) Exempt transactions**

Such regulations may exempt from the provisions of this subchapter any class of transactions that are not primarily for personal, family, or household purposes, or business or commercial loans made available by a financial institution, except that a particular type within a class of such transactions may be exempted if the Bureau determines, after making an express finding that the application of this subchapter or of any provision of this subchapter of such transaction would not contribute substantially to effecting the purposes of this subchapter.

**(c) Limitation on exemptions**

An exemption granted pursuant to subsection (b) shall be for no longer than five years and shall be extended only if the Bureau makes a subsequent determination, in the manner described by such paragraph,[1] that such exemption remains appropriate.

**(d) Maintenance of records**

Pursuant to Bureau regulations, entities making business or commercial loans shall maintain such records or other data relating to such loans as may be necessary to evidence compliance with this subsection [2] or enforce any action pursuant to the authority of this chapter. In no event shall such records or data be maintained for a period of less than one year. The Bureau shall promulgate regulations to implement this paragraph [3] in the manner prescribed by chapter 5 of title 5.

**(e) Notice of denial of loan**

The Bureau shall provide in regulations that an applicant for a business or commercial loan shall be provided a written notice of such applicant's right to receive a written statement of the reasons for the denial of such loan.

**(f) Board authority**

Notwithstanding subsection (a), the Board shall prescribe regulations to carry out the purposes of this subchapter with respect to a person described in section 5519(a) of title 12. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith.

**(g) Deference**

Notwithstanding any power granted to any Federal agency under this subchapter, the deference that a court affords to a Federal agency with respect to a determination made by such agency relating to the meaning or interpretation of any provision of this subchapter that is subject to the jurisdiction of such agency shall be applied as if that agency were the only agency authorized to apply, enforce, interpret, or administer the provisions of this subchapter [4]

(Pub. L. 90–321, title VII, §703, as added Pub. L. 93–495, title V, §503, Oct. 28, 1974, 88 Stat. 1522 ; amended Pub. L. 94–239, §3(a), Mar. 23, 1976, 90 Stat. 252 ; Pub. L. 100–533, title III, §301, Oct. 25, 1988, 102 Stat. 2692 ; Pub. L. 111–203, title X, §1085(1), (3), July 21, 2010, 124 Stat. 2083 .)

## EDITORIAL NOTES

## AMENDMENTS

**2010**-Pub. L. 111–203, §1085(3)(A), substituted "Promulgation of regulations by the Bureau" for "Regulations" in section catchline.

Pub. L. 111–203, §1085(1), substituted "Bureau" for "Board" wherever appearing.

Subsecs. (a) to (e). Pub. L. 111–203, §1085(3)(B)–(E), in subsec. (a), struck out "(a)" designation before "(1)", redesignated subsec. (a) pars. (1) to (5) as subsecs. (a) to (e), respectively, in subsec. (c) substituted "subsection (b)" for "paragraph (2)", and struck out former subsec. (b), which related to establishment of a Consumer Advisory Council to advise and consult with the Board.

Subsecs. (f), (g). Pub. L. 111–203, §1085(3)(F), added subsecs. (f) and (g).

**1988**-Subsec. (a). Pub. L. 100–533 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain but are not limited to such classifications, differentiation, or other provision, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith. In particular, such regulations may exempt from one or more of the provisions of this subchapter any class of transactions not primarily for personal, family, or household purposes, if the Board makes an express finding that the application of such provision or provisions would not contribute substantially to carrying out the purposes of this subchapter. Such regulations shall be prescribed as soon as possible after the date of enactment of this Act, but in no event later than the effective date of this Act."

**1976**-Pub. L. 94–239 designated existing provisions as subsec. (a), inserted provisions exempting from regulations of this subchapter any class of transactions not primarily for personal, family, or household purposes to be determined by the Board, and added subsec. (b).

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## EFFECTIVE DATE OF 1976 AMENDMENT

Amendment by Pub. L. 94–239 effective Mar. 23, 1976, see section 708 of Pub. L. 90–321, set out as an Effective Date note under section 1691 of this title.

¹ So in original. Probably should be "subsection,".

