RECORD NO. 23-1654

In the United States Court of Appeals
for the Seventh Circuit

Consumer Financial Protection Bureau,

*Plaintiff–Appellant,*

v.

Townstone Financial, Inc., and Barry Sturner,

*Defendants–Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois, No. 1:20-cv-4176,
The Honorable Franklin U. Valderrama

Brief of Amici Curiae National Fair Housing Alliance, American Civil Liberties Union, Lawyers' Committee for Civil Rights Under Law, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights, South Suburban Housing Center, Fair Housing Center of Central Indiana, HOPE Fair Housing Center, Open Communities, Metropolitan Milwaukee Fair Housing Council, and American Civil Liberties of Illinois in Support of Plaintiff–Appellant's Request for Reversal

Valerie Comencencia Ortiz
Stephen Hayes
Relman Colfax PLLC
1225 19th St., NW, Suite 600
Washington, D.C. 20036
Tel.: (202) 728-1888
Fax: (202) 728-0848

Morgan Williams
National Fair Housing Alliance
1331 Pennsylvania Ave, NW
Suite 650
Washington, DC 20004
Tel.: 202-898-1661
Fax: 202-371-9744

*Counsel for Amici Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Fair Housing Alliance, American Civil Liberties Union, Lawyers' Committee for Civil Rights Under Law, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights, South Suburban Housing Center, Fair Housing Center of Central Indiana. HOPE Fair Housing Center, Open Communities, Metropolitan Milwaukee Fair Housing Council, American Civil Liberties Union of Illinois

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Relman Colfax PLLC

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

None

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature:  /s/ Stephen Hayes    Date:  June 21, 2023

Attorney's Printed Name:  Stephen Hayes

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☒    **No** ☐

Address:  1225 19th St N.W., Suite 600

Washington, D.C. 20036

Phone Number:  202-728-1888    Fax Number:  202-728-0848

E-Mail Address:  shayes@relmanlaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Fair Housing Alliance, American Civil Liberties Union, Lawyers' Committee for Civil Rights Under Law, National Consumer Law Center, Chicago Lawyers' Committee for Civil Rights, South Suburban Housing Center, Fair Housing Center of Central Indiana. HOPE Fair Housing Center, Open Communities, Metropolitan Milwaukee Fair Housing Council, American Civil Liberties Union of Illinois

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Relman Colfax PLLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Valerie Comenencia Ortiz    Date: June 21, 2023

Attorney's Printed Name: Valerie Comenencia Ortiz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [X]

Address: 1225 19th St N.W., Suite 600

Washington, D.C. 20036

Phone Number: 202-728-1888    Fax Number: 202-728-0848

E-Mail Address: vcomenenciaortiz@relmanlaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 National Fair Housing Alliance

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Relman Colfax PLLC

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and
     None

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
     None

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
 N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
 N/A

Attorney's Signature: /s/ Morgan Williams          Date: June 21, 2023

Attorney's Printed Name:  Morgan Williams

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address:  1331 Pennsylvania Avenue, NW, Suite 650 Washington, DC 20004

Phone Number:  (202) 898-0661          Fax Number:

E-Mail Address: mwilliams@nationalfairhousing.org

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

AMICI STATEMENT OF INTEREST ............................................................ 1

SUMMARY OF ARGUMENT ......................................................................... 5

ARGUMENT .................................................................................................... 8

   I.   ECOA's Text and this Court's Title VII Caselaw Support the Longstanding
       Prohibition Against Pre-Application Discouragement ............................ 8

  II.  Invalidating ECOA's Longstanding Prohibitions Against Pre-Application
       Discrimination Would Severely Limit the Act's Effectiveness ........................ 12

     A.   Mortgage Redlining Is a Persistent Obstacle to Equality ............................ 13

     B.   Limiting ECOA Would Impede Transparency into the Practices of Major
         Mortgage Lenders ................................................................................. 17

     C.   The District Court's Interpretation Would Severely Limit Protections
         Against Discrimination in Non-Mortgage Credit Markets ........................ 21

        1.   Discrimination in Small Business Lending ................................. 21

        2.   Discrimination in Auto Lending................................................. 24

 III.  ECOA's Pre-Application Protections Are Vital Given the Rise of Targeted
       Digital Marketing .................................................................................. 25

 IV.  Limiting Civil Rights Protections Harms Our Economy ..................... 28

CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Anderson v. United Fin. Co.*,
666 F.2d 1274 (9th Cir. 1982) ............................................................... 8

*Bingham v. Centier Bank*,
No. 2:20-CV-478-TLS-JPK, 2022 WL 355765 (N.D. Ind. Feb. 7, 2022) ........................................................................................................ 10

*CFPB, et al. v. Hudson City Sav. Bank, F.S.B.*,
No. 2:15-cv-07056-CCC-JBC (D.N.J. Nov. 4, 2015) ............................... 14

*CFPB, et al. v. Trident Mortg. Co. LP*,
No. 2:22-cv-02936-GEKP (E.D. Pa. Sept. 14, 2022). ............................ 14

*In re Facebook, Inc.*,
No. 18-2-18287-5SEA (Wa. Super. Ct., July 24, 2018). ....................... 26

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) ............................................................... 11

*Gray v. Seterus, Inc.*,
233 F. Supp. 3d 865 (D. Or. 2017) ........................................................ 17

*Hildebrandt v. Vilsack*,
102 F. Supp. 3d 318 (D.D.C. 2015) ....................................................... 10

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) ................................................................................ 6

*Markham v. Colonial Mortg. Serv. Co., Assocs. Inc.*,
605 F.2d 566 (D.C. Cir. 1979) ................................................................ 8

*Nat'l Fair Hous. All., et al. v. Facebook, Inc.*,
No. 1:18-cv-02689-JGK (S.D.N.Y. June 25, 2018) ................................ 26

*Page v. Midland Fed. Sav. & Loan Ass'n*,
No. 12 C 8261, 2013 WL 5211747 (N.D. Ill. Sept. 13, 2013) ................ 16

*United States, et al. v. BancorpSouth*,
No. 1:16-cv-001118-MPM-DAS (N.D. Miss. July 25, 2016). ................. 14

*United States, et al. v. Trustmark Nat'l Bank*,
No. 2:21-cv-2664 (W.D. Tenn. Oct. 27, 2021). ...................................... 14

*United States v. City Nat'l Bank*,
    No. 2:23-cv-00204-DMG-RAO (C.D. Cal. Jan. 30, 2023) ....................................... 14

*United States v. First Merchants Bank*,
    No. 1:19-CV-02365-JPH-MPB, 2019 WL 3779768 (S.D. Ind. Aug. 12,
    2019) ....................................................................................................................... 14

*United States v. Lakeland Bank*,
    No. 2:22-cv-05746 (D.N.J. Sept. 29, 2022) .............................................................. 14

*Volling v. Kurtz Paramedic Servs., Inc.*,
    840 F.3d 378 (7th Cir. 2016) ............................................................... 6, 11, 13

**Statutes**

1 U.S.C. § 1 ..................................................................................................................... 10

12 U.S.C. § 5481 ............................................................................................................. 19

12 U.S.C. § 5511 ...................................................................................................... 7, 17, 20

12 U.S.C. § 5514 ............................................................................................................. 19

12 U.S.C. § 5515 ............................................................................................................. 18

12 U.S.C. §§ 5516 ........................................................................................................... 18

15 U.S.C. § 1691 ........................................................................................................ 4, 8, 9

15 U.S.C. § 1691a ........................................................................................................... 10

15 U.S.C. § 1691b ...................................................................................................... 6, 11

15 U.S.C. § 1691e ......................................................................................................... 5, 9

42 U.S.C. § 2000e-3 ...................................................................................................... 10

42 U.S.C. § 3604 ............................................................................................................ 16

42 U.S.C § 3605 ............................................................................................................. 16

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L.
    No. 111-203, § 1085, 124 Stat. 1376 (2010) ............................................................ 6

FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 223, 105 Stat.
    2236 (1991) .............................................................................................................. 9

Equal Credit Opportunity Act Amendments of 1976,
Pub. L. No. 94-239, 90 Stat. 251 (1976)...................................................... 8

**Other Authorities**

12 C.F.R. pt. 202 ............................................................................................ 9

12 C.F.R. § 1002.4 .......................................................................................... 9

40 Fed. Reg. 49298 (Oct. 22, 1975)............................................................ 5, 9

76 Fed. Reg. 79442 (Dec. 21, 2011) .............................................................. 9

CFPB, Final Rule, Small Business Lending Under the Equal Credit
Opportunity Act (Regulation B), 88 Fed. Reg. 35150 (May 31, 2023)................. 21

