No. 23-1654

IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

CONSUMER FINANCIAL PROTECTION BUREAU,

*Appellant*,

v.

TOWNSTONE FINANCIAL, INC, ET AL,

*Appellees.*

On Appeal from the United States District Court for the Northern District of Illinois (No. 1:20-cv-04176, Hon. Franklin U. Valderrama)

**BRIEF OF FIRST AMENDMENT LEGAL SCHOLARS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT'S REQUEST FOR REVERSAL AND REMAND**

Orlando Economos
   *Counsel of Record*
Robin Thurston*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(551) 655-7477

*Counsel for Proposed* Amici Curiae
*First Amendment Legal Scholars*

* Motion for admission pending

Save As        Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Genevieve Lakier; Amanda Shanor; Rebecca Tushnet

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Democracy Forward

(3)    If the party, amicus or intervenor is a corporation:

        i)    Identify all its parent corporations, if any; and
            n/a

        ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
            n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
n/a

Attorney's Signature: /s/ Orlando Economos      Date: 6/23/23

Attorney's Printed Name: Orlando Economos

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [✔]    No [ ]

Address: P.O. Box 34553

Washington, DC 20043

Phone Number: +15516557477      Fax Number: 202-701-1779

E-Mail Address: oeconomos@democracyforward.org

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Genevieve Lakier; Amanda Shanor; Rebecca Tushnet

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Democracy Forward

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
    n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
    n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
n/a

Attorney's Signature: /s/ Robin Thurston      Date: 6/23/23

Attorney's Printed Name: Robin Thurston

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]  No [✔]

Address: P.O. Box 34553

Washington, DC 20043

Phone Number: (202) 701-1775      Fax Number: 202-701-1779

E-Mail Address: rthurston@democracyforward.org

rev. 12/19 AK

# TABLE OF CONTENTS

**Interest of AmicI Curiae** ........................................................1

**Introduction**..........................................................................1

**Argument**..............................................................................3

**I.    Regulation B and its application to Townstone are consistent with the First Amendment.**................................5

A.    Regulation B targets discriminatory commercial conduct, not speech. ..........................................................................6

B.    To the extent Regulation B is read to directly regulate speech, it is a constitutionally permissible regulation of commercial speech...12

*i.    Statements in advertising discouraging consumers, on the basis of race, from pursuing an application for credit, like Townstone's infomercial, are, at most, commercial speech.* ...................................................... 13

*ii.    Regulation B applies only to a proscribable class of unprotected speech under Central Hudson.* ............................................................ 19

*iii.    Regulation B satisfies intermediate scrutiny under Central Hudson.* ..... 21

