No. 23-1654

_____

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

CONSUMER FINANCIAL PROTECTION BUREAU,

Plaintiff-Appellant,

v.

TOWNSTONE FINANCIAL, INC. AND BARRY STURNER,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division,
Case No. 1:20-cv-04176
The Honorable Franklin U. Valderrama

_____

## BRIEF OF THE DEFENDANTS-APPELLEES

_____

OLIVER DUNFORD
FL Bar No. 017991
Pacific Legal Foundation
4440 PGA Boulevard, Suite 307
Palm Beach Gardens, FL 33410
Tel: (916) 503-9060
ODunford@pacificlegal.org

STEVEN M. SIMPSON
DC Bar No. 462553
JESSICA L. THOMPSON
DC Bar No. 1542170
JOHN F. KERKHOFF
OH Bar No. 0097134
Pacific Legal Foundation
3100 Clarendon Boulevard,
Suite 1000
Arlington, VA, 22201
Tel: (916) 288-1398
SSimpson@pacificlegal.org
JLThompson@pacificlegal.org
JKerkhoff@pacificlegal.org

*Additional counsel for Defendants-Appellees listed on inside cover*

RICHARD HORN
Garris Horn LLP
One South Church Avenue, Suite 1200
Tucson, AZ 85701-1601
Mobile: (917) 696-1525
Website: www.garrishorn.com
Email: rich@garrishorn.com

MARX DAVID STERBCOW
The Sterbcow Law Group LLC
824 Elmwood Park Boulevard, Suite 205
New Orleans, LA 70123
Office: 504-523-4930
Marx@sterbcowlaw.com

SEAN BURKE
Mattingly Burke Cohen & Biederman, LLP
155 E. Market St
Suite 400
Indianapolis, IN 46204
Office: (317) 614-7320
Sean.Burke@mbcblaw.com

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Townstone and its attorneys make the following disclosures:

PACIFIC LEGAL FOUNDATION, a nonprofit corporation organized under the laws of California, hereby states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

DATED: August 14, 2023.

 _____/s/ Steven M. Simpson_____
STEVEN M. SIMPSON

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc. et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Townstone Financial, Inc.; Barry Sturner

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Pacific Legal Foundation; Mattingly Burke Cohen & Biederman LLP; Sterbcow Law Group LLC; Garris Horn LLP;

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and
N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Steven M. Simpson          Date: 8/15/2023

Attorney's Printed Name: Steven M. Simpson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No ☐

Address: 3100 Clarendon Boulevard, Suite 1000

Arlington, VA 22201

Phone Number: 916-288-1398          Fax Number: 916-419-7747

E-Mail Address: ssimpson@pacificlegal.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Townstone Financial Inc., Barry Sturner

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Pacific Legal Foundation; Mattingly Burke Cohen & Biederman LLP; Sterbcow Law Group, LLC; Garris Horn LLP

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Jessica  L.Thompson　　　　Date: 8/15/2023

Attorney's Printed Name:　Jessica L. Thompson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　Yes ☐　No ☑

Address:　3100 Clarendon Boulevard, Suite 1000

　　　　Arlington, VA 22201

Phone Number: 202.888.6881　　　　Fax Number:

E-Mail Address: jlthompson@pacificlegal.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Townstone Financial Inc., Barry Sturner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Pacific Legal Foundation; Mattingly Burke Cohen & Biederman LLP; Sterbcow Law Group, LLC; Garris Horn LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ John F. Kerkhoff    Date: 8/15/2023

Attorney's Printed Name: John F. Kerkhoff

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 3100 Clarendon Boulevard, Suite 1000

Arlington, VA 22201

Phone Number: 202.888.6881    Fax Number:

E-Mail Address: jkerkhoff@pacificlegal.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Townstone Financial Inc., Barry Sturner

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Pacific Legal Foundation; Mattingly Burke Cohen & Biederman LLP; Sterbcow Law Group, LLC; Garris Horn LLP

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

_____

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

_____

Attorney's Signature: s/ Oliver J. Dunford       Date: 8/15/2023

Attorney's Printed Name: Oliver J. Dunford

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐  No ☑

Address: 4440 PGA Blvd., Suite 307

      Palm Beach Gardens, FL 33410

Phone Number: 916.503.9060       Fax Number: _____

E-Mail Address: odunford@pacificlegal.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al.,

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Townstone Financial Inc., Barry Sturner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Pacific Legal Foundation; Mattingly Burke Cohen & Biederman LLP; Sterbcow Law Group, LLC; Garris Horn LLP

(3)    If the party, amicus or intervenor is a corporation:

     i)         Identify all its parent corporations, if any; and

           N/A

     ii)        list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

           N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Richard Horn           Date: 8/15/23

Attorney's Printed Name: RICHARD HORN

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: One South Church Avenue, Suite 1200

        Tucson, AZ 85701-1601

Phone Number: (917) 696-1525          Fax Number:

E-Mail Address: rich@garrishorn.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Townstone Financial Inc., Barry Sturner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Pacific Legal Foundation; Mattingly Burke Cohen & Biederman LLP; Sterbcow Law Group, LLC; Garris Horn LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Marx David Sterbcow    Date: 8/15/2023

Attorney's Printed Name: MARX DAVID STERBCOW

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 824 Elmwood Park Boulevard, Suite 205

    New Orleans, LA 70123

Phone Number: 504-523-4930    Fax Number:

E-Mail Address: Marx@sterbcowlaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: CFPB v. Townstone Financial, Inc., et al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Townstone Financial Inc., Barry Sturner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Pacific Legal Foundation; Mattingly Burke Cohen & Biederman LLP; Sterbcow Law Group, LLC; Garris Horn LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: /s/ Sean Burke        Date: 8/15/2023

Attorney's Printed Name:  SEAN BURKE

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address:  155 E. Market St, Suite 400

    Indianapolis, IN 46204

Phone Number:  (317) 614-7320        Fax Number:

E-Mail Address: Sean.Burke@mbcblaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUE ............................................................. 1

STATEMENT OF THE CASE ............................................................... 1

SUMMARY OF ARGUMENT ............................................................... 3

STANDARD OF REVIEW .................................................................... 7

ARGUMENT ....................................................................................... 7

    I.   Regulation B's anti-discouragement rule conflicts with the plain terms of ECOA and deserves no deference at *Chevron* step one ...................... 7

       A.  ECOA unambiguously bars *discrimination* only against *applicants* with respect to any aspect of a *credit transaction* ................................ 11

          1.  "Applicant" necessarily means an identifiable person who requests credit from a creditor ................................................ 14

          2.  The anti-discouragement rule cannot be reconciled with the unambiguous meaning of "discrimination" and "credit transaction" ............................................................................. 21

       B.  Congress did not authorize the implementing agencies to rewrite ECOA's core prohibition and massively expand liability under the law ................. 25

          1.  Congress's rulemaking delegation in section 1691b(a) does not expressly authorize the anti-discouragement rule ................................ 26

          2.  The Supreme Court's decision in *Mourning* does not support CFPB's argument .................................................................................. 29

          3.  Congress did not authorize the anti-discouragement rule by adding "discouragement" to ECOA's referral provision in section 1691e(g) ..... 33

   II.  Regulation B's anti-discouragement rule is not entitled to deference at *Chevron* step two ........................................................................ 40

       A.  The anti-discouragement rule is not a permissible construction of ECOA ........................................................................................ 41

       B.  The anti-discouragement rule raises serious constitutional problems ..... 44

   III.  Regulation B's anti-discouragement rule violates the First and Fifth Amendments ................................................................................... 45

CONCLUSION .................................................................................... 50

CERTIFICATE OF COMPLIANCE ........................................................................ 52

CERTIFICATE OF SERVICE ................................................................................. 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
143 S.Ct. 2298 (2023) ........................................................................ 6, 46, 47, 48

*Air Transp. Ass'n of Am., Inc. v. U.S. Dep't. of Agric.,*
37 F.4th 667 (D.C. Cir. 2022) .......................................................................... 13

*Allegheny Def. Project v. FERC,*
964 F.3d 1 (D.C. Cir. 2020) ............................................................................. 29

*Am. Min. of Cong. v. EPA,*
824 F.2d 1177 (D.C. Cir. 1987) ....................................................................... 30

*Board of Governors of Federal Reserve System v. Dimension Fin. Corp.,*
474 U.S. 361 (1986) ......................................................................................... 30

*Bona v. Gonzales,*
425 F.3d 663 (9th Cir. 2005) ........................................................................... 29

*Brumfield v. City of Chicago,*
735 F.3d 619 (7th Cir. 2013) ....................................................................*passim*

*Buongiorno v. Sullivan,*
912 F.2d 504 (D.C. Cir. 1990) ......................................................................... 28

*CFPB v. Townstone,*
20-cv-4176 (N.D. Ill.) ........................................................................................ 1

*Chamber of Com. of U.S. v. N.L.R.B.,*
721 F.3d 152 (4th Cir. 2013) ...................................................................... 26, 30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) .................................................................................*passim*

*City of Arlington, Tex. v. F.C.C.,*
569 U.S. 290 (2013) .................................................................................*passim*

*Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.,*
717 F.3d 545 (7th Cir. 2013) ............................................................... 11, 21, 34

*Contender Farms, LLP v. U.S. Dep't. of Agric.,*
779 F.3d 258 (5th Cir. 2015) ...................................................................... 17, 26

*Cook County, Illinois v. Wolf,*
   962 F.3d 208 (7th Cir. 2020) ............................................................*passim*

*Counterman v. Colorado,*
   143 S.Ct. 2106 (2023) ........................................................... 46

*Cragin v. First Fed. Sav. & Loan Ass'n,*
   498 F.Supp.379 (D. Nev. 1980) ............................................... 19

*Cuomo v. Clearing House Ass'n, LLC,*
   557 U.S. 519 (2009) ........................................................... 42

*Davis v. Strata Corp.,*
   242 F.Supp.2d 643 (D.N.D. 2003) ............................................. 19

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.*
   *Trades Council,*
   485 U.S. 568 (1988) ........................................................... 44

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 U.S. 208 (2009) ........................................................... 40

*F.C.C. v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ........................................................... 48

*FEC v. Cruz,*
   142 S.Ct. 1638 (2022) ........................................................... 7

*Hawkins v. Cmty. Bank of Raymore,*
   761 F.3d 937 (8th Cir. 2014) ............................................. 8, 14, 17–18

*Hildebrandt v. Vilsack*
   102 F.Supp.3d 318 (D.D.C. 2015) ............................................. 19

*Household Credit Services Inc. v. Pfennig,*
   541 U.S. 232 (2004) ........................................................... 31

*Huston v. Hearst Commc'ns, Inc.,*
   53 F.4th 1097 (7th Cir. 2022) ................................................... 7

*Iancu v. Brunetti,*
   139 S.Ct. 2294 (2019) ........................................................... 46

*John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank,*
   510 U.S. 86 (1993) ........................................................... 20

*Kisor v. Wilkie,*
    139 S.Ct. 2400 (2019) ............................................................. 11, 40

*Latimore v. Citibank Sav. Bank,*
    151 F.3d 712 (7th Cir.1998) ........................................................ 23

*Louisiana Pub. Serv. Comm'n v. F.C.C.,*
    476 U.S. 355 (1986) ...................................................................... 7

*Marbury v. Madison,*
    5 U.S. 137 (1803) ......................................................................... 7

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ..................................................................... 11

*Matal v. Tam,*
    137 S.Ct. 1744 (2017) ............................................................. 46, 47

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..................................................................... 11

*Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC,*
    476 F.3d 436 (7th Cir. 2007) ....................................... 8, 17–18, 25

*Mourning v. Fam. Publ'ns Serv., Inc.,*
    411 U.S. 356 (1973) ............................................................*passim*

*Nixon v. Missouri Mun. League,*
    541 U.S. 125 (2004) ..................................................................... 35

*NY Stock Exch. LLC v. SEC,*
    962 F.3d 541 (D.C. Cir. 2020) ..................................... 9, 10, 30, 40

*Opoka v. I.N.S.,*
    94 F.3d 392 (7th Cir. 1996) ........................................................... 2

*Ortiz-Santiago v. Barr,*
    924 F.3d 956 (7th Cir. 2019) ....................................................... 17

*Penny Saver Publ'ns, Inc. v. Vill. of Hazel Crest,*
    905 F.2d 150 (7th Cir. 1990) ....................................................... 48

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
    413 U.S. 376 (1973) ..................................................................... 47

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    132 S.Ct. 2065 (2012) ................................................................. 13

*Ragsdale v. Wolverine World Wide, Inc.*,
535 U.S. 81 (2002) ................................................................*passim*

*Regions Bank v. Legal Outsource PA*,
936 F.3d 1184 (11th Cir. 2019) ......................................*passim*

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) ................................................................ 47

*Roberts v. City of Chicago*,
817 F.3d 561 (7th Cir. 2016) .................................................. 7

*Rush Univ. Med. Ct. v. Burwell*,
763 F.3d 754 (7th Cir. 2014) ..................................... 9, 27, 28

*Sacco v. Bank of Versailles*,
No. 2:14-cv-04185, 2014 WL 5343537 (W.D. Mo. Oct. 20, 2014) ........................ 19

*SAS Inst., Inc. v. Iancu*,
138 S.Ct. 1348 (2018) ...................................................... 11, 37

*Shurtleff v. City of Boston*,
142 S.Ct. 1583 (2022) ............................................................ 45

*Snyder v. Phelps*,
562 U.S. 443 (2011) ............................................................... 46

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ........................................................ 40, 44

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......................................................... 47–48

*Southworth v. Bd. of Regents of Univ. of Wisconsin Sys.*,
307 F.3d 566 (7th Cir. 2002) ............................................ 44–45

*United States v. Chevy Chase Fed. Sav. Bank*,
No. 94-1824-JG (D.D.C. Aug. 22, 1994) ............................. 38

*United States v. Kahn*,
5 F.4th 167 (2d Cir. 2021) .................................................... 29

*United States v. LaBonte*,
520 U.S. 751 (1997) .......................................................... 11, 34

*United States v. Mead Corp.*,
533 U.S. 218 (2001) .............................................................. 26

*United States v. O'Hagan,*
    521 U.S. 642 (1997) ............................................................ 27–28

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................................. 48

*Valencia v. City of Springfield, Ill.,*
    883 F.3d 959 (7th Cir. 2018) ............................................... 7, 45

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................. 34

**Constitution**

U.S. CONST. amend. I ............................................................ *passim*

U.S. CONST. amend. V ........................................................ 44, 47

**Statutes**

8 U.S.C. § 1103(a)(1) ................................................................. 27

8 U.S.C. § 1103(a)(2) ................................................................. 27

15 U.S.C. § 1691 ........................................................... 11, 12, 13

15 U.S.C. § 1691(a) ........................................................... *passim*

15 U.S.C. § 1691(a)(2) ............................................................... 12

15 U.S.C. § 1691(b) ................................................................... 12

15 U.S.C. § 1691(b)(2) ............................................................... 13

15 U.S.C. § 1691(b)(3) ............................................................... 13

15 U.S.C. § 1691(c) ................................................................... 12

15 U.S.C. § 1691(c)(3) ............................................................... 13

15 U.S.C. § 1691(d) ................................................................... 12

15 U.S.C. § 1691(d)(1) ............................................................... 13

15 U.S.C. § 1691a ..................................................................... 12

15 U.S.C. § 1691a(b) ........................................................... 14, 35

15 U.S.C. § 1691a(d) ............................................................. 15

15 U.S.C. § 1691b ............................................................. 12, 18

15 U.S.C. § 1691b(a) ....................................................... *passim*

15 U.S.C. § 1691c ................................................................. 12

15 U.S.C. § 1691 .................................................................. 12

15 U.S.C. § 1691c-2 ............................................................ 12

15 U.S.C. § 1691c-2(g)(2) .................................................. 13

15 U.S.C. § 1691d ............................................................... 12

15 U.S.C. § 1691d(f) ...................................................... 13, 28

15 U.S.C. § 1691d(g) ..................................................... 13, 28

15 U.S.C. § 1691e ............................................................... 12

15 U.S.C. § 1691e(g) ..................................................... *passim*

15 U.S.C. § 1691f ............................................................... 12

42 U.S.C. § 3604(c) ........................................................... 38

Equal Credit Opportunity Act ....................................... *passim*

Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-
239, 90 Stat. 251, § 706 Civil Liability, 15 U.S.C. 1691(h) (1976) ...................... 36

FDIC Improvement Act of 1991, Pub. L. 102-242, § 223, 105 Stat 2236
(1991) ............................................................................... 36

## Regulations

12 C.F.R. § 1002.2 ............................................................. 20

12 C.F.R. § 1002.2(m) ....................................................... 22

12 C.F.R. § 1002.2(n) ........................................................ 22

12 C.F.R. § 1002.4(b) ............................................. 3, 8, 16, 48

50 FR 48018, 48050 (Nov. 20, 1985) .............................. 36

**Other Authorities**

Ballentine's Law Dictionary (3rd ed. 1969) ............................................................ 21

Black's Law Dictionary (rev. 4th ed. 1968) .......................................... 15, 21, 22

S. Rep. 102–167 .......................................................................................................... 37

Scalia, Antonin & Garner, Bryan, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................................................................ 44

Vartanian, Thomas P., Ledig, Robert H., and Babitza, Alisa, *Chevy Chase Case Sets New Standards For Fair Lending Law Compliance*, 13 No. 17 Banking Pol'y Rep. 1 (Sept. 19, 1994) ................................... 38

Webster's New International Dictionary (1961) ............................................... 23

## JURISDICTIONAL STATEMENT

Appellant's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUE

Did the District Court correctly hold that Equal Credit Opportunity Act does not prohibit the discouragement of prospective applicants on a prohibited basis?

## STATEMENT OF THE CASE

Founded by Barry Sturner in 2002, Townstone Financial, Inc. was, at all times relevant to the complaint, a small, non-bank mortgage lender or broker with its sole office in Chicago. Amended Complaint ¶¶ 4, 9, 13; ECF 27, *CFPB v. Townstone*, 20-cv-4176 (N.D. Ill.); ECF 89-7 at ¶ 1. Today, it is a mortgage broker. Townstone markets its services almost entirely through radio advertisements and the Townstone Financial Show, a weekly one-hour talk radio show that was broadcast on AM radio throughout the entire Chicago area between 2013 and 2018. Episodes were also available on the internet. Amend. Compl. ¶29. Today, it is exclusively a podcast.

CFPB filed this action in 2020, following a three-year investigation in which Townstone produced approximately 100 GB of information, answered interrogatories, and produced several employees, including Barry Sturner, for sworn testimony. ECF 1; ECF 67 at 2. During its investigation, CFPB referred this matter to the Department of Justice pursuant to the Equal Credit Opportunity Act. ("ECOA")

1

15 U.S.C. §1691e(g). In April 2020, DOJ informed Townstone's counsel that it had decided not to pursue the matter and that its investigation was closed. A040.[1]

Townstone moved to dismiss the amended complaint on February 8, 2021, pointing out that CFPB alleged nothing that shows Townstone violated ECOA. ECF 31–32. Nothing in the complaint alleges that Townstone discriminated against anyone, applicant or otherwise. Nor does the complaint allege that anyone— "prospective applicant" or otherwise—was dismayed, dejected, dispirited, discouraged, or even bothered by anything Townstone ever said on its show. And CFPB did not allege that it knows of anyone, nor did it identify anyone in discovery, who was "discouraged on a prohibited basis" from seeking credit because of Townstone's comments. ECF 105 at 2 (Obj. Mag. Ord.); *citing* ECF 89-1 (Defs'. Mot. to Compel Ex. A, CFPB Resp. to Interrogatory No. 2); ECF 89-2 (Ex. B, Aug. 23, 2022 Ltr. from Defs. to Plaintiff).

Townstone also pointed out in its motion that CFPB mischaracterized Townstone's comments and took them out of context. ECF 32 at 2–3. That CFPB has excerpted only small portions of the comments and characterized them in its own self-serving manner is obvious from the complaint. Am. Compl. ¶¶ 33–37. It is also obvious that the comments represented a tiny portion of the shows in which they were made, *id.*, and that all of the comments combined represent a tiny portion the total broadcast time during the years in which the weekly, one-hour show was aired, ECF

---

[1] This brief cites to the Short Appendices using the format "A__." This Court should take judicial notice of the DOJ no-action letter. *See Opoka v. I.N.S.*, 94 F.3d 392, 394–96 (7th Cir. 1996).

32 at 2. CFPB's entire case is thus based on a handful of innocuous comments, none of which had anything to do with race and none of which indicated an intent not to do business with anyone. *See* Am. Compl. ¶¶ 38–39.[2]

The district court dismissed CFPB's complaint on February 3, 2023, ECF 110, after the parties had engaged in over nine months of discovery. *See* ECF 56.

## SUMMARY OF ARGUMENT

ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction" on the basis of race, sex, and other prohibited bases. 15 U.S.C. § 1691(a). Regulation B's anti-discouragement rule purports to expand liability under ECOA and make it unlawful for a creditor to "make any oral or written statement in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application." 12 C.F.R. § 1002.4(b). The question in this case is whether CFPB can effect such a radical expansion of the core liability provision in ECOA.

The District Court's answer was: "No." That conclusion was correct, for "applicant" and the other terms in section 1691(a) are unambiguous. Taken together, those terms prohibit discrimination against someone who has made a request for credit from a creditor. Only in that context can the requester be considered an

---

[2] The shows cited in the complaint are publicly available, in full, here: (Show mentioned in Am. Compl. ¶ 33) https://www.youtube.com/watch?v=L4Z89D3An8c;
https://www.youtube.com/watch?v=-tmGkuqZhN0 (Am. Compl. at ¶ 34);
https://www.youtube.com/watch?v=osTkpE46QzQ (Am. Compl. at ¶ 35);
https://www.youtube.com/watch?v=EtsgCPObDm4 (Am. Compl. at ¶ 36);
https://www.youtube.com/watch?v=Zx36GwTPySY (Am. Compl. at ¶ 37).

"applicant" and the interaction between that person and the creditor be described as part of a "credit transaction."

The anti-discouragement rule flips this structure on its head. Section 1691(a) bases liability on the *actions* of a creditor—*i.e.*, treating an applicant differently from others based on the applicant's race, sex, etc. The rule, by contrast, bases liability on the subjective *reaction* of a listener to the creditor's speech. Discrimination can be proved with facts. "Discouragement" turns on feelings. Nothing in the rule requires that the creditor's speech be connected to race or convey an intention not to do business with anyone. And it is up to the creditor to figure out what it means for someone to be "discourage[ed] on a prohibited basis." Most significantly, the relevant listener need not be an applicant, or have any connection with the creditor, or even be a known individual. A creditor can violate the rule by making any statement that a "prospective"—*i.e.*, future—"applicant" might hear that "would discourage a reasonable person on a prohibited basis" from seeking credit.

