## No. 23-1654

# In the
# United States Court of Appeals
## for the Seventh Circuit

CONSUMER FINANCIAL PROTECTION BUREAU,

*Plaintiff-Appellant,*

v.

TOWNSTONE FINANCIAL, INC. and BARRY STURNER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:20-cv-04176.
The Honorable **Franklin U. Valderrama**, Judge Presiding.

## *AMICI CURIAE* BRIEF OF MORTGAGE BANKERS ASSOCIATION AND HOUSING POLICY COUNCIL IN SUPPORT OF DEFENDANTS-APPELLEES TOWNSTONE FINANCIAL, INC. AND BARRY STURNER AND AFFIRMANCE

JONICE GRAY TUCKER
PAUL HASTINGS LLP
2050 M. Street, NW
Washington, DC 20036
(202) 551-1781

MATTHEW P. PREVIN (*Counsel of Record*)
ZACHARY S. ZWILLINGER
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

KRISTOPHER KNABE
PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
(312) 499-6075

*Counsel for Amici Curiae*

 

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1654

Short Caption: Consumer Financial Protection Bureau v. Townstone Financial, Inc., and Barry Sturner

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Mortgage Bankers Association and Housing Policy Council

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Paul Hastings LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: Matthew P. Previn    Date: 8/15/2023

Attorney's Printed Name:  Matthew P. Previn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑  **No** ☐

Address:  200 Park Avenue, New York, NY 10166

Phone Number: 1(212) 318-6049    Fax Number:  1(212) 303-7049

E-Mail Address: matthewprevin@paulhastings.com

rev. 12/19 AK

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1654

Short Caption: Consumer Financial Protection Bureau v. Townstone Financial, Inc., and Barry Sturner

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Mortgage Bankers Association and Housing Policy Council

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Paul Hastings LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: Zachary S. Zwillinger    Date: 8/18/2023

Attorney's Printed Name: Zachary S. Zwillinger

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐  No ☑

Address: 200 Park Avenue, New York, NY 10166

Phone Number: 1(212) 318-6774    Fax Number: 1(212) 230-7774

E-Mail Address: zacharyzwillinger@paulhastings.com

rev. 12/19 AK

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1654

Short Caption: Consumer Financial Protection Bureau v. Townstone Financial, Inc., and Barry Sturner

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Mortgage Bankers Association and Housing Policy Council

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Paul Hastings LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: Jonice Gray Tucker    Date: 8/15/2023

Attorney's Printed Name: Jonice Gray Tucker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: 2050 M. St. NW, Washington, DC 20036

Phone Number: 1(202)551-1781    Fax Number: 1(202) 551-0271

E-Mail Address: jonicegraytucker@paulhastings.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-1654</u>

Short Caption: <u>Consumer Financial Protection Bureau v. Townstone Financial, Inc., and Barry Sturner</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Mortgage Bankers Association and Housing Policy Council</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Paul Hastings LLP</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: <u>Kristopher Knabe</u>     Date: <u>8/15/2023</u>

Attorney's Printed Name: <u>Kristopher Knabe</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]    **No** [✓]

Address: <u>71 S. Wacker Dr. Suite 4500, Chicago, IL 60606</u>

Phone Number: <u>1(312) 499-6075</u>     Fax Number: <u>1(312) 499-6175</u>

E-Mail Address: <u>kristopherknabe@paulhastings.com</u>

rev. 12/19 AK

## <u>TABLE OF CONTENTS</u>

**Page**

AMICI STATEMENT OF INTEREST ........................................................ 1

SUMMARY OF ARGUMENT ................................................................... 2

ARGUMENT ............................................................................................. 5

I.    AFFIRMING THAT THE ANTI-DISCOURAGEMENT PROVISION OF REGULATION B IS INVALID WILL NOT CREATE A REGULATORY GAP ................................................................................ 5

II.   THE ANTI-DISCOURAGEMENT PROVISION OF REGULATION B IS INVALID UNDER CHEVRON STEP 1 BECAUSE IT IS INCONSISTENT WITH THE PLAIN TEXT OF ECOA .............................. 10

     A.    The Plain Language of ECOA Applies Only to Applicants, Not Prospective Applicants .......................................................... 10

     B.    The Dictionary Act Cannot Change the Statutory Language of ECOA ......................................................................................... 12

     C.    The District Court's Decision Is Supported by Case Law ................... 13

     D.    The Referral Provision Was a Procedural Amendment that Did Not Change the Substantive Scope of ECOA ....................................... 15

III.  THE ANTI-DISCOURAGEMENT PROVISION OF REGULATION B IS INVALID UNDER CHEVRON STEP 2 BECAUSE THE BUREAU'S INTERPRETATION IS HOPELESSLY VAGUE AND OVERBROAD ........ 17

IV.  ANY APPLICATION OF REGULATION B MUST BE CONSISTENT WITH ECOA ............................................................................................ 19

     A.    Limiting Principle No. 1:  The Bureau Must Plead and Prove That Statements Made by the Lender Affirmatively Discouraged Applications on a Prohibited Basis ....................................... 19

     B.    Limiting Principle No. 2:  The Bureau Must Plead and Prove that the Discouraging Statements Caused Identifiable Applicants or Prospective Applicants to Be Discouraged from Making or Pursuing an Application ...................................... 23

CONCLUSION ......................................................................................... 25

CERTIFICATION OF COMPLIANCE ..................................................... 27

CERTIFICATE OF SERVICE ................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aragon-Salazar v. Holder*,
    769 F.3d 699 (9th Cir. 2014) ..................................................... 6

*Bank of America Corp. v. City of Miami*,
    581 U.S. 189 (2017) ............................................................... 23

*Carmichael v. The Payment Center, Inc.*,
    336 F.3d 636 (7th Cir. 2003) ..................................................... 6

*Carr v. Capital One Bank (USA) N.A.*,
    2021 WL 8998918 (N.D. Ga. Dec. 8, 2021) .................................... 15, 16

