**No. 23-1654**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

Consumer Financial Protection Bureau,

*Plaintiff-Appellant,*

*v.*

Townstone Financial, Inc., and Barry Sturner,

*Defendants-Appellees.*

On Appeal From the United States District Court
For the Northern District of Illinois
Hon. Franklin U. Valderrama
Case No. 1:20-cv-4176

**REPLY BRIEF OF APPELLANT
CONSUMER FINANCIAL PROTECTION BUREAU**

Seth Frotman
　*General Counsel*
Steven Y. Bressler
　*Deputy General Counsel*
Christopher Deal
　*Assistant General Counsel*
Justin M. Sandberg
　*Senior Counsel*
　Counsel of Record
Lauren Gorodetsky
　*Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7043 (Sandberg)
(202) 435-7560 (Gorodetsky)

justin.sandberg@cfpb.gov
lauren.gorodetsky@cfpb.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

    I.   Congress Authorized the Anti-Discouragement Provision of Regulation B ..... 3

        A.  Section 1691(a) Does Not Foreclose the Bureau's Interpretation ............... 3

        B.  Defendants' Interpretation of § 1691b Is Inconsistent with the Text ........ 7

        C.  Defendants Offer an Implausible Reading of § 1691e(g) .......................... 14

    II.  Regulation B's Prohibition on Discouragement Is Not Arbitrary, Capricious, or Manifestly Contrary to the Statute ........................................................... 18

    III.  Regulation B's Anti-Discouragement Provision Is Constitutional ................. 20

CONCLUSION.................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**     **Page(s)**

*303 Creative LLC v. Elenis*,
   143 S. Ct. 2298 (2023) ................................................................ 26, 27

*Adirondack Med. Ctr. v. Sebelius*,
   740 F.3d 692 (D.C. Cir. 2014) ........................................................ 8

*Bible v. United Student Aid Funds, Inc.*,
   799 F.3d 633 (7th Cir. 2015) ...................................................... 9, 10

*Bd. of Governors of Federal Reserve Sys. v. Dimension Financial Corp.*,
   474 U.S. 361 (1986) .............................................................. 10, 11

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006) ................................................................... 5

*Cartwright v. Am. Sav. & Loan Ass'n*,
   880 F.2d 912 (7th Cir. 1989) .......................................................... 5

*Chicago Lawyers' Comm. for C.R. Under L., Inc. v. Craigslist, Inc.*,
   519 F.3d 666 (7th Cir. 2008) ........................................................ 21

*Cisneros v. Lynch*,
   834 F.3d 857 (7th Cir. 2016) ......................................................... 9

*City of Arlington v. F.C.C.*,
   569 U.S. 290 (2013) ............................................................... 9, 15

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
   142 S. Ct. 1464 (2022) ............................................................. 23

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*,
   149 F.3d 679 (7th Cir. 1998) ........................................................ 23

*Cook County v. Wolf*,
   962 F.3d 208 (7th Cir. 2020) ...................................................... 18, 19

*Ctr. for Individual Freedom v. Madigan*,
   697 F.3d 464 (7th Cir. 2012) ...................................................... 25, 26

*Davis v. Strata Corp.*,
   242 F. Supp. 2d 643 (D.N.D. 2003) .................................................. 17

*Gates v. Bd. of Educ. of Chicago,*
    916 F.3d 631 (7th Cir. 2019) ....................................................................... 5

*GEFT Outdoor, LLC v. City of Westfield,*
    39 F.4th 821 (7th Cir. 2022) ................................................................. 20, 24

*Hibbs v. Winn,*
    542 U.S. 88 (2004) ..................................................................................... 17

*Household Credit Services Inc. v. Pfennig,*
    541 U.S. 232 (2004) .............................................................................. 10, 11

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ................................................................................... 23

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) ............................................................................... 24

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977) ......................................................................... *passim*

*Jancik v. Dep't of Hous. & Urb. Dev.,*
    44 F.3d 553 (7th Cir. 1995) ...................................................................... 22

*Matal v. Tam,*
    582 U.S. 218 (2017) ................................................................................... 24

*McCoy v. Atherton,*
    818 F. App'x 538 (7th Cir. 2020) ............................................................. 19

*Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co.,*
    476 F.3d 436 (7th Cir. 2007) ...................................................................... 4

*Mourning v. Family Publ'ns Serv., Inc.,*
    411 U.S. 356 (1973) ................................................................. 8, 10, 11, 12

*Patriotic Veterans, Inc. v. Indiana,*
    736 F.3d 1041 (7th Cir. 2013) .................................................................... 8

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,*
    413 U.S. 376 (1973) .............................................................................. 21, 25

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ................................................................................... 20

*Ragin v. New York Times Co.,*
    923 F.2d 995 (2d Cir. 1991) ............................................................ 21, 22, 24

*Ragsdale v. Wolverine World Wide, Inc.*,
  535 U.S. 81 (2002) ................................................................... 11, 12

*Roberson v. Health Career Inst. LLC*,
  No. 22-CV-81883-RAR, 2023 WL 4991121 (S.D. Fla. Aug. 3, 2023) ....................... 7

*Shipley v. Chicago Bd. of Election Commissioners*,
  947 F.3d 1056 (7th Cir. 2020) ................................................................... 25

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ................................................................... 20

*United States v. Bonin*,
  932 F.3d 523 (7th Cir. 2019) ................................................................... 22

*United States v. Dingwall*,
  6 F.4th 744 (7th Cir. 2021) ................................................................... 22

*United States v. Hansen*,
  143 S. Ct. 1932 (2023) ................................................................... 26

*United States v. Hunter*,
  459 F.2d 205 (4th Cir. 1972) ................................................................... 21

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ................................................................... 10

*United States v. Space Hunters*,
  429 F.3d 416 (2d Cir. 2005) ................................................................... 21

*Volling v. Kurtz Paramedic Servs., Inc.*,
  840 F.3d 378 (7th Cir. 2016) ................................................................... 4, 6