² So in original.

³ So in original. Probably should be "subsection".

⁴ So in original. Probably should be followed by a period.

**A033**

---

**15 USC 1691e: Civil liability**
Text contains those laws in effect on June 12, 2023

**From Title 15-COMMERCE AND TRADE**
    CHAPTER 41-CONSUMER CREDIT PROTECTION
    SUBCHAPTER IV-EQUAL CREDIT OPPORTUNITY
**Jump To:**
    **<u>Source Credit</u>**
    **<u>Miscellaneous</u>**
    **<u>References In Text</u>**
    **<u>Amendments</u>**
    **<u>Effective Date</u>**

---

## §1691e. Civil liability

**(a) Individual or class action for actual damages**

Any creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

**(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award**

Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

**(c) Action for equitable and declaratory relief**

Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter.

**(d) Recovery of costs and attorney fees**

In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection.

**(e) Good faith compliance with rule, regulation, or interpretation of Bureau or interpretation or approval by an official or employee of Bureau of Consumer Financial Protection duly authorized by Bureau**

No provision of this subchapter imposing liability shall apply to any act done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the Bureau or in conformity with any interpretation or approval by an official or employee of the Bureau of Consumer Financial Protection duly authorized by the Bureau to issue such interpretations or approvals under such procedures as the Bureau may prescribe therefor, notwithstanding that after such act or omission has occurred, such rule, regulation, interpretation, or approval is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

**(f) Jurisdiction of courts; time for maintenance of action; exceptions**

Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than 5 years after the date of the occurrence of the violation, except that-

    (1) whenever any agency having responsibility for administrative enforcement under section 1691c of this title commences an enforcement proceeding within 5 years after the date of the occurrence of the violation,

    (2) whenever the Attorney General commences a civil action under this section within 5 years after the date of the occurrence of the violation,

then any applicant who has been a victim of the discrimination which is the subject of such proceeding or civil action may bring an action under this section not later than one year after the commencement of that proceeding or action.

Case 23-1654   Document 12   Filed 06/14/2023   Pages: 89

**(g) Request by responsible enforcement agency to Attorney General for civil action**

The agencies having responsibility for administrative enforcement under section 1691c of this title, if unable to obtain compliance with section 1691 of this title, are authorized to refer the matter to the Attorney General with a recommendation that an appropriate civil action be instituted. Each agency referred to in paragraphs (1), (2), and (9) of section 1691c(a) of this title shall refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a) of this title. Each such agency may refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has violated section 1691(a) of this title.

**(h) Authority for Attorney General to bring civil action; jurisdiction**

When a matter is referred to the Attorney General pursuant to subsection (g), or whenever he has reason to believe that one or more creditors are engaged in a pattern or practice in violation of this subchapter, the Attorney General may bring a civil action in any appropriate United States district court for such relief as may be appropriate, including actual and punitive damages and injunctive relief.

**(i) Recovery under both subchapter and fair housing enforcement provisions prohibited for violation based on same transaction**

No person aggrieved by a violation of this subchapter and by a violation of section 3605 of title 42 shall recover under this subchapter and section 3612 [1] of title 42, if such violation is based on the same transaction.

**(j) Discovery of creditor's granting standards**

Nothing in this subchapter shall be construed to prohibit the discovery of a creditor's credit granting standards under appropriate discovery procedures in the court or agency in which an action or proceeding is brought.

**(k) Notice to HUD of violations**

Whenever an agency referred to in paragraph (1), (2), or (3) [1] of section 1691c(a) of this title-

(1) has reason to believe, as a result of receiving a consumer complaint, conducting a consumer compliance examination, or otherwise, that a violation of this subchapter has occurred;

(2) has reason to believe that the alleged violation would be a violation of the Fair Housing Act [42 U.S.C. 3601 et seq.]; and

(3) does not refer the matter to the Attorney General pursuant to subsection (g),

the agency shall notify the Secretary of Housing and Urban Development of the violation, and shall notify the applicant that the Secretary of Housing and Urban Development has been notified of the alleged violation and that remedies for the violation may be available under the Fair Housing Act.