S. Rep. No. 93-278 (1973) .............................................................................. 8

S. Rep. No. 94-589 (1976) .....................................................................5, 8, 27

S. Rep. No. 102-167 (1991) ............................................................................ 9

Adam Levitin, *How to Start Closing the Racial Wealth Gap*, The
American Prospect (June 17, 2020), available at:
https://prospect.org/economy/how-to-start-closing-the-racial-wealth-
gap/......................................................................................................... 15

Alanna McCargo and Jung Hyun Choi, *Closing the Gaps: Building
Black Wealth Through Homeownership*, Urban Institute 7 (Nov. 23,
2020), available at:
https://www.urban.org/research/publication/closing-gaps-building-
black-wealth-through-homeownership .................................................... 15

Alicia Robb, *Financing Patterns and Credit Market Experiences: A
Comparison by Race and Ethnicity for U.S. Employer Firms*, SBA
Office of Advocacy (Feb. 1, 2018), available at:
https://advocacy.sba.gov/2018/02/01/financing-patterns-and-credit-
market-experiences-a-comparison-by-race-and-ethnicity-for-u-s-
employer-firms/;...................................................................................... 21

Andre Perry, et al., *Black-owned Businesses in U.S. Cities: The
Challenges, Solutions, and Opportunities for Prosperity*, Brookings
Metro (Feb. 14, 2022), available at: https://www.brookings.edu/wp-
content/uploads/2022/02/Black-business-report_PDF.pdf;................................... 21

Anneliese Lederer, et al., *Lending Discrimination During Covid-19: Black and Hispanic Women-Owned Businesses*, National Community Reinvestment Coalition (2020), available at: https://ncrc.org/lending-discrimination-during-covid-19-black-and-hispanic-women-owned-businesses/ ...................................................................... 23

*Applicant*, Oxford Learner's Dictionaries (last visited June 20, 2023), available at: https://www.oxfordlearnersdictionaries.com/us/definition/english/applicant ................................................................................................................. 10

Bruce Mitchell and Juan Franco, *HOLC 'Redlining' Maps: The Persistent Structure of Segregation and Economic Inequality*, National Community Reinvestment Coalition (Dec. 18, 2018), available at: https://ncrc.org/wp-content/uploads/dlm_uploads/2018/02/NCRC-Research-HOLC-10.pdf ................................................................................................................. 13

Carol Evans and Westra Miller, *From Catalogs to Clicks: The Fair Lending Implications of Targeted, Internet Marketing*, Federal Reserve Board Consumer Compliance Outlook (2019), available at: https://www.consumercomplianceoutlook.org/2019/third-issue/from-catalogs-to-clicks-the-fair-lending-implications-of-targeted-internet-marketing/ ................................................................................ 25, 26

CFPB, *An Introduction to CFPB's Exams of Financial Companies* (Jan. 9, 2023), available at: https://files.consumerfinance.gov/f/documents/cfpb_an-introduction-to-cfpbs-exams-of-financial-companies_2023-01.pdf ............................................ 18

CFPB, *Institutions subject to CFPB supervisory authority* (last visited June 13, 2023), available at: https://www.consumerfinance.gov/compliance/supervision-examinations/institutions/ ................................................................... 18

CFPB, *Summary of 2021 Data on Mortgage Lending* (June 16, 2022), available at: https://www.consumerfinance.gov/data-research/hmda/summary-of-2021-data-on-mortgage-lending/ ............................ 18

CFPB, *Supervision and Examination Manual* (June 2023), available at: https://www.consumerfinance.gov/compliance/supervision-examinations/ ................................................................................................ 19

CFPB, *Supervisory Highlights* (Fall 2021), available at: https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-25_2021-12.pdf ............................................ 6, 22

Charles L. Nier III, *Perpetuation of Segregation: Toward a New Historical and Legal Interpretation of Redlining under the Fair Housing Act*, 32 J. Marshall L. Rev. 617 (1999)......................................................14

Christine Kymn, *Access to Capital for Women- and Minority-owned Businesses: Revisiting Key Variables*, SBA Office of Advocacy (Jan. 29, 2014), available at: https://advocacy.sba.gov/2014/01/29/access-to-capital-for-women-and-minority-owned-businesses-revisiting-key-variables/........................................................................................... 22

Citigroup, *In Pursuit of Equity: Why America's Future Depends on Closing the Racial Wealth Gap* (2021), available at: https://www.nytimes.com/paidpost/citi/in-pursuit-of-equity.html ...................... 28

Dana Peterson and Catherine Mann*, Closing the Racial Inequality Gaps: The Economic Cost of Black Inequality in the U.S.*, Citi Global Perspectives and Solutions 3 (Sept. 1, 2020), https://www.citivelocity.com/citigps/closing-the-racial-inequality-gaps/ ............................................................................................................ 28

Department of Justice, *Justice Department Secures Groundbreaking Settlement Agreement with Meta Platforms, Formerly Known as Facebook, to Resolve Allegations of Discriminatory Advertising* (June 21, 2022), available at: https://www.justice.gov/opa/pr/justice-department-secures-groundbreaking-settlement-agreement-meta-platforms-formerly-known .............................................................. 27

*Facebook Settlement*, NFHA (Mar. 14, 2019), available at: https://nationalfairhousing.org/facebook-settlement/#:~:text=NFHA%20and%20the%20other%20plaintiffs,%2C%20Hispanics%2C%20and%20Asian%20Americans ...................................... 26

Fannie Mae, *Equitable Housing Finance Plan* (June 2022), available at: https://www.fanniemae.com/media/43636/display............................................ 15

*FDIC National Survey of Unbanked and Underbanked Households*, FDIC 2, 6-7, 37 (2021), available at: https://www.fdic.gov/analysis/household-survey/2021report.pdf; ....................... 12

Fed. Rsrv. Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis, and San Francisco, *Small Business Credit Survey: 2021 Report on Firms Owned by People of Color* (Apr. 2021), available at: https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/sbcs-report-on-firms-owned-by-people-of-color;.................................... 22

Fed. Rsrv. Banks of New York and Kansas City, *Small Business Credit Survey: 2016 Report on Women-Owned Firms* (Nov. 2017), available at: https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-WomenOwnedFirms-2016.pdf; ..................................................... 22

Federal Housing Finance Agency, *2022 Annual Housing Report* 11 (Oct. 28, 2022), available at: https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/Annual-Housing-Report-2022.pdf; ...................................................................... 15

Federal Reserve Bank of New York, *Quarterly Report on Household Debt and Credit* (May 2023), available at: https://www.newyorkfed.org/medialibrary/Interactives/householdcredit/data/pdf/HHDC_2023Q1.pdf?sc_lang=en ....................................... 24

Federal Reserve Board, *Consumer Compliance Outlook, Risk-Focused Consumer Compliance Supervision Program for Community Banks* (2014), available at: https://www.consumercomplianceoutlook.org/2014/second-quarter/risk-focused-consumer-compliance-supervision-program-for-community-banks/; ............................................................................ 18

Federal Reserve Board, *FFIEC Guidance on the Uniform Interagency Consumer Compliance Rating System* (last visited June 13, 2023), available at: https://www.federalreserve.gov/supervisionreg/caletters/ca_16-8_attachment_uniform_interagency_cc_rating_system_(002).pdf; ...................... 18

Federal Reserve, *Small Business Credit Survey: 2021 Report on Firms Owned by People of Color* (2021), available at: https://www.fedsmallbusiness.org/survey/2021/2021-report-on-firms-owned-by-people-of-color ............................................................. 21

Federal Reserve System, *2020 Fair Lending Interagency Webinar* (Dec. 2020), available at: https://www.consumercomplianceoutlook.org/Outlook-Live/2020/2020-Fair-Lending-Interagency-webinar/ ....................................... 6, 22

Jason Cover, *Digital Targeted Marketing, Business Regulation & Regulated Industries* (Feb. 9, 2022), available at: https://businesslawtoday.org/2022/02/digital-targeted-marketing-fair-lending-clickbait/ ............................................................. 25

Jeff Cox, *Morgan Stanley says Housing Discrimination Has Taken a Huge Toll on the Economy*, CNBC (Nov. 13, 2020), https://www.cnbc.com/2020/11/13/morgan-stanley-says-housing-discrimination-has-taken-a-huge-toll-on-the-economy.html#:~:text=Morgan%20Stanley%20says%20racial%20inequality,five%20million%20from%20owning%20homes ..................................... 28

Jinyan Zang, *Solving the Problem of Racially Discriminatory Advertising on Facebook*, The Brookings Institution (Oct. 19, 2021), available at: https://www.brookings.edu/research/solving-the-problem-of-racially-discriminatory-advertising-on-facebook/............................. 26

john a. powell and Jason Reece, *The Future of Fair Housing and Fair Credit: From Crisis to Opportunity*, 57 Clev. St. L. Rev. 209, 221-222 (2009) ................................................................................. 13