**II.    Regulation B is clear about what it prohibits.**..................... 26

**Conclusion**.......................................................................... 29

# TABLE OF AUTHORITIES

**Cases**..................................................................................**Page(s)**

*Ariix, LLC v. NutriSearch Corp.*,

    985 F.3d 1107 (9th Cir. 2021) ................................................................. 15

*Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*,

    481 U.S. 537 (1987) ................................................................................... 22

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,

    492 U.S. 469 (1989) ........................................................ 12, 17, 18, 21-22

*Beauharnais v. Illinois*,

    343 U.S. 250 (1952) ..................................................................................... 8

*Bob Jones Univ. v. United States*,

    461 U.S. 574 (1983) ................................................................................... 22

*Bolger v. Youngs Drug Prod. Corp.*,

    463 U.S. 60 (1983) ............................................................................... 15-18

*Campbell v. Robb*,

    162 F. App'x 460 (6th Cir. 2006)............................................................. 20

Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of *N.Y.*,

    447 U.S. 557 (1980) ................................................. 12, 13, 17, 19, 21, 24

*Chaplinsky v. New Hampshire*,

    315 U.S. 568 (1942) ..................................................................................... 8

*Ctr. for Indiv. Freedom v. Madigan*,

    697 F.3d 464 (7th Cir. 2012)............................................................... 26-27

*DeMarco v. United States*,

    415 U.S. 449 (1974) ................................................................................... 25

ii

*Facenda v. N.F.L. Films, Inc.,*

    542 F.3d 1007 (3d Cir. 2008) ................................................................ 14, 15

*FCC v. Fox Television Stations, Inc.,*

    567 U.S. 239 (2012) ................................................................................ 26

*F.T.C. v. Trudeau,*

    662 F.3d 947, 953 (7th Cir. 2011)........................................................ 21

*Gomez v. Illinois State Bd. of Educ.,*

    811 F.2d 1030 (7th Cir. 1987)............................................................ 5, 16

*Harris v. Forklift Sys., Inc.,*

    510 U.S. 17 (1993) .................................................................................. 8

*Hecker v. Deere & Co.,*

    556 F.3d 575 (7th Cir. 2009)............................................................ 11-12

*Hishon v. King & Spalding,*

    467 U.S. 69 (1984) .................................................................................. 6

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston,*

    515 U.S. 557 (1995) .............................................................................. 11

*Jancik v. HUD,*

    44 F.3d 553 (7th Cir. 1995)............................................................... 27-29

*Jordan v. Jewel Food Stores, Inc.,*

    743 F.3d 509 (7th Cir. 2014).............................................................. 14-17

*Kasky v. Nike, Inc.,*

    27 Cal.4th 939 (2002) .......................................................................... 17

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*

    138 S. Ct. 2361 (2018) ........................................................................... 5

*Nike, Inc. v. Kasky,*

  539 U.S. 654 (2003) ......................................................................... 17

*Norwood v. Harrison,*

  413 U.S. 455 (1973) ........................................................................... 6

*N.Y. State Club Ass'n, Inc. v. City of New York,*

  487 U.S. 1 (1988) ............................................................................. 22

*Ohralik v. Ohio State Bar Ass'n,*

  436 U.S. 447 (1978) ........................................................................... 7

*Pittsburgh Press Co. v. Human Rels. Comm'n,*

  413 U.S. 376 (1973) .................................................................... 13, 19

*Pittsburgh Press Co. v. Human Rels. Comm'n,*

  413 U.S. 376 (1973) .................................................................... 13, 19

*Pullman-Standard v. Swint,*

  456 U.S. 273 (1982) ......................................................................... 25

*Ragin v. N.Y. Times,*

  923 F.2d 995 (2d Cir. 1991) ................................................ 20-21, 25, 27

*R.A.V. v. St. Paul,*

  505 U.S. 377 (1992) ................................................ 6, 8, 10-11, 22, 23

*Riley v. Nat'l Fed'n of the Blind of N Carolina, Inc.,*

  487 U.S. 781 (1988) ......................................................................... 18

*Roberts v. U.S. Jaycees,*

  468 U.S. 609 (1984) ............................................................ 7, 10, 22, 23

*Romer v. Evans,*

  517 U.S. 620 (1996) ........................................................................... 1

*Roth v. United States*,

    354 U.S. 476 (1957) ................................................................................. 8

*Rumsfeld v. F.A.I.R.*,

    547 U.S. 47 (2006) ...................................................................... 5, 7, 8, 12

*Sorrell v. IMS Health Inc.*,

    564 U.S. 552 (2011) ................................................................................. 5

*Tamayo v. Blagojevich*,

    526 F.3d 1074 (7th Cir. 2008) .............................................................. 12

*Texas v. Johnson*,

    491 U.S. 397 (1989) .............................................................................. 10

*United States v. Benson*,

    561 F.3d 718 (7th Cir. 2009) ........................................................... 12, 15

*United States ex rel. Jackson v. Racey*,

    112 F.3d 512 (4th Cir. 1997) ................................................................ 20

*United States v. O'Brien*,

    391 U.S. 367 (1968) ........................................................................... 9-10

*United States v. Space Hunters, Inc.*,

    429 F.3d 416 (2d Cir. 2005) ........................................................... 20, 29

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,

    425 U.S. 748 (1976) .............................................................................. 13

*Wash. State Dept. of Social and Health Servs. v. Guardianship Est. of Keffeler*,

    537 U.S. 371 (2003) .............................................................................. 28

*Wisconsin v. Mitchell*,

    508 U.S. 476 (1993) ......................................................................... 10-11

*Yates v. United States*,

    574 U.S. 528 (2015) ................................................................. 28

**Constitutional Provisions**

U.S. Const.:

    Amend. I ........................................................................................ 2

    Amend. V ...................................................................................... 26

**Statutes**

12 C.F.R. § 1002.4 ......................................................... 2, 3, 4, 10, 13, 23, 24

15 U.S.C. § 1691 .......................................................... 2, 3, 9, 11, 12, 20, 21, 23

**Other Authorities**

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 HARV. L. REV. 1765 (2004) ......................................................................... 7

Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog that Didn't Bark*, 1994 SUP. CT. REV. 1 (1994) ................. 8

S. Rep. No. 94-589 (1975) ............................................................... 23

## INTEREST OF AMICI CURIAE

*Amici curiae* are First Amendment scholars from universities around the United States. They are Genevieve Lakier, Professor of Law and Herbert and Marjorie Fried Teaching Scholar at the University of Chicago Law School; Amanda Shanor, Assistant Professor at the Wharton School of the University of Pennsylvania; and Rebecca Tushnet, Frank Stanton Professor of First Amendment Law at Harvard Law School. *Amici* have a strong interest in assisting this Court in resolving questions of law that go to the core of their professional expertise and scholarship, namely, the application of the First Amendment to government regulation of unlawful commercial conduct and the contours of First Amendment protections in the realm of anti-discrimination law.