As this case shows, creditors can be liable under the rule simply for talking about crime in a particular area as long as a "prospective applicant" might hear them. CFPB claims that Townstone "disparaged" people from minority communities. That is false, but even if it were true, the rule does not prohibit "disparagement" of anyone. It requires only that they be "discouraged" from seeking credit.

In defending the rule, CFPB does not even attempt to show that it is consistent with section 1691(a) or that 1691(a) is ambiguous. Instead, CFPB argues, (1) that ECOA's rulemaking delegation in 1691b(a) authorized the implementing agencies to

amend ECOA in order to serve the purposes of the statute and prevent circumvention; and, (2) that Congress tacitly endorsed the anti-discrimination rule in section 1691e(g), by directing agencies to refer matters to the Attorney General that they believe involve patterns and practices of "discouraging or denying applications for credit in violation of section 1691(a)."

The first argument runs head long into *Chevron*, which requires that Congress leave a gap for an agency to fill. Congress does so either by expressly directing an agency to fill a specific gap in a law or by leaving terms ambiguous. Section 1691b(a), however, is simply a general grant of rulemaking authority. Such a grant is necessary for an agency to have any power to issue rules, but, standing alone, it does not even get an agency to *Chevron* step two. And because section 1691(a) is unambiguous, the District Court was correct to end its analysis at *Chevron* step one.

CFPB's second argument fails because section 1691e(g) makes clear that, whatever "discouraging and denying applications" means, it must qualify as a violation of 1691(a). As noted, the anti-discrimination rule sweeps far more broadly than section 1691(a) allows. Rejecting someone who requests credit because of their race, however, *is* a violation of 1691(a). One could call such a rejection "discouragement"—and that is a sensibly broad term to use in a section whose purpose is to direct an agency to refer suspected violations to DOJ—but it would also be discrimination in violation of section 1691(a). Again, "applicant" means one who requests credit. It does not refer to hypothetical persons who imagine one day requesting credit. Reading 1691e(g) to refer to things that actually violate section

1691(a) comports with the language of ECOA and is consistent with the legislative history. It also addresses the hypothetical "White Applicants Only" sign, as such a sign would announce a practice of violating section 1691(a). Any creditor who displayed such a sign would, and should, face an immediate investigation by CFPB and DOJ.

This case should therefore end at *Chevron* step one. But CFPB even loses at step two, because the anti-discouragement rule is not a permissible interpretation of ECOA. Indeed, it is not an interpretation of ECOA at all; it is a rewrite. It is also a blatant First Amendment violation, meaning deference would run afoul of the constitutional avoidance canon.

Indeed, if there were ever any doubts about the federal government's authority to outlaw statements such as "the South Side is a war zone," the Supreme Court just put them to rest in *303 Creative LLC v. Elenis*, 143 S.Ct. 2298 (2023). There, the Court held that Colorado may not enforce an anti-discrimination law to compel a web designer to say things to which she objected. *Id*. at 2309–10, 2321–22. As the Court explained, "the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief." *Id*. at 2311–12 (cleaned up). *303 Creative* explodes every conceivable defense CFPB could have to Townstone's First Amendment arguments and makes crystal clear—if it were ever *unclear*—that this case should never have been brought.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss de novo. *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). While agencies are entitled to deference in appropriate circumstances, *Brumfield v. City of Chicago*, 735 F.3d 619, 626 (7th Cir. 2013), "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). And, of course, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Finally, this Court "may affirm [the district court] on any basis that appears in the record[,]" *See Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 967 (7th Cir. 2018), including issues the "district court did not explicitly consider[,]" *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1100 (7th Cir. 2022).

## ARGUMENT

### I.    Regulation B's anti-discouragement rule conflicts with the plain terms of ECOA and deserves no deference at *Chevron* step one.

"No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 97 (2013) (emphasis in original). This follows from the broader principle that "[a]n agency … 'literally has no power to act' … unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 142 S.Ct. 1638, 1649 (2022) (quoting *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986)).

Here, the District Court correctly held that the anti-discouragement rule cannot be squared with ECOA's unambiguous terms. A011. ECOA makes it "unlawful for any creditor to *discriminate* against any *applicant*, with respect to any aspect of a *credit transaction*" on the basis of race, sex, and other prohibited bases. 15 U.S.C. § 1691(a) (emphasis added). Regulation B's anti-discouragement rule, by contrast, makes it unlawful for a creditor to "make *any oral or written statement* in advertising or otherwise, to applicants or *prospective applicants* that *would discourage* on a prohibited basis *a reasonable person* from making or pursuing an application." 12 C.F.R. § 1002.4(b) (emphasis added). Because "applicant" is not ambiguous and may not be stretched to include "prospective applicant," the District Court concluded that, under *Chevron*, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43. A011.

The District Court was correct. As this Court has recognized, "there is nothing ambiguous about 'applicant'" in ECOA. *Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC*, 476 F.3d 436, 441 (7th Cir. 2007). Other courts have recognized the same thing. *See Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190–91 (11th Cir. 2019) (holding that "applicant" in ECOA unambiguously excludes "guarantors"); *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 941 (8th Cir. 2014) (same). Congress has therefore spoken to the precise issue at hand and the result is clear: the anti-discouragement rule is invalid.

CFPB all but ignores the clear terms of section 1691(a), and argues instead that the precise issue at hand is whether Congress's delegation in section 1691b(a) to make rules that are "necessary or proper" to, among other things, "prevent circumvention or evasion" of ECOA is broad enough to cover Regulation B's anti-discouragement rule. CFPB Br. at 17–18, 20. Relying on *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356 (1973), CFPB claims that the rule is valid because it is reasonably related to preventing circumvention of ECOA. CFPB Br. at 20–21.

But CFPB badly misunderstands the analysis under *Chevron*. While a delegation of rulemaking authority is necessary for an agency to receive deference under *Chevron*, it is not sufficient. *See Brumfield*, 735 F.3d at 625–26 (stating that a regulation can qualify for *Chevron* deference only where "Congress has authorized the agency to interpret the statute through rules carrying the force of law"). Such a delegation gets the agency's foot in the door, but, standing alone, it does not entitle a rule to deference, as "'[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority.'" *NY Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (cleaned up).

To qualify for deference the agency must satisfy *Chevron*'s familiar two-step inquiry. First, it must show that Congress left a gap to fill. *Chevron*, 467 U.S. at 842. That gap can be explicit—for example, where Congress delegates to the agency the power to define statutory terms. *See, e.g.*, *Rush Univ. Med. Ct. v. Burwell*, 763 F.3d 754, 760 (7th Cir. 2014) ("When a statute specifically authorizes an agency to define a term, there is no need to consider whether the term is ambiguous and thus left to

agency delegation."). Or, the gap can be implicit, which happens when a statutory term is ambiguous. *See Brumfield*, 735 F.3d at 626. But in either event, a general grant of rulemaking authority does not answer the question whether Congress has spoken to the precise issue at hand. *See City of Arlington*, 569 U.S. at 306 ("[F]or *Chevron* deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted.").

*Mourning* changes nothing. As the D.C. Circuit has noted, *Mourning* "was decided decades ago, before the Supreme Court issued *Chevron* … changing the framework for judicial review of agency action. And *Mourning* has been effectively diluted by later cases." *NY Stock Exch.*, 962 F.3d at 546 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 92 (2002)). Simply put, *Chevron* is the framework for analyzing agency interpretations of statutes, and *Chevron* requires *both* a delegation of rulemaking authority *and* a showing that Congress left a statutory gap for the agency to fill. Because Congress left no gap or ambiguity in ECOA that would accommodate the anti-discouragement provision, the District Court correctly held that the rule fails at *Chevron* step one.

But even if this Court were to conclude that Congress did not speak to the precise issue at hand, CFPB still loses at *Chevron* step two because the rule is not a permissible interpretation of ECOA. Among other things, it has no limiting principle, and it creates more problems—statutory and constitutional—than it resolves. Regulation B's anti-discouragement rule is not an interpretation of ECOA—it is a total rewrite. Deferring here would allow the CFPB to use its own "judgment" as "a

roving license to ignore the statutory text." *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007). But agencies must exercise "discretion within defined statutory limits." *Id.*; *see also Michigan v. EPA*, 576 U.S. 743, 751–52 (2015) (declining to defer to EPA interpretation where agency failed to comply with statutory terms).

### A.    ECOA unambiguously bars *discrimination* only against *applicants* with respect to any aspect of a *credit transaction.*

*Chevron* step one is a straightforward matter of statutory interpretation. The question is whether, after "employing traditional tools of statutory construction," a court is "unable to discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1358 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9). The "starting point in cases involving statutory construction is the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013) (cleaned up). Importantly, a reviewing court does "not start from the premise that [the statutory] language is imprecise." *United States v. LaBonte*, 520 U.S. 751, 757 (1997). Instead, the court should "assume that in drafting this legislation, Congress said what it meant." *Id*. In short, a court must "empty" its "legal toolkit" to ensure that a statute is "genuinely ambiguous" before moving to *Chevron* step two. *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019).

As the District Court recognized, the logical starting point in determining whether Congress spoke to the precise issue at hand is ECOA's "Scope of Prohibition" section, 15 U.S.C. § 1691. A010. As the title implies, that section establishes ECOA's

core prohibition in subsection (a), "Acts constituting discrimination." That subsection states in full:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--
> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);
> (2) because all or part of the applicant's income derives from any public assistance program; or
> (3) because the applicant has in good faith exercised any right under this chapter.

15 U.S.C. § 1691(a). The remaining sections of ECOA all supplement section 1691, covering definitions (1691a), promulgation of regulations by the Bureau (1691b), administrative enforcement (1691c), incentives for self-testing and correction (1691c-1), small business loan data collection (1691c-2), applicability to other laws (1691d), civil liability (1691e), and annual reports to Congress (1691f). Section 1691 is thus the logical place to look to determine what Congress intended ECOA to prohibit.

Three things about section 1691 are immediately apparent. First, the entire section focuses on interactions between applicants and creditors in the context of a credit transaction. As the District Court noted, ECOA uses "applicant" twenty-six times. A016. "Indeed, the entire statutory scheme revolves around applicants." A015. Nowhere does section 1691 or the rest of ECOA mention "prospective applicants" or address individuals who have merely been exposed to a creditor's advertising.

Second, section 1691 is specific, and its scope is comprehensive. It begins by establishing, in specific terms, the types of discrimination ECOA prohibits. Included is not just discrimination against individuals based on race, sex, religion, and the

12

like, but also discrimination based on participation in a public assistance program. *See* 15 U.S.C. § 1691(a)(2). It then lists acts not constituting discrimination, again in specific terms. *See id*. § 1691(b) and (c). Subsection (d) then covers in detail the actions a creditor must take when it rejects an application, including the time within which the creditor must make a decision and the information to which an applicant is entitled concerning the reasons for the rejection. It would be strange for this section to list specifically what is and is not prohibited under ECOA and to describe in detail what a creditor must do if it rejects an application, if Congress had intended to allow the agencies to prohibit much more than discrimination against applicants. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2070–71 (2012) (noting that when Congress has enacted a "comprehensive scheme" that targets "specific problems with specific solutions," that scheme will govern over more general statutory language) (internal quotation marks omitted). *Accord Brumfield*, 735 F.3d at 628–29.