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ..........................................................*passim*

*Cnty. of Cook, Ill. v. Bank of Am. Corp.*,
    2023 WL 5249450 (7th Cir. Aug. 16, 2023) ....................................... 23

*Cook Cnty. v. Wolf*,
    962 F.3d 208 (7th Cir. 2020) ..................................................... 10

*Dhade v. Huntington Learning Ctrs., Inc.*,
    414 F. Supp. 3d 703 (D. Del. 2019) .............................................. 14

*Guadalupe v. Attorney Gen. United States*,
    951 F.3d 161 (3rd Cir. 2020) ..................................................... 12

*Hawkins v. Cmty. Bank of Raymore*,
    761 F.3d 937 (8th Cir. 2014) .................................................. 11, 14

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977) ............................................................... 21

*Moran Foods, Inc. v. Mid-Atlantic Mkt. Dev. Co., LLC*,
    476 F.3d 436 (7th Cir. 2007) ..................................................... 13

*Estate of Moreland v. Dieter*,
    576 F.3d 691 (7th Cir. 2009) ..................................................... 10

*Regions Bank v. Legal Outsource PA*,
    936 F.3d 1184 (11th Cir. 2019) ................................................... 14

*Revilla v. H&E Equip. Servs., Inc.*,
  2020 WL 9259087 (S.D. Tex. Oct. 6, 2020) .......................................... 12

*Rowland v. Cal. Men's Colony*,
  506 U.S. 194 (1993) .......................................................................... 13

*Shell v. Burlington N. Santa Fe Ry. Co.*,
  941 F.3d 331 (7th Cir. 2019) ............................................................. 12

*State Farm Fire and Cas. Co. v. Plutsky*,
  1988 WL 53926 (9th Cir. 1988) .......................................................... 12

*Trs. of Chi. Truck Drivers Pension Fund v. Leaseway Transp. Corp.*,
  76 F.3d 824 (7th Cir. 1996) ............................................................... 10

*Turley v. Gaetz*,
  625 F.3d 1005 (7th Cir. 2010) ............................................................ 10

**Statutes**

1 U.S.C. § 1 .......................................................................................... 13

12 U.S.C. §§ 5481 (12)(A)-(R) ................................................................. 6

15 U.S.C.
  § 1691(a).................................................................... 11, 16, 17
  § 1691a(b).................................................................... 11, 13
  § 1691e(g)..................................................................... 3, 15, 16

42 U.S.C.
  § 3605(a)............................................................................... 5
  § 3610.................................................................................. 9
  § 3611.................................................................................. 9
  § 3612............................................................................... 7, 9
  § 3613.................................................................................. 7
  § 3614.................................................................................. 7

Fla. Stat. § 760.25(2)(a) ......................................................................... 9

Ga. Code §8-3-223 ................................................................................. 9

Indiana Code
  § 22-9-1-2 ............................................................................. 9
  § 22-9-1-6 ............................................................................. 9

Va. Code § 36-96.4 ................................................................................. 9

Wis. Stat. Ann.
   § 106.50(1s) ............................................................................................ 9
   § 106.50(k) .............................................................................................. 9

Wyo. Stat. Ann. § 40-26-108 ...................................................................... 9

## Other Authorities

12 C.F.R.
   § 1002(4)(a) .......................................................................................... 20
   § 1002.4(b) .................................................................................... *passim*

24 C.F.R. § 100.120(a) ............................................................................... 5

Annual Report to Congress Pursuant to the Equal Credit Opportunity
   Act Amendments of 1976, at 6 (Sept. 2021),
   https://www.justice.gov/crt/page/file/1436056/download (accessed
   Aug. 16, 2023) ..................................................................................... 8

*Discourage*, Merriam-Webster.com Dictionary, MERRIAM-WEBSTER,
   https://www.merriam-webster.com/dictionary/discourage (accessed
   July 25, 2023) ..................................................................................... 20

*Discouragement*, Merriam-Webster.com Dictionary, Merriam-
   Webster, https://www.merriam-
   webster.com/dictionary/discouragement (accessed Aug. 16, 2023) ...... 20

DOJ/CFPB Fair Lending MOU, at 8,
   201212_cfpb_doj-fair-lending-mou.pdf (consumerfinance.gov)
   (accessed Aug. 16, 2023) ...................................................................... 8

40 Fed. Reg. 49299 (Oct. 22, 1975) ........................................................... 20

Fed. Rule of App. Proc.
   R. 29(a)(2) ............................................................................................ 1
   R. 29(a)(4)(E) ....................................................................................... 1

Office of the Comptroller of the Currency Federal Deposit Insurance
   Corp., Interagency Fair Lending Examination Procedures
   (Aug. 2009), https://www.ffiec.gov/pdf/fairlend.pdf ............................ 22

Press Release, U.S. Dep't of Justice Office of Public Affairs, Justice
   Department Announces New Initiative to Combat Redlining (Oct.
   22, 2021), https://www.justice.gov/opa/pr/justice-department-
   announces-new-initiative-combat-redlining (accessed Aug. 16, 2023) ... 7

*Prospective*, Merriam-Webster.com Dictionary, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/prospective (accessed
    July 25, 2023) ................................................................................................ 17

S. Rep. 102-167 (Oct. 1, 1991) .................................................................... 16

U.S. Dep't of Housing and Urban Development,
    https://www.hud.gov/program_offices/fair_housing_equal_opp
    (accessed Aug. 16, 2023)............................................................................. 9

## AMICI STATEMENT OF INTEREST

The Mortgage Bankers Association ("MBA") and Housing Policy Council ("HPC," and together with MBA, the "Associations") respectfully submit this brief as *Amici Curiae* in support of Appellees' position.[1]

The MBA is a trade association that represents more than 2,300 different companies working in the real estate finance industry, including residential mortgage lenders, mortgage insurance companies, title insurance companies, and other companies that provide services to residential mortgage lenders. The members of the MBA employ more than 280,000 individuals who serve customers in virtually every community in the country. In particular, the MBA represents many companies engaged in residential mortgage lending within the Seventh Circuit.