*Wandering Dago, Inc. v. Destito*,
  879 F.3d 20 (2d Cir. 2018) ................................................................... 24

*Wetzel v. Glen St. Andrew Living Community, LLC*,
  901 F.3d 856 (7th Cir. 2018) ................................................................... 5

**Statutes**

12 U.S.C. § 1844 ................................................................... 10

15 U.S.C. § 1691 ................................................................... *passim*

15 U.S.C. § 1691a ................................................................... 16

15 U.S.C. § 1691b ................................................................ *passim*

15 U.S.C. § 1691e ................................................................ *passim*

29 U.S.C. § 2601 ...................................................................... 12

42 U.S.C. § 2000e-3 ................................................................. 21

42 U.S.C. § 3604 ..................................................................... 21

Pub. L. No. 93-495, § 502, 88 Stat. 1500 (1974) ........................ 7

## Regulations

12 C.F.R. pt. 1002 Supp. I .............................. 13, 22, 25, 26

12 C.F.R. § 1002.2 .................................................................. 13

12 C.F.R. § 1002.4 .......................................... 1, 4, 13, 17

12 C.F.R. § 202.5 .................................................................... 16

50 Fed. Reg. 48018 (Nov. 20, 1985) .............................. 15, 16, 17

## Other Authorities

*A Hater's Guide to Geoblocking,*
    25 B.U. J. Sci. & Tech. L. 503 (2019) ................................ 6

S. Rep. 102-167 (1991) .............................................. 2, 15

## INTRODUCTION

Lending offices adorned with "Whites Only" signs, advertisements admonishing the elderly that they need not bother applying for loans, and commercials reminding women to bring their husbands to appointments should all be relics of a bygone era. But in Defendants' view—and under the district court's decision—the Equal Credit Opportunity Act (ECOA) allows these things (and more), and there is nothing that the Consumer Financial Protection Bureau (CFPB) can do to stop them. That can't be right—and it's not.

For almost 50 years, the anti-discouragement provision of Regulation B has prohibited creditors from making any "statement … to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application." 12 C.F.R. § 1002.4(b). Defendants want to cast this rule aside, arguing that it is incompatible with ECOA. But, in fact, the regulation is entirely consistent with the statute.

Congress made it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction," on a prohibited basis. 15 U.S.C. § 1691(a). And Congress tasked the Federal Reserve Board and then the Bureau with "prescrib[ing] regulations" that in its "judgment" "are necessary or proper to effectuate the purposes of this subchapter" or "to prevent circumvention or evasion thereof." 15 U.S.C. § 1691b(a). It is hard to imagine a more straightforward "circumvention or evasion" of ECOA and its purposes than the open discouragement of prospective applicants on the basis of race, sex, or another prohibited basis.

1

Congress confirmed this straightforward interpretation of the statute when it amended ECOA in 1991 to add 15 U.S.C. § 1691e(g). That provision obligates certain agencies to refer matters to the Attorney General when they believe there is a "pattern or practice of discouraging or denying applications for credit in violation of section 1691(a)." 15 U.S.C. § 1691e(g). The similarity between the statute's reference to "discouraging … applications" and Regulation B's existing bar on "discourag[ing]… a reasonable person from making or pursuing an application" was no accident, as the relevant Senate Report makes plain, *see* S. Rep. 102-167, at *86, 93, n.8 (Oct. 1, 1991) (discussing Regulation B).

Faced with this, Defendants offer interpretations that amount to "brute rewrite[s]" of the statute, Defs.' Br. 32 (Opp.), slippery slope arguments at odds with history, and constitutional boogeymen. Defendants' interpretation of ECOA is a flop: it reads the anti-circumvention and anti-evasion language out of the statute. And their slippery-slope argument—that if the text means what it says, then the Bureau can "change ECOA" in any way it pleases— fares no better. Enacting rules authorized by Congress is not "chang[ing] ECOA." Finally, under the Constitution, courts have long blessed prohibitions on "Whites Only" signs and less obvious forms of discriminatory discouragement, and Defendants offer no persuasive reason to turn back the clock.

The Court should reverse the district court's judgment.

## ARGUMENT

### I. Congress Authorized the Anti-Discouragement Provision of Regulation B

Congress authorized Regulation B's anti-discouragement provision. Defendants misread ECOA in three ways to argue otherwise. First, Defendants read ECOA's proscription on "discriminat[ing] against any applicant, with respect to any aspect of a credit transaction," 15 U.S.C. § 1691(a), on a prohibited basis, as inconsistent with Regulation B's longstanding ban on discriminatorily discouraging applications. Second, Defendants read Congress's specific instruction to the Bureau to issue rules to "effectuate the purposes of this subchapter" or "to prevent circumvention or evasion thereof," 15 U.S.C § 1691b, to be meaningless surplusage. Third, contrary to logic and legislative history, Defendants read § 1691e(g)—which confirms that "discouraging … applications" can violate ECOA—as if Congress were unaware that Regulation B had long prohibited discouraging applications on a prohibited basis.

### A. Section 1691(a) Does Not Foreclose the Bureau's Interpretation

To prevail at *Chevron* step one, Defendants would have to show that § 1691(a)'s prohibition against discrimination against applicants on a prohibited basis unambiguously foreclosed the use of the Bureau's rulemaking authority to prohibit creditors from discriminatorily discouraging applications, including by advertising a policy of discriminating against applicants on the basis of race, sex or otherwise. Nothing in § 1691(a)'s prohibition on discrimination against any applicant, with respect to any aspect of a credit transaction, supports that extraordinary result.