(Pub. L. 90–321, title VII, §706, as added Pub. L. 93–495, title V, §503, Oct. 28, 1974, 88 Stat. 1524 ; amended Pub. L. 94–239, §6, Mar. 23, 1976, 90 Stat. 253 ; Pub. L. 102–242, title II, §223(a)–(c), Dec. 19, 1991, 105 Stat. 2306 ; Pub. L. 111–203, title X, §1085(1), (5)–(7), July 21, 2010, 124 Stat. 2083 , 2085.)

**EDITORIAL NOTES**

## REFERENCES IN TEXT

Section 3612 of title 42, referred to in subsec. (i), which related to enforcement of the Fair Housing Act (42 U.S.C. 3601 et seq.) by private persons, was repealed by Pub. L. 100–430, §8(2), Sept. 13, 1988, 102 Stat. 1625 . See section 3613 of Title 42, The Public Health and Welfare.

Paragraph (1), (2), or (3) of section 1691c(a) of this title, referred to in subsec. (k), probably means par. (1), (2), or (3) of section 1691c(a) of this title prior to repeal of pars. (1) and (2), enactment of new pars. (1) and (9), and redesignation of par. (3) as (2) by Pub. L. 111–203, title X, §1085(4)(A)(ii)–(vi), July 21, 2010, 124 Stat. 2084 .

The Fair Housing Act, referred to in subsec. (k), is title VIII of Pub. L. 90–284, Apr. 11, 1968, 82 Stat. 81 , which is classified principally to subchapter I (§3601 et seq.) of chapter 45 of Title 42. For complete classification of this Act to the Code, see Short Title note set out under section 3601 of Title 42 and Tables.

## AMENDMENTS

**2010**-Subsec. (e). Pub. L. 111–203, §1085(5)(B), substituted "Bureau of Consumer Financial Protection" for "Federal Reserve System" in text.

Pub. L. 111–203, §1085(5)(A), which directed amendment of "subsection heading" by substituting "Bureau" for "Board" wherever appearing and "Bureau of Consumer Financial Protection" for "Federal Reserve System", was executed by making the substitutions in heading that had been supplied editorially, to reflect the probable intent of Congress.

Pub. L. 111–203, §1085(1), substituted "Bureau" for "Board" wherever appearing.

Subsec. (f). Pub. L. 111–203, §1085(7), substituted "5 years after" for "two years from" wherever appearing.

Subsec. (g). Pub. L. 111–203, §1085(6), substituted "(9)" for "(3)".

**1991**—Subsec. (g). Pub. L. 102–242, §223(a), inserted at end "Each agency referred to in paragraphs (1), (2), and (3) of section 1691c(a) of this title shall refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a) of this title. Each such agency may refer the matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has violated section 1691(a) of this title."

Subsec. (h). Pub. L. 102–242, §223(b), inserted "actual and punitive damages and" after "be appropriate, including".

Subsec. (k). Pub. L. 102–242, §223(c), added subsec. (k).

**1976**—Subsec. (a). Pub. L. 94–239 substituted reference to member for reference to representative.

Subsec. (b). Pub. L. 94–239 inserted provisions exempting government or governmental subdivision or agency from requirements of this subchapter, incorporated provisions contained in former subsec. (c) relating to recovery in class actions and, as incorporated, raised the total amount of recovery under a class action from $100,000 to $500,000.

Subsec. (c). Pub. L. 94–239 redesignated subsec. (d) as (c) and specified United States district court or other court of competent jurisdiction as court in which to bring action, and substituted provisions authorizing such court to grant equitable and declaratory relief, for provisions authorizing civil actions for preventive relief. Provisions of former subsec. (c) were incorporated into present subsec. (b) and amended.

Subsec. (d). Pub. L. 94–239 redesignated subsec. (e) as (d) and made minor changes in phraseology. Former subsec. (d) redesignated (c) and amended.

Subsec. (e). Pub. L. 94–239 redesignated subsec. (f) as (e) and inserted reference to officially promulgated rule, regulation, or interpretation and provisions relating to approval and interpretations by an official or employee of the Federal Reserve System duly authorized by the Board. Former subsec. (e) redesignated (d) and amended.