Jonathan Lanning, *Evidence of Racial Discrimination in the $1.4 Trillion Auto Loan Market*, ProfitWise News and View (Jan. 2023), available at: https://www.chicagofed.org/publications/profitwise-news-and-views/2023/discrimination-auto-loan-market#ftn3............................. 24

Jung Hyun Choi, et al., *Explaining the Black-White Homeownership Gap*, Urban Institute (Oct. 2019), available at: https://www.urban.org/sites/default/files/publication/101160/explaining_the_black-white_homeownership_gap_2.pdf................................... 15

Linda Lutton, Andrew Fan, and Alden Loury, *Where Banks Don't Lend*, City Bureau and WBEZ 91.5 Chicago (June 3, 2020), available at: https://interactive.wbez.org/2020/banking/disparity/ ..................... 16

Lisa Rice and Deidre Swesnik, *Discriminatory Effects of Credit Scoring on Communities of Color*, 46 Suffolk U. L. Rev. 935 (2013) ................................. 12

Lisa Rice and Erich Schwartz Jr., *Discrimination When Buying a Car: How the Color of your Skin Can Affect your Car-Shopping Experience*, NFHA (Jan. 2018), available at: https://nationalfairhousing.org/wp-content/uploads/2018/01/Discrimination-When-Buying-a-Car-FINAL-1-11-2018.pdf ............................................................... 24

Lisa Rice, *Missing Credit: How the U.S. Credit System Restricts Access to Consumers of Color*, National Fair Housing Alliance (Feb. 26, 2019), available at: https://nationalfairhousing.org/wp-content/uploads/2019/04/Missing-Credit.pdf....................................... 12

Marshall Lux and Robert Green, *What's Behind the Non-Bank Mortgage Boom?*, Harvard Kennedy School Associate Working Paper No. 42 (June 2015), available at: https://www.hks.harvard.edu/centers/mrcbg/publications/awp/awp42 .................................................................................................................... 19

Meta, *Expanding Our Work on Ads Fairness* (June 21, 2022), available at: https://about.fb.com/news/2022/06/expanding-our-work-on-ads-fairness/ ........................................................................................................ 27

NFHA, *Redlining Toolkit* (April 2022), available at: https://nationalfairhousing.org/issue/redlining/ .................................................. 16

OCC, FDIC, Federal Reserve Board, Office of Thrift Supervision, NCUA, *Interagency Fair Lending Examination Procedures* (Aug. 2009), available at: https://www.ffiec.gov/pdf/fairlend.pdf ........................... 17, 19

Offices of Inspector General, FDIC, Board of Governors of the Federal Reserve System, CFPB, OCC, NCUA, *Coordination of Responsibilities Among the Consumer Financial Protection Bureau and the Prudential Regulators—Limited Scope Review* 13 (June 2015), available at: https://www.fdicoig.gov/sites/default/files/reports/2022-08/15-004EV.pdf ........................................................................................................ 19

Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* (2017) .............................................. 13

Robert W. Fairlie and Alicia M. Robb, *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs*, Minority Business Development Agency (Jan. 2010), available at: https://www.mbda.gov/sites/default/files/migrated/files-attachments/DisparitiesinCapitalAccessReport.pdf ............................................ 22

Samantha Ondrade, *Enforcement of the Fair Housing Act and Equal Credit Opportunity Act to Combat Redlining*, 70 DOJ J. Fed. L. & Prac. 247 (2022). ....................................................................... 14, 16, 21

U.S. Small Business Administration, *2022 Small Business Profile* (2022), available at: https://advocacy.sba.gov/wp-content/uploads/2022/08/Small-Business-Economic-Profile-US.pdf .................... 21

United States Census Bureau, *Quarterly Residential Vacancies and Homeownership First Quarter 2023* 9 (May 3, 2023), available at: https://www.census.gov/housing/hvs/files/currenthvspress.pdf ........................... 15

## AMICI STATEMENT OF INTEREST

The National Fair Housing Alliance ("NFHA"), the American Civil Liberties Union ("ACLU"), Lawyers' Committee for Civil Rights Under Law ("LCCR"), the National Consumer Law Center ("NCLC"), Chicago Lawyers' Committee for Civil Rights ("CLCCR"), South Suburban Housing Center ("SSHC"), Fair Housing Center of Central Indiana ("FHCCI"), HOPE Fair Housing Center ("HOPE"), Open Communities ("OC"), Metropolitan Milwaukee Fair Housing Council ("MMFHC"), and the ACLU of Illinois respectfully submit this brief as *Amici Curiae* in support of Appellant's position.[1]

NFHA is a national organization dedicated to ending discrimination and ensuring equal opportunity in housing for all people. Founded in 1988, NFHA is a consortium of 167 private, nonprofit fair housing organizations, state and local civil rights agencies, and individuals. NFHA strives to eliminate housing discrimination and ensure equal housing opportunities through leadership, homeownership, credit access, tech equity, education, member services, public policy, community development, and enforcement initiatives. Relying on the Equal Credit Opportunity Act ("ECOA" or "Act") and other civil rights laws, NFHA undertakes enforcement initiatives in cities and states across the country.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all Parties have consented to the filing of this brief. In addition, pursuant to Appellate Rule 29(a)(4)(E), *Amici* certify that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no person other than *Amici* and their counsel contributed money intended to fund the preparation or submission of the brief.

The ACLU is a nationwide, nonpartisan organization with nearly two million members and supporters dedicated to the principles of liberty and equality embodied in the United States Constitution. The ACLU works to promote and safeguard individuals' civil rights and civil liberties, including the right of every individual to access housing and credit free of discrimination.

LCCR is a nonprofit civil rights organization founded in 1963 to secure equal justice for all through the rule of law, targeting, in particular, the inequities confronting Black Americans and other people of color. LCCR uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have voice, opportunity, and power to make the promises of our democracy real. LCCR has for decades sought to protect homebuyers, student borrowers, and other consumers from lending discrimination, including in partnership with the Consumer Financial Protection Bureau ("CFPB"), and to redress the legacy of redlining. ECOA's coverage of discouragement is essential to our efforts to prevent the reemergence of redlining.

NCLC is recognized nationally as an expert in consumer credit issues. For over fifty-three years, NCLC has drawn on this expertise to provide information, legal research, policy analyses, and market insights to federal and state legislatures, administrative agencies, and the courts. NCLC also publishes a twenty-one volume Consumer Credit and Sales Legal Practice Series, including Credit Discrimination (8th Ed. 2022), which examines and applies ECOA, the Fair Housing Act ("FHA"), other civil rights statutes.

CLCCR is a group of civil rights lawyers and advocates working to secure racial equity and economic opportunity for all. CLCCR's mission is to root out and dismantle deeply entrenched systems of discrimination, racism, and economic oppression. Through its Equitable Community Development and Housing practice, CLCCR engages in litigation and advocacy through administrative and regulatory processes.

SSHC is a regional fair housing and comprehensive housing counseling agency primarily serving majority-Black communities in the south suburbs of Chicago, including Markham, a suburb involved in Plaintiff–Appellant's allegations now on appeal. SSHC operates a host of fair housing enforcement, housing counseling, and education and outreach programs.

FHCCI is a private, nonprofit organization that works to ensure equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education, and outreach. FHCCI offers four main programs to fight housing discrimination and promote equal housing opportunity in Central Indiana: Advocacy, Education, Inclusive Communities, and Public Policy.

HOPE is a nonprofit organization dedicated to eliminating housing discrimination across Illinois since 1968. HOPE works to create greater housing opportunities and choice for all. Its mission is to ensure everyone has the chance to live in the community, home, or apartment of their choice, free from discrimination. HOPE accomplishes this through education, outreach, enforcement, training, and advocacy.

OC is a nonprofit organization that works to ensure that housing in north suburban Chicago is fair and inclusive. OC does this by educating, advocating, and organizing to eradicate housing discrimination.

MMFHC is a private, nonprofit organization that operates a full-service housing program. Its purpose is to promote fair housing throughout the State of Wisconsin by combating illegal housing discrimination and by creating and maintaining racially and economically integrated housing patterns. MMFHC's programs and services include case intake and counseling, investigative services, outreach and education, professional support to government agencies, and fair lending and inclusive communities programs.

The ACLU of Illinois is a nonpartisan, nonprofit organization dedicated to protecting the liberties guaranteed by the U.S. Constitution, the Illinois Constitution, and state/federal human rights laws. The ACLU of Illinois accomplishes its goals through litigating, lobbying, and educating the public on a broad array of civil rights issues.