## INTRODUCTION

While many citizens may take for granted equal access to goods and services in the commercial market—including access to credit, which is for so many the door to the necessities of life—members of communities of color and other historically marginalized groups often cannot. Nondiscrimination laws ensure equal opportunity to participate in the "transactions and endeavors that constitute ordinary civic life in a free

society," including commercial markets. *Romer v. Evans*, 517 U.S. 620, 631 (1996). The First Amendment protects our right to speak, U.S. Const. amend. I, but it does not prevent the government from passing laws that regulate conduct to ensure equal access to public life. The Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, is one such law.

The Consumer Financial Protection Bureau (CFPB) enforces Regulation B to implement ECOA. Regulation B bans discrimination on specified bases in any aspect of a credit transaction, 12 C.F.R. § 1002.4(a) and specifically prohibits "discourag[ing] on a prohibited basis a reasonable person from making or pursuing a[ credit] application." *Id.* § 1002.4(b).

Regulation B is fully consistent with the First and Fifth Amendments. First, Regulation B, at most, touches speech only incidentally in the course of the government's regulation of unlawful discriminatory conduct. Second, even if treated as a regulation that targets speech, Regulation B reaches only commercial speech, and where commercial speech furthers unlawful conduct, it is outside the coverage of the First Amendment. Third, even if the communications at issue were to be treated as covered by the First Amendment, Regulation B is not

more extensive than necessary to directly advance the government's substantial interest in ensuring equal access to credit. Finally, Regulation B is clear about what it prohibits, provides fair notice of what it requires, and is neither overbroad nor vague.

The lending practices of Townstone Financial, Inc. (Townstone) demonstrate Regulation B's importance and constitutionality. As the CFPB alleges, Townstone and its executives[1] sought and secured a pool of mortgage applicants that excluded Black Chicagoans through an advertising campaign that included racially charged comments by its executives on its infomercial. ECOA forbids such discrimination through Regulation B. The Constitution will not save Townstone's discriminatory lending practices.

## ARGUMENT

Regulation B provides that "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction." 12 C.F.R. § 1002.4(a). To fulfill ECOA's direction that

---

[1] The CFPB brought this enforcement action against both Townstone Financial, Inc. itself, as well as against its Chief Executive, Barry Sturner. *See* Am. Compl., ECF No. 27, *CFPB v. Townstone*, 20-cv-4176 (N.D. Ill.), at 1.

its prohibition be made immune to "circumvention or evasion," 15 U.S.C.

§ 1691b(a), it further provides that a "creditor shall not make any oral or

written statement, in advertising or otherwise, to applicants or

prospective applicants that would discourage on a prohibited basis a

reasonable person from making or pursuing an application." 12 C.F.R.

§ 1002.4(b).

Before the District Court, Townstone argued that Regulation B

violates the First Amendment, both facially and as applied, and that it

violates the Fifth Amendment on vagueness grounds. Defs.' Mot. to

Dismiss, ECF No. 32, at 12–22. The District Court did not reach these

constitutional questions.[2] While this Court need not either, if it does, this

Court should reject such arguments and find Regulation B consistent

with the First and Fifth Amendments.

---

[2] The District Court disposed of the case by holding that ECOA's
text does not include "prospective applicants," Mem. Op., ECF No. 110,
at 9–18, and so did not reach the question of whether Regulation B
comports with the First Amendment. Should this Court reverse the
District Court on its interpretation of ECOA, the appropriate course
would be remand, including for the District Court to consider
Townstone's First Amendment arguments in the first instance.

I.    **Regulation B and its application to Townstone are consistent with the First Amendment.**

Regulation B prohibits discriminatory conduct in credit transactions, including against prospective applicants. Townstone claims this prohibition infringes its First Amendment right to the freedom of speech.[3] It is black letter law that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)). The government "can prohibit employers from discriminating in hiring on the basis of race," *Rumsfeld v. F.A.I.R.*, 547 U.S. 47, 62 (2006), and such a ban may require employers to refrain from some speech—for

---

[3] At the outset, we recognize that a court need only reach these issues if it determines that the alleged conduct violated Regulation B, namely that it would discourage a reasonable person from pursuing an application for credit on a prohibited basis. Townstone's actions appear to meet this standard, particularly here on a motion to dismiss where facts must be construed in favor of the Bureau. *See Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987). But this liability determination is separate from the constitutional question of whether an enforcement action against Townstone would violate the First or Fifth Amendments. We address only the latter questions, based on the premise that Townstone's actions meet the standard for discouragement under Regulation B.

instance to "take down a sign reading 'White Applicants Only.'" *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 389 (1992)).

Townstone initially argued below that the CFPB sought to suppress its political speech, and that the constitutionality of its actions should be assessed under strict scrutiny. Defs.' Mot. to Dismiss, ECF No. 32, at 12–13. It later argued that its statements discouraging Black Chicagoans from applying for credit were disconnected from the advertising program during which they were made. Defs.' Reply to Pl.'s Opp. to Mot. to Dismiss, ECF No. 38, [hereinafter "Reply"] at 12. These arguments are incorrect and should be rejected.