Third, section 1691 shows that Congress knew how to leave gaps for the implementing agencies to fill. For example, subsection (b)(2) states that it is not discrimination for a creditor to inquire about an applicant's age, among other things, if such inquiry is for the purpose of determining the applicant's credit worthiness "as provided in regulations of the Bureau." And subsection (b)(3) allows creditors to use empirically-derived credit systems that consider age if such systems are sound "in accordance with regulations of the Bureau." Similar language appears throughout ECOA. *See, e.g.*, 15 U.S.C. §§ 1691(c)(3), 1691(d)(1), 1691c-2(g)(2), 1691d(f), 1691d(g).

13

In the face of these explicit and relatively narrow gaps, it is unlikely Congress somehow intended the agencies to massively change ECOA's central prohibition when it left no gap for such a change at all. *See Air Transp. Ass'n of Am., Inc. v. U.S. Dep't. of Agric.*, 37 F.4th 667, 673 (D.C. Cir. 2022) (Courts do "read meaning into statutory silence when Congress has demonstrated that it is perfectly capable of delegating this authority to [the agency] when it so chooses.")

Thus, the statutory context and structure support the District Court's conclusion that Congress spoke to the precise issue at hand by barring discrimination against *applicants* in section 1691(a). *See Brumfield*, 735 F.3d at 628 (stating that words in a statute "must be read in their context and with a view to their place in the overall statutory scheme") (cleaned up). A further analysis of section 1691(a) confirms that conclusion.

### 1.    "Applicant" necessarily means an identifiable person who requests credit from a creditor.

ECOA defines "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). The statute does not define "to apply," but dictionaries at the time ECOA was passed define it as the act of requesting something from someone else. *See Regions Bank*, 936 F.3d at 1190–91 (listing dictionary definitions of "apply" and "applicant" in analyzing the meaning of "applicant" in ECOA); *Hawkins*, 761 F.3d at 941 (same). "So, taken together, these definitions suggest that the ordinary meaning of the term 'applicant' is one who requests credit to benefit

himself." *Regions Bank*, 936 F.3d at 1191. Section 1691a(b)'s definition of "applicant" is entirely consistent with this meaning. It lists two ways in which an applicant can make a request for credit from a creditor: (1) directly, by actually asking for credit; and, (2) indirectly, through action—specifically, by using an existing credit plan for more than the previously established limit.

The necessary conclusion is that an applicant must be an *identifiable person* who requests credit from a creditor. *See Regions Bank*, 936 F.3d at 1192. This is confirmed by ECOA's definition of "credit," which is "the right granted by a creditor *to a debtor* to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d) (emphasis added). In other words, an applicant is someone who requests the right to become a future debtor who may defer payment on her debts in order to make purchases in the present. That there must be an identifiable "someone" who is making such a request is obvious.

But adding "prospective" to "applicant" obliterates this limitation. "Prospective applicant" is not defined in Regulation B, but "prospective" simply means "future." Prospective, Black's Law Dictionary 1386 (rev. 4th ed. 1968) ("Looking forward; contemplating the future"). A "future applicant" can include anyone who may one day request credit. That logically includes individuals who are thinking of applying for credit, but who have not yet done so, as well as individuals who have not considered seeking credit but may, at some unidentifiable time in the future, do so. As CFPB

uses the term "prospective applicant," it can include not only *unidentified* individuals, but also individuals who are *unidentifiable.*

This case illustrates perfectly the unlimited scope of liability that the anti-discouragement rule adds to ECOA—and just how far CFPB is willing to push that liability. The rule states that "[a] creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application." 12 C.F.R. § 1002.4(b). "Any statement in advertising or otherwise" necessarily means *any* statement by a creditor and would logically include statements on social media or in any other public or private media, platform, or context. *See* Am. Cmpl. ¶¶ 23–24, 29 (noting that the Townstone Financial Show is made available on social media). Because "prospective" simply means "future," a statement can be made to a "prospective applicant" so long as some listener who hears it might one day seek credit. And because the test for whether a violation occurred is whether a "reasonable person" would be discouraged, CFPB need not identify any actual prospective applicants who heard the relevant statements or were discouraged to show that a creditor violated the rule. *See* Am. Cmpl. at 39; ECF 89-2 (Ex. B, Aug. 23, 2022 Ltr. from Defs. to Plaintiff). Finally, because the anti-discouragement rule says a violation occurs when a reasonable person would be discouraged "from making or pursuing an application"—which is not limited to those who would be discouraged from making or pursuing an application *from the creditor who made the statement*—a creditor violates the rule if its statement would discourage a reasonable person from seeking credit

from *any creditor*. *See* Am. Cmpl. ¶ 41 (alleging that Townstone's statements "would discourage" African Americans, or people from majority African American neighborhoods or people who considered moving to a majority African American neighborhood "from seeking credit, *including from Townstone*") (emphasis added).

The result is that a creditor would be liable under the anti-discouragement rule for making a statement in any context that might be heard by someone who might consider one day seeking credit, as long as the statement "would discourage on a prohibited basis" a hypothetical reasonable person from pursuing an application for credit from anyone. This incredible expansion of liability under ECOA simply cannot be squared with what Congress said in section 1691(a). *See*, *e.g.*, *Ortiz-Santiago v. Barr*, 924 F.3d 956, 961 (7th Cir. 2019) (Courts interpreting statutes "start with the uncontroversial proposition that an agency has no power to rewrite the text of a statute."); *Contender Farms, LLP v. U.S. Dep't. of Agric.*, 779 F.3d 258, 272 (5th Cir. 2015) ("Although federal agencies often possess broad authorit[y] … an agency may not create from whole cloth new liability provisions.") (cleaned up).

CFPB all but ignores the three cases most pertinent to the meaning of applicant in ECOA: *Moran Foods,* 476 F.3d 436; *Regions Bank*, 936 F.3d 1184; and *Hawkins*, 761 F.3d 937. Each case addressed whether Regulation B could expand the meaning of applicant to include "guarantor." Each concluded that it could not, because, as this Court stated in *Moran Foods*, "there is nothing ambiguous about 'applicant' and no way to confuse an applicant with a guarantor." 476 F.3d at 441. *See also Regions Bank*, 936 F.3d at 1190–91; *Hawkins,* 761 F.3d at 941. It is just as clear

that "applicant" cannot mean "prospective applicant." Indeed, whether "applicant" can include "guarantor" is a harder question, as a "guarantor" is at least an identifiable individual who participates in a credit transaction with an applicant. *See Regions Bank*, 936 F.3d at 119.

CFPB claims these cases are distinguishable because the "courts did not determine the scope of the Bureau's authority to issue regulations under § 1691b." CFPB Br. at 28. But this is a dodge. In all three cases, the parties supporting Regulation B's expansion of "applicant" relied on section 1691b to claim *Chevron* deference. *See* Defendants-Appellees' Br., *Moran Foods*, 2006 WL 565098, *26; Defendants-Appellants' Br., *Regions Bank*, 2017 WL 3976774, *31–32; Plaintiffs-Appellants' Br., *Hawkins*, 2013 WL 6069373, *20. And, in *Regions Bank*, the dissent relied on section 1691b(a) in arguing that the regulation at issue deserved deference. *See* 936 F.3d at 1211.

That the courts did not specifically address section 1691b supports *Townstone's* argument, not CFPB's. The courts obviously did not think that the grant of rulemaking authority answered the question at issue. Indeed, if CFPB's reliance on the rulemaking provision were a sufficient basis for deference, all three cases would have been resolved on that issue alone. As the dissent in *Region's Bank* argued, banning discrimination against "guarantors" can easily be said to serve ECOA's purpose. *See Regions Bank*, 936 F.3d at 1217–18 (Rosenbaum, J., dissenting). And as the concurrence noted in *Hawkins*, part of the Federal Reserve Board's reason for expanding "applicant" to include "guarantor" was to "enhanc[e] protections" under

ECOA. 761 F.3d at 945. Nevertheless, "[w]hatever might be the salutary effects of the change in policy, it was not a choice for the Board to make .... Any decision to expand the civil liability of creditors and to provide a cause of action for guarantors must come from Congress." *Id.*

In an effort to sidestep the unambiguous meaning of "applicant," CFPB contends that "numerous courts have concluded that ECOA's protections for 'applicants' extend to—and thus the term 'applicants' includes—those who have not *formally* initiated an application." CFPB Br. at 24–25 (emphasis added). Aside from the fact that none of the cited cases address the validity of a regulation or whether "applicant" is ambiguous, the cases all support Townstone's argument, for they support the unremarkable conclusion that "applicant" means one who requests credit from a creditor. The cases all involved private plaintiffs who were clearly seeking credit from particular creditors. The question in each was one of proof: Did they offer enough evidence or plead enough facts to show they had, in fact, requested credit? *See Hildebrandt v. Vilsack* 102 F.Supp.3d 318, 324–25 (D.D.C. 2015) (noting that plaintiff had repeatedly asked both for a loan application and for a loan); *Sacco v. Bank of Versailles*, No. 2:14-cv-04185, 2014 WL 5343537, at *3 (W.D. Mo. Oct. 20, 2014) ("Given Plaintiffs' meeting with [a creditor's representative], the clear purpose of which was to obtain a home loan, Plaintiffs qualify as applicants under the ECOA."); *Davis v. Strata Corp.*, 242 F.Supp.2d 643, 651 (D.N.D. 2003) (denying summary judgment in part because there were "factual issues in dispute as to whether Davis was an 'applicant' as that term is defined in" ECOA); *Cragin v. First*

19

*Fed. Sav. & Loan Ass'n*, 498 F.Supp.379, 384 (D. Nev. 1980) (holding that definition of applicant in 12 C.F.R. § 1002.2 barred plaintiff's claim because his oral request for credit did not comply with the creditor's procedures).

Unlike those cases, the issue here is not one of proof; *i.e.*, the question does not involve whether a person seeking credit has followed CFPB's regulations or a creditor's procedures or filed a "formal" request versus an informal one. Rather, the question here is one of interpretation—whether liability under section 1691(a) requires an identifiable person who has requested credit *at all*. The answer under the anti-discouragement rule is: no. The answer under section 1691(a) is: yes.

For much the same reason, CFPB's attempts to read ambiguity into "applicant" are unavailing. CFPB exclaims that "questions abound. Does the application have to be written? Should the definition of 'application' depend on what the creditor considers an application?" And so on. CFPB Br. at 24. But none of these questions alter the irreducible minimum of what an applicant can be: an actual person who requests credit from a creditor. CFPB's questions again go to proof—*i.e.*, what facts add up to a "request"—not to statutory interpretation. The proof needed will vary from case to case, but that issue does not make "applicant" ambiguous, at least not for *Chevron* purposes. *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86 (1993) (refusing to consider whether the Department of Labor's interpretation of ERISA should receive *Chevron* deference because the agency's attempt to read the statutory language "to the extent" to mean "if" "exceeded the scope of available ambiguity").

### 2. The anti-discouragement rule cannot be reconciled with the unambiguous meaning of "discrimination" and "credit transaction."

Even though the District Court declined to address whether the anti-discouragement rule conflicts with other parts of section 1691(a), A011 n.5, it is appropriate for this Court to consider the entire section, because, when interpreting a statute, courts "view words not in isolation but in the context of the terms that surround them." *Commodity Futures Trading Comm'n*, 717 F.3d at 550 (cleaned up).

Recall that section 1691(a) prohibits discrimination against applicants "with respect to any aspect of a credit transaction." ECOA does not define "credit transaction," but a "transaction," in the commercial sense, is the "act of transacting or conducting any business." Transaction, Black's Law Dictionary 1668 (rev. 4th ed. 1968). "It may involve selling, leasing, borrowing, mortgaging or lending ... It must therefore consist of an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered." *Id. See also* Transaction, Ballentine's Law Dictionary 1292 (3rd ed. 1969) ("A matter of dealing between parties, the word implying action, consent, knowledge, or acquiescence on the part of both of them.").