The HPC is a trade association whose members include mortgage originators, as well as other institutions involved in the housing finance market, including mortgage loan servicers and insurers. Thirty out of 31 HPC members either have a physical presence or are licensed to do business in the Seventh Circuit, and two members are headquartered in the Seventh Circuit.

The Associations' members are regulated by the Consumer Financial Protection Bureau ("CFPB" or the "Bureau"), and are thus subject to the Equal

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief. In addition, pursuant to Appellate Rule 29(a)(4)(E), the Associations certify that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no person other than the Associations and their counsel contributed money intended to fund the preparation or submission of the brief.

Credit Opportunity Act (the "ECOA") and Regulation B.  The Associations work with their members and policymakers to deliver fair, sustainable, and responsible home financing to meet the needs of customers, as well as to expand home ownership to consumers and communities that have historically been underserved, including minority communities.  The Associations thus have an interest in ensuring that courts and regulators interpret laws enacted by Congress (including ECOA) consistent with their statutory language.

## SUMMARY OF ARGUMENT

The Associations fully support the purpose of ECOA, made plain through the statute's express language—to prohibit any creditor from discriminating against any applicant for credit on the basis of any protected status.  The Associations also fully support the Bureau's statutory mandate to enforce ECOA.  In particular, the Associations share with the Bureau the common goal of promoting lending equality across the country, as well as closing the housing gap for people of color.  The Associations' members are committed to eradicating racism and other forms of discrimination in housing finance.

But the Bureau cannot pursue even these laudable goals by contravening the statutory language enacted by Congress in ECOA or ignoring the broad regulatory scheme that applies to pre-application activities outside of ECOA.  Moreover, the Bureau's expansive interpretation of Regulation B puts the Associations' members in an impossible position of trying to follow a rule that has no defined boundaries.

First, an extensive and broad federal and state regulatory framework already exists to promote equal opportunity throughout the lending lifecycle independent of Regulation B.  Contrary to the Bureau's hyperbolic claim that applying the statute's plain language and invalidating a single sub-section of Regulation B will create a gaping regulatory void, the Associations' members are subject to a multitude of legal requirements that extend to pre-application activities, and the policy concerns raised by the CFPB and its *Amici* are unfounded.

Second, the anti-discouragement provision of Regulation B, 12 C.F.R. § 1002.4(b), fails *Chevron* Step 1.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  The regulation cannot expand the scope of ECOA (which covers only applicants for credit) to the amorphous group of prospective applicants because that would be inconsistent with the statutory language enacted by Congress.  The Bureau and *Amici* supporting the Bureau raise numerous arguments that do not change this basic fact.  Other courts have consistently held that the defined term "applicant" must be interpreted in line with its statutory definition.  The Bureau tries to rewrite what Congress actually said by relying on the Dictionary Act and the referral provision at 15 U.S.C. § 1691e(g).  However, the Dictionary Act cannot change the meaning of ECOA when the statute itself is clear, and ECOA's referral provision is merely a procedural amendment that was not intended to change the substantive scope of ECOA to cover prospective applicants.  The fact that ECOA does not apply to prospective applicants is made clear in

comparison to the Fair Housing Act ("FHA"), which predates ECOA and unambiguously applies to pre-application conduct.

Third, the anti-discouragement provision of Regulation B fails *Chevron* Step 2, because the Bureau's interpretation is unbounded by any reasonable limiting principle. In the Bureau's eyes, any individual could apparently be a potential applicant to a lender for credit. And in the Bureau's eyes, any statement made by a lender could be unpalatable to a prospective applicant, and thus construed as an effort to discourage the prospective applicant. This wholesale ambiguity renders 12 C.F.R. § 1002.4(b) impossible to comply with, and unenforceable under *Chevron*.

Fourth, if this Court holds that the anti-discouragement provision of Regulation B is valid on its face, it should nevertheless make clear that its application must be reasonably limited to comply with the statutory language in ECOA. To that end, the Associations propose that, if the Court holds the anti-discouragement provision to be valid on its face, the Court adopt two limiting principles. First, this Court should require the Bureau to plead and ultimately prove that statements made by the lender affirmatively discouraged applications on a prohibited basis. And second, this Court should require the Bureau to plead and ultimately prove that the discouraging statements caused identifiable applicants or prospective applicants to be discouraged from making or pursuing an application for credit.

For those reasons, and the reasons that follow, the district court's decision should be affirmed.

4

# ARGUMENT

## I.     AFFIRMING THAT THE ANTI-DISCOURAGEMENT PROVISION OF REGULATION B IS INVALID WILL NOT CREATE A REGULATORY GAP

The Bureau and certain *Amici* supporting the Bureau claim that if this Court were to uphold the district court's decision, there would no longer be any prohibition on pre-application activity (particularly for non-banks) in the Seventh Circuit.  Not so.  Mortgage lenders, including both banks and non-banks, must comply with the FHA.  The FHA predates ECOA and explicitly prohibits pre-application activity, stating that lenders must not discriminate "in making available" a residential mortgage loan or other financial assistance for dwelling.  42 U.S.C. § 3605(a) ("It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person *in making available* such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.") (emphasis added); 24 C.F.R. § 100.120(a) ("It shall been unlawful for any person or entity whose business includes engaging in residential real estate-related transactions to discriminate against any person *in making available* loans or other financial assistance for a dwelling, or which is or is to be secured by a dwelling, because of race, color, religion, sex, handicap, familial status, or national origin.") (emphasis added).

If Congress had wanted ECOA to extend to pre-application activity, it could have modeled ECOA after the FHA.  It did not.  Likewise, if Congress had wanted to give the Bureau the authority to enforce the FHA, it could have.  But it did not.