According to Defendants, § 1691(a)'s use of the term "applicant" means that Regulation B can't address discriminatory conduct (i.e., discouragement) that deters a consumer from requesting credit because the term "applicant" necessarily means an identifiable person who requests credit. Opp. at 15. Defendants admit, however, that the statute covers individuals who "clearly want to apply for credit" but are turned away before having actually done so. *Id.* at 36. Likewise, Defendants implicitly recognize, in arguing that the cases cited in the Bureau's opening brief involve mere questions of proof as to whether a person qualifies as an applicant, *id.* at 20, that there are reasonable judgment calls about what conduct brings an individual under ECOA's protection. All of this undermines Defendants' assertions that the statute establishes a clear "irreducible minimum of what an applicant can be" and clearly precludes the anti-discouragement provision. *Id.* at 20. *Cf. Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 384 (7th Cir. 2016) (explaining that discrimination that deters or prevents applicants from applying violates Title VII).[1]

Defendants similarly argue that use of the term "discrimination" forecloses Regulation B's prohibition on discriminatory advertisements. Opp. 22-23. This argument starts from the flawed premise that assessment of discouragement under the rule turns on the "subjective reaction of the listener," Opp. 23. *But see* 12 C.F.R. § 1002.4(b) (prohibiting "statement[s]" that would "discourage on a prohibited basis

---

[1] Defendants allege that this Court's decision in *Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co.*, 476 F.3d 436, 441 (7th Cir. 2007), and similar decisions from other circuits, establish that the definition of "applicant" precludes the Bureau's interpretation of ECOA. But *Moran* and the other cases address whether the term "applicant" encompasses "guarantors," not whether the term requires an identifiable individual—and they also don't address the Bureau's authority to enact rules to prevent "circumvention" and "evasion."

4

a *reasonable person* from making or pursuing an application") (emphasis added).

Worse, Defendants' argument turns on an untenable definition of "discrimination."

Defendants insist that the term "discrimination" excludes speech or conduct that

would discourage a reasonable person on a prohibited basis. Opp. at 22-23.

Defendants are wrong. For instance, in the context of Title VII's anti-retaliation

provision, the Supreme Court has held that to establish that an employer

"discriminate[d] against" the plaintiff, the plaintiff must show that the challenged

action "well might have dissuaded a reasonable worker from making or supporting

a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

59, 68 (2006); *see also Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365

(1977). Moreover, courts have long recognized that the reasonable and predictable

effects of statements can constitute discrimination, including under Title VII, *e.g.*,

*Gates v. Bd. of Educ. of Chicago*, 916 F.3d 631, 640 (7th Cir. 2019) (recognizing that

statements can create a hostile work environment), and the Fair Housing Act

(FHA), s*ee Wetzel v. Glen St. Andrew Living Community, LLC*, 901 F.3d 856, 861-62

(7th Cir. 2018) (same for hostile housing environment).

Put simply, the argument that discouragement is not a form of discrimination

does not make sense—one way to treat some applicants worse than others is to

discourage them from applying in the first place.[2] Indeed, under Defendants' theory,

---

[2] Redlining, which is "'mortgage credit discrimination based on the characteristics of the neighborhood surrounding the would-be borrower's dwelling,'" *Cartwright v. Am. Sav. & Loan Ass'n*, 880 F.2d 912, 923 (7th Cir. 1989), can also involve discouraging prospective applicants, *see generally* CFPB Opp. to MTD, ECF No. 35, at 11-12 (discussing redlining). Notably, technology can be used to facilitate redlining, *e.g.*, a creditor could block access to

ECOA does not—and rules promulgated under ECOA cannot—proscribe a "Whites Only" sign that discourages minorities, on the basis of race, from requesting credit. While Defendants acknowledge that such a sign would give the Bureau a basis to investigate a creditor or refer it to the Department of Justice, *see* Opp. at 6, 39, they evidently believe that such a sign would not itself violate ECOA—or any rule the Bureau could issue—because it would not constitute discrimination against an identifiable person who requested credit. Defendants' extraordinary theory that creditors must be allowed to discourage applications on a prohibited basis is inconsistent with the commonsense principle that anti-discrimination laws apply whether or not an individual submits a doomed application. *Cf. Teamsters*, 431 U.S. at 365 (futile applications not required under Title VII); *Volling*, 840 F.3d at 384 (same).[3] Given all of this, there is no reason to think that Congress, in prohibiting discrimination in ECOA, meant to foreclose a prohibition of discouragement.

In like fashion, the term "credit transaction" does not stand in the way of the anti-discouragement provision. The statute doesn't use "credit transaction" in a vacuum. It states that discrimination is prohibited with respect to "*any aspect* of a credit transaction." 15 U.S.C. § 1691(a) (emphasis added). Solicitation of a

---

its website to individuals using IP addresses traced to ZIP codes with many adherents to a particular religion. *Cf. Peter K. Yu, A Hater's Guide to Geoblocking*, 25 B.U. J. Sci. & Tech. L. 503, 504 (2019) (discussing "[g]eoblocking").

[3] Defendants contend the anti-discouragement provision is unclear because they don't know who a "reasonable person" is or what it means to discourage someone on a prohibited basis. *See* Opp. 23. But these objections do not demonstrate the Bureau lacked the authority to issue the provision, and courts are familiar with applying the "reasonable person" and "discourage" standards in a variety of contexts, including under the FHA and Title VII. *See below* at pp. 22-23.

transaction—i.e., advertising—is plainly one aspect of a credit transaction. *See, e.g.*, *Roberson v. Health Career Inst. LLC*, No. 22-CV-81883-RAR, 2023 WL 4991121, at *15-17 (S.D. Fla. Aug. 3, 2023). And given the obvious intended breadth of this provision, it cannot be the case that the statute unambiguously forecloses the regulation of such conduct. Thus, the anti-discouragement provision fits well with the statutory reference to "credit transaction[s]."

The language of § 1691(a) does not foreclose the Bureau's interpretation.

### B. Defendants' Interpretation of § 1691b Is Inconsistent with the Text

Congress's delegation of authority to the Bureau to issue rules that, in the Bureau's "judgment[,] … are necessary or proper to effectuate the purposes of this subchapter" or "to prevent circumvention or evasion thereof," demonstrates that Congress provided ample authority for the issuance of the anti-discouragement rule. *See* Opening Br. 17-21.[4]

Defendants disagree, contending that "a general rulemaking provision [cannot] satisf[y] *Chevron* step one." Opp. 29. What is more, Defendants add, § 1691b does not explicitly leave a gap for the agency to fill and, thus, "does not even get [the] agency to *Chevron* step two." *Id.* at 5. Lastly, Defendants contend Congress would not have used § 1691b's language to delegate broad regulatory authority. Defendants' arguments come up short.