Subsec. (f). Pub. L. 94–239 redesignated subsec. (g) as (f) and inserted provisions which substituted a two year limitation for one year limitation and provisions extending time in which to bring action under enumerated conditions. Former subsec. (f) redesignated (e) and amended.

Subsecs. (g) to (j). Pub. L. 94–239 added subsecs. (g) to (j). Former subsec. (g) redesignated (f) and amended.

### Statutory Notes and Related Subsidiaries

## Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## Effective Date of 1976 Amendment

Amendment by Pub. L. 94–239 effective Mar. 23, 1976, see section 708 of Pub. L. 90–321, set out as an Effective Date note under section 1691 of this title.

[1] See References in Text note below.

**Bur. of Consumer Financial Protection** **§ 1002.5**

determine controlling interests, beneficial interests, beneficial ownership, or purchase limitations and restrictions;

(v) Section 1002.7(c) relating to action concerning open-end accounts, to the extent the action taken is on the basis of a change of name or marital status;

(vi) Section 1002.7(d) relating to the signature of a spouse or other person;

(vii) Section 1002.10 relating to furnishing of credit information; and

(viii) Section 1002.12(b) relating to record retention.

(c) *Incidental credit* (1) *Definition.* Incidental credit refers to extensions of consumer credit other than the types described in paragraphs (a) and (b) of this section:

(i) That are not made pursuant to the terms of a credit card account;

(ii) That are not subject to a finance charge (as defined in Regulation Z, 12 CFR 1026.4); and

(iii) That are not payable by agreement in more than four installments.

(2) *Exceptions.* The following provisions of this part do not apply to incidental credit:

(i) Section 1002.5(b) concerning information about the sex of an applicant, but only to the extent necessary for medical records or similar purposes;

(ii) Section 1002.5(c) concerning information about a spouse or former spouse;

(iii) Section 1002.5(d)(1) concerning information about marital status;

(iv) Section 1002.5(d)(2) concerning information about income derived from alimony, child support, or separate maintenance payments;

(v) Section 1002.7(d) relating to the signature of a spouse or other person;

(vi) Section 1002.9 relating to notifications;

(vii) Section 1002.10 relating to furnishing of credit information; and

(viii) Section 1002.12(b) relating to record retention.

(d) *Government credit*—(1) *Definition.* Government credit refers to extensions of credit made to governments or governmental subdivisions, agencies, or instrumentalities.

(2) *Applicability of regulation.* Except for §1002.4(a), the general rule against discrimination on a prohibited basis,

the requirements of this part do not apply to government credit.

**§ 1002.4  General rules.**

(a) *Discrimination.* A creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction.

(b) *Discouragement.* A creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application.

(c) *Written applications.* A creditor shall take written applications for the dwelling-related types of credit covered by §1002.13(a).

(d) *Form of disclosures*—(1) *General rule.* A creditor that provides in writing any disclosures or information required by this part must provide the disclosures in a clear and conspicuous manner and, except for the disclosures required by §§1002.5 and 1002.13, in a form the applicant may retain.

(2) *Disclosures in electronic form.* The disclosures required by this part that are required to be given in writing may be provided to the applicant in electronic form, subject to compliance with the consumer consent and other applicable provisions of the Electronic Signatures in Global and National Commerce Act (E-Sign Act) (15 U.S.C. 7001 *et seq.*). Where the disclosures under §§1002.5(b)(1), 1002.5(b)(2), 1002.5(d)(1), 1002.5(d)(2), 1002.13, and 1002.14(a)(2) accompany an application accessed by the applicant in electronic form, these disclosures may be provided to the applicant in electronic form on or with the application form, without regard to the consumer consent or other provisions of the E-Sign Act.

(e) *Foreign-language disclosures.* Disclosures may be made in languages other than English, provided they are available in English upon request.

[76 FR 79445, Dec. 21, 2011, as amended at 78 FR 7248, Jan. 31, 2013]

**§ 1002.5  Rules concerning requests for information.**

(a) *General rules*—(1) *Requests for information.* Except as provided in paragraphs (b) through (d) of this section, a