*Amici* are dedicated to vigorous enforcement of ECOA. Their interests will be adversely affected by a decision that limits ECOA as a tool to combat redlining and other kinds of discrimination. *Amici*'s familiarity with the impact of lending discrimination and the history and purpose of ECOA may be of assistance to this Court.

## SUMMARY OF ARGUMENT

Access to credit is a "virtual necessity of life[,]"[2] crucial for most consumers to obtain housing and transportation, start and maintain businesses, cover everyday expenses, and weather life events. To address widespread credit discrimination, Congress enacted ECOA, a landmark civil rights law that prohibits discrimination in "any aspect of a credit transaction" on the basis of a protected status. 15 U.S.C. § 1691(a). Since 1975, ECOA's implementing regulation, Regulation B, has clarified the commonsense understanding that these protections prohibit discouraging protected groups from applying for credit in the first place.[3] Congress endorsed this prohibition in a statutory amendment, recognizing that discriminatory discouragement violates the Act. *See* 15 U.S.C. § 1691e(g). These core protections have been in place for nearly fifty years.

Upending these longstanding protections, the district court concluded that ECOA does not reach *any* pre-application discriminatory acts, including discriminatory statements that would discourage or prevent protected groups from applying for credit at all. This position would severely limit ECOA's protections and provide a roadmap for evasion of the Act. The federal law designed to eradicate credit discrimination would have no application, for example, to a creditor turning away a nonprofit because of its religious affiliation, so long as the nonprofit is

---

[2] S. Rep. No. 94-589, at 3-4 (1976).
[3] 40 Fed. Reg. 49298 (Oct. 22, 1975).

turned away before applying.[4] Nor would ECOA prohibit a "Whites Only" sign in a

lender's window or a statement on a lender's website that it does not lend to

unmarried women. Lenders could freely discriminate as long as they successfully

deter people from applying in the first place.

This is an untenable position. If a creditor "should announce his policy of

discrimination by a sign reading 'Whites Only' . . . his victims would not be limited

to the few who ignored the sign and subjected themselves to personal rebuffs." *Int'l*

*Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977). The district court's

position is contrary to the text and purposes of the Act, as well as this Circuit's

treatment of analogous circumstances under Title VII, where a victim of hiring

discrimination is entitled to judicial relief even if she did not apply because she was

discriminatorily deterred from doing so. *See Volling v. Kurtz Paramedic Servs., Inc.*,

840 F.3d 378, 384 (7th Cir. 2016). The district court's holding also ignores the

explicit statutory delegation to the Federal Reserve Board ("the Board"), and now

the CFPB,[5] to prescribe regulations that include "adjustments and exceptions" that

are "necessary or proper to effectuate the purposes of [ECOA]" and to "prevent

---

[4] This scenario is not hypothetical; credit discrimination on the basis of religious affiliation, as well as race, sex, and other protected traits is well documented. *See infra* Section II.C.1. For example, CFPB and the Federal Deposit Insurance Corporation have identified instances where creditors have inquired to and restricted credit to entities because of their religious affiliation. *See* CFPB, *Supervisory Highlights* 8 (Fall 2021), available at: https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-25_2021-12.pdf; Federal Reserve System, *2020 Fair Lending Interagency Webinar* 36, 39 (Dec. 2020), available at: https://www.consumercomplianceoutlook.org/Outlook-Live/2020/2020-Fair-Lending-Interagency-webinar/.
[5] In 2010, Congress transferred the Board's rulemaking authority to the CFPB. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1085, 124 Stat. 1376, 2083-84 (2010).

circumvention or evasion thereof." 15 U.S.C. § 1691b(a). The district court failed to give meaning to this statutory language, which authorizes the CFPB to make "adjustments" to prohibit what would be evasive discriminatory actions.

Invalidating ECOA's longstanding prohibitions against pre-application discouragement would severely limit the Act's effectiveness, with significant consequences for communities affected by redlining and other forms of credit discrimination that have fueled a racial wealth gap and disproportionately low rates of homeownership among Black and Latino households.

It would also disrupt a system of uniform regulatory fair lending supervision for banks and nonbanks, contrary to the Dodd-Frank Act's purpose of ensuring consumer financial law is "enforced consistently, without regard to the status of a person as a depository institution, in order to promote fair competition." 12 U.S.C. § 5511(b)(4). Even the smallest banks would still be supervised for pre-application mortgage discrimination under the Fair Housing Act. But no agency would supervise the pre-application mortgage activities of nonbank lenders—the most significant entities in the mortgage market—because these entities are only supervised for ECOA violations, drastically limiting transparency into their conduct.

The district court's position would also leave virtually no protections for pre-application discrimination in non-mortgage credit markets, such as small business, auto, and personal loans, as well as credit cards and other staple credit products. These limitations would come at a moment when targeted digital marketing

technologies increasingly allow lenders to screen and discourage consumers on the basis of their protected characteristics, before they can apply. Finally, credit discrimination is a drag on our nation's economic growth and limiting civil rights protections threatens to exacerbate those negative economic impacts.

## ARGUMENT

### I. ECOA's Text and this Court's Title VII Caselaw Support the Longstanding Prohibition Against Pre-Application Discouragement

ECOA prohibits discrimination in "any aspect of a credit transaction," 15 U.S.C. § 1691(a), encompassing a broad range of discriminatory credit practices, including pre-application discouragement of consumers.

Congress enacted ECOA in 1974 to eradicate "widespread discrimination . . . in the granting of credit to women." S. Rep. No. 93-278, at 16 (1973); *see also Anderson v. United Fin. Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982); *Markham v. Colonial Mortg. Serv. Co., Assocs. Inc.*, 605 F.2d 566, 569 (D.C. Cir. 1979). Two years later, ECOA was amended to further its "major purpose of extending the federal ban on discriminatory credit practices" to include additional protected classes, such as race, religion, national origin, and age. *See* S. Rep. No. 94-589, at 2 (1976); Pub. L. No. 94-239, 90 Stat. 251 (1976). The Act was "intended to prevent the kinds of credit discrimination which have occurred in the past, and to anticipate and prevent discriminatory practices in the future." S. Rep. No. 94-589, at 4 (1976). Congress recognized that credit is not "a luxury item," as most consumers rely on credit for everything from home mortgages to auto purchases to everyday expenses.

8

*Id* at 3. The Act was thus meant to produce a market with "evenhanded treatment in the[] quest for what has become a virtual necessity of life"—credit. *Id.* at 4.

ECOA and Regulation B have long prohibited discriminatory conduct designed to limit consumers' access to credit before they have a chance to submit applications. Namely, lenders are prohibited from making statements, in advertising or otherwise, that would discourage, on a prohibited basis, a reasonable person from pursuing an application.[6] 12 C.F.R. § 1002.4(b). This prohibition is "necessary to protect applicants against discriminatory acts occurring before an application is initiated." 40 Fed. Reg. 49298, 49299 (Oct. 22, 1975).

The plain language of ECOA readily encompasses this commonsense prohibition. First, it is explicit in the text of the Act. In 1991, Congress amended ECOA to require agencies enforcing the Act to refer matters to the Attorney General when there is reason to believe that a creditor has engaged in a "pattern or practice of *discouraging* or denying applications for credit in violation of [ECOA]." 15 U.S.C. § 1691e(g); FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 223, 105 Stat. 2236 (1991) (emphasis added); *see also* S. Rep. No. 102-167, at *86 (1991) (noting that "[d]iscouraging applications on a prohibited basis and advertising which implies a discriminatory preference are also prohibited").

---

[6] Regulation B first codified this provision in 1975, prohibiting "any statements to applicants or prospective applicants which would, [on a prohibited basis], discourage a reasonable person from applying for credit or pursuing an application for credit." 40 Fed. Reg. 49298, 49307 (Oct. 22, 1975) (promulgating 12 C.F.R. pt. 202). The CFPB later republished this provision without material change. 76 Fed. Reg. 79442 (Dec. 21, 2011).

Second, the Act prohibits discrimination against "any applicant, with respect to any aspect of a credit transaction." 15 U.S.C. § 1691(a). The term "applicant" is defined to mean "any person who applies to a creditor."[7] 15 U.S.C. § 1691a(b). The Dictionary Act instructs that, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . words used in the present tense include the future as well as the present." 1 U.S.C. § 1. The context here supports this interpretation. An "applicant" who "applies" for credit encompasses those likely to apply in the future or that otherwise would have applied absent the discriminatory actions. In ordinary parlance, for example, a company might "seek applicants"[8] or discourage applicants, but in either case, the company does so with respect to people that will or would apply but have not yet done so. Unsurprisingly, courts have thus recognized that ECOA's protections for "applicants" must extend to individuals who have not yet applied. *See, e.g.*, *Hildebrandt v. Vilsack*, 102 F. Supp. 3d 318, 323 (D.D.C. 2015) ("The refusal to provide a person with a credit application because of the applicant's race plainly constitutes 'discriminat[ion]' . . . proscribed by the ECOA.").