### A. Regulation B targets discriminatory commercial conduct, not speech.

This is not the first time a commercial enterprise has sought to avoid a nondiscrimination law by invoking the First Amendment or other constitutional provisions. But discriminatory commercial conduct "has never been accorded affirmative constitutional protections." *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973)) (rejecting a law firm's asserted First Amendment right to associate only with male partners in a challenge to Title VII's prohibition on employment discrimination). "The Constitution

does not guarantee a right to choose employees, customers, suppliers, or those with whom one engages in simple commercial transactions, without restraint from the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring).

The First Amendment does not restrict the government's ability to regulate conduct simply because that regulation touches some spoken language: "it has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed." *Rumsfeld*, 547 U.S. at 62 (internal quotation omitted); *see Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity."). The ordinary regulation of contracts, malpractice, securities, or tax returns, all of which regulate written or spoken words but which do not trigger First Amendment review, show how ubiquitous and constitutionally unremarkable such regulation is. *See* Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 HARV. L. REV. 1765 (2004).

Whether understood "as not being speech at all," or as speech regulable "because of [its] constitutionally proscribable content," the result is the same: it is outside the coverage of the First Amendment. *R.A.V.*, 505 U.S. at 383 (internal quotation omitted); *see Roth v. United States,* 354 U.S. 476 (1957) (obscenity); *Beauharnais v. Illinois,* 343 U.S. 250 (1952) (defamation); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ("'fighting' words"). This has long been true in the context of commercial nondiscrimination laws. Congress "can prohibit employers from discriminating in hiring on the basis of race," and the fact that that requires employers to refrain from some speech "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld*, 547 U.S. at 62; *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) (ignoring First Amendment defense to Title VII sexual harassment enforcement); Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog that Didn't Bark*, 1994 SUP. CT. REV. 1 (1994) (analyzing the Court's decision to ignore the First Amendment issue in *Forklift*). As will be shown, speech promoting unlawful conduct, like an illegal commercial transaction, receives no constitutional protection.

Even outside of commercial settings, when a government regulation of conduct incidentally affects expression, the Court has applied at most deferential scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), and has routinely upheld the regulations under that standard. "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376.

Whether the Court applies the minimal scrutiny appropriate for regulations of commercial conduct that incidentally affect expression or the "expressive conduct" standard set forth in *O'Brien*, Regulation B is constitutional. The Equal Credit Opportunity Act targets discriminatory commercial conduct that may be carried out through speech—not speech itself. The Act makes it "unlawful for any creditor to discriminate against any applicant" on any prohibited basis, including "race." 15 U.S.C. § 1691(a). Regulation B carries out ECOA's purpose by prohibiting "discrimination against an applicant on a prohibited basis regarding any aspect of a credit transaction," including "oral or written statement[s], in advertising or otherwise . . . that would discourage on a prohibited basis

9

a reasonable person from making or pursuing an application." 12 C.F.R. § 1002.4. "[W]ords can in some circumstances violate laws directed not against speech but against conduct." *R.A.V.*, 505 U.S. at 389. Like a "White Applicants Only" sign or classified advertisements offering employment only to men, advertisements that promote discriminatory business conduct are "swept up incidentally within the reach of a statute directed at conduct rather than speech." *Id*. Thus, it is only in the course of regulating unlawful discriminatory conduct that Regulation B affects communications at all, and the First Amendment does not prevent the government from doing so.

Likewise, because the Act targets discriminatory conduct, not speech, the critical inquiry under *O'Brien* is whether the government seeks to regulate conduct *because* of what it communicates, or *regardless* of what it communicates. *Texas v. Johnson*, 491 U.S. 397, 406–07 (1989). The Supreme Court has repeatedly held that "eliminating discrimination and assuring its citizens equal access to publicly available goods and services . . . is unrelated to the suppression of expression." *Roberts*, 468 U.S. at 624. In other words, antidiscrimination laws regulate conduct *regardless* of what it communicates. "[F]ederal and state

10

antidiscrimination laws" are "an example of a permissible content-neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). Such laws do not "target speech or discriminate on the basis of its content, the focal point of [their] prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds." *Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 572 (1995). As such, acts that violate Regulation B "are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V.*, 505 U.S. at 390.