Thus, just as "applicant" in the context of section 1691(a) must be an identifiable person who requests credit from a creditor, so a "credit transaction" requires two or more identifiable individuals acting in concert with one another with the goal of one obtaining credit from the other. This is consistent with CFPB's own definition of "credit transaction" in Regulation B, which includes "every aspect of an

*applicant's* dealings with a *creditor* regarding an *application* for credit or an existing extension of credit." 12 C.F.R. § 1002.2(m) (emphasis added).

One cannot act in concert with, manage an affair with, negotiate with, or conduct business with an unknown and unknowable hypothetical individual who may or may not one day apply for credit. Nor is a "prospective applicant," as CFPB and the anti-discouragement rule use the term, part of an "application process." *See* CFPB Br. at 22–23. (claiming that "[t]he anti-discouragement rule shares [ECOA's] focus on the application process"). Someone who gazes at a creditor's advertisement or listens to its radio broadcast is not participating in an "application process" or engaged in a "transaction" with a creditor simply because that person may one day decide to apply for a loan.

Regulation B's anti-discouragement rule does similar damage to Congress's choice of "discrimination" as the prohibited action under ECOA. ECOA does not define "discrimination," but dictionaries define it as "a failure to treat all equally; favoritism" and conferring "privileges on a class arbitrarily selected from a large number of persons." Discrimination, Black's Law Dictionary 553 (rev. 4th ed. 1968). CFPB's regulations define "discrimination against an applicant" similarly as "to treat an applicant less favorably than other applicants." 12 C.F.R. § 1002.2(n). Thus, to discriminate on a prohibited basis means to treat an applicant differently than other applicants because of the applicant's race, sex, etc.

But "discourage" is a far broader term that is much less susceptible of an objective definition than "discrimination." "Discrimination" under section 1691(a)

turns on the actions of the creditor. The test is fact-based and objective. *Latimore v. Citibank Sav. Bank*, 151 F.3d 712, 715 (7th Cir. 1998). "Discouragement" under the rule, by contrast, turns entirely on the subjective *reaction* of the listener. "Discourage" means "[t]o lessen the courage of; to dishearten; to depress the spirits of; to deprive of confidence; to deject." Discourage, Webster's New International Dictionary 744 (1961). The types of statements that could cause a listener to become dejected or disheartened are legion. Limiting relevant listeners to "reasonable persons" and adding that they must be discouraged "on a prohibited basis" clarifies nothing. What does it mean to be discouraged "on a prohibited basis"? Must the subject matter of the statement involve race, sex, etc.? Must the "reasonable person" be a member of a protected class? The closest one can get to an interpretation of this language is that the statement must discourage a reasonable person *because of* race, sex, religion, and the like. But that is nothing like saying a creditor may not discriminate on a prohibited basis, which focuses on the creditor's *actions* (*e.g.*, treating people differently based on their race) not the listener's *reaction* (*i.e.*, feeling dejected "because of" race, etc.).

This case shows just how broadly the anti-discouragement rule sweeps. None of Townstone's statements indicate a desire or intention not to do business with anyone for any reason, let alone because of their race. Indeed, none of the statements has to do with race *at all*. The closest is the statement, blurted out by a guest on the Townstone Financial Show during a discussion of preparing homes for sale, that, in addition to painting and replacing carpets, owners should "take down the confederate

flag." Am. Cmpl. at ¶ 34. Presumably, CFPB's view is that merely saying "confederate flag" would discourage a reasonable person on a prohibited basis from seeking credit. Several of the comments dealt with crime in Chicago, some jokingly. For example, in one, a Townstone employee wondered why a person would go skydiving when he could get the same rush from walking through the South Side at night. *Id.* at ¶ 37. In another, Mr. Sturner stated that the police were "the only ones between [the South Side] turning into a real war zone and keeping it where it's kind of at." *Id.* at ¶ 35.

CFPB claims that Townstone's statements "disparaged" people from minority communities. *Id.* at 38. That is CFPB's interpretation, and it is false. But CFPB makes clear that even disparagement is not necessary for a statement to violate the anti-discouragement rule. In claiming that Townstone violated the rule, CFPB states in its complaint that "a reasonable prospective applicant would consider the characteristics of prospective neighborhoods, including the neighborhoods' safety or dangerousness, when making decisions about a property or seeking credit." *Id.* at ¶ 39. The implication is clear: even *true* statements about crime in certain neighborhoods can violate the rule.

Under these "standards" what would *not* violate the rule? Are creditors permitted to talk about crime at all? Education? Homelessness? Welfare? Poverty? Income distribution? Are they permitted to criticize the Black Lives Matter movement? Support the police? Criticize the Catholic Church about child abuse scandals? Support the BDS movement? Criticize the BDS movement? Support abortion rights? Oppose immigration?

Nothing in the anti-discouragement rule requires a creditor's allegedly discouraging statements to be about particular neighborhoods or to be connected to credit or financing in any way or even to be directed to protected groups. But even if one read such limitations into the rule, that would still cover an incredibly broad range of subjects, it would bear no similarity to section 1691(a)'s ban on discrimination, and the standard for violating the rule would still be unknowable in advance. If the Court needs an example of what true ambiguity looks like, it is on full display in the anti-discouragement rule.

CFPB has arrogated to itself the power to censor creditors' speech. That is obviously a violation of the First Amendment, as we show in Part III, below. But for present purposes, the question is whether Congress intended to give such broad and vague power to the agencies who administer ECOA. The answer is clear: It did not. To conclude otherwise would introduce "vistas of liability" into ECOA that the language of the statute simply does not support. *See Moran Foods,* 476 F.3d at 441.

## B. Congress did not authorize the implementing agencies to rewrite ECOA's core prohibition and massively expand liability under the law.

Unable to make a credible argument that the anti-discouragement rule can be squared with the unambiguous terms of section 1691(a), CFPB's case boils down to two propositions. First, it claims that Congress explicitly authorized the implementing agencies to promulgate the anti-discouragement rule through the rulemaking delegation in section 1691b(a). CFPB Br. at 17–18, 20. Second, it claims that Congress confirmed the validity of the anti-discouragement rule by adding the word "discouraged" to a referral provision in section 1691e(g). CFPB Br. at 17–20.

Through these provisions, CFPB claims, Congress spoke directly to the issue at hand—Is the anti-discouragement rule a valid interpretation of ECOA?—and answered with a resounding "yes."

But CFPB places far more weight on both sections than they can bear, it misunderstands the proper analysis under *Chevron*, and it vastly overstates the significance of the Supreme Court's decision in *Mourning v. Fam. Publ'ns Serv., Inc.*

### 1.    Congress's rulemaking delegation in section 1691b(a) does not expressly authorize the anti-discouragement rule.

To be entitled to *Chevron* step two's reasonableness determination, an agency must show either ambiguity in the statute or an explicit gap that Congress left for the agency to fill. *See, e.g.*, *City of Arlington*, 569 U.S. at 306 ("[F]or *Chevron* deference to apply, the agency must have received congressional authority to determine *the particular matter at issue in the particular manner adopted*.") (emphasis added) (citing *United States v. Mead Corp.,* 533 U.S. 218 (2001)). Because section 1691(a) is not ambiguous, CFPB is left with option two. But section 1691b(a) does not direct the agencies to define a term or fill a specific gap. Instead, it is a general rulemaking provision that directs CFPB to enact regulations that are "are necessary or proper to effectuate the purposes of [ECOA] [and] prevent circumvention or evasion thereof." 15 U.S.C. § 1691b(a). To be sure, the provision is written in broad terms, but that is not uncommon and it does not, alone, satisfy *Chevron* step one. *See, e.g., Chamber of Com. of U.S. v. N.L.R.B.*, 721 F.3d 152, 161–62 (4th Cir. 2013) (holding that a delegation to make rules that are "necessary to carry out" the provisions of a law insufficient, alone, to satisfy *Chevron* step one); *Contender Farms*, 779 F.3d at 273

("[A] broad grant of general rulemaking authority does not allow an agency to make amendments to statutory provisions.").

This Court's decision in *Brumfield* illustrates the point. There, the question was whether Title II of the Americans with Disabilities Act covered disability in employment claims even though Title I already did so. 735 F.3d at 622. According to a rule issued by the Attorney General, the answer was "yes." *Id*. at 625. Despite the ADA's broad delegation of rulemaking authority to the Attorney General to "promulgate regulations … that implement" Title II, this Court focused on whether the ADA was ambiguous on the question at issue, not on the rulemaking delegation. *Id.* at 626–630. Finding no ambiguity, this Court held the rule failed at *Chevron* step one. *Id.* at 626, 630.

Likewise, in *Cook County, Illinois v. Wolf*, 962 F.3d 208 (7th Cir. 2020), this Court addressed whether the Department of Homeland Security's public charge rule exceeded its power under the Immigration and Nationality Act. *Id.* at 214–15. Again, despite a broad rulemaking delegation that gave the Secretary the power to "administ[er] and enforc[e]" the Act and "establish such regulations …; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under" the Act, 8 U.S.C. § 1103(a)(1), (2), this Court focused at *Chevron* step one on the text of the act, not on the rulemaking delegation. *Id.* at 222–26. Finding the relevant statutory language ambiguous, it proceeded to *Chevron* step two, where it concluded the public charge rule was unreasonable. *Id.* at 227–29.

27

Contrast these cases with those in which courts have held that Congress *did* explicitly direct an agency to fill a gap. CFPB cites several. CFPB Br. at 31. For example, in *United States v. O'Hagan*, Congress delegated to the SEC the power to issue rules that "define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative"—which were the acts and practices the law prohibited. 521 U.S. 642, 674 (1997). Similarly, in *Rush*, the statute expressly assigned to the agency the authority to interpret the exact part of the statute at issue. 763 F.3d at 760. Because that constituted an explicit gap that Congress directed the agency to fill, this Court held "there [was] no need to consider whether the [statutory] term [was] ambiguous." *Id. See also Buongiorno v. Sullivan*, 912 F.2d 504, 509 (D.C. Cir. 1990) (noting explicit delegation allowing the National Health Service Corps to determine when to "waive[] or suspen[d]" payments under a scholarship program).

It is no answer, as CFPB would surely argue, that unlike the provisions in *Brumfield* and *Wolf*, section 1691b(a) gives the implementing agencies authority to prevent "circumvention or evasion" of ECOA. First, this language is not an explicit gap-filling provision such as those at issue in *O'Hagan*, *Rush*, and *Buongiorno*, all of which told the agency to elaborate on a particular statutory term or provision. Indeed, the distinction between an explicit directive to issue rules on a particular statutory provision versus a general rulemaking provision is clear from a review of ECOA itself, as Congress expressly directed CFPB to elaborate on a number of specific parts of the law. *See, e.g.*, 15 U.S.C. §§ 1691d(f), 1691d(g). Clearly, Congress knew how to direct

an agency in ECOA "to determine the particular matter at issue." *City of Arlington*, 569 U.S. at 306. Second, if a statement that an agency can issue rules to prevent "evasion or circumvention" can justify the anti-discouragement rule, it could be used to justify virtually any change to ECOA.