5

Indeed, the FHA reflects a rare instance where Congress declined to give the Bureau authority to enforce a federal consumer financial law impacting the mortgage industry. *See* 12 U.S.C. §§ 5481 (12)(A)-(R) (listing ECOA, but not the FHA, as one of the "enumerated consumer laws" subject to Bureau authority).

The National Fair Housing Alliance ("NFHA") *Amici* further raise policy-based concerns, suggesting that a reading of ECOA that precludes "prospective applicants" would have the effect of disrupting a system of "fair lending supervision for banks and nonbanks," but this is wrong. NFHA Brief (ECF 18) at 7. *First*, as a preliminary matter, the NFHA *Amici*'s policy-based concerns are inappropriate in the context of *Chevron*'s first step, as parties cannot alter the plain text of the statute to fit their purpose. *Carmichael v. The Payment Center, Inc.*, 336 F.3d 636, 640 (7th Cir. 2003) ("When interpreting the meaning of a statute, we look first to the text; the text is the law, and it is the text to which we must adhere.") (internal quotation and citation omitted); *see also Aragon-Salazar v. Holder*, 769 F.3d 699, 706 (9th Cir. 2014) ("Using extrinsic policy considerations to determine whether there is statutory ambiguity is plainly contrary to Supreme Court precedent on both *Chevron* step one and statutory interpretation more generally.").

*Second*, the NFHA *Amici*'s policy concerns are factually inaccurate. The NFHA *Amici* claim that reading ECOA as it was written would lead to the result that "no agency would supervise the pre-application mortgage activities of non-bank lenders—the most significant entities in the mortgage market—because these entities are only supervised for ECOA violations." *See* NFHA Brief at 7. This is a

6

gross understatement of the amount of supervision and enforcement extended to non-bank lenders. Any non-bank lenders that may engage in discrimination in the pre-application setting would be held accountable under the FHA by the Department of Housing and Urban Development ("HUD") and the Department of Justice ("DOJ"), both of which have statutory authority (unlike the Bureau) to enforce the FHA. Reading ECOA as written would also not impact supervision over bank lending, as banks are similarly subject to supervision and enforcement under the FHA by the "prudential banking regulators" (*i.e.*, Office of the Comptroller of the Currency ("OCC"), Federal Reserve Board ("FRB"), and Federal Deposit Insurance Corporation ("FDIC")), as well as HUD and DOJ. 42 U.S.C. §§ 3612, 3613, 3614.[2]

In particular, the DOJ has repeatedly enforced the FHA, and has substantial resources to continue to pursue such claims against any mortgage lenders (non-banks or banks) that engage in pre-application discrimination. For example, in October 2021, the DOJ announced a new initiative to combat redlining, which is the "illegal practice in which lenders avoid providing services to individuals living in communities of color because of the race or national origin of the people who live in those communities." *See* Press Release, U.S. Dep't of Justice Office of Public Affairs, Justice Department Announces New Initiative to Combat Redlining (Oct. 22, 2021), https://www.justice.gov/opa/pr/justice-department-announces-new-

---

[2] The FHA also creates a private right of action for any "aggrieved person" that has been the victim of an "alleged discriminatory housing practice." 42 U.S.C. § 3613.

initiative-combat-redlining (accessed Aug. 16, 2023).  And far from acting on its

own, the DOJ works with other federal agencies and state authorities to ensure that

the FHA is enforced.  *See, e.g.*, U.S. Dep't of Justice, The Attorney General's 2020

Annual Report to Congress Pursuant to the Equal Credit Opportunity Act

Amendments of 1976, at 6 (Sept. 2021),

https://www.justice.gov/crt/page/file/1436056/download (accessed Aug. 16, 2023)

("The Division continued its collaborative work with other federal and state

partners through interagency engagement, joint investigations, and outreach

efforts.  The Division is an active participant in the federal Interagency Task Force

on Fair Lending."); *see also id.* (identifying "Civil Rights Division Partners"—CFPB,

FDIC, FRB, National Credit Union Administration ("NCUA"), OCC, and "[o]ther

partners," including the Federal Trade Commission ("FTC") and HUD).  Regardless

of what happens in this case, the Bureau will still be able to conduct routine

supervisory examinations of both bank and non-bank lenders and can "notify the

DOJ whenever it has reason to believe that it has information that may be relevant

to potential violations of other statutes enforced by the DOJ, including but not

limited to potential violations of the FHA."  *See* DOJ/CFPB Fair Lending

Memorandum of Understanding, at 8, 201212_cfpb_doj-fair-lending-mou.pdf

(consumerfinance.gov) (accessed Aug. 16, 2023).

HUD also has authority to enforce the FHA against both banks and non-

banks, and oversees non-banks' compliance with fair lending requirements.  HUD

enforces the FHA through investigations, conciliation, and adjudication of

complaints.  42 U.S.C. §§ 3610, 3611, 3612.  In fact, HUD has a dedicated office of fair housing and equal opportunity.  *See* Fair Housing and Equal Opportunity, U.S. DEP'T OF HOUSING AND URBAN DEVELOPMENT,

https://www.hud.gov/program_offices/fair_housing_equal_opp (accessed Aug. 16, 2023).

Choosing to interpret the plain text of ECOA as written will also have no impact on the robust regulation that lenders face at the state level.  State regulators and agencies have the authority to examine, investigate, enforce, and handle complaints related to fair lending compliance, and they have anti-discrimination laws that apply to financial institutions.[3]  Indeed, many states have statutes that mirror the language in the FHA that covers pre-application activity. *See, e.g.*, Fla. Stat. § 760.25(2)(a); Ga. Code §8-3-223; Va. Code § 36-96.4; Wis. Stat. Ann. § 106.50(k); Wyo. Stat. Ann. § 40-26-108.