---

[4] Congress explained that ECOA's purpose is to "require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers without regard to [prohibited characteristics]." ECOA, Pub. L. No. 93-495, § 502, 88 Stat. 1500 (1974).

Defendants' equation of § 1691b to general rulemaking authority improperly reads the anti-circumvention and anti-evasion authority out of the statute. *See Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1047 (7th Cir. 2013) (Congress "means in a statute what it says there"). The cases Defendants cite involve statutes authorizing agencies to enact regulations necessary to "carry out" or "implement" the law, or do something similar. *See* Opp. 26-29. But § 1691b does not authorize the Bureau to only "effectuate the purposes" of ECOA; it also empowers the Bureau "to prevent circumvention or evasion thereof." And Congress's enactment of ECOA following *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 371 (1973), demonstrates that it intended for this language, like TILA's delegatory language at issue in *Mourning*, to authorize the Bureau to proscribe conduct not specifically referenced in the statute's prohibitory section, if necessary to prevent "circumvention" or "evasion" of ECOA (and its purposes). *See* Opening Br. 20-21.

Indeed, ECOA's delegatory language emphasizes a basic flaw with Defendants' argument that the meaning of "applicant," "discrimination," or "credit transaction" in § 1691(a) of ECOA foreclose the anti-discouragement rule. Defendants depend on an *expressio unius* rationale, i.e., the Bureau's regulations cannot extend to circumstances not specifically mentioned in § 1691(a). Such arguments generally lack force in the regulatory context. *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014) ("The *expressio unius* canon is a 'feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved.'"). And that weakness

8

is amplified here, because Congress directed the Bureau to issue rules to prevent "circumvention" and "evasion," not simply to "carry out" the law. Moreover, Defendants' interpretation is not only atextual; it is also nonsensical. Under Defendants' theory, the Bureau cannot prohibit a creditor from posting "Whites Only" signs, notwithstanding that such signs would circumvent ECOA's prohibitions and frustrate its purpose.

Even if the Court concludes that the Bureau does not prevail at *Chevron* step one, § 1691b creates a gap for the Bureau to fill, allowing the analysis to move to step two. Defendants contend that there is no such gap because Congress did not specifically instruct the Bureau to define a term or use other similarly specific language. *See* Opp. 26. But the law does not require Congress to use magic words. Instead, the agency must simply "have received congressional authority to determine the particular matter at issue." *City of Arlington v. F.C.C.*, 569 U.S. 290, 306 (2013). ECOA authorized the Bureau to determine the matter at issue—what regulations are needed to "prevent circumvention or evasion" of ECOA and its purposes. 15 U.S.C. § 1691b. And this Court has found that Congress explicitly delegated to an agency the authority to fill a gap in a statute by using language just as (non)specific as the language granting the Bureau's anti-evasion and circumvention authority. *See, e.g.*, *Cisneros v. Lynch*, 834 F.3d 857, 862 (7th Cir. 2016) (holding that Congress explicitly left a gap for the agency to fill by explaining that the agency may "by regulations prescribe" "terms, conditions, and procedures" to channel its discretion); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633,

650 (7th Cir. 2015) (similar); *see also United States v. O'Hagan*, 521 U.S. 642, 667 (1997).

Defendants' contrary arguments regarding § 1691b are mistaken. Defendants contend that "if a statement that an agency can issue rules to prevent evasion or circumvention can justify the anti-discouragement rule, it could be used to justify virtually any change to ECOA." Opp. at 29. But it is Defendants who seek to "change" ECOA by reading the anti-circumvention and evasion authority out of the statute. Nor would upholding the anti-discouragement rule leave creditors on the precipice of a slippery slope: The rule has existed in one form or another for nearly 50 years, and it has not paved the way for an onslaught of anti-circumvention and anti-evasion rules. *See id.* 43-44. That is no surprise because the statutory text requires that rules must be designed to actually prevent "circumvention" or "evasion."

Defendants also maintain that two cases, *Board of Governors of Federal Reserve System v. Dimension Financial Corporation*, 474 U.S. 361 (1986), and *Household Credit Services Inc. v. Pfennig*, 541 U.S. 232 (2004), demonstrate that the "circumvention" and "evasion" language does not create a gap for the agency to fill. But Defendants leave unaddressed the Bureau's arguments about why *Dimension Financial*—which touched on the Federal Reserve Board's ability to promulgate regulations under the Bank Holding Company Act's anti-circumvention and evasion authority, 12 U.S.C. § 1844(b)—does not undercut *Mourning* here. Opening Br. 29-31. Those unrefuted arguments—including that the regulations at issue in

10

*Dimension Financial* were not properly categorized as anti-evasion measures, *id.* at 30—carry the day. As for *Household Credit*, that case involved regulations defining an ambiguous statutory term under TILA, not regulations relying on the agency's anti-evasion authority, so it does not speak to the scope of that authority in ECOA. *See* 541 U.S. at 242.

Defendants also assert that *Mourning* "changes nothing," Opp. 9, because "*Mourning*'s directive to defer to regulations that are reasonably related to the purposes of the enabling legislation" is relevant at *Chevron* step two (not one), Opp. at 30 (cleaned up); and "the regulation at issue in *Mourning* was different in kind from the anti-discouragement rule," as it accorded with Congress's intent, *id.* at 31-32, a point illustrated (in Defendants' view) by *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002).