This interpretation aligns with the Seventh Circuit's employment discrimination jurisprudence. A plaintiff who has not applied for a position can

---

[7] The definition includes both explicit and implicit applications for credit, which it refers to as "direct" and "indirect" applications, respectively. An "indirect" application includes an implicit request for additional credit via exceeding an existing credit limit, and a "direct" application includes an explicit application. *See* 15 U.S.C. § 1691a(b).

[8] *Applicant*, Oxford Learner's Dictionaries (last visited June 20, 2023), available at: https://www.oxfordlearnersdictionaries.com/us/definition/english/applicant, ("The company will seek applicants nationwide").

qualify for relief under Title VII's prohibition against an employer discriminating against "applicants for employment," 42 U.S.C. § 2000e-3(a), where the plaintiff was "deterred from applying by the very discriminatory practices he is protesting." *Volling*, 840 F.3d at 384 (quoting *Loyd v. Philips Bros.*, 25 F.3d 518, 523 (7th Cir. 1994)).[9] Here, the CFPB's allegations, *see* Dist. Ct. Op. 2-3, ECF No. 110, are sufficient to plead that Townstone's actions would discourage Black prospective applicants from applying for mortgage loans. It is reasonable to infer, for example, that the audience affirmatively tuning into "The Townstone Financial Show," which is a "long-form commercial advertisement, in which the hosts discuss mortgage-related issues . . . and take questions from prospective applicants," Dist. Ct. Op. 2, would include consumers interested in applying for loans, and that some of those consumers would have been deterred from applying by the challenged pre-application practices.

Third, the district court's position ignores the plain text of ECOA's rulemaking delegation. The Act delegates to the Board (and now the CFPB) the power to proscribe regulations that "provide for *such adjustments* and exceptions . . . as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [ECOA], *to prevent circumvention or evasion thereof*[.]" 15 U.S.C. § 1691b(a) (emphasis added). The Board (now CFPB) rightly concluded that the prohibition on discouragement is necessary to implement ECOA and prevent

---

[9] In assessing ECOA claims, courts often apply standards from other discrimination contexts, such as Title VII or the FHA. *See, e.g., Garcia v. Johanns*, 444 F.3d 625, 632 (D.C. Cir. 2006) (listing Circuit cases); *Bingham v. Centier Bank*, No. 2:20-CV-478-TLS-JPK, 2022 WL 355765, at *2 (N.D. Ind. Feb. 7, 2022).

evasion of the Act. Even if the statutory text were not readily interpreted to prohibit pre-application discrimination (which it is), it is squarely within the agencies' authority to provide for an "adjustment" to effectuate this protection. Just as an "exception" would include an agency determination to excuse conduct otherwise prohibited by the Act, an "adjustment" includes an agency determination to cover conduct not explicitly prohibited. Like the rest of ECOA's text, the statutory language authorizing "adjustments" must be given effect; there is no more obvious "adjustment" to prevent evasion and effect the purposes of ECOA than Regulation B's prohibition against pre-application discrimination.

## II.    Invalidating ECOA's Longstanding Prohibitions Against Pre-Application Discrimination Would Severely Limit the Act's Effectiveness

Decades of discriminatory credit practices—including redlining and other forms of discouragement—have limited access to credit, helping to entrench severe gaps in homeownership, small business creation, and wealth on the basis of protected class.[10] These practices have contributed to a dual credit market, where predominantly white communities often have access to a safe, well-regulated credit market, while historically underserved communities of color are disproportionately

---

[10] Lisa Rice, *Missing Credit: How the U.S. Credit System Restricts Access to Consumers of Color*, National Fair Housing Alliance (Feb. 26, 2019), available at: https://nationalfairhousing.org/wp-content/uploads/2019/04/Missing-Credit.pdf; Lisa Rice and Deidre Swesnik, *Discriminatory Effects of Credit Scoring on Communities of Color*, 46 Suffolk U. L. Rev. 935 (2013).

unbanked at every income level and relegated to non-traditional, subprime credit alternatives.[11]

Unfortunately, discrimination in credit markets persists and is often effectuated through pre-application discouragement. Insulating these discriminatory practices from ECOA's reach would hobble the progress made to date. As this Court and the Supreme Court have recognized, interpreting antidiscrimination laws to "requir[e] applications . . . could effectively bar 'victims of the most entrenched forms of discrimination'" from relief. *Volling*, 840 F.3d at 384 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 367).

A. Mortgage Redlining Is a Persistent Obstacle to Equality

The district court's decision would render ECOA largely inapplicable to much of the discriminatory activity that commonly effectuates redlining—mortgage discrimination based on the characteristics of a neighborhood.

Redlining has its roots in historic policies designed to limit credit availability, including via government-sanctioned "redlining" maps of the 1930s that discouraged financing for communities of color.[12] Discriminatory redlining, however, is not solely a thing of the past. Across administrations, the CFPB and the

---

[11] *FDIC National Survey of Unbanked and Underbanked Households*, FDIC 2, 6-7, 37 (2021), available at: https://www.fdic.gov/analysis/household-survey/2021report.pdf; *see generally* Rice, *supra* note 10; *see generally* Rice and Swesnik, *supra* note 10.

[12] john a. powell and Jason Reece, *The Future of Fair Housing and Fair Credit: From Crisis to Opportunity*, 57 Clev. St. L. Rev. 209, 221-222 (2009); *see also* Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* (2017); Bruce Mitchell and Juan Franco, *HOLC 'Redlining' Maps: The Persistent Structure of Segregation and Economic Inequality*, National Community Reinvestment Coalition (Dec. 18, 2018), available at: https://ncrc.org/wp-content/uploads/dlm_uploads/2018/02/NCRC-Research-HOLC-10.pdf.

Department of Justice ("DOJ") have resolved lawsuits challenging financial institutions' efforts to structure their businesses to discourage credit applications from prospective applicants in predominantly minority communities.[13]

Redlining continues to be carried out largely through pre-application discouragement rather than through the denial of individual applicants.[14] It is often accomplished through marketing campaigns or public statements, the exclusion of communities of color from publicly-announced geographic "assessment areas" where lenders focus products, and other practices that discourage prospective applicants and result in significantly fewer loan applications from communities of color as compared to peer lenders.[15]

Redlining has contributed to stark disparities in credit access, homeownership, and wealth. The share of conventional mortgage loans to Black

---

[13] *See, e.g.*, Consent Order, *CFPB, et al. v. Trident Mortg. Co. LP*, No. 2:22-cv-02936-GEKP (E.D. Pa. Sept. 14, 2022), ECF No. 13; Consent Order, *CFPB, et al. v. Hudson City Sav. Bank, F.S.B.*, No. 2:15-cv-07056-CCC-JBC (D.N.J. Nov. 4, 2015), ECF No. 9; *United States v. First Merchants Bank*, No. 1:19-CV-02365-JPH-MPB, 2019 WL 3779768 (S.D. Ind. Aug. 12, 2019); Consent Order, *United States, et al. v. BancorpSouth*, No. 1:16-cv-001118-MPM-DAS (N.D. Miss. July 25, 2016), ECF. No, 8; Consent Order, *United States, et al. v. Trustmark Nat'l Bank*, No. 2:21-cv-2664 (W.D. Tenn. Oct. 27, 2021), ECF No. 26; Consent Order, *United States v. City Nat'l Bank*, No. 2:23-cv-00204-DMG-RAO (C.D. Cal. Jan. 30, 2023), ECF. No. 20; Consent Order, *United States v. Lakeland Bank*, No. 2:22-cv-05746 (D.N.J. Sept. 29, 2022), ECF No. 4.

[14] *See, e.g.*, Charles L. Nier III, *Perpetuation of Segregation: Toward a New Historical and Legal Interpretation of Redlining under the Fair Housing Act*, 32 J. Marshall L. Rev. 617, 637 (1999) (discussing study concluding that lack of loan applications, rather than low application approval rates, was the immediate cause of the most severe negative lending patterns, and that those low volumes resulted from lender strategies related to marketing, delineating lending territory, and other policies).