Taking the facts in the light most favorable to the Bureau and assuming, as we do, that Townstone's actions and comments here constitute discouragement prohibited by Regulation B, *see supra*, note 3, the First Amendment imposes no bar to its enforcement. Townstone may not deny applications for credit because the applicants are Black. *See* 15 U.S.C. § 1691(a). Neither may it structure its marketing to discourage Black borrowers from applying at all. But that is precisely what the CFPB has alleged it has done, Br. of Appellant at 7–9, and those factual allegations are taken as true on consideration of a motion to dismiss, *see*

*Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). The fact that the advertisements Townstone used to draw the discriminatory pool of applications it wanted to receive were, in part, "carried out by means of language," *Rumsfeld*, 547 U.S. at 62, does not preempt prevention. That Townstone got what it wanted through words spoken by its executives on its infomercials does not entitle Townstone to "circumvent[] and eva[de]" the clear command of ECOA under the guise of free speech. 15 U.S.C. § 1691b(a).

### B. To the extent Regulation B is read to directly regulate speech, it is a constitutionally permissible regulation of commercial speech.

Not all speech is created equal: "Commercial speech receives lesser protection" than core speech, and commercial speech that does not "concern lawful activity" "receives no protection at all." *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 562–66 (1980). That is so even where commercial speech might "contain discussions of important public issues." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 475 (1989). Courts considering commercial regulation that might

burden speech first consider whether the speech regulated is itself commercial; and then, if so, whether the regulation is justified under the test set out in *Central Hudson. See Cent. Hudson,* 447 U.S. at 557. Under that standard, for commercial speech to be protected under the First Amendment at all, "it at least must concern lawful activity and not be misleading." *Id.* at 566. If so, courts next ask "whether the asserted governmental interest is substantial," "whether the regulation directly advances the governmental interest asserted," and, finally, "whether it is not more extensive than is necessary to serve that interest." *Id.*

>           i.   *Statements in advertising discouraging consumers,*
>                *on the basis of race, from pursuing an application for*
>                *credit, like Townstone's infomercial, are, at most,*
>                *commercial speech.*

No matter how it is assessed, Townstone's speech is commercial. Commercial speech includes speech that "propose[s] a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Human Rels. Comm'n*, 413 U.S. 376, 385 (1973)). If Regulation B affects protected speech at all, this is the class of speech it affects. It applies only to conduct (expressive or otherwise) related to "credit transactions." 12

C.F.R. § 1002.4. A "credit transaction" is a "commercial transaction"—and that is enough to end the inquiry.[4]

Townstone's speech is commercial, however assessed. Even if this Court were to credit the argument that certain elements of Townstone's infomercial, considered in isolation, appear non-commercial, such appearance does not warrant stricter scrutiny. The Seventh Circuit has recently clarified that courts should consider context when classifying commercial speech because "[m]odern commercial advertising is enormously varied in form and style." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517–18 (7th Cir. 2014). Townstone's infomercials are precisely the kind of creative advertising anticipated by *Jewel*. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008) (finding a "documercial" about the making of a video game, like a "half-hour-long 'infomercial,'" to be commercial speech).

Townstone admits that the informercials containing its racially charged statements were part of its "advertising efforts." Defs.' Mot. to

---

[4] Indeed, if Townstone's speech (or the speech of any creditor) were not related to commercial transactions, Regulation B would not be implicated, and the Court would not need to reach the First Amendment issue.

Dismiss, ECF No. 32, at 2. The infomercials repeatedly mentioned, and indeed were centered around a specific product: Townstone's mortgages. *See* Am. Compl. ¶¶ 30-31, ECF No. 27 (explaining the show included its local and national mortgage license numbers at the top of every show along with regular references by the hosts to their work and the benefits of Townstone's mortgage loans). Finally, Townstone has an economic interest in representing its staff as "Chicago real-estate experts" via its infomercial, including through discussion of the Chicago real-estate market and the comparable desirability of various neighborhoods. *See*, *e.g.*, Am. Compl. ¶ 28, ECF No. 27. Such speech intended to "burnish" a corporate "brand name" is economically motivated, such that it is appropriately treated as commercial, *Jewel Food Stores*, 743 F.3d at 520; so too is speech providing "general exposure of a product," as the lengthy infomercial did. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) (citing *Facenda*, 542 F.3d at 1017). The presence of all these commercial elements makes clear that the speech here is commercial. *See Benson*, 561 F.3d at 725 (classifying commercial speech by asking "whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic

motivation for the speech.") (citing *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66–67 (1983)).[5]

Townstone's attempts in the District Court to characterize its speech as non-commercial political speech because it contains the "extemporaneously offered opinions" of its executives fail.[6] *See* Reply, ECF No. 38, at 12. Townstone cannot describe the neighborhoods in which Black credit applicants may live and seek to live as "scary" "jungles" in one breath, list its mortgage license number with the next, and then deny that there is a nexus between the two. Defs.' Mot. to Dismiss, ECF No. 32, at 18. It is precisely that nexus that produces the proscribed—and constitutionally regulable—conduct: the invitation to transact based on race.