CFPB cites no authority for the proposition that, under *Chevron*, a general rulemaking provision satisfies *Chevron* step one. Indeed, many cases say the opposite. *See, e.g.*, *United States v. Kahn*, 5 F.4th 167, 174 (2d Cir. 2021) ("[A] statute's general provision that an administrator may issue such other regulations as he 'considers necessary' does not constitute authorization to issue a regulation that contradicts an express provision of the statute."); *Allegheny Def. Project v. FERC*, 964 F.3d 1, 16 (D.C. Cir. 2020) (same); *Bona v. Gonzales*, 425 F.3d 663, 670–71 (9th Cir. 2005) (same).

### 2.    The Supreme Court's decision in *Mourning* does not support CFPB's argument.

CFPB leans heavily on the Supreme Court's decision in *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356 (1973), claiming that the case gave the Board, and now CFPB, the power to "police 'matter[s] not specifically mentioned in the enabling legislation' if the failure to regulate would frustrate ECOA's purposes or permit evasion of the statute." CFPB Br. at 20 (quoting *Mourning*, 411 U.S. at 374). Thus, CFPB contends that *Mourning* directs the Court to leapfrog *Chevron* step one and uphold the anti-discouragement rule so long as it is reasonably related to preventing circumvention. *Id.* at 29 n.6. This argument fails for two reasons.

First, as several courts have recognized, *Mourning*'s directive to defer to regulations that are "reasonably related to the purposes of the enabling legislation" is simply another way of describing *Chevron* step two. As the Fourth Circuit has explained, this "guidance [from *Mourning*] is relevant only once we have determined that a statute is ambiguous. That is, we are only to defer to an agency's interpretation of what is 'necessary' once we have progressed to *Chevron*'s second step." *Chamber of Commerce*, 721 F.3d at 161. *See also NY Stock Exch.*, 962 F.3d. at 554 (same). Two post-*Mourning* Supreme Court decisions illustrate this point.

In *Board of Governors of Federal Reserve System v. Dimension Fin. Corp.* the Court struck down a regulation by the Federal Reserve Board that defined "banks" differently than the statutory definition in the Bank Holding Company Act. 474 U.S. 361, 363 (1986). Despite a rulemaking delegation in the law that "vest[ed] broad regulatory authority in the Board," *id.* at 365, the Court held the regulation invalid at *Chevron* step one because the law was unambiguous. *Id.* at 368, 375. And the Court specifically rejected the argument that the rulemaking delegation—which, like that in TILA and ECOA, directed the Board to "issue regulations 'necessary to enable it to administer and carry out the purposes of this chapter and prevent evasions thereof'"—authorized the regulation. *Id.* at 373 n.6. This provision, the Court stated, "only permits the Board to police within the boundaries of the Act; it does not permit the Board to expand its jurisdiction beyond the boundaries established by Congress." *Id.*

This language stands in stark contrast to CFPB's claim that *Mourning* permits "the Board (and now the Bureau) to *police 'matter[s] not specifically mentioned'*" in ECOA. CFPB Br. at 25 (emphasis added) (quoting *Mourning*, 411 U.S. at 374). Clearly, then, a rulemaking delegation such as ECOA's is not a one-way ticket to *Chevron* step two. *See Am. Min. of Cong. v. EPA*, 824 F.2d 1177, 1185 (D.C. Cir. 1987) (stating that "it is difficult, as *Dimension Financial* taught us, to pour meaning into a highly specific term by resort to grand purposes" of a statute). Instead, CFPB must show that Congress left a gap in ECOA for the agency to fill.

This point is confirmed by *Household Credit Services Inc v. Pfennig*, in which the Supreme Court addressed a regulation adopted by the Federal Reserve Board under TILA, the very same statute at issue in *Mourning*. 541 U.S. 232 (2004). At issue was the Board's regulation excluding over-limit fees from the definition of finance charge. *Id.* at 235. Despite TILA's broad rulemaking delegation, the Court approached the issue under *Chevron*'s two-step framework. *Id.* at 238–39. It upheld the regulation, but only after concluding that the definition of "finance charge" did "not explicitly address whether over-limit fees are included" and that Congress had therefore "left a gap for the agency to fill." *Id.* at 239. If CFPB's position were correct, the Court in *Household* would simply have reviewed TILA's broad rulemaking delegation and gone directly to *Chevron* step two.

Second, CFPB's reliance on *Mourning* is misplaced because the regulation at issue in *Mourning* was different in kind from the anti-discouragement rule. The "four installment rule" at issue in *Mourning* prevented creditors from hiding finance

31

charges in transactions that were paid in installments but that did not include any explicit finance charges. 411 U.S. at 362. Transactions such as these were, in form and substance, exactly what TILA was designed to cover. *Id.* at 371. By contrast, Regulation B's anti-discouragement provision is a brute rewrite of ECOA's central prohibition.

The Supreme Court's decision in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002), illustrates this point. There, the Court specifically addressed *Mourning* in the context of a regulation interpreting the Family Medical Leave Act. The FMLA guarantees 12 weeks leave to qualifying employees, but encourages employers to grant more leave than the statutory minimum. *Id.* at 84. Wolverine granted Ragsdale 30 weeks of leave when she fell ill, but under a regulation adopted by the Secretary of HHS, Wolverine could not count any of that leave toward the FMLA minimum, because it failed to notify Ragsdale her leave counted as FMLA leave. *Id.* At *Chevron* step one, the Court assumed, without deciding, that Congress had "spoken to the precise question" of notice." *Id.* at 88. At step two, the Court held that the regulation failed because "it alter[ed] the FMLA's cause of action in a fundamental way" and worked "an end run around important limitations of the statute's remedial scheme." *Id.* at 90–91.

As a result, "the Government's reliance upon *Mourning* … is misplaced." *Id.* at 92. Although the rulemaking delegation in *Mourning* was broader than that in the FMLA, "[t]he crucial distinction, however, is that although we referred to the Board's regulation as a 'remedial measure,' … the disclosure requirement was in fact enforced

32

through the statute's pre-existing remedial scheme and in a manner consistent with it." *Id.* In contrast, the regulation in *Ragsdale* "enforces the individualized notice requirement in a way that contradicts and undermines the FMLA's pre-existing remedial scheme ... . Our previous decisions, *Mourning* included, do not authorize agencies to contravene Congress' will in this manner." *Id.* at 92.

Likewise, here, Regulation B "alters [ECOA's] cause of action in a fundamental way"—by expanding it beyond discrimination against applicants in the context of a credit transaction. It bears no relation to ECOA's remedial scheme whatsoever, other than fitting the description of an anti-evasion provision. But, as *Ragsdale* shows, the mere fact that an agency intends a regulation to serve the purposes of a law does not validate it, under *Mourning* or any other case. *Id.* at 91 ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.") (quotation omitted).

### 3. Congress did not authorize the anti-discouragement rule by adding "discouragement" to ECOA's referral provision in section 1691e(g).

CFPB vastly overstates the significance of section 1691e(g). In directing agencies to refer certain matters for investigation to the Attorney General, Congress did not implicitly amend ECOA or endorse the anti-discouragement rule. CFPB pours enormous meaning into one word in the provision—"discouraging"—while ignoring the rest of the language in the section and the vast differences between the anti-discouragement rule and section 1691(a). "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one

might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). CFPB offers no support for the proposition that Congress hid a massive expansion of liability under ECOA in a referral provision whose purpose, by its terms, is to direct agencies to refer matters they believe to be violations of section 1691(a) to the Attorney General.

A review of the relevant text of section 1691e(g) confirms this. The sentence on which CFPB relies states that certain agencies with administrative authority under ECOA, "shall refer [a] matter to the Attorney General whenever the agency has reason to believe that 1 or more creditors has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a) of this title."

The first thing about this sentence that "leaps out," to use CFPB's expression, is that the provision nowhere refers to "prospective applicants" or suggests that anything approaching the scope of the anti-discouragement rule is illegal under ECOA. Instead, the sentence envisions the agencies referring patterns and practices "in violation of section 1691(a)." The terms of section 1691(a) are specific and unambiguous. Thus, whatever the phrase "discouraging or denying applications for credit" means in section 1691e(g), it cannot mean something more than discrimination against applicants on a prohibited basis in the context of a credit transaction, because that is what section 1691(a) actually prohibits. *See LaBonte*, 520 U.S. at 757 (stating that courts should "assume that in drafting legislation, Congress said what it meant"); *Commodity Futures Trading Comm'n*, 717 F.3d at 550 (same).

CFPB protests that this interpretation of section 1691e(g) "makes little practical sense," because Congress would not enact a "provision that applies only to consumers who are discouraged from applying for credit but apply anyway, and not to consumers who don't apply for credit because they are successfully discouraged from applying." CFPB Br. at 26.

But CFPB's complaint here has nothing to do with the meaning of section 1691e(g), for "avoidance of unhappy consequences" is an inadequate basis for interpreting a text. *Nixon v. Missouri Mun. League*, 541 U.S. 125, 141 (2004) (Scalia, J., concurring in judgment). And, in any event, it is not hard to understand why Congress would have used the phrase "discouraging or denying applications in violation of section 1691(a)" in the referral provision, because discouraging or denying applications can, indeed, be a violation of section 1691(a).

Recall that the common meaning of "applicant" is one who requests credit. *See*, *supra*, at 14–15. Under that meaning, someone who approaches a creditor and expresses a desire for credit is "requesting" credit. And if a creditor in that situation were to rebuff the individual because of their race, sex, or some other prohibited basis, that would be discrimination against the individual in violation of section 1691(a). One can call this "discouragement," but it is discouragement that amounts to discrimination in violation of section 1691(a). Examples of this type of situation appear in the cases CFPB cites for the proposition that ECOA applies to applicants prior to filing a formal application. CFPB Br. at 24–25. But nothing in section 1691(a)

or the definition of "applicant" in section 1691a(b) suggests that a violation can occur only if a creditor discriminates against someone who has filed a "formal" application.

The takeaway is that section 1691e(g) requires referrals to the Attorney General when an agency believes that creditors are engaging in a pattern or practice of turning away individuals who are requesting credit because of their race or other prohibited basis. This is the best reading of the referral provision because it is based on the actual language that Congress used, and it does not require this Court to conclude that Congress intended one word in the provision to effect a sea-change in ECOA. *See Ragsdale*, 535 U.S. at 96. Indeed, this interpretation accords with the first sentence of the Federal Reserve Board's official commentary on the anti-discouragement rule from 1985. "Generally, the regulation's protections apply only to persons who have requested or received an extension of credit." 50 FR 48018, 48050 (Nov. 20, 1985). And the first example of "practices prohibited" is "[a] statement that the applicant should not bother to apply, after the applicant states that he is retired." *Id*. Any member of Congress reading this official commentary would be justified in thinking that the anti-discouragement rule applied to situations such as this. Indeed, the legislative history CFPB itself cites confirms that the senators who commented about discouragement had this type of situation in mind. CFPB Br. at 37–38. But turning away individuals who clearly want to apply for credit is a world away from prohibiting statements to "prospective applicants" that "would discourage a reasonable person on a prohibited basis."

ECOA's legislative history simply does not support CFPB's arguments. All that can be gleaned from that history is that Congress decided first to allow, and then to require, certain kinds of referrals to DOJ to ensure better enforcement of ECOA. *See* Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, 90 Stat. 251, § 706 Civil Liability, 15 U.S.C. 1691(h) (1976); FDIC Improvement Act of 1991, Pub. L. 102-242, § 223, 105 Stat 2236 (1991).