A ruling affirming the district court decision and holding that the anti-discouragement provision of Regulation B is invalid, therefore, would not create a regulatory or enforcement gap for pre-application conduct.  Indeed, the Meta/Facebook settlement described by the NFHA *Amici* is a perfect example of multiple federal and state agencies and regulators working together to enforce the FHA to resolve claims related to activities that would impact prospective

---

[3] *See, e.g.*, within the Seventh Circuit, 775 Ill. Comp. Stat. 5/4-102; Indiana Code 22-9-1-2; Wis. Stat. Ann. § 106.50(k).  These state statutes are enforced by state Attorneys General and other comparable state regulators.  775 Ill. Comp. Stat. 5/8a-101, 775 Ill. Comp. Stat. 8/8b-101; Indiana Code § 22-9-1-6; Wis. Stat. Ann. § 106.50(1s).

applicants.  *See* NFHA Brief at 26-27 (describing the resolution of FHA claims

involved by the State of Washington Attorney General, DOJ, and HUD).

## II.     THE ANTI-DISCOURAGEMENT PROVISION OF REGULATION B IS INVALID UNDER *CHEVRON* STEP 1 BECAUSE IT IS INCONSISTENT WITH THE PLAIN TEXT OF ECOA

### A.     The Plain Language of ECOA Applies Only to Applicants, Not Prospective Applicants

The district court's decision should be affirmed because the anti-

discouragement provision of Regulation B fails *Chevron* Step 1.  The first step of

*Chevron* requires the Court to look to ECOA's text to determine whether Congress

has spoken unambiguously on the question at issue.  *Cook Cnty. v. Wolf*, 962 F.3d

208, 221 (7th Cir. 2020).  This analysis begins with the plain language of the text

and assumes that the ordinary meaning of language "accurately expresses the

legislative purpose."  *Turley v. Gaetz*, 625 F.3d 1005, 1008 (7th Cir. 2010) (quoting

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).  It is a

"holistic" endeavor that takes into account the statute's "full text, language as well

as punctuation, structure, and subject matter."  *Trs. of Chi. Truck Drivers Pension

Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 (7th Cir. 1996); *see also Estate of

Moreland v. Dieter*, 576 F.3d 691, 699 (7th Cir. 2009).  If Congress has

unambiguously spoken on the question at issue, then that ends the inquiry, and

agencies and courts alike are bound by Congress' words.  *Wolf*, 962 F.3d at 221

(citing *Chevron*, 467 U.S. at 837).

Congress has unambiguously spoken—ECOA extends only to "applicants,"

and not "prospective applicants."  Regulation B's attempt to expand ECOA to reach

prospective applicants is thus impermissible. The text of ECOA, on its face, makes clear that the statute extends only to applicants. *See* 15 U.S.C. § 1691(a). The statute provides that it is "unlawful for any creditor to discriminate against any *applicant*, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age . . ." *Id.* (emphasis added). The text lacks any references to prospective applicants. In fact, the word "prospective" does not appear *even once* in Section 1691(a). *Id.*

This conclusion is further supported by ECOA's statutory definition of the term "applicant." The statute defines "applicant" as "any person who *applies* to a creditor directly for an extension, renewal or continuation of credit, or *applies* to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b) (emphasis added). Courts have interpreted this to mean that a person is an applicant only if she requests credit. *See Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 941-42 (8th Cir. 2014) (citing 15 U.S.C. § 1691a(b)) ("The plain language of the ECOA *unmistakably* provides that a person is an applicant *only if she requests credit.*") (emphasis added).

The Bureau argues that a prospective applicant falls within the ambit of ECOA under Regulation B (CFPB Brief (ECF 12) at 21), but this cannot be. A "prospective applicant" is a person who has not yet requested credit. Such a person cannot be an "applicant" because an "applicant" is a person who has already requested credit. Courts routinely recognize the common sense distinction between

11

someone who may prospectively have a particular status, and someone who actually does have that status. *See, e.g.*, *Revilla v. H&E Equip. Servs., Inc.*, 2020 WL 9259087, at *4 (S.D. Tex. Oct. 6, 2020) (holding that anti-discrimination statute's reference to employers applied only to "[a] current, not prospective, employer"); *State Farm Fire and Cas. Co. v. Plutsky*, 1988 WL 53926, at *1 (9th Cir. 1988) (affirming district court holding that "the right of private occupancy is clearly a right enjoyed only by current tenants, not prospective ones"). Because ECOA is clear that it only covers applicants, and not prospective applicants, 12 C.F.R. § 1002.4(b) is invalid.

> B.    The Dictionary Act Cannot Change the Statutory Language of ECOA

The Bureau's reliance on the Dictionary Act to extend the meaning of "applicant" to prospective applicants is misplaced. The Bureau argues that the Dictionary Act supports its view that "applicant" should include both those who apply for credit, and those who have not yet applied for credit. CFPB Brief at 23-24. This Court has found, however, that the "first (and usually final) stop for statutory questions" is not the Dictionary Act, but the text. *See Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019). Where the text is clear, the Dictionary Act does not apply. *Id.* ("[T]he ADA's plain language and context indicates that the Dictionary Act does not apply here as the EEOC suggests.") (quoting *EEOC v. STME, LLC*, 938 F.3d 1305, 1317 (11th Cir. 2019)); *see Guadalupe v. Attorney Gen. United States*, 951 F.3d 161, 166 (3rd Cir. 2020) (suggesting that Courts will rely on the Dictionary Act only where "necessary to

carry out the evident intent of the statute" and that where the language of the statute is clear, it is not necessary to rely on the Dictionary Act).

Further, the Dictionary Act itself states that the Act would not apply in "determining the meaning of any Act of Congress" if "*the context indicates otherwise.*" 1 U.S.C. § 1 (emphasis added). Where Congress has "include[d] an express, specialized definition" for the purpose of the statute, Courts need not look to the Dictionary Act. *Rowland v. Cal. Men's Colony,* 506 U.S. 194, 200 (1993). Here, Congress provided an express definition for "applicants," making clear that an applicant is one who "*applies*" for credit. 15 U.S.C. § 1691a(b) (emphasis added). The statutory text is thus clear, and the Court need not, and should not, look to the Dictionary Act.