These arguments are flawed. The Bureau does not contend that *Mourning* alters or displaces *Chevron*'s framework. *See* Opening Br. 15-16, 29 n.6. Rather, *Mourning* is powerful, contemporaneous evidence of what Congress meant when it copied the delegatory language that the Supreme Court construed in *Mourning*. And there is similarly no merit to Defendants' argument that the rule in *Mourning* was materially different than the rule at issue here. The anti-discouragement rule, like the rule at issue in *Mourning,* accords with Congress's intent by prescribing conduct to prevent "circumvention" or "evasion" of the relevant statute and its purposes. *See* Opening Br. 21.

11

*Ragsdale* does not support a different conclusion. There, the Supreme Court concluded, at *Chevron* step two, that a Department of Labor regulation constituted an impermissible interpretation of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*, because it "contradict[ed] and undermine[d] the FMLA's pre-existing remedial scheme." *Ragsdale*, 535 U.S. at 92. But *Ragsdale* involved different statutory language than that at issue here or in *Mourning*, as the Supreme Court recognized. *Id.* ("[T]he Federal Reserve Board's rulemaking authority [in *Mourning*] was much broader than the Secretary's is here."). And, unlike in *Ragsdale*, the anti-discouragement rule does not "contradict or undermine[]" the statute. Rather, the rule accords with and supports ECOA by ensuring that § 1691(a)'s protections of the application process are not rendered irrelevant through circumventive conduct, like discouragement.

Lastly, Defendants contend that "Congress [could not have] intended to give such broad and vague power to the agencies who administer ECOA." Opp. 25. But Defendants' preferences cannot supplant Congress's actual legislative choices. ECOA's delegatory provision is precisely how Congress empowered the responsible agency to police circumventive conduct, as made clear through Congress's (i) enactment of ECOA following *Mourning's* interpretation of TILA; (ii) expansion of ECOA after the Federal Reserve Board issued Regulation B; and (iii) adoption of the referral provision, § 1691e(g). *See* Opening Br. 12, 19-22.

In arguing otherwise, Defendants exaggerate the magnitude of the policy decision delegated to the Bureau by suggesting that allowing the Bureau to prohibit

discouragement allows it to challenge "true statements about crime in certain neighborhoods" and make certain topics (e.g., education and income distribution) and viewpoints off limits. Opp. 24. This is a strawman. Regulation B regulates "discourage[ment] on a *prohibited basis*," like race or sex, and is based on a "reasonable person" standard. 12 C.F.R. §§ 1002.4(b),1002.2(z). As the Official Interpretations have long explained, this means creditors can't suggest that they have a "discriminatory preference or a policy of exclusion." 12 C.F.R. pt. 1002 Supp. I, ¶ 4(b). Discussions of standardized test scores of specified schools or data on income distribution would not, then, without more, constitute forbidden discouragement.

Nor, in the nearly 50 years of the anti-discouragement rule, is there any history of the Board or the Bureau enforcing the anti-discouragement rule as Defendants fear. This case does not prove otherwise. Take, for example, the statement in Townstone's infomercial that the South Side of Chicago—a majority African American area—is "hoodlum weekend" between Friday and Monday. *See* Am. Compl. ¶ 35, ECF Doc. No. 27. This is not a true statement about crime; one cannot check crime data reports to verify its accuracy. Moreover, here, as in all cases, the statements were considered wholistically, in the full context of the creditors' actions. When, as here, a creditor engages in redlining through discouragement, that context includes statistical evidence of racial disparities in lending activities indicative of redlining, as well as other conduct by creditors that indicates discriminatory practices. *See id.* ¶¶ 42-52. Taken together, Defendants' overall

conduct sends a clear message about which applicants they want and which they do not, indicates a discriminatory preference, and amounts to prohibited discouragement. Such discouragement has long been held to be unlawful. *Cf. Teamsters,* 431 U.S. at 365.

Thus, authorizing the Bureau to police expressions of an intent to discriminate is not a delegation of momentous scope, and the grant of authority in ECOA is precisely how Congress would accomplish that task.

### C. Defendants Offer an Implausible Reading of § 1691e(g)

As the opening brief explains, if any doubt remained as to whether Regulation B comports with the statutory text, the subsequent enactment of § 1691e(g) shows congressional approval of the agency's construction. Section 1691e(g) directs certain agencies to "refer [a] matter to the Attorney General whenever the agency has reason to believe that" a creditor "has engaged in a pattern or practice of discouraging or denying applications for credit in violation of section 1691(a)." The recognition that discouragement of applications for credit is a prohibited practice in violation of section 1691(a) cannot be squared with Defendants' theory.

Defendants argue that ECOA's referral provision, § 1691e(g), does not reflect Congress's approval of the anti-discouragement rule, notwithstanding its reference to discouraging applications as violating ECOA. They insist that, when Congress enacted the referral provision in 1991, it did not intend for the term discouragement

to encompass "a creditor's marketing,"[5] Opp. 37, and it could not have known that Regulation B used the term in that way, *id.* at 38. They also maintain that the referral provision's reference to § 1691(a) limits its reach to "discrimination against applicants on a prohibited basis in the context of a credit transaction." Opp. 34.

Defendants offer an unconvincing explanation of the meaning of § 1691e(g). In their telling, Congress's use of the term "discouragement" is a coincidence, which tells us nothing about what Congress thought about the anti-discouragement rule. That's implausible. Prior to 1991, the term "discouragement" did not appear in ECOA. But it was an integral part of Regulation B—and had been since 1975. And we need not presume that Congress knew this, because a Senate Report issued before the enactment of the referral provision explains that under Regulation B, "[d]iscouraging applications on a prohibited basis and advertising which implies a discriminatory preference are also prohibited." S. Rep. 102-167, at *86, 93, n.8 (Oct. 1, 1991). Congress's use of the term "discouragement" was no accident.