[15] *See* Samantha Ondrade, *Enforcement of the Fair Housing Act and Equal Credit Opportunity Act to Combat Redlining*, 70 DOJ J. Fed. L. & Prac. 247, 253 (2022) (noting that indicia of redlining include "marketing, advertising, and conducting outreach only to predominantly white communities and avoiding communities of color").

borrowers is bleak, with approximately 4% of home purchase loans going to Black borrowers in 2021 despite the fact that Black people comprise 12.1% of the nation's population, while over 60% of such loans went to non-Hispanic white borrowers.[16] Similarly, Black borrowers (including those with higher incomes) are disproportionately steered to risky subprime loans with higher fees and a greater likelihood of default resulting in foreclosure.[17]

These credit disparities have driven disparities in homeownership. The homeownership gap between Black and white families is wider today than in the 1960s, before passage of ECOA and the FHA.[18] As of 2023, homeownership rates for Black and Latino households lagged at 45.8% and 49.7%, respectively, far behind

---

[16] Federal Housing Finance Agency, *2022 Annual Housing Report* 11 (Oct. 28, 2022), available at: https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/Annual-Housing-Report-2022.pdf; United States Census Bureau, *Demographic and Housing Estimates* (2021), available at: https://data.census.gov/table?q=DP05:+ACS+DEMOGRAPHIC+AND+HOUSING+ESTIMA TES&tid=ACSDP1Y2021.DP05.

[17] Alanna McCargo and Jung Hyun Choi, *Closing the Gaps: Building Black Wealth Through Homeownership*, Urban Institute 7 (Nov. 23, 2020), available at: https://www.urban.org/research/publication/closing-gaps-building-black-wealth-through-homeownership.

[18] Jung Hyun Choi, et al., *Explaining the Black-White Homeownership Gap*, Urban Institute (Oct. 2019), available at: https://www.urban.org/sites/default/files/publication/101160/explaining_the_black-white_homeownership_gap_2.pdf; McCargo and Hyun Choi, *supra* note 17, at 4.

that of non-Hispanic white families, at 74.4%.[19] This almost thirty-point gap is at its highest point since 1890,[20] and it is persistent across income levels.[21]

Because homeownership is the principal means of accumulating and transferring wealth across generations, discriminatory constraints on mortgage credit have contributed to a substantial wealth gap across racial lines.[22] Today, the median wealth of a Black family ($24,100) is only a fraction of that of a white family ($188,200).[23]

Lending in Chicago is no exception. A Chicago public media analysis of home purchase records from 2012 through 2018 found that "for every $1 banks loaned in Chicago's white neighborhoods, they invested just 12 cents in the city's [B]lack neighborhoods and 13 cents in Latino areas."[24] Financial institutions "made four times more loans in Chicago's white neighborhoods than they did in [B]lack or Latino areas."[25]

---

[19] United States Census Bureau, *Quarterly Residential Vacancies and Homeownership First Quarter 2023* 9 (May 3, 2023), available at: https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

[20] Adam Levitin, *How to Start Closing the Racial Wealth Gap*, The American Prospect (June 17, 2020), available at: https://prospect.org/economy/how-to-start-closing-the-racial-wealth-gap/.

[21] *See* Fannie Mae, *Equitable Housing Finance Plan* 7-8 (June 2022), available at: https://www.fanniemae.com/media/43636/display.

[22] *See generally id*; Ondrade, *supra* note 15, at 251; NFHA, *Redlining Toolkit* 10 (April 2022), available at: https://nationalfairhousing.org/issue/redlining/.

[23] McCargo and Hyun Choi, *supra* note 17, at 2.

[24] Linda Lutton, Andrew Fan, and Alden Loury, *Where Banks Don't Lend*, City Bureau and WBEZ 91.5 Chicago (June 3, 2020), available at: https://interactive.wbez.org/2020/banking/disparity/.

[25] *Id.*

Holding that ECOA is inapplicable to pre-application discriminatory conduct would exacerbate these stark disparities by undermining efforts to counteract redlining and its pernicious effects.

    B.  <u>Limiting ECOA Would Impede Transparency into the Practices of Major Mortgage Lenders</u>

ECOA has long been applied alongside the FHA to challenge discriminatory discouragement in mortgage lending. 42 U.S.C. §§ 3604(a)-(c), 3605(a); *see Page v. Midland Fed. Sav. & Loan Ass'n*, No. 12 C 8261, 2013 WL 5211747, at *4 (N.D. Ill. Sept. 13, 2013); *Gray v. Seterus, Inc.*, 233 F. Supp. 3d 865, 871 (D. Or. 2017).[26] However, limiting the scope of ECOA would result in an uneven regulatory playing field between banks and nonbanks—contrary to a primary purpose of the Dodd-Frank Act to ensure consistent enforcement "without regard to the status of a person as a depository institution," 12 U.S.C. § 5511(b)(4). Today, agencies supervise the pre-application activities of all mortgage lenders under ECOA, the FHA, or both. Federal banking agencies supervise smaller institutions like community banks and small credit unions, applying similar standards under both ECOA and the FHA. The CFPB supervises large banks and *nonbank* mortgage companies—arguably the most significant entities in mortgage lending—but the CFPB does not supervise them for FHA compliance. If ECOA no longer applies to pre-application discrimination and discouragement, even the largest nonbank

---

[26] As discussed *infra* Section II.C, the FHA does not extend beyond housing credit; accordingly, the district court's holding would create a significant gap in fair lending protections for non-mortgage credit, such as small business, auto, student, and personal loans, as well as credit cards and other everyday credit products.

17

mortgage lenders would not be supervised for such conduct whereas smaller community lenders still would be.

To explain, a primary function of the CFPB and each of the "prudential" banking regulators—the Federal Reserve Board, the Federal Deposit Insurance Corporation ("FDIC"), the National Credit Union Administration ("NCUA"), and the Office of the Comptroller of the Currency ("OCC")—is to conduct examinations of financial institutions via supervision programs.[27] Through these programs, the regulators obtain information about supervised entities' activities and compliance systems, detect risks to consumers and markets, and determine compliance with consumer financial laws.[28] The process is confidential and can include the review of documents, onsite interviews, and transaction testing. An examination typically results in a supervisory letter or report that identifies any compliance weaknesses or violations of law. Financial institutions then review these findings and implement any necessary changes.[29]

---

[27] *See* CFPB, *An Introduction to CFPB's Exams of Financial Companies* (Jan. 9, 2023) (hereafter "CFPB's Exams"), available at: https://files.consumerfinance.gov/f/documents/cfpb_an-introduction-to-cfpbs-exams-of-financial-companies_2023-01.pdf; *See also* Federal Reserve Board, *Consumer Compliance Outlook, Risk-Focused Consumer Compliance Supervision Program for Community Banks* (2014), available at: https://www.consumercomplianceoutlook.org/2014/second-quarter/risk-focused-consumer-compliance-supervision-program-for-community-banks/; Federal Reserve Board, *FFIEC Guidance on the Uniform Interagency Consumer Compliance Rating System* (last visited June 13, 2023), available at: https://www.federalreserve.gov/supervisionreg/caletters/ca_16-8_attachment_uniform_interagency_cc_rating_system_(002).pdf; OCC, FDIC, Federal Reserve Board, Office of Thrift Supervision, NCUA, *Interagency Fair Lending Examination Procedures* (Aug. 2009), available at: https://www.ffiec.gov/pdf/fairlend.pdf.
[28] CFPB's Exams, *supra* note 27, at 1.
[29] *Id.* at 3.

The prudential regulators are primarily responsible for supervision of consumer financial laws with respect to smaller depository institutions, including community banks and smaller credit unions.[30] The CFPB, in turn, is charged with supervising very large depository institutions, meaning banks and credit unions with assets over $10 billion.[31] The CFPB is also charged with supervising certain "non-depository" institutions, including nonbank mortgage originators.[32] The CFPB's supervision of this latter category is vital to consumers and our economy because nonbanks dominate the mortgage market. After years of drastic increases in market share, these institutions account for more than two-thirds of mortgage lending.[33]

Importantly, the prudential regulators have authority to examine institutions, including smaller depositories, for violations of ECOA *and* the FHA.[34] In contrast, the CFPB supervises its institutions for compliance with ECOA, but it

---

[30] 12 U.S.C. §§ 5516(a), (d).

[31] 12 U.S.C. § 5515(a); CFPB, *Institutions subject to CFPB supervisory authority* (last visited June 13, 2023), available at:
https://www.consumerfinance.gov/compliance/supervision-examinations/institutions/.

[32] 12 U.S.C. § 5514(a)(1)(A).

[33] CFPB, *Summary of 2021 Data on Mortgage Lending* (June 16, 2022), available at:
https://www.consumerfinance.gov/data-research/hmda/summary-of-2021-data-on-mortgage-lending/; Marshall Lux and Robert Green, *What's Behind the Non-Bank Mortgage Boom?*, Harvard Kennedy School Associate Working Paper No. 42 (June 2015), available at:
https://www.hks.harvard.edu/centers/mrcbg/publications/awp/awp42.