---

[5] "No one factor is sufficient [or] necessary," *Jewel Food Stores*, 743 F.3d at 517; but "[t]he combination of *all* these characteristics . . . provides strong support" for the proposition that the statements discussed are commercial speech, *Bolger*, 463 U.S. at 67.

[6] Townstone's factual quibbles are premature. Whether the nexus between Townstone's comments and its advertisements is close enough to qualify the whole as commercial speech is a factual question, and must be resolved in favor of the plaintiff at this stage. *See Gomez*, 811 F.2d at 1039.

Courts routinely reject attempts to obtain the rigorous First Amendment protections that apply to political speech for what is effectively an advertising campaign dressed up as education or social commentary. *See Bolger*, 463 U.S. at 67–68 ("[A]dvertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech.") (quoting *Cent. Hudson*, 447 U.S., at 563, n.5). Such speech only gets the protection of strict scrutiny if its commercial and non-commercial elements are so "inextricably intertwined" that they are "legally or practically impossible . . . to separate," such that "the relevant speech 'taken as a whole' is properly deemed noncommercial." *Jewel Food Stores*, 743 F.3d at 520–21 (citing *Fox*, 492 U.S. at 474); *see Fox*, 492 U.S. at 474 (rejecting housewares seller's claim that its First Amendment interest in teaching home economics while selling home goods superseded public university's commercial solicitation ban); *Kasky v. Nike, Inc.,* 27 Cal.4th 939 (2002), *cert. dismissed*, 539 U.S. 654 (2003) (finding Nike's public relations campaign countering claims that it used sweatshop labor constituted commercial speech, despite Nike's claim that those statements were protected non-commercial speech).

The same is true here. It is Townstone's choice to include political commentary in its infomercials that links the two, not any inextricable relationship between the commentary and the advertisement. "No law of man or of nature makes it impossible to sell [mortgages] without [discussing politics], or to [discuss politics] without selling [mortgages]." *Fox*, 492 U.S. at 474. "Nothing . . . prevents the speaker from conveying, or the audience from hearing, these noncommercial messages." *Id.* The inclusion of such messages on an infomercial does not change the commercial character of the infomercial; unlike a nonprofit fundraising pitch, where the commercial means are inextricable from their noncommercial ends, *see Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988), Townstone and its executives are free to discuss these topics separate from Townstone advertisements. Thus, Congress can regulate the infomercials' commercial effects on borrowers, just as it could regulate contraceptive advertisements despite their inclusion of advice about family planning, *see Bolger*, 463 U.S. at 67–68. But neither Townstone nor its officers may use Townstone advertisements to discourage prospective credit applicants on the basis of their protected class status.

> ii.   *Regulation B applies only to a proscribable class of unprotected speech under Central Hudson.*

Turning to the four-part analysis required under *Central Hudson*, this case is resolved on prong one because statements discouraging prospective applicants on a prohibited basis from seeking credit are unlawful under ECOA.[7] Thus, the Court need not balance whether Regulation B is tailored to the interest it serves. Just as Townstone may not advertise that "no Blacks need apply" for its loans, it may not use racially coded language to the same effect. "Any First Amendment interest which might be served by advertising an ordinary commercial proposal . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co.*, 413 U.S. at 389. As the Court in *Pittsburgh Press* explained, "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes." *Id.* at 388. Neither did it have any doubt newspapers could be prohibited from placing advertisements in a way that facilitated unlawful sex discrimination in employment. *Id.*

---

[7] For the purpose of this argument, we assume that appellants are correct that Regulation B lawfully implements ECOA.

Regulation B likewise regulates only speech incidental to unlawful commercial conduct. ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction." 15 U.S.C. § 1691(a). Conduct that invites or discourages prospective applicants from receiving credit on the basis of their protected class status—an aspect of such transactions—would therefore enable unlawful commercial conduct.

The Courts of Appeals "have consistently found that commercial speech that violates" a substantially similar provision of the Fair Housing Act, which prohibits advertising for housing indicating a racial preference "is not protected by the First Amendment" because such racial preferences in housing are illegal conduct. *United States v. Space Hunters, Inc.*, 429 F.3d 416, 425 (2d Cir. 2005); *see Campbell v. Robb*, 162 F. App'x 460, 468–72 (6th Cir. 2006); *United States ex rel. Jackson v. Racey*, 112 F.3d 512, at *1 (4th Cir. 1997); *Ragin v. N.Y. Times*, 923 F.2d 995, 1002–05 (2d Cir. 1991).[8] So too, there is no protected interest in

---

[8] It is not "circular to determine that a particular kind of commercial speech is illegal by reference to the very statute that authorizes the regulation here at issue—"Congress's power to prohibit such speech is unquestioned," so "reliance upon the statute to determine

speech that promotes discrimination in credit on one of ECOA's protected bases. 15 U.S.C. § 1691(a).