Certainly, during the discussions about the 1991 amendments, some Senators expressed frustration at the lack of enforcement actions under ECOA and some used the word "discouraged," *see e.g.*, CFPB Br. at 5–6, 38, but others questioned why the ECOA amendments were included in the FDIC Improvement Act and thought the extraneous provisions should be deleted. *See* S. Rep. 102–167, at \*235 (Senator Jake Garn, former Senate Banking Committee Chairman, stating the ECOA amendments were "*contrary to the needed focus of the legislation* and should be deleted") (emphasis added); *id.* at \*250–51 (Senator Connie Mack noting that "the bill goes on to add several new consumer related provisions that have nothing to do with the safety and soundness of our financial institutions"). But nothing in the legislative history supports the claim that Congress endorsed the anti-discouragement rule in the 1991 amendments. In any event, courts may not "defer to an agency official's preferences because we imagine some 'hypothetical reasonable legislator' would have favored that approach. Our duty is to give effect to the text that 535 actual legislators (plus one President) enacted into law." *SAS Inst., Inc. v. Iancu*, 138 S.Ct. 1348, 1359 (2018).

Nor, as CFPB claims, does the fact "Congress never repudiated" the anti-discouragement rule amount to a silent amendment to ECOA. CFPB Br. at 21. First, "[l]egislative silence is a poor beacon to follow in construing a statute." *Regions Bank*, 936 F.3d at 1197 (cleaned up). Second, no cases prior to 1991 interpret the scope of the anti-discouragement rule, and the first settlements by DOJ or other agencies involving allegations that a creditor's marketing violated ECOA did not occur until 1994—and those settlements alleged violations of both ECOA *and* FHA. *See e.g.*, *United States v. Chevy Chase Fed. Sav. Bank*, No. 94-1824-JG (D.D.C. Aug. 22, 1994). And those settlements were criticized for containing allegations that went beyond the terms of ECOA and FHA. *See e.g.*, Thomas P. Vartanian, Robert H. Ledig and Alisa Babitza, *Chevy Chase Case Sets New Standards For Fair Lending Law Compliance*, 13 No. 17 Banking Pol'y Rep. 1, 7–10 (Sept. 19, 1994) ("Although the Chevy Chase consent decree alleges violations of the FHA and the ECOA, the claims it asserts are not directly traceable to any specific provisions of those laws when viewed in light of prior interpretations and precedents"); *see also* ECF 38 at 6, n.26. The notion that Congress somehow had the same view of the anti-discouragement rule in 1991 that was just being developed in 1994 is fanciful.

To be sure, the phrase "discouraging or denying applications" in section 1691e(g), standing alone, could be interpreted to include more than just "discrimination" against applicants. But including language that is broader than "discrimination" makes sense in a provision whose purpose is to ensure that agencies are referring matters, which might be pattern and practice violations, for

investigation. In any event, that language *does not stand alone*. It is necessarily limited by "in violation of section 1691(a)," and there is no indication anywhere that Congress intended to change the meaning of that pivotal section. Indeed, in 1991, Congress knew how to add a provision banning statements of discriminatory intent in advertising, as it did so in the Fair Housing Act, which was passed in 1968. *See* 42 U.S.C. § 3604(c).

The referral provision also answers CFPB's claim that without the anti-discouragement rule, creditors will be permitted to advertise for "White Applicants Only." But advertising such as this would announce a "practice" of violating section 1691(a) by indicating that the creditor rejects non-white applicants. And the proper response would be for CFPB to investigate ECOA against that creditor and to refer the matter to the Attorney General, who would doubtless do the same. Notably, CFPB referred the Townstone matter to DOJ under section 1691e(g), and DOJ decided not to pursue it. *See* A040.[3]

CFPB's claim that section 1691e(g) is an endorsement of the anti-discouragement rule has no credible support and contradicts the express language of that section and the rest of ECOA.

---

[3] In 1996, DOJ provided guidance to the federal bank regulatory agencies on pattern or practice referrals. Available here:
https://www.justice.gov/sites/default/files/crt/legacy/2014/03/05/regguide.pdf (last accessed Aug. 14, 2023).

**II.　　Regulation B's anti-discouragement rule is not entitled to deference at *Chevron* step two.**

Even if this Court concludes that Congress did not speak to the precise issue at hand, the anti-discouragement rule still fails at *Chevron* step two.

At *Chevron* step two, courts consider "whether the agency's [regulation] is based on a permissible construction of the statute." *Cook Cnty.*, 962 F.3d at 226 (cleaned up). "A court may strike down an agency's interpretation of a law if, for example, the agency's reading disregards the statutory context [or] its rule is based on an unreasonable interpretation of legislative history." *Id.* And, consistent with the constitutional avoidance canon, a court should not defer to an agency's construction of a statute that "would raise serious constitutional problems" unless Congress plainly intended that construction. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (cleaned up).

Importantly, *Chevron* step two "is a requirement that an agency can fail." *Kisor*, 139 S.Ct. at 2416. Accordingly, CFPB's claim that this Court can defer to the anti-discouragement rule if ECOA does not preclude the rule, CFPB Br. at 11, 14, 23, is wrong. *See, e.g.*, *NY Stock Exch.*, 962 F.3d at 546 ("Nor does a court presume that an agency's promulgation of a rule is permissible because Congress did not expressly foreclose the possibility.") (cleaned up). *See also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009) ("[S]tatutory silence, when viewed in context, is best interpreted as limiting agency discretion.").

### A. The anti-discouragement rule is not a permissible construction of ECOA.

The anti-discouragement rule is not a permissible construction of ECOA because it is not a "construction" of the statute at all. It is a rewrite of the core liability provision of ECOA that fundamentally changes the statute Congress passed. But as this Court and the Supreme Court have held, even under *Chevron* step two, an agency does not possess "unfettered discretion" to rewrite the law. *Cook Cnty.*, 962 F.3d at 229. *See Ragsdale* 535 U.S. at 90–91. *Ragsdale* and *Cook County* show why the anti-discouragement rule cannot survive *Chevron* step two.

First, the anti-discouragement rule "is invalid because it alters [ECOA's] cause of action in a fundamental way." *Ragsdale*, 535 U.S. at 90–91. As discussed, *Ragsdale* involved a regulation adopted under the FMLA that prevented employers from getting FMLA credit for leave granted to employees if they failed to notify the employee that the leave was FMLA leave. *Id.* at 84. The Court invalidated the regulation at *Chevron* step two because it fundamentally changed FMLA's cause of action by relieving employees from having to prove any harm or prejudice from a violation of FMLA. *Id.* at 92. Under the statute, "[t]he remedy is tailored to the harm suffered." *Id.* at 89. Under the regulation, that was no longer true. *See id.* at 90. Thus, "even if the Secretary were authorized to reconfigure the FMLA's cause of action," "this particular rule would be an unreasonable choice." *Id.* at 92.

The anti-discouragement rule likewise fundamentally alters ECOA's cause of action. Under section 1691(a), a creditor is liable only by taking a specific action—discrimination—against a known individual—an applicant—with whom the creditor

41

knows she is dealing in a credit transaction. The anti-discouragement rule changes this dynamic entirely, imposing liability on creditors simply for making public statements that, based on the subjective reaction of the listener, "would discourage" them from seeking credit from *anyone*. *See*, *supra*, at 16–17, 22–25. The creditor does not even have to know to whom he or she is speaking. It is enough that a statement is made in a context that a "prospective applicant" could hear it. Indeed, liability can attach under the provision even if there is no evidence that anyone heard the statements or was discouraged at all.

Even if this Court were to conclude that "applicant" is in some sense ambiguous, the anti-discouragement rule would still fail *Chevron* step two, for even where a statute is ambiguous, agencies can only "give authoritative meaning to the statute within the bounds of that uncertainty." *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 525 (2009). *See also City of Arlington*, 569 U.S. at 307 ("[W]here Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow."). Thus, CFPB's point that that ECOA does not establish whether an application can be oral or must be in writing is immaterial. CFPB Br. at 22. That does not make "applicant" ambiguous, but even if it did, it would not justify expanding the concept to unknown "prospective applicants" who have had no contact with a creditor at all.

Second, the anti-discouragement rule is an impermissible construction of ECOA because CFPB's "interpretation of its statutory authority has no natural limitation." *Cook Cnty.*, 962 F.3d at 228–29. *Cook County* involved a challenge to a

rule interpreting a provision of the INA that allows deportation of immigrants who become "public charges." In the rule, DHS defined as a "public charge" any noncitizen who receives certain government benefits, no matter how small, "for more than '12 months' in the aggregate in a 36-month period." *Id.* at 215. Even though the INA gave DHS broad discretion, the Court held that the rule still failed at *Chevron* step two, because "Congress drew the balance between acceptance of benefits and preference for self-sufficiency in the statutes." *Id.* at 228. But because DHS counted almost any public assistance against an immigrant, DHS upset that balance. *Id.* "Our concerns are heightened by the fact that DHS's interpretation of its statutory authority has no natural limitation." *Id.* at 228–29. Although DHS set the limit at public assistance for 12 months out of a 36 month period, "[t]here is nothing in the text of the statute, as DHS sees it, that would prevent the agency from imposing a zero-tolerance rule under which the receipt of even a single benefit on one occasion would result in" public charge status. *Id.* at 229. "We see no warrant in the Act for this sweeping view," because "[t]here is a floor inherent in the words 'public charge,' backed up by the weight of history." *Id.*

Likewise, here, there is no limit in CFPB's interpretation of its authority to amend ECOA under the rulemaking delegation. CFPB's position would allow it to expand the definition of "applicant" to include guarantors, among other things, or to adopt a rule banning creditors from relying on income or credit scores, requiring them to hire loan officers of a particular race or ethnicity, or ensuring that their loan portfolios are balanced among protected groups based on their representation in the

community. These, and many other changes CFPB could make, would fit comfortably within its authority to make rules that prevent circumvention or effectuate ECOA's purposes. *See* 15 U.S.C. § 1691b(a).

And just as there is a floor inherent in the meaning of public charge, there is a ceiling in the meaning of "applicant" in ECOA. Regulation B's anti-discouragement rule destroys that ceiling and implies that CFPB can change ECOA in virtually any way it pleases. Even under the deferential standard at *Chevron* step two, CFPB does not possess that discretion.

## B.    The anti-discouragement rule raises serious constitutional problems.

It is a cardinal rule of statutory interpretation that a court should not interpret a statute in a way that potentially violates the constitution when an alternative interpretation is available. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). It follows that an agency may not interpret a statute to create constitutional problems either. As a result, the Supreme Court has held that deference to a rule that "would raise serious constitutional problems" is improper unless Congress has made contrary intent unmistakably clear. *Solid Waste Agency*, 531 U.S. at 173 (cleaned up). Importantly, to apply this canon, the Court need not conclude that the anti-discouragement rule is definitely unconstitutional. It is enough that doubts be "substantial." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* § 38, at 250 (2012) (citation omitted).

Here, for the reasons stated in the next section, doubts concerning the constitutionality of the anti-discouragement rule are much more than substantial. And Congress said nothing in ECOA or the legislative history that even hints it intended to hand CFPB the power to censor speech.

## III. Regulation B's anti-discouragement rule violates the First and Fifth Amendments.

Even though the district court did not reach Townstone's constitutional arguments, this Court may affirm its judgment on "any basis in the record." *Valencia*, 883 F.3d at 967. Thus, if this Court concludes that the anti-discouragement rule is valid, it should hold the rule unconstitutional.

The anti-discouragement rule violates the First Amendment for at least four reasons.