C.     The District Court's Decision Is Supported by Case Law

Case law also supports the position that the plain language of ECOA does not extend to "prospective" applicants. In *Moran Foods, Inc. v. Mid-Atlantic Mkt. Dev. Co., LLC*, this Court considered whether a guarantor was an "applicant" under ECOA. The Court found that ECOA's definition of "applicant" was unambiguous and did not apply to the guarantor, because the guarantor "neither received credit nor was denied it." 476 F.3d 436, 441 (7th Cir. 2007) (concluding that "there is nothing ambiguous about 'applicant'" and that "applicant" could not be "stretched far enough" to include guarantors). For the same reason, ECOA cannot extend to "prospective applicants" who have neither received nor been denied credit.

13

In *Hawkins*, the Eighth Circuit similarly rejected a plaintiff's invitation to interpret "applicant" as inclusive of guarantors. 761 F.3d at 941-942, *aff'd by an equally divided Court,* 136 S.Ct. 1072 (2016). In so holding, the court explained that guarantors take on "secondary, contingent liability," and that this did not amount to a request for credit. *Id.* at 942. The Bureau's suggestion that ECOA extends to prospective applicants—who have not taken on *any* liability—makes little sense in light of *Hawkins*.

The Eleventh Circuit similarly determined that the ordinary meaning of the term "applicant" is one who "requests credit to benefit himself" and that Congress created ECOA as "a right that runs *only to* 'applicants.'" *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190-91, 96 (11th Cir. 2019) (emphasis added) (explaining that legal dictionaries and English language dictionaries from both before and after the enactment of ECOA universally define the term "apply" to mean "a request for something"). ECOA thus cannot extend to prospective applicants who have not requested anything.[4]

---

[4] In *Dhade v. Huntington Learning Ctrs., Inc.*, the United States District Court for the District of Delaware explicitly found that "applicant" was distinct from "prospective applicant" under ECOA. 414 F. Supp. 3d 703, 704 (D. Del. 2019). The court explained that Regulation B does not change the definition of "applicant," let alone expand the definition to include "prospective applicants." The court noted that Regulation B's "use of the disjunctive 'or' makes clear that the Bureau draws a distinction between 'applicants' and 'prospective applicants.'" *Id.* at 707. The court also found that even if Regulation B could somehow be interpreted to expand the definition of "applicant," courts can only defer to an agency's interpretation of the statute "when the text of the statute is ambiguous." *Id.* The court declined to extend ECOA to prospective applicants because "the text of the ECOA" was "unmistakably clear." *Id.*

The distinction between applicants and prospective applicants is not confined to the guarantor setting.  In *Carr v. Capital One Bank (USA) N.A.*, the plaintiff argued that he met the definition of "applicant" under ECOA because he had "applied for credit with Capital One" at "some point in time."  2021 WL 8998918, at *2 (N.D. Ga. Dec. 8, 2021).  The district court disagreed, explaining that ECOA's requirement that an "applicant" request something could not be squared with plaintiff's broad reading of "applicant" under which "anyone who has an existing relationship with a creditor is automatically an 'applicant,' and remains that way in perpetuity."  *Id.* at *4.  Indeed, ECOA's definition of "applicant" "does not automatically cover all persons who are existing account holders."  *Id.* at *7.  Instead, an existing account holder at Capital One qualified as an "applicant" "only if the person directly applies for extension, renewal, or continuation of credit or indirectly applies for an amount exceeding a previously-established credit limit by using an existing credit plan."  *Id.*  Ultimately, the court found that nothing in the Complaint suggests that the plaintiff met that definition of applicant.  For the same reasons, the Bureau's argument that Regulation B permissibly extends ECOA to "prospective applicants" cannot stand.

    D.    <u>The Referral Provision Was a Procedural Amendment that Did Not Change the Substantive Scope of ECOA</u>

The Bureau argues that Congress' amendment of the referral provision of the statute, 15 U.S.C. § 1691e(g), suggests that Congress intended for ECOA to extend to prospective applicants.  CFPB Brief at 17.  This is wrong.  Section 1691e(g) states that agencies enforcing ECOA shall refer to the Attorney General any matter

15

involving a suspected "pattern or practice of discouraging or denying *applications* for credit in violation of section 1691(a) of this title." 15 U.S.C. § 1691e(g) (emphasis added). At the outset, the context of Section 1691e(g) makes clear that it is a procedural, not substantive, amendment, meaning that the purpose of Section 1691e(g) is to grant agencies the procedural authority to refer cases to the Attorney General when applicable, not to expand the substantive reach of ECOA. *See id.* The Bureau's interpretation of Section 1691e(g) seeks to expand the substantive breadth of ECOA through this procedural provision, contravening congressional intent.

The plain text of Section 1691e(g) also makes no reference to "*prospective applications*," only referencing "*applications*." Had Congress meant to reach pre-application activity, Congress could have added the word "prospective" before applications. Congress did not do so, and the legislative record makes clear that this was no mistake. *See* S. Rep. 102-167, at *86 & n.8 (Oct. 1, 1991) (stating that "[d]iscouraging *applications*" is "prohibited" and making no mention of "prospective" applications) (emphasis added). The Bureau's reading of Section 1691e(g)'s use of the term "discouragement" as "confirmation" that ECOA should extend to "prospective applicants," is also unsubstantiated. Nothing in the word "discouragement" suggests that Congress intended to extend the reach of the statute. CFPB Brief at 30. Instead, courts have made clear, in cases like *Carr*, that ECOA is not boundless and cannot cover "anyone" with a relationship (yet alone a potential relationship) to the creditor. 2021 WL 8998918, at *4.