Nor would Congress have been confused in 1991 about whether the rule reached advertising. Defendants selectively quote a portion of the interpretative guidance available in 1991, which stated, "[g]enerally, the regulation's protections apply only to persons who have requested or received an extension of credit," 50 Fed. Reg. 48018, 48050 (Nov. 20, 1985). Opp. 36. But they neglect to mention that this excerpt

---

[5] Defendants discuss legislative history in this argument. Opp. at 37. Under this Court's precedent, discussions of legislative history technically belong at step two of *Chevron*. But the Bureau addresses legislative history here to avoid a fragmented discussion, because *Chevron* is meant to facilitate the Court's analysis, not obscure resolution of the ultimate question of "whether the agency has stayed within the bounds of its statutory authority." *City of Arlington*, 569 U.S. at 297.

15

is preceded by the paragraph heading "Potential applicants," and is followed by the statement that "[i]n keeping with the purpose of the act—to promote the availability of credit on a nondiscriminatory basis[—][12 C.F.R.] § 202.5(a)[6] covers acts or practices directed at potential applicants." 50 Fed. Reg. at 48050. They also highlight that "the first example of 'practices prohibited' is 'a statement that the applicant should not bother to apply, after the applicant states that he is retired.'" Opp. 36 (quoting 50 Fed. Reg. at 48050). This was an odd choice because the example highlights that the concept of discouragement applies to individuals who have not filed an application. In any case, Defendants failed to mention the second example of prohibited practices, namely, a prohibition on "advertising that express[es], impl[ies] or suggest[s] a discriminatory preference or a policy of exclusion in violation of the act." 50 Fed. Reg. at 48050.

Defendants claim that because the referral provision addresses discouraging applications "in violation of § 1691(a)," Congress could not have been referring to the anti-discouragement rule. Opp. 34-36. This is wrong. The statute's reference to discouraging applications "in violation of § 1691(a)" mirrors the rule's bar on discouraging the making of applications on a "basis" "prohibited" by § 1691(a). What's more, ECOA provides that "[a]ny reference to any requirement imposed under this subchapter or any provision thereof includes reference to the regulations of the [agency] under this subchapter or the provision thereof in question." 15 U.S.C. § 1691a(g). So, when Congress referred to the practice of "discouraging …

---

[6] In 1985, Section 202.5 was the home of the anti-discouragement provision in the Federal Reserve Board's version of Regulation B. 50 Fed. Reg. 48029.

applications … in violation of § 1691(a)," it necessarily referred to the existing rule implementing § 1691(a) to bar creditors from "discourag[ing] … a reasonable person from making or pursuing an application." And, contrary to Defendants' suggestion, Congress did not thereby effect a "one word … sea-change," Opp. at 36, but rather endorsed the established regulatory regime.

Moreover, reading § 1691e(g) to refer only to discouragement of applicants, as by refusing to hand applications to individuals who ask for them, Opp. 35-36, would largely read the term "discourag[e]" out of the statute (and would ignore the incorporation discussed above). The referral provision also mentions "denying applications." 15 U.S.C. § 1691e(g). The term "denying applications" covers the refusal of a creditor to provide an application. *See Davis v. Strata Corp.*, 242 F. Supp. 2d 643, 650-51 (D.N.D. 2003) (denying defendant-creditor's motion for summary judgment on plaintiff's ECOA claim, reasoning that a policy refusing to grant credit within tribal reservation equated to a "pre-emptive denial" of credit). The rule against surplusage, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004), tells us that "discouraging" applications covers something beyond "denying" applications. Specifically, it also covers discouraging prospective applicants from "making … applications" in the first place, 12 C.F.R. § 1002.4(b), including through "advertising" that conveys "a discriminatory preference." 50 Fed. Reg. at 48050.

Finally, there is no reason to think that Congress would have used "discouraging" in the crabbed sense that Defendants suggest. Not only would it have been contrary to the well-established meaning of the term, but as mentioned

17

earlier, limiting discouragement to applicants would clear the way for a creditor to post "Whites Only" signs. By 1991, though, discouragement of prospective applicants on the basis of race, sex, and the like had been anathema in the law for years. *See, e.g., Teamsters,* 431 U.S. at 365 (Title VII context). And the text of the referral provision, as well as its legislative history, Opening Br. 37-38, indicates that Congress was attempting to improve access to credit, a purpose inconsistent with Defendants' interpretation.

## II. Regulation B's Prohibition on Discouragement Is Not Arbitrary, Capricious, or Manifestly Contrary to the Statute

Defendants contend that they should prevail if the Court reaches step two of the *Chevron* analysis, notwithstanding the deferential standard applicable at this stage.[7] Opening Br. 33-34. None of Defendants' arguments has merit, especially in view of the nearly 50-year history of the anti-discouragement rule, Opening Br. 39.

Defendants argue that the Bureau's interpretation is a "rewrite" of the statute. Opp. 41. This is a rehash of the argument refuted in the Bureau's opening brief, and in the step-one discussion above. It is no more convincing here.

Defendants' next argument—that the Bureau's interpretation of ECOA "has no natural limitation," Opp. 42, and would allow the Bureau to "change ECOA in virtually any way it pleases," *id*. at 43-44—also lacks merit. Defendants cite to this Court's decision in *Cook County v. Wolf*, 962 F.3d 208 (7th Cir. 2020). But that case supports the Bureau's interpretation. In *Wolf*, this Court rejected the Department of

---

[7] To be clear, the Bureau should prevail regardless of whether the Court defers to its interpretation, because the Bureau's interpretation is correct.

18

Homeland Security's (DHS's) "public charge" rule, which addressed when a noncitizen's receipt of public aid could be held against the noncitizen in determining immigration status. *Id.* at 215. The Court deemed the interpretation unreasonable, *id.* at 229, labeling it a "striking departure from the previous administrative guidance," *id.* at 216. And the Court explained that "its concerns are heightened by the fact that DHS's interpretation of its statutory authority has no natural limitation" and ignores that "there is a floor inherent in the words 'public charge,' backed up by the weight of history." *Id.* at 228, 229. But, here, it's Defendants who want to ignore the inherent meaning of words—the delegatory language of §1691b and Congress's approval of Regulation B in § 1691e(g)—"backed up by the weight of history." The anti-discouragement provision has existed for nearly a half century, and it's Defendants' interpretation of ECOA that would constitute a "striking departure" from the past.