[34] The prudential regulators retained authority to supervise larger depository institutions for FHA but not ECOA violations. *See* Offices of Inspector General, FDIC, Board of Governors of the Federal Reserve System, CFPB, OCC, NCUA, *Coordination of Responsibilities Among the Consumer Financial Protection Bureau and the Prudential Regulators—Limited Scope Review* 13 (June 2015), available at:
https://www.fdicoig.gov/sites/default/files/reports/2022-08/15-004EV.pdf.

does *not* supervise for compliance with the FHA.[35] Given Regulation B's longstanding discouragement prohibitions, mortgage lenders—whether small community banks and credit unions or the largest nonbank institutions—have historically been supervised for evidence of discriminatory discouragement, which would violate both the FHA and ECOA.[36]

However, if the district court's holding that ECOA is inapplicable to discriminatory pre-application discouragement is affirmed, small community banks and credit unions would be held to a higher supervisory standard than even the largest nonbank mortgage companies. Prudential regulators would continue to supervise small banks and credit unions to ensure they are not engaging in activities that discriminate against prospective mortgage applicants in violation of the FHA. But supervision of this conduct with respect to nonbank mortgage lenders would be severely limited because no federal agency supervises these institutions for FHA violations, and ECOA would no longer be directly applicable to this pre-application conduct.

This result would shield the nonbank entities that dominate the mortgage market from the regulatory transparency that all mortgage lenders have been subject to since the subprime mortgage crisis of 2007–2009, and unduly restrict fair

---

[35] *See* CFPB, *Supervision and Examination Manual* ECOA 1 (June 2023) (adopting the FFIEC Interagency Fair Lending Examination Procedures and noting that the FHA "unlike ECOA, is not a 'Federal consumer financial law' as defined by the Dodd-Frank Act for which the CFPB has supervisory authority"), available at: https://www.consumerfinance.gov/compliance/supervision-examinations/; 12 U.S.C. §§ 5481(12)(A)-(R), 5481(14).

[36] *See* OCC, FDIC, Board, Office of Thrift Supervision, NCUA, *supra* note 27, at i, iv, 29, 38.

competition. Limiting ECOA, and the CFPB's supervisory transparency, would thus be contrary to one of the core purposes of the Dodd-Frank Act—ensuring that consumer financial law is enforced consistently across banks and nonbanks.[37]

C.   <u>The District Court's Interpretation Would Severely Limit Protections Against Discrimination in Non-Mortgage Credit Markets</u>

Pre-application discriminatory discouragement extends beyond the mortgage market. From auto loans to business loans, to credit cards and personal loans, pre-application discrimination is pervasive. Outside of the mortgage context, ECOA is the main federal recourse to challenge discriminatory credit practices,[38] yet the district court's holding would do away with the Act's protections so long as discriminatory acts effectively deter consumers from applying.

1.   *Discrimination in Small Business Lending*

Small businesses account for more than 99.9% of all U.S. businesses, employing approximately 46% of the American workforce.[39] Financing plays a vital role in enabling small businesses to form and grow.[40] Unfortunately, however, discrimination in access to small business loans is well-documented.[41]

---

[37] 12 U.S.C. § 5511(b)(4).

[38] *See* Ondrade, *supra* note 15, at 252 ("Although the FHA outlaws lending discrimination related to housing, other types of lending discrimination, such as discrimination in consumer or auto lending, were without federal recourse until 1974, when the Equal Credit Opportunity Act (ECOA) was enacted….").

[39] U.S. Small Business Administration ("SBA"), *2022 Small Business Profile* (2022), available at: https://advocacy.sba.gov/wp-content/uploads/2022/08/Small-Business-Economic-Profile-US.pdf.

[40] CFPB, Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35150, 35158 (May 31, 2023).

[41] Andre Perry, et al., *Black-owned Businesses in U.S. Cities: The Challenges, Solutions, and Opportunities for Prosperity*, Brookings Metro (Feb. 14, 2022), available at: https://www.brookings.edu/wp-content/uploads/2022/02/Black-business-report_PDF.pdf;

Entrepreneurs of color seeking financing for their small businesses face a more difficult journey than similarly-situated counterparts, including exposure to discriminatory discouragement.[42] Minority- and women-owned firms are more likely to be discouraged from applying for or denied financing than other firms.[43]

Religious discrimination in small business lending also persists. CFPB reported finding that certain lenders improperly inquired into small businesses' religious affiliation and refused to grant credit to those that did not respond to the questions.[44] Similarly, the FDIC has identified instances where creditors have

---

Alicia Robb, *Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms*, SBA Office of Advocacy (Feb. 1, 2018), available at: https://advocacy.sba.gov/2018/02/01/financing-patterns-and-credit-market-experiences-a-comparison-by-race-and-ethnicity-for-u-s-employer-firms/; Federal Reserve, *Small Business Credit Survey: 2021 Report on Firms Owned by People of Color* (2021), available at: https://www.fedsmallbusiness.org/survey/2021/2021-report-on-firms-owned-by-people-of-color.

[42] Maura L. Scott, et al., *Revealing and Mitigating Racial Bias and Discrimination in Financial Services*, J. of Mktg. Rsch. 3, available at: https://doi.org/10.1177/00222437231176470.

[43] *See, e.g.*, Fed. Rsrv. Banks of Atlanta, Boston, Chicago, Cleveland, Dallas, Kansas City, Minneapolis, New York, Philadelphia, Richmond, St. Louis, and San Francisco, *Small Business Credit Survey: 2021 Report on Firms Owned by People of Color* (Apr. 2021), available at: https://www.fedsmallbusiness.org/medialibrary/FedSmallBusiness/files/2021/sbcs-report-on-firms-owned-by-people-of-color; Robert W. Fairlie and Alicia M. Robb, *Disparities in Capital Access between Minority and Non-Minority-Owned Businesses: The Troubling Reality of Capital Limitations Faced by MBEs*, Minority Business Development Agency (Jan. 2010), available at: https://www.mbda.gov/sites/default/files/migrated/files-attachments/DisparitiesinCapitalAccessReport.pdf; Fed. Rsrv. Banks of New York and Kansas City, *Small Business Credit Survey: 2016 Report on Women-Owned Firms* (Nov. 2017), available at: https://www.newyorkfed.org/medialibrary/media/smallbusiness/2016/SBCS-Report-WomenOwnedFirms-2016.pdf; Christine Kymn, *Access to Capital for Women- and Minority-owned Businesses: Revisiting Key Variables*, SBA Office of Advocacy (Jan. 29, 2014), available at: https://advocacy.sba.gov/2014/01/29/access-to-capital-for-women-and-minority-owned-businesses-revisiting-key-variables/.

[44] CFPB, *supra* note 4.

restricted the availability of commercial loans to entities because of their religious affiliations.[45]

One study assessed pre-application discrimination and discouragement in financial institutions' operation of federal Paycheck Protection Program lending to small businesses.[46] Matched-pair tests revealed troubling "patterns of discouragement for minority and women-owned businesses."[47] The tests showed statistically significant differences in treatment across racial, ethnic, and gender lines. Black and Latina female testers were far more likely to be discouraged from applying, including through overt statements, informational asymmetry (the provision of no or limited information about loan products), or other discouraging tactics (including encouraging testers to go elsewhere, stating that the institution was not offering loans, or simply telling testers not to apply).[48]

Another set of studies demonstrated that financial institutions engaged in racially biased marketing in presenting their product portfolios to Black business owners.[49] Despite having stronger financial profiles, Black testers were recommended loans with favorable terms significantly less often than white

---

[45] *See* Federal Reserve System, *supra* note 4.
[46] Anneliese Lederer, et al., *Lending Discrimination During Covid-19: Black and Hispanic Women-Owned Businesses*, National Community Reinvestment Coalition (2020), available at: https://ncrc.org/lending-discrimination-during-covid-19-black-and-hispanic-women-owned-businesses/.
[47] *Id.* at 9.
[48] *Id.* at 14–20.
[49] Scott, et al., *supra* note 42.

customers. Moreover, some Black business owners received significantly less favorable treatment while inquiring about loan products.[50]

Women- and minority-owned businesses and religious-affiliated entities continue to face obstacles in their search for credit, including pervasive pre-application discouragement.