Assuming the Bureau can show on remand that Townstone's statements amount to the kind of discouragement prohibited by Regulation B as implementing ECOA, Townstone would have no First Amendment-protected interest in its advertisements engaged in this unlawful discouragement. Townstone cannot use the First Amendment as a shield to protect speech that the statute forbids.

        *iii.*   *Regulation B satisfies intermediate scrutiny under* Central Hudson.

Even if the issue were not resolved under the first prong of *Central Hudson*, Regulation B directly advances a substantial government interest and is not more extensive than necessary to do so. *Cent. Hudson*, 447 U.S. at 557. "[C]ommensurate with [the] subordinate position of [commercial speech] in the scale of First Amendment values," "the fit needn't be perfect, but only 'reasonable[,] . . . not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *F.T.C. v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011) (quoting

_____

the illegality of ads with a racial message is not circular but inexorable." *Ragin*, 923 F.2d at 1003.

*Fox*, 492 U.S. at 480); *c.f. Fox*, 492 U.S. at 475–76 (finding the fit between public university's commercial solicitation ban and its substantial interest in "promoting an educational rather than commercial atmosphere" to be sufficient).

The government's interest in ensuring equal access to credit is substantial. The Supreme Court has repeatedly recognized that the government has a compelling interest in "eliminating discrimination and assuring . . . citizens equal access to publicly available goods and services." *Roberts*, 468 U.S. at 623–24; *see also id.* at 628 (discrimination "cause[s] unique evils that government has a compelling interest to prevent"); *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14 n.5 (1988); *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983). Townstone concedes as much. *See* Defs.' Mot. To Dismiss, ECF No. 32, at 14 (conceding that ECOA's purpose was "well intended" and analogous to *R.A.V.*, where the Court found a compelling state interest). Congress found that in light of credit's ubiquity in home, car, and retail purchases, it had "ceased to be a luxury item" and that it thus "must be established as clear national policy that no credit applicant shall be

denied the credit he or she needs and wants on the basis of characteristics that have nothing to do with his or her creditworthiness," and passed ECOA to address "credit discrimination," both "past, and . . . future." S. Rep. No. 94-589, at 3–4 (1975). The government's interest in "ensur[ing] the basic human rights of members of groups that have historically been subjected to discrimination, including," for example, "the right of such group members to live in peace where they wish" is "compelling." *R.A.V.*, 505 U.S. at 395. Congress has found that credit, like housing, is "a virtual necessity of life," S. Rep. 94-589, at 4, and equal access is a national priority. Indeed, Regulation B advances the First Amendment's core democratic values by securing "the benefits of wide participation in political, economic, and cultural life." *Roberts*, 468 U.S. at 625. The government's interest in doing so is substantial.

By implementing ECOA, 15 U.S.C. § 1691b(a), Regulation B directly advances the government's interest in ensuring equal access to credit, and it is not broader than necessary to do so. If lenders can avoid applicants from protected classes by discouraging such individuals from applying for credit in the first place, which is prohibited by Regulation B, 12 C.F.R. § 1002.4(b), then ECOA's prohibition on discrimination in

lending would be a dead letter. Regulation B's prohibition on statements that would "discourage . . . a reasonable person from making or pursuing an application" for credit, 12 C.F.R. § 1002.4(b), directly advances the government's interest in prohibiting credit discrimination. Nor is it any broader than it needs to be: Regulation B limits its reach to statements that would discourage people on ECOA's list of enumerated "prohibited bas[e]s" and which have some connection to an application for credit. Regulation B accordingly meets *Central Hudson's* intermediate scrutiny standard.

The application of Regulation B to Townstone's alleged conduct likewise directly advances equal access to credit and is not more expansive than necessary to do so. Considering, as appropriate on a motion to dismiss standard, that it is plausible that an advertisement for a home loan where the lender disparages predominantly Black neighborhoods would discourage a reasonable person from seeking a mortgage from that lender, whether they come from such a neighborhood or wish to live in one.[9]

_____

[9] Such a factual determination is a question most appropriately put to a factfinder with the benefit of discovery as to the context of these

That Townstone uses coded rather than explicit references to race—for instance, by saying its customers should "take down the Confederate flag" with a wink and a nod instead of an explicit slur, *see* Defs.' Mot. to Dismiss, ECF No. 32, at 19—is no defense. "Ordinary readers may reasonably infer a racial message from advertisements that are more subtle than the hypothetical swastika or burning cross." *Ragin,* 923 F.2d at 999–1000. "A housing complex that runs ads several times a week for a year depicting numerous white models as consumers and black models as doormen or custodial employees would have difficulty persuading a trier of fact that its ads did not facially indicate a racial preference." *Id.* at 1002. That Townstone has its all-White team of loan officer executives paint Black neighborhoods as undesirable indicates the same.