First, it gives CFPB "unbridled discretion" to decide who may speak and what they may say. As this Court held in *Southworth v. Bd. of Regents of Univ. of Wisconsin Sys.*, laws that give officials such authority pose a danger of self-censorship and viewpoint discrimination. 307 F.3d 566, 578–79 (7th Cir. 2002); *See also Shurtleff v. City of Boston*, 142 S.Ct. 1583, 1593 (2022). As a result, such laws violate the First Amendment unless they contain specific and objective standards. *Id.* at 589. As noted earlier, however, violations of the anti-discouragement rule turn entirely on the subjective views of the listener, which is no standard at all. *See id.* (stating that a law may not leave the decision up to the "whim of the administrator") (cleaned up). The "reasonable person" language in the rule does not change this conclusion, for it is impossible for anyone to know what "discourage on a prohibited basis" means. *See*,

*supra*, at 16–17, 22–25. But even an intelligible "reasonable person" standard applied to the *listener* would not comply with the First Amendment, because, even to prosecute true threats, government must prove that the *speaker* acted recklessly. *See Counterman v. Colorado*, 143 S.Ct. 2106, 2117–19 (2023). Finally, the intervention of a jury would not save the rule, as juries are too likely to make decisions based on their "dislike of particular expression." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).

This leads to the second reason the rule violates the First Amendment: CFPB is enforcing it against Townstone because of Townstone's views. *See id.* at 458–59 (setting aside jury verdict holding speaker liable for intentional infliction of emotional distress as inconsistent with First Amendment). Saying the South Side is a war zone is a viewpoint. If Townstone had instead called the South Side a "peace-zone," we would not be here. *Cf. Iancu v. Brunetti*, 139 S.Ct. 2294, 2300–01 (2019) (detailing trademark decisions approving some views but rejecting those "offensive to many Americans"). The same is true of Townstone's other comments. Expressing views CFPB thought complimentary to certain neighborhoods or groups would not have resulted in a lawsuit. That is classic viewpoint discrimination. *Id.* at 2299–300. Townstone disparaged no one, but even if it had, *government is not permitted to ban "disparagement." See, e.g., Matal v. Tam*, 137 S.Ct. 1744, 1765 (2017) (striking down restriction on registering "disparaging" trademarks); *303 Creative LLC v. Elenis*, 143 S.Ct. 2298, 2311–12 (2023) (reviewing the many cases showing that "the First Amendment protects an individual's right to speak his mind regardless of whether

the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief") (cleaned up).

The notion that Townstone's statements are tantamount to a "White Applicants Only" sign is "pure fiction." *303 Creative*, 143 S.Ct. at 2319 (rebutting dissent's comparison of the speech at issue to a "White Applicants Only" sign). Such a sign clearly proposes an illegal transaction, by saying the merchant will do business only with white people. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 387–89, 391 (1973) (explaining limited exception to First Amendment for speech that proposes an illegal transaction). That is not what Townstone did, which is evident even from the selective and self-serving allegations in the complaint. Indeed, the comments at issue did not propose a transaction at all. Nor does the fact that they were made as part of the Townstone Financial Show make them commercial speech. *See id.* at 384 ("[S]peech is not rendered commercial by the mere fact that it relates to an advertisement."); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (stating speech is not considered commercial "when it is inextricably intertwined with otherwise fully protected speech"). Regardless, viewpoint discrimination violates the First Amendment whether the speech is commercial or not. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Commercial speech is no exception" to the viewpoint-discrimination doctrine.); *See also Matal,* 137 S.Ct. at 1767 (Kennedy, J., concurring) (stating viewpoint discrimination is forbidden whether speech is commercial or non-commercial).

Third, the anti-discouragement rule is facially content-based, because it singles out speech that would discourage someone because of its subject matter. *See Sorrell*, 564 U.S. 565. The fact that the subject matter is race, sex, and other prohibited bases does not save the rule. The prohibited bases listed in ECOA are not prohibited *subjects*. And, of course, *there is no such thing as a prohibited subject in America*. *See 303 Creative*, 143 S.Ct. at 2313 (holding that government may not compel speech in order to "excis[e] certain ideas or viewpoints from the public dialogue") (citation omitted). ECOA prohibits a very specific action—discrimination. This case involves speech.

Fourth, the rule is unconstitutionally vague and overbroad under both the First and Fifth Amendments, because a person of ordinary intelligence cannot know, in advance, what it prohibits, *Penny Saver Publ'ns, Inc. v. Vill. of Hazel Crest*, 905 F.2d 150, 155 (7th Cir. 1990); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), and it restricts a "substantial amount of protected speech," *United States v. Williams*, 553 U.S. 285, 292 (2008). Among other reasons, the rule applies to any statements, not just advertising. *See* 12 C.F.R. § 1002.4(b).

The Supreme Court's decision in *303 Creative* puts to rest any doubt about the anti-discouragement rule's constitutionality. There, the Court held that Colorado may not enforce an anti-discrimination law to compel a web designer to say things to which she objected. 143 S.Ct. at 2309–10, 2321–22. Here, CFPB seeks to prohibit Townstone from saying things on its radio show and podcast that CFPB believes would offend certain listeners. *303 Creative* forecloses every argument CFPB has

48

made and could make in support of the rule. It holds that speech cannot be suppressed simply because it is expressed in the context of commercial activity. *Id*. at 2316, 2320. It holds that restricting a person's views and ideas is not merely "incidental" to the regulation of conduct. *Id*. at 2317–19. And it makes clear that a court should rule a law that threatens to chill speech unconstitutional even at the *pre-enforcement* stage. *Id*. at 2318.

At bottom, *303 Creative* makes eminently clear, if it were somehow unclear, that "[t]he framers designed the Free Speech Clause of the First Amendment to protect the freedom to think as you will and to speak as you think." *Id*. at 2310 (cleaned up). Both the anti-discouragement rule and CFPB's application of it in this case, violate that right.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's judgment.

DATED: August 14, 2023.

<div style="margin-left:40%">

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

/s/ Steven M. Simpson
STEVEN M. SIMPSON
DC Bar No. 462553
JESSICA L. THOMPSON
DC Bar No. 1542170
JOHN F. KERKHOFF
OH Bar No. 0097134
Pacific Legal Foundation
3100 Clarendon Boulevard
Suite 1000
Arlington, VA, 22201
Tel: (916) 288-1398
SSimpson@pacificlegal.org
JLThompson@pacificlegal.org
JKerkhoff@pacificlegal.org

OLIVER DUNFORD
FL Bar No. 017991
Pacific Legal Foundation
4440 PGA Boulevard, Suite 307
Palm Beach Gardens, FL 33410
Tel: (916) 503-9060
ODunford@pacificlegal.org

RICHARD HORN
Garris Horn LLP
One South Church Avenue, Suite 1200
Tucson, AZ 85701-1601
Mobile: (917) 696-1525
Website: www.garrishorn.com
Email: rich@garrishorn.com

</div>

MARX DAVID STERBCOW
The Sterbcow Law Group LLC
824 Elmwood Park Boulevard, Suite 205
New Orleans, LA 70123
Office: 504-523-4930
Marx@sterbcowlaw.com

SEAN BURKE
Mattingly Burke Cohen & Biederman, LLP
155 E. Market St
Suite 400
Indianapolis, IN 46204
Office: (317) 614-7320
Sean.Burke@mbcblaw.com


*Attorney for Defendants-Appellees*

**Certificate of Compliance with**
**FRAP Rule 32(A)(7), FRAP Rule 32(G) and CR 32(C)**

The undersigned, counsel of record for the Defendants-Appellees, Townstone and Barry Sturner, furnishes the following in compliance with F.R.A.P Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 13,172 words.

DATED: August 14, 2023.

/s/ Steven M. Simpson
STEVEN M. SIMPSON

*Attorney for Defendant-Appellees*

**Certificate of Service**

I hereby certify that on August 14, 2023, I filed the foregoing DEFENDANTS-APPELLEES' BRIEF with the Court via CM/ECF. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system:

DATED: August 14, 2023.

<div style="text-align: right;">

_____/s/ Steven M. Simpson_____
STEVEN M. SIMPSON

</div>

# APPENDIX

## TABLE OF CONTENTS – SHORT APPENDIX

DECLARATION OF RICHARD HORN.................................................................A038

LETTER FROM U.S. DEPARTMENT OF JUSTICE CIVIL RIGHTS
DIVISION TO RICHARD HORN DATED APRIL 9, 2020 ....................................A040

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

CONSUMER FINANCIAL
PROTECTION BUREAU,

                        Plaintiff-Appellant,

        v.

TOWNSTONE FINANCIAL INC., et al.,

                    Defendants-Appellees.

**Case No. 23-1654**

Appeal from the U.S. District Court for the
Northern District of Illinois
No. 1:20-CV-4176
Franklin U. Valderrama, District Judge

## DECLARATION OF RICHARD HORN

      1.     I, RICHARD HORN, am over 18 and am competent to testify as to the matters in the declaration. The facts stated herein are true and of my own personal knowledge; if called as a witness, I could and would competently testify to the matters set forth below.

      2.     I am an attorney licensed to practice in Arizona, the District of Columbia, and New York.

      3.     I represent Appellee Townstone Financial Inc. in this appeal.

      4.     I represented Townstone throughout the fair lending investigation carried out by Appellant Consumer Financial Protection Bureau and the Bureau's ensuing lawsuit, *Consumer Financial Protection Bureau v. Townstone Financial Inc.*, et al., N.D. Ill. No. 1:20-CV-4176.

      5.     As counsel for Townstone, I received a letter from the Housing and Civil Enforcement Section of the Civil Rights Division of the United States Department of Justice, dated April 9, 2020. A true and correct copy of this April 9, 2020 letter is attached to this Declaration.

1

**A038**

I declare under penalty of perjury, that the foregoing is true and correct.

Executed on August _13_, 2023

RICHARD HORN

**A039**



U.S. Department of Justice

Civil Rights Division

Housing and Civil Enforcement Section

SSM:JMS:MC:bss
DJ 188-23-41

| | |
|---|---|
| *U.S. Mail:* | *950 Pennsylvania Avenue, NW - 4CON* |
| | *Washington, DC 20530* |
| *Overnight:* | *150 M St. NE* |
| | *Washington, DC 20002* |
| *Telephone:* | *(202) 514-4713* |
| *Facsimile:* | *(202) 514-1116* |

April 9, 2020

By email only rich@garrishorn.com

Richard Horn
Garris Horn PLLC
360 South Convent Avenue
Tucson, AZ 85701

     Re: Townstone Financial, Inc.

Dear Mr. Horn:

  As you are aware, the Consumer Financial Protection Bureau ("CFPB") made a referral concerning the lending practices of Townstone Financial, Inc., ("Townstone") to the Department of Justice ("Department") pursuant to the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691e(g). The CFPB found reason to believe that Townstone has engaged in a pattern or practice of violating the ECOA and its implementing regulation, Regulation B, 12 C.F.R. Part 1002, by discriminating on the basis of race in credit transactions in its mortgage lending business.

  The Department has completed its review and determined that the circumstances of this matter do not require enforcement action by the Department at this time. This does not constitute a determination on the merits of the allegations outlined in the CFPB's referral to the Department. Townstone Financial is relieved from the extension of its record-retention policy implemented in connection with the Department's review.

       Sincerely,

      Sameena Shina Majeed
        Chief

   By:     /s/

      Jon M. Seward
     Principal Deputy Chief
   Housing and Civil Enforcement Section

cc: Patrice Alexander Ficklin
  Assistant Director of Fair Lending
  Consumer Financial Protection Bureau