### III.   THE ANTI-DISCOURAGEMENT PROVISION OF REGULATION B IS INVALID UNDER *CHEVRON* STEP 2 BECAUSE THE BUREAU'S INTERPRETATION IS HOPELESSLY VAGUE AND OVERBROAD

Even if the anti-discouragement provision of Regulation B were not inconsistent with ECOA, it would still be invalid because it would fail under *Chevron* Step 2.  Under that prong, if Congress has made "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," then the resulting regulations are "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 843-44.

Regulation B provides that a creditor cannot "discourage" "prospective applicants" from making or pursuing an application.  12 C.F.R. § 1002.4(b).  But Regulation B does not define what would render any individual a "prospective" applicant.  This is in contrast to ECOA, which expressly defines an applicant as a "person who applies to a creditor" for credit.  15 U.S.C. § 1691(a).  The dictionary definition of "prospective" explains that the word indicates something that an individual is "likely to be or become," *e.g.*, "a prospective mother."  *Prospective*, Merriam-Webster.com Dictionary, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/prospective (accessed July 25, 2023).  Thus, combining ECOA's definition of "applicant" with the dictionary definition of "prospective" suggests that the anti-discouragement provision of Regulation B would potentially apply to an individual who is "likely to be or become" a person who applies to a creditor for credit.

But even with this definition, the scope is still unclear.  Is someone a prospective applicant if she hears a message discouraging an application but has no present or future intention of applying for credit?  Is she a prospective applicant if she does not have a present intention of applying for credit, but has such an intention to do so in six months?  What if there is a thirty percent chance she may want to apply for credit in three years?  What if she has an intention of applying for credit, but from her local bank rather than from the lender whose discouraging message she heard?  What if the individual does not actually hear or see the purportedly discouraging "oral or written statement"?  Because Regulation B leaves so many questions unanswered, potential lenders cannot develop compliance programs to ensure that they are following the law.

Moreover, a regulation without a viable limiting principle risks arbitrary and capricious enforcement by the Bureau, with potentially significant differences in interpretation and application depending on changes in political leadership at the Bureau.  For example, if a lender posts at its entrance a political message (*e.g.*, a "Black Lives Matter" flag, or a "Blue Lives Matter" flag), the leadership of the Bureau at one time may argue that the purpose of such a message was to discourage prospective applicants who support the opposing view.  But because the political leadership of the Bureau will undoubtedly change over time, the Bureau could bring different enforcement actions only against lenders that favor opposing

political messages.  This is exactly the sort of arbitrary and capricious enforcement that *Chevron* Step 2 is meant to preclude.[5]

## IV.  ANY APPLICATION OF REGULATION B MUST BE CONSISTENT WITH ECOA

Even if this Court concludes that Regulation B's prohibition on discouraging prospective applicants from applying for credit on a prohibited basis is on its face consistent with ECOA, that should not end the inquiry.  In that case, this Court should ensure that the Bureau's application of Regulation B is consistent with ECOA by adopting two limiting interpretive principles.  First, the Bureau must plead, and ultimately prove at trial, that the lender has affirmatively discouraged applications on a prohibited basis.  And second, the Bureau must plead, and ultimately prove at trial, that the lender's affirmatively discouraging statements in fact caused identifiable applicants or prospective applicants to be discouraged from making or pursuing an application.  Applying these two limiting principles to the reach of Regulation B would help render the scope of the regulation more consistent with Congress' stated intent in ECOA's framework, and would also permit lenders to have clear rules and guidelines they can follow to comply with the law.

### A.  Limiting Principle No. 1:  The Bureau Must Plead and Prove That Statements Made by the Lender Affirmatively Discouraged Applications on a Prohibited Basis

To bring a viable claim under Regulation B, the Bureau should be required to allege, and ultimately prove at trial, that statements made by the lender

---

[5] The Associations do not address here whether certain speech by lenders is also protected under the First Amendment.

affirmatively discouraged applications on a prohibited basis. The regulation states that creditors must not "make any oral or written statement . . . *to* applicants or prospective applicants" that would discourage the person from "making or pursuing an application." 12 C.F.R. 1002(4)(a) (emphasis added).

By using the word "discourage," Regulation B requires an affirmative action directed at someone. "Discouragement" means the "*the act of* discouraging," and to discourage means "*to dissuade or attempt to dissuade* from doing something." *Discourage*, Merriam-Webster.com Dictionary, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/discourage (accessed July 25, 2023); *Discouragement*, Merriam-Webster.com Dictionary, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/discouragement (accessed Aug. 16, 2023).

The requirement that discouragement necessitates an affirmative act is further supported by the regulatory history of Regulation B. In particular, the section discussing the Federal Reserve's promulgation of the original final rule states that this provision "requires a creditor to refrain from making any statements to an applicant or a prospective applicant that would discourage a reasonable person from applying for credit by suggesting that, because of the applicant's sex or marital status, the applicant is unlikely to receive credit privileges which would otherwise be available. The Board believes that this section is necessary to protect applicants against *discriminatory acts* occurring before an application is initiated." *See* 40 Fed. Reg. 49299 (Oct. 22, 1975) (emphasis added).

20

Indeed, the Bureau's examples of what should be impermissible under Regulation B satisfy the affirmative discouragement requirement.  A hypothetical sign saying "no Catholics need apply" (CFPB Brief at 12) would constitute an impermissible statement that affirmatively discourages a prospective applicant on a prohibited basis.  Similarly, the Supreme Court's example of hanging a "Whites Only" sign outside a lender's offices would be an affirmative discouragement to non-white prospective applicants. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs.").

A limiting principle that is tethered to statements made by a lender that affirmatively discourage applications on a prohibited basis would be consistent with other examples regulators have provided of conduct that, in their view, violates Regulation B.  The Official Interpretation to Regulation B provides three examples of discriminatory conduct that would affirmatively discourage a prospective applicant: (i) a statement that the applicant should not bother to apply, after the applicant states that he is retired; (ii) the use of words, symbols, models or other forms of communication in advertising that express, imply, or suggest a discriminatory preference or a policy of exclusion; or (iii) the use of interview scripts that discourage applications on a prohibited basis.  *See* Official Interpretation to Regulation B, 12 C.F.R § 1002.4(b) at Paragraph 4(b)-1 (i)-(iii).