Finally, Defendants argue that the canon of constitutional avoidance requires the Court to reject the Bureau's interpretation because it would raise "substantial" doubts about the constitutionality of the statute. Opp. 45. This is wrong. Defendants concede that the Constitution permits laws that prohibit discriminatory discouragement, like "Whites Only" signs, when the law prohibits discrimination in the underlying transaction. *See id.* at 47. And as explained below, there are no serious constitutional questions about the longstanding anti-discouragement rule.[8]

---

[8] Amici raise numerous arguments not pressed by appellees; those arguments are waived. *See McCoy v. Atherton*, 818 F. App'x 538, 541 (7th Cir. 2020).

19

### III. Regulation B's Anti-Discouragement Provision Is Constitutional

As an alternative ground for affirming the district court's order, Defendants ask this Court to strike down as unconstitutional a regulatory provision that has been on the books for almost fifty years—one that mirrors similar provisions in many other civil rights laws. The district court did not reach Defendants' constitutional challenges to the rule, *see* A011 n.5, and this Court should decline Defendants' perfunctory invitation to decide them in the first instance. *See GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 826 (7th Cir. 2022) (declining "to reach any conclusion on the constitutionality of the [challenged law] because the district court has not yet considered all relevant aspects of it").

In any event, Regulation B's anti-discouragement provision is constitutional. Regulation B fits comfortably within decades of precedent recognizing that the government may prohibit discriminatory acts or practices in the marketplace—such as expressions of a discriminatory policy or preference. As the Supreme Court has made clear, the government may proscribe acts of discrimination even though such acts can, and often are, expressed through words. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."). Thus, the Court has acknowledged that the government can prohibit employers from discriminating in the workplace, which "may require employers to remove 'White Applicants Only' signs," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), to refrain from making "sexually derogatory 'fighting words'" in the workplace, *R.A.V.*, 505 U.S. at 389, or to remove sex-specific

job advertisements from newspapers (*e.g.*, "Jobs—Male Interest," "Jobs—Female Interest"), *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973).

Indeed, several civil rights laws not only generally prohibit discrimination, but also specifically bar commercial advertisements or other statements that indicate an unlawful preference. For instance, the FHA, much like Regulation B, prohibits "any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race … or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). Likewise, Title VII prohibits "any notice or advertisement relating to employment ... indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-3(b). And courts have routinely rejected First Amendment challenges to such prohibitions. *See, e.g.*, *United States v. Space Hunters*, 429 F.3d 416 (2d Cir. 2005); *Ragin v. New York Times Co.*, 923 F.2d 995, 1002-03 (2d Cir. 1991) (holding § 3604(c) of the FHA does not violate the First Amendment); *United States v. Hunter*, 459 F.2d 205, 211-13 (4th Cir. 1972) (same); *Chicago Lawyers' Comm. for C.R. Under L., Inc. v. Craigslist, Inc.*, 519 F.3d 666, 668 (7th Cir. 2008) (citing *Ragin* and *Hunter* and noting "Section 3604(c) applies to [] ads without constitutional cavil"); *Pittsburgh Press*, 413 U.S. at 378 (holding a state law that mirrors Title VII does not violate the First Amendment).

Regulation B fits comfortably within this established precedent and civil rights framework. As the Official Interpretation to Regulation B explains, the discouragement provision "covers *acts or practices* directed at prospective applications that could discourage a reasonable person, on a prohibited basis, from applying for credit," including "[t]he use of words, symbols, models ... in advertising that express, imply, or suggest a discriminatory preference or a policy of exclusion in violation of the Act." 12 C.F.R. pt. 1002, Supp. I, ¶ 4(b)(1) (emphasis added).

Nonetheless, Defendants ask this Court to hold that the anti-discouragement rule is unconstitutional in an apparent facial challenge. *See* Opp. at 45, 48. But Defendants cannot meet the high bar of establishing "that no set of circumstances exists in which [the law] would be valid or that it lacks any plainly legitimate sweep." *United States v. Bonin*, 932 F.3d 523, 534 (7th Cir. 2019) (cleaned up).

To start, Regulation B does not give the Bureau "unbridled discretion." Contrary to Defendants' arguments otherwise, the text of the discouragement provision contains specific and objective standards. Most notably, it includes a "reasonable person" standard—a paradigmatic objective standard that courts frequently apply under the FHA, *e.g.*, *Ragin*, 923 F.2d at 1002; *Jancik v. Dep't of Hous. & Urb. Dev.*, 44 F.3d 553, 556 (7th Cir. 1995), and other civil rights laws, *see United States v. Dingwall*, 6 F.4th 744, 756 (7th Cir. 2021). Likewise, the rule prohibits discouragement on a prohibited basis, also a familiar standard that courts regularly apply. *E.g.*, *Jancik*, 44 F.3d at 556; *Ragin*, 923 F.2d at 999-1000; *see also Teamsters*,

431 U.S. at 365 & n.51 (noting courts are adept at assessing unlawful practices that "discourag[e] job applications from minority-group members").

Defendants fare no better in claiming the rule is facially content based because it restricts speech related to race, sex, and other prohibited bases. As noted above, courts have long rejected challenges to laws like the FHA and Title VII that prohibit advertisements and other statements (including "White Applicant Only" signs) indicating a discriminatory preference. Like those laws, Regulation B permissibly prohibits discrimination however it occurs. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) (noting antidiscrimination law "does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals").[9]

Defendants are also incorrect to suggest that the rule represents unconstitutional viewpoint discrimination. As decades of precedent make clear, the government may prohibit acts or practices that express a discriminatory preference

---

[9] Defendants' arguments about Regulation B being content based also run headlong into the commercial speech doctrine, which applies intermediate scrutiny to commercial speech restrictions. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) (noting it was unnecessary for a court to decide if a "prohibition was content based, as it regulated only commercial speech and so was subject to intermediate scrutiny in any event"). Though Defendants dispute that they engaged in commercial speech, they concede that the Townstone Radio Show was an advertisement designed to encourage mortgage applications. In any event, to the extent there is uncertainty on that factual question, it is best resolved by the district court in the first instance on a developed factual record. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685, 686 n.2 (7th Cir. 1998) (declining to decide whether "on the present record that [party's] publications constitute commercial speech" and remanding for district court to evaluate "based on additional factual evidence").

in credit, housing, employment, or other economic opportunity. *See above* at pp. 20-22. Nothing in *Matal v. Tam*, 582 U.S. 218 (2017), or *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019), disturbs this settled law. Indeed, as the Second Circuit explained in *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018), antidiscrimination laws are "not considered viewpoint discriminatory" because they prohibit practices "not because of the viewpoints ... but because of the immediate harms ... such discrimination causes," and "nothing in *Matal* changes that." *Id.* at 32; *see also Matal*, 582 U.S. at 246 (plurality opinion) (noting the trademark clause "is not an anti-discrimination clause; it is a happy-talk clause").

To the extent Defendants' position is that the rule cannot be constitutionally applied to them because they did not convey a discriminatory preference, their argument is both premature and mistaken. It is premature because whether Defendants' acts and practices conveyed a discriminatory message is a factual question on the merits, one best resolved on a more developed record before the district court in the first instance. *See GEFT Outdoor*, 39 F.4th at 826 (remanding to district court to consider unaddressed constitutional arguments on a more fully developed record). And it is mistaken because the Bureau has alleged that Defendants have conveyed a prohibited discriminatory message to consumers who would have otherwise applied for credit from Townstone. *See Ragin*, 923 F.2d at 998, 1003 (explaining that advertisements for housing that featured thousands of human models of whom virtually none were Black could "discourage [B]lack people from pursuing housing opportunities by conveying a racial message in much the

same way that the sex-designated columns in *Pittsburgh Press* furthered illegal
employment discrimination"); *see also Teamsters*, 431 U.S. at 365 & n.51 (1977)
(explaining that a discriminatory message of discouragement can be "communicated
to potential applicants more subtly" than a "Whites Only" sign, but just as clearly,
"by his consistent discriminatory treatment of actual applicants, by the manner in
which he publicizes vacancies, his recruitment techniques, his responses to casual
or tentative inquiries, and even by the racial or ethnic composition of … his work
force").

Turning to vagueness and overbreadth, Defendants "offer only a few cursory
sentences in support of" their argument, and such "perfunctory and undeveloped
arguments … are waived." *Shipley v. Chicago Bd. of Election Commissioners*, 947
F.3d 1056, 1063 (7th Cir. 2020). In any event, Defendants' arguments fail because
they do not even claim that Regulation B "prohibits a substantial amount of
protected speech … relative to the [rule's] plainly legitimate sweep." *Ctr. for
Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012). Indeed, they
otherwise concede that a "White Applicants Only" sign can be proscribed consistent
with the First Amendment, Opp. 47, and this falls precisely within the Official
Interpretation's example of prohibited conduct and demonstrates the rule's plainly
legitimate sweep, *see* 12 C.F.R. pt. 1002, Supp. I, ¶ 4(b)(1)(ii).

On the flipside, Defendants do not show a burden on speech or potential chilling
that is "real and substantial." *See Madigan*, 697 F.3d at 479. At times, Defendants
offer hypothetical situations about how Regulation B could apply, but such "remote,

hypothetical applications do not justify invalidating [the rule] for facial overbreadth." *Id.* at 493. And it is notable that Defendants "fail[] to identify a single [enforcement] for ostensibly protected expression" in the nearly 50 years that Regulation B has been in place. *See United States v. Hansen*, 143 S. Ct. 1932, 1946-48 (2023). Moreover, the fact that the rule applies to statements other than advertising does not render it unconstitutionally vague or overbroad; it just means that the rule applies also to creditors making statements directly to prospective applicants that discourage them from making or pursuing an application, for instance, by making a "statement that the applicant should not bother to apply, after the applicant states that he is retired," or using "interview scripts that discourage applications on a prohibited basis." 12 C.F.R. pt. 1002, Supp. I, ¶ 4(b)(1)(i), (iii).

Finally, Defendants are wrong to claim that *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023), dooms the rule. In *303 Creative*, the Court held that a state's public accommodations law could not compel a person to create personalized websites conveying messages with which she disagreed, given the "parties' stipulations" that the websites were "expressive in nature." *Id.* at 2316, 2318.

The Supreme Court made clear, however, that *303 Creative* does not apply to rules "requiring an ordinary, non-expressive business to serve all customers or consider all applicants," and "ensur[ing] ordinary, non-expressive goods and services are sold on equal terms." *Id.* at 2319-20 n.5 & n.6. Nor does the decision "concern—much less endorse—anything like the 'straight couples only' notices" or "a

'White Applicants Only' sign." *Id.* at 2319 & n.5 (quotation marks omitted).

Accordingly, *303 Creative* does not apply to cases (like this one) involving a non-expressive business's obligations under a standard nondiscrimination rule that includes a commonplace restriction on expressing a discriminatory preference in the marketing of non-expressive goods and services.

## <u>CONCLUSION</u>

The district court's judgment should be reversed.

Dated:  September 19, 2023

Respectfully submitted,

*/s/ Justin M. Sandberg*
Seth Frotman
   *General Counsel*
Steven Y. Bressler
   *Deputy General Counsel*
Christopher Deal
   *Assistant General Counsel*
Justin M. Sandberg
   *Senior Counsel*
   Counsel of Record
Lauren Gorodetsky
   *Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-7043 (Sandberg)
(202) 435-7560 (Gorodetsky)
justin.sandberg@cfpb.gov
lauren.gorodetsky@cfpb.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32(c). It contains 6,983 words, excluding the portions exempted by Federal Rule 32(f).


*/s/ Justin M. Sandberg*
Justin M. Sandberg