## 2. *Discrimination in Auto Lending*

Auto loans are the third largest category of household debt, behind only mortgages and student loans.[51] Access to automobiles, along with the loans to obtain them, is of particular importance in low- and moderate-income communities with limited access to nearby jobs, medical care, food, and other daily necessities.[52]

Yet, evidence exists that racial discrimination in the auto loan market is pervasive, with studies indicating that Black and Latino borrowers pay higher interest rates than their white counterparts, even after controlling for financial qualifications or borrower literacy.[53]

A 2018 investigation by NFHA into the car-buying process using matched pair testing found that despite having better financial profiles, non-white testers

---

[50] *Id.*

[51] Federal Reserve Bank of New York, *Quarterly Report on Household Debt and Credit* 21 (May 2023), available at: https://www.newyorkfed.org/medialibrary/Interactives/householdcredit/data/pdf/HHDC_2023Q1.pdf?sc_lang=en.

[52] Jonathan Lanning, *Evidence of Racial Discrimination in the $1.4 Trillion Auto Loan Market*, ProfitWise News and View (Jan. 2023), available at: https://www.chicagofed.org/publications/profitwise-news-and-views/2023/discrimination-auto-loan-market#ftn3.

[53] *Id.*

were treated considerably worse, were less likely to be taken seriously as buyers, and received higher quotes for financing and fewer financing options.[54]

Under the district court's view, ECOA would not apply in these circumstances unless the consumers pursued credit applications, even if doing so would obviously have been futile.

## III.   ECOA's Pre-Application Protections Are Vital Given the Rise of Targeted Digital Marketing

The district court's holding that ECOA is silent with respect to pre-application discrimination is particularly troubling given the rise of creditors' use of digital targeted marketing tools to reach (and exclude) consumers. Digital targeted marketing allows creditors to disseminate advertisements through online platforms—like webpages and social media—using "sophisticated data analytics that effectively preselect a precise target audience."[55] Namely, new technologies allow lenders to curate detailed information about consumers, including their habits, preferences, financial patterns, and where they live.[56] Financial institutions, in turn, "increasingly use these tools because they allow advertisement placement not only with those most likely to be *interested* in a given financial product, but also

---

[54] Lisa Rice and Erich Schwartz Jr., *Discrimination When Buying a Car: How the Color of your Skin Can Affect your Car-Shopping Experience*, NFHA (Jan. 2018), available at: https://nationalfairhousing.org/wp-content/uploads/2018/01/Discrimination-When-Buying-a-Car-FINAL-1-11-2018.pdf.

[55] Jason Cover, *Digital Targeted Marketing, Business Regulation & Regulated Industries* (Feb. 9, 2022), available at: https://businesslawtoday.org/2022/02/digital-targeted-marketing-fair-lending-clickbait/.

[56] Carol Evans and Westra Miller, *From Catalogs to Clicks: The Fair Lending Implications of Targeted, Internet Marketing*, Federal Reserve Board Consumer Compliance Outlook (2019), available at: https://www.consumercomplianceoutlook.org/2019/third-issue/from-catalogs-to-clicks-the-fair-lending-implications-of-targeted-internet-marketing/.

with those most likely to *qualify* for it."[57] In other words, these technologies are fast

becoming a pre-application screening tool with the ability to draw on a trove of

consumers' personal characteristics.

These automated technologies present new risks for prospective applicants,

who may be excluded or discouraged through algorithmic marketing and

advertising.[58] Use of this data can result in "digital redlining" or "digital steering,"

whereby institutions discourage applications from certain types of consumers or

attempt to steer consumers into products that are inferior to ones they might

otherwise qualify for based on traditional criteria.[59]

The risk that digital advertising systems will be used to target or exclude

consumers because of their protected characteristics is not hypothetical. In 2018,

NFHA and others sued Facebook, asserting that it allowed advertisers placing

housing, credit, and employment ads to exclude (or target) individuals because of

their protected class status, including their sex, age, and race.[60] This lawsuit

resulted in a 2019 settlement involving changes to Facebook's advertising platform,

including creating a separate portal for housing, employment, and credit ads.[61] The

---

[57] Cover, *supra* note 55.

[58] *Id.*; *see also* Jinyan Zang, *Solving the Problem of Racially Discriminatory Advertising on Facebook*, The Brookings Institution (Oct. 19, 2021), available at: https://www.brookings.edu/research/solving-the-problem-of-racially-discriminatory-advertising-on-facebook/.

[59] Evans and Miller, *supra* note 56.

[60] *See Nat'l Fair Hous. All., et al. v. Facebook, Inc.*, No. 1:18-cv-02689-JGK (S.D.N.Y. June 25, 2018).

[61] *Facebook Settlement*, NFHA (Mar. 14, 2019), available at: https://nationalfairhousing.org/facebook-settlement/#:~:text=NFHA%20and%20the%20other%20plaintiffs,%2C%20Hispanics%2C%20and%20Asian%20Americans.

Attorney General of Washington also entered into a consent order in which Facebook agreed to cease providing advertisers with the option to use exclusionary advertising tools that allowed credit advertisers to discriminate based on protected class status.[62] DOJ entered into its own agreement resolving allegations that Meta (formerly known as Facebook) enabled and encouraged advertisers to target housing ads by relying on protected class status, and used algorithms that relied in part on protected characteristics to help determine which subset of advertisers' targeted audience would receive a housing ad.[63] That DOJ resolution focused on the FHA because it originated with the U.S. Department of Housing and Urban Development, which has authority over the FHA. But Meta announced it would expand protections required by the DOJ consent order to credit ads.[64]

Allegations specific to Meta/Facebook have received attention to date, but many other entities use or offer digital marketing services, and discriminatory practices related to these technologies will continue to arise. The district court's holding that ECOA is silent as to all pre-application conduct would significantly undermine the Act's ability to "anticipate and prevent discriminatory practices in the future." S. Rep. No. 94-589, at 4 (1976).

---

[62] Consent Order, *In re Facebook, Inc.*, No. 18-2-18287-5SEA (Wa. Super. Ct., July 24, 2018), ECF No. 4.

[63] Department of Justice, *Justice Department Secures Groundbreaking Settlement Agreement with Meta Platforms, Formerly Known as Facebook, to Resolve Allegations of Discriminatory Advertising* (June 21, 2022), available at: https://www.justice.gov/opa/pr/justice-department-secures-groundbreaking-settlement-agreement-meta-platforms-formerly-known.

[64] Meta, *Expanding Our Work on Ads Fairness* (June 21, 2022), available at: https://about.fb.com/news/2022/06/expanding-our-work-on-ads-fairness/.

27

## IV.    Limiting Civil Rights Protections Harms Our Economy

Systemic racial inequality has cost our nation trillions of dollars in economic growth. One study estimates that improving access to housing credit would have resulted in an additional 770,000 Black homeowners and $218 billion in sales and expenditures.[65] Another estimates that addressing racial disparities in homeownership could create nearly 800,000 jobs and generate $400 billion in tax revenue.[66] This analysis found that by not addressing housing inequality, nearly five million people have been denied homeownership opportunities. Eliminating racial inequities in the United States could add $5 trillion of growth to our GDP over the next five years.[67] The inequities in our markets and systems also stifle innovation, productivity, profitability, and economic progress.

Credit discrimination not only harms individuals, it also inhibits the nation's economic viability.

---

[65] *See* Citigroup, *In Pursuit of Equity: Why America's Future Depends on Closing the Racial Wealth Gap* (2021), available at: https://www.nytimes.com/paidpost/citi/in-pursuit-of-equity.html.

[66] Jeff Cox, *Morgan Stanley says Housing Discrimination Has Taken a Huge Toll on the Economy*, CNBC (Nov. 13, 2020), https://www.cnbc.com/2020/11/13/morgan-stanley-says-housing-discrimination-has-taken-a-huge-toll-on-the-economy.html#:~:text=Morgan%20Stanley%20says%20racial%20inequality,five%20million%20from%20owning%20homes.

[67] Dana Peterson and Catherine Mann, *Closing the Racial Inequality Gaps: The Economic Cost of Black Inequality in the U.S.*, Citi Global Perspectives and Solutions 3 (Sept. 1, 2020), https://www.citivelocity.com/citigps/closing-the-racial-inequality-gaps/.

## CONCLUSION

The district court's decision to invalidate ECOA's longstanding prohibitions against pre-application discrimination is contrary to the Act and undermines its ability to fulfill its purpose of eradicating credit discrimination. For the reasons stated above, the district court's decision should be vacated and the case remanded.

Dated: June 21, 2023

Respectfully Submitted,

/s/ Stephen Hayes
Valerie Comenencia Ortiz
Stephen Hayes
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, D.C. 20036
Tel: (202) 728-1888
Fax: (202) 728-0848

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 7th Cir. R. 29 because it contains 6,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 7th Cir. R. 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Century 12-point font.

/s/ Stephen Hayes
Stephen Hayes

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Stephen Hayes
Stephen Hayes