Nor is such a restriction any more expansive than it needs to be. Regulation B leaves Townstone's executives free to denigrate Chicago

_____

statements. *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982) ("[F]actfinding is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not have resolved in the first instance this factual dispute which had not been considered by the District Court.") (quoting *DeMarco v. United States*, 415 U.S. 449, 450, n. (1974)).

neighborhoods and their residents in their private capacity—just as long as they are not simultaneously advertising a commercial product.

## II.    Regulation B is clear about what it prohibits.

The text of Regulation B is clear in its prohibition of discrimination in lending and of commercial statements that would discourage reasonable people from applying for credit on enumerated prohibited bases. Thus, it is not overbroad or vague, and provides fair notice to regulated entities, whether considered on its face or as applied to Townstone.

Regulation B provides fair notice of what conduct is and is not regulated. The Due Process Clause of the Fifth Amendment, U.S. Const. amend. V, requires that government regulation be specific enough that "regulated parties [] know what is required of them," and that those enforcing the law have "precision and guidance" so that they "do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Government regulation fails that requirement in the context of the First Amendment only if it has a "potential chilling effect on protected expression" that is both "real and

substantial." *Ctr. For Indiv. Freedom v. Madigan*, 697 F.3d 464, 479 (7th Cir. 2012).

Townstone argued below that it was "wholly unaware of what speech is prohibited," and that its ignorance is evidence of Regulation B's vagueness and overbreadth. Defs.' Mot. to Dismiss, ECF No. 32, at 20. Specifically, Townstone claims the "terms and phrases 'or otherwise', 'prospective applicants', 'discourage', and 'pursuing an application' create significant uncertainty." *Id*. at 21. All have meaningful legal content, and Townstone's comments come within their clear scope.

First, Regulation B relies on an established legal standard: the effect of statements on an "ordinary" or "reasonable" person. *Ragin*, 923 F.2d at 1002 (explaining the reasonable person standard "not a novel, untried concept"). "Of course, close questions will arise, as they do in every area of the law, but we cannot say" that it "is a hopelessly vague legal standard." *Id.* Consistent with its roots in the common law, courts have found this standard to provide adequate notice with respect to discouragement provisions in anti-discrimination law, specifically the Fair Housing Act (FHA). *See id.*; *Jancik v. HUD*, 44 F.3d 553, 556 (7th Cir. 1995) (citing *Ragin*, 923 F.2d at 999–1000) (holding that § 3604 of

the FHA is "violated by 'any ad that would discourage an ordinary reader of a particular [protected group] from answering it.'").

The other aspects of Regulation B's discouragement provision are equally clear. The inclusion of "or otherwise" after "advertising" does not expand the regulation's reach infinitely; that phrase is to be read in context and simply serves to ensure that lenders cannot evade ECOA by making discouraging statements related to a credit transaction in contexts that may not technically be considered "advertisements"—for example, on the "About" page of a lender's website, or in a meeting with a loan officer. *See Yates v. United States*, 574 U.S. 528, 545 (2015) ("[W]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (quoting *Wash. State Dept. of Social and Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003)). The Act requires that statements must be made by a creditor and related to a credit transaction. Nor is "making or pursuing an application" unclear, for the same reason. The terms on either side of the disjunctive "or" must still be understood in each other's context. The passage thus makes clear that

creditors may not discriminate against borrowers, whether they have formally applied for credit, or, for example, have simply "pursued" it by requesting an application. Finally, neither "prospective applicant" nor "discourage" are impermissibly vague, as courts have held with respect to other statutory schemes. *See Space Hunters,* 429 F.3d at 425 (upholding FHA § 3604(c) as applied to a rental listing agency's comments that discouraged a prospective applicant from ever applying). The fact that discouragement includes conduct less overt than burning a cross or hanging a swastika does not mean Regulation B is boundless. *Cf. Jancik,* 44 F.3d at 553. Regulation B is thus neither vague nor overbroad.

## CONCLUSION

For the reasons stated above, should this Court reverse the decision of the District Court, *amici curiae* urge this Court to remand for further proceedings, and, in any event, to reject arguments defendants-appellees make under the First or Fifth Amendments.

Respectfully submitted,

_/s/ Orlando Economos_

Orlando Economos*
   *Counsel of Record*
Robin Thurston**
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(551) 655-7477
oeconomos@democracyforward.org
rthurston@democracyforward.org

*Counsel for Proposed* Amici Curiae
*First Amendment Legal Scholars*

* Admitted *pro hac vice*
** Motion for admission *pro hac vice* forthcoming

**<ins>CERTIFICATE OF COMPLIANCE</ins>**

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 7th Cir. R. 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,796 words according to the word count function of Microsoft Word 365.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and 7th Cir. R. 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

<em><ins>/s/ Orlando Economos</ins></em>

Date: June 21, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2023, a true and accurate copy of the foregoing motion was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

<em><u>/s/ Orlando Economos</u></em>

Date: June 21, 2023