The Interagency Fair Lending Examination Procedures (a set of guidelines from the OCC, FDIC, FRB, NCUA, and the now-defunct Office of Thrift Supervision), provide another example of an affirmative act of discouragement that would violate Regulation B:

> A lending officer told a customer, "We do not like to make home mortgages to Native Americans, but the law says we cannot discriminate and we have to comply with the law." This statement violated the FHAct's prohibition on statements expressing a discriminatory preference as well as Section 202.4(b) of Regulation B, which prohibits discouraging applicants on a prohibited basis.[6]

Without clear limiting principles, the Bureau's expansive, ill-defined interpretation could yield absurd results. For example, if a lender with a loan office in rural Illinois wanted to place an advertisement in a local church newsletter that merely states that it offers mortgages, then under an expansive interpretation of Regulation B—one without appropriate limiting principles—this could be a violation of the regulation because it might discourage other prospective applicants who live in the community but do not attend that church. To allege a viable claim under Regulation B, therefore, the CFPB should be required to allege that the lender affirmatively discouraged applications on a prohibited basis.

---

[6] Office of the Comptroller of the Currency Federal Deposit Insurance Corp., Interagency Fair Lending Examination Procedures (Aug. 2009), https://www.ffiec.gov/pdf/fairlend.pdf (accessed Aug. 20, 2023).

B.     <u>Limiting Principle No. 2:  The Bureau Must Plead and Prove that the Discouraging Statements Caused Identifiable Applicants or Prospective Applicants to Be Discouraged from Making or Pursuing an Application</u>

To assert a viable claim, the Bureau also should be required to plead, and ultimately prove at trial, that the lender's statements at issue proximately *caused* certain applicants to be discouraged from applying for credit.  The causation element is necessary to establish a nexus between the statements at issue and the discouragement of applications.  For example, if a lender makes statements in a radio advertisement that the Bureau interprets as discouraging certain applications on a prohibited basis, but there is no evidence that the advertisements in fact caused any applicants or prospective applicants to be discouraged from pursuing an application, there can be no violation of Regulation B.  The lender's statements must proximately cause discouragement, a requirement that is consistent with the text and purpose of both ECOA and Regulation B.  For example, in *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 201 (2017), the Supreme Court held that FHA provides relief only for injury "proximately caused" by a statutory violation and rejected the lower court's holding that "foreseeability" was sufficient to establish proximate cause.  "Rather, proximate cause under the FHA requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"  *Id.* at 202-03 *(quoting Holmes v. Sec. Inv. Prot. Corp.*, 503 U. S. 258, 268 (1992)); *see also Cnty. of Cook, Ill. v. Bank of Am. Corp.*, 2023 WL 5249450, at *1-2 (7th Cir. Aug. 16, 2023) (relying on *Miami* to affirm dismissal of FHA claim for lack of proximate cause).

In addition to the causation requirement, the Bureau must allege that identifiable applicants or prospective applicants were in fact discouraged from making or pursuing an application.  For example, if no Catholic applicant or prospective applicant ever saw the hypothetical sign "no Catholics need apply," then the sign did not cause any identifiable Catholic applicant to be discouraged from applying for a loan.  The mere fact that a lender's statement could potentially discourage a hypothetical prospective applicant cannot be sufficient to allege a viable claim, because ECOA itself prohibits creditors from actually "discriminat[ing] against any applicant."  The Bureau should be required to allege that specific, identifiable prospective applicants saw or heard the affirmatively discouraging statement and were, in fact, discouraged from submitting an application.  This could be any individual who saw or heard any oral or written statement (a sign, a radio message, etc.) and was actually discouraged from making or pursuing an application for a loan.

Such a requirement still would enable the Bureau to bring claims based on a variety of conduct, including pre-application conduct.  For example, the Bureau would be able to bring a claim if someone began an oral application over the phone, but did not complete it because she had been actively discouraged from applying.  Or the Bureau could bring a claim when a prospective applicant entered a physical branch location but subsequently did not fill out any paperwork because of active discouragement.  Or the Bureau could bring a claim where a prospective applicant started the application process, submitted an incomplete or partial application, and

was subsequently discouraged from completing the application. Thus, this limiting principle would permit the Bureau to police various pre-application conduct without giving the Bureau discretion to bring claims because it merely disapproved of a statement made by a lender or disagreed with its marketing strategies.

The Associations urge this Court to adopt, at least, these two limiting principles to constrain the otherwise vague and overbroad language of Regulation B if it reaches the conclusion that this part of Regulation B survives. To render Regulation B consistent with the text and purpose of ECOA, and allow creditors to adopt compliance programs reasonably designed to ensure that they are following the law, the Bureau should be required to (1) plead and prove that the creditor's statements affirmatively discouraged applications on a prohibited basis, and (2) plead and prove that the creditor's statements in fact caused identifiable applicants or prospective applicants to be discouraged from making or pursuing an application.

## CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.

Dated:   New York, New York          Respectfully Submitted,
         August 21, 2023

        */s/ Matthew P. Previn*
Matthew P. Previn (Counsel of Record)
Zachary S. Zwillinger
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Jonice Gray Tucker
Paul Hastings LLP
2050 M. Street, NW
Washington, DC 20036
(202) 551-1781

Kristopher Knabe
Paul Hastings LLP
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
(312) 499-6075

## CERTIFICATION OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 7th Cir. R. 29 because it contains 6,318 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 7th Cir. R. 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Century 12-point font (11-point footnotes).

*/s/ Matthew P. Previn*
Matthew P. Previn

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Matthew P. Previn*
Matthew